Nos. 22-15166 & 22-15167

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

CORONAVIRUS REPORTER et al.,

*Appellants*,

*v.*

APPLE INC.,

*Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of California (Hon. Edward M. Chen)
No. 3:21-cv-05567-EMC

_____

**RESPONSE BRIEF OF
APPELLEE APPLE INC.**

_____

Cynthia E. Richman
Zachary B. Copeland
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105
(415) 393-8293
RBrass@gibsondunn.com

*Attorneys for Apple Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the under-signed counsel of record certifies that Apple Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated:  October 14, 2022

/s/ *Rachel S. Brass*
Rachel S. Brass

## STATEMENT REGARDING ORAL ARGUMENT

There is no need for oral argument. As the district court recognized, Appellants' Complaint failed to conform to basic pleading principles and ran afoul of settled law. Appellants' appeal presents no substantial questions. To the extent the Court would find argument helpful, Apple would welcome the opportunity to present oral argument.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES .....................................................................3

STATEMENT OF THE CASE .................................................................4

    I.       Apple Develops a Revolutionary Ecosystem ........................4

    II.     Appellants' Apps Are Approved for Distribution Except Where They Run Afoul of Apple's Published Policies .....................................6

    III.   Appellants File Scattershot Complaint After Complaint ......................7

    IV.   The District Court Dismisses the Case..................................9

STANDARD OF REVIEW ....................................................................12

SUMMARY OF ARGUMENT ..............................................................13

ARGUMENT .........................................................................................15

    I.       Appellants' Antitrust Claims Were Properly Dismissed ....................15

        A.     Appellants Do Not Allege a Plausible Relevant Market ..........16

             1.     Appellants' Argument that They Need Not Allege a Market Is Forfeited and Wrong ...................................16

             2.     Appellants' Scattered Markets are Ill-Defined and Contradictory ................................................18

             3.     Appellants' Asserted Markets Are Otherwise Implausible ................................................23

                 a.     Appellants Do Not Allege the Prerequisites of a Single-Brand Market ...........................................23

                 b.     Appellants Fail To Allege the Requisite Facts To Support a Plausible Market............................26

             4.     Isaacs' Judicial Estoppel Argument Is Baseless.............32

B.      Appellants Do Not Allege Plausible Antitrust Injury ............... 33

        1.     "Censorship Harm" Is Not Antitrust Injury ................... 34

        2.     There Is No "International Consensus" Relevant to Antitrust Injury ................................................................ 37

        3.     Appellants' "Ranking Suppression" Theory Is Forfeited and Meritless .................................................... 39

C.      Appellants' Antitrust Claims Fail for Myriad Other Reasons ....................................................................................... 40

        1.     Appellants' Tying Claim Fails ....................................... 40

        2.     Appellants' Section 2 Claims Fail .................................. 43

        3.     Appellants' Section 1 Claim Fails .................................. 45

        4.     Appellants May Not Incorporate a Separate Class Action Complaint by Reference ...................................... 46

II.     Appellants' Contract Claims Fail Because They Identify No Contractual Term that Was Breached or Frustrated ........................... 47

III.    Appellants' RICO and Fraud Claims Fail for Multiple Reasons ........ 50

A.      The Complaint Fails to Allege the Claims or Predicate Acts with Particularity Under Rule 9(b) .................................... 50

B.      The Complaint Fails to Allege a RICO Enterprise Distinct from the Defendant ....................................................... 53

IV.    The District Court Did Not Abuse its Discretion in Denying Leave to Amend ................................................................................ 56

V.     There Is No Basis for a Preliminary Injunction ................................. 58

CONCLUSION .............................................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Intermountain Health Care Inc.*,
  461 F.3d 1249 (10th Cir. 2006) .......................................................42

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ...................................................44, 45

*Allen v. Ornoski*,
  435 F.3d 946 (9th Cir. 2006) ..........................................................17

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*
  592 F.3d 991 (9th Cir. 2010) ..........................................................45

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ........................................................................45

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ....................................................20, 21

*Ascon Props., Inc. v. Mobil Oil Co.*,
  866 F.2d 1149 (9th Cir. 1989) ........................................................56

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................12, 35, 43, 48

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
  241 F.3d 696 (9th Cir. 2001) ..........................................................35

*Assoc. des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ..........................................................58

*Auraria Student Hous. at the Regency, LLC v. Campus Vill.
  Apartments, LLC*,
  843 F.3d 1225 (10th Cir. 2016) .......................................................22

*Baumer v. Pachl*,
  8 F.3d 1341 (9th Cir. 1993) ............................................................55

v

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ....................................................................... 12, 35

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
　65 F.3d 1406 (7th Cir. 1995) ............................................................. 15

*Brady v. Dairy Fresh Prods. Co.*,
　974 F.2d 1149 (9th Cir. 1992) ........................................................... 56

*Brantley v. NBC Universal, Inc.*,
　675 F.3d 1192 (9th Cir. 2012) ........................................................... 41

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
　No. 21-30622, 2022 WL 4298764 (5th Cir. Sept. 19, 2022) ............... 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
　509 U.S. 209 (1993) .......................................................................... 33

*Brown Shoe Co. v. United States*,
　370 U.S. 294 (1962) .......................................................................... 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
　429 U.S. 477 (1977) .......................................................................... 34

*Cargill, Inc. v. Monfort of Colo., Inc.*,
　479 U.S. 104 (1986) .......................................................................... 36

*Cascade Health Sols. v. PeaceHealth*,
　515 F.3d 883 (9th Cir. 2008) ...................................................... 17, 33, 41

*Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*,
　940 F.3d 971 (7th Cir. 2019) ............................................................. 36

*Christy Sports, LLC v. Deer Valley Resort Co.*,
　555 F.3d 1188 (10th Cir. 2009) ......................................................... 31

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*,
　708 F. App'x 29 (2d Cir. 2017) ......................................................... 21

*City Lincoln-Mercury Co. v. Lindsey*,
　52 Cal. 2d 267 (1959) ....................................................................... 49

vi

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991)..................................................................................55

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016) ....................................................................31

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)..................................................................................45

*Cyntegra Inc. v. Idexx Labs., Inc.*,
    520 F. Supp. 2d 1199 (C.D. Cal. 2007) .............................................42

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) ..................................................50, 51, 55

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
    73 F.3d 756 (7th Cir. 1996) ....................................................................43

*Dreamstime.com, LLC v. Google, LLC*,
    2019 WL 341579 (N.D. Cal. Jan. 28, 2019)......................................39

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ................................................................12

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ................................................................53

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021)................................................28

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
    848 F.2d 976 (9th Cir. 1988) ................................................................44

*Foman v. Davis*,
    371 U.S. 178 (1962)..................................................................................57

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..............................................17, 41, 44

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ................................................................58

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Gatton v. T-Mobile USA, Inc.*,
  152 Cal. App. 4th 571 (2007) .............................................................49

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
  699 F.2d 965 (9th Cir. 1983) ............................................................17

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) ........................................................41, 42

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
  433 F. App'x 598 (9th Cir. 2011) .......................................................32

*Gonzalez v. Planned Parenthood of L.A.*,
  759 F.3d 1112 (9th Cir. 2014) ...........................................................48

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ...........................................................33

*Guz v. Bechtel Nat'l, Inc.*,
  24 Cal. 4th 317 (2000) ....................................................................49

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*
  736 F.3d 1239 (9th Cir. 2013) ...........................................................59

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ............................... 17, 18, 19, 26, 27, 31

*Hillis v. Heineman*,
  626 F.3d 1014 (9th Cir. 2010) ...........................................................34

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) ..............................................................43

*Ill. Tool Works, Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006)......................................................................17, 41

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ...........................................................18

*Indep. Towers of Wash. v. Wash.*,
  350 F.3d 925 (9th Cir. 2003) .............................................................38

viii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Isaacs v. USC Keck Sch. Of Med.*,
   142 S. Ct. 592 (Dec. 6, 2021) ................................................................. 33

*Isaacs v. USC Keck Sch. of Med.*,
   142 S. Ct. 762 (Jan. 10, 2022) ............................................................... 33

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ..................................................................................... 43

*Jones v. Allison*,
   9 F.4th 1136 (9th Cir. 2021) ........................................................... 16, 40

*Kaplan v. Burroughs Corp.*,
   611 F.2d 286 (9th Cir. 1979) .................................................................. 26

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................... 12, 27, 31

*Kinderstart.com LLC v. Google, Inc.*,
   2006 WL 3246596 (N.D. Cal. July 13, 2006) ....................................... 39

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) .......................................................... 36

*Malaney v. UAL Corp.*,
   552 F. App'x 698 (9th Cir. 2014) .......................................................... 27

*McDaniel v. Appraisal Inst.*,
   117 F.3d 421 (9th Cir. 1997) .................................................................. 34

*McHenry v. Renne*,
   84 F.3d 1172 (9th Cir. 1996) .................................................................. 57

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ................................................................ 43

*Miron v. Herbalife Int'l, Inc.*,
   11 Fed. App'x 927 (9th Cir. 2001) ........................................................ 48

*Muttathottil v. Gordon H. Mansfield*,
   381 F. App'x 454 (5th Cir. 2020) .......................................................... 46

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ..............................................24, 25

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
202 F.3d 1088 (9th Cir. 2000) ...............................................16

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ................................................50

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018).......................................17, 27, 37

*Okwu v. McKim*,
682 F.3d 841 (9th Cir. 2012) ...............................................12, 58

*Pasadena Live v. City of Pasadena*,
114 Cal. App. 4th 1089 (2004) ............................................48

*Pepper v. Apple Inc.*,
No. 11-cv-6714-YGR (N.D. Cal.) ......................................8

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018) .............................................34

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ............................................24

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) .............................................32

*Rae v. Union Bank*,
725 F.2d 478 (9th Cir. 1984) .............................................53

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .............................................36

*Retlaw Broadcasting Corp. v. NLRB*,
53 F.3d 1002 (9th Cir. 1995) .............................................25, 52

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ............................................52

x

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Rik-Mik Enters., Inc. v. Equilion Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ...........................................................42, 43

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986)...............................................................27

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) .................................................34, 35, 36

*Santa Monica Nativity Scenes Comm. v. City of Santa Monica*,
    784 F.3d 1286 (9th Cir. 2015) ...............................................................58

*Sch. Dist. No. 1J v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ...................................................................12

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
    59 F.3d 902 (9th Cir. 1995) ...................................................................39

*Shelter Mutual Ins. Co. v. Pub. Water Supply Dist. No. 7*,
    747 F.2d 1195 (8th Cir. 1984) ...............................................................46

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ...............................................................32

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .........................................33, 37, 40, 52

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .................................................................55

*Soundgarden v. UMG Recordings, Inc.*,
    2020 WL 1815855 (C.D. Cal. Apr. 6, 2020) ........................................49

*Tanaka v. Univ. of S. California*,
    252 F.3d 1059 (9th Cir. 2001) ...............................................19, 21, 24

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*,
    12 F.3d 609 (6th Cir. 1993) ...................................................................25

*The Jeanery, Inc. v. James Jeans, Inc.*,
    849 F.2d 1148 (9th Cir. 1988) ...............................................................45

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ........................................................22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..........................................................24

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*,
    433 F.3d 1024 (7th Cir. 2006) ........................................................36

*Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*,
    244 F. App'x 130 (9th Cir. 2007) ...................................................18

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    512 F.2d 1264 (9th Cir. 1975) ........................................................30

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ........................................................29

*United States v. Brugnara*,
    856 F.3d 1198 (9th Cir. 2017) ........................................................53

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)...............................................................23, 32

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)..........................................................41

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) ........................................................53

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...............................................................15, 44

*Walter v. Drayson*,
    538 F.3d 1244 (9th Cir. 2008) ........................................................55

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ..........................................................20

*Whitaker v. Tesla Motors, Inc.*,
    985 F.3d 1173 (9th Cir. 2021) ....................................................12, 40

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*WildEarth Guardians v. EPA*,
   759 F.3d 1064 (9th Cir. 2014) ...................................................39, 48

*Yount v. Acuff Rose-Opryland*,
   103 F.3d 830 (9th Cir. 1996) ............................................................49

**Statutes**

28 U.S.C. § 1654 ...................................................................................6

Cal. Civ. Code § 1709 ........................................................................53

**Rules**

Fed. R. App. P. 28 ................................................................................4

Fed. R. Civ. Proc. 9(b) .......................................................................50

**Treatises**

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application* (4th and 5th Ed. 2020) .................23

Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1326 (4th ed.) .............46

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2949 (4th ed.) ..........58

**Other Authorities**

David S. Evans & Richard Schmalensee, *Matchmakers: The New
   Economics of Multisided Platforms* (Harv. Bus. Rev. Press 2016)....28

## INTRODUCTION

When Apple introduced the App Store fourteen years ago, it sought to create in a single platform both an advanced and open space for app developers and a curated and protective environment for users. To that end, Apple licenses its intellectual property to developers, including the technology and tools needed to develop an app and distribute it on the App Store, and then holds those developers' apps to high standards. Every app available for consumer download goes through a rigorous review. Consumers in turn enjoy a wide selection of apps they can trust. This differentiates Apple's platform as more secure, more private, and higher quality than its peers. That is good for consumers and competition alike.

Even in its seventh iteration, the Complaint remains beset by clatter, confusion, and contradiction. At bottom, Appellants[1] seek to challenge Apple's procompetitive licensing and curation. To them, every app rejection is anticompetitive "censorship." This theory would bar any platform, whether a newspaper, art gallery, or app store, from refusing to distribute any kind of content—a proposition that courts have long rejected. None of the eleven claims articulates a viable theory of liability, much less one that would entitle Appellants to confiscate the App Store and install

---

[1] On October 13, 2022, the Court granted Apple's motion to consolidate case numbers 22-15166 and 22-15167. *See* ECF 36. Apple refers to the appellants in originally docketed case number 22-15166 as "the Entities"; Apple refers to the appellant in originally docketed case number 22-15167 as "Isaacs"; Apple refers to the appellants collectively as "Appellants."

an "Independent App Court," as they seek.

The district court rejected Appellants' claims in a thirty-four page order. The court dismissed their antitrust claims because all fifteen ill-defined markets were drawn without reference to commercial reality, and their theory of antitrust injury centered on harm to themselves, not the competitive process. It dismissed Appellants' contractual claims as untethered to any contractual provision. And it dismissed their fraud and racketeering claims because there was no fraud alleged.

Appellants hardly mention the district court's lengthy analysis, focusing instead on imagined injustices by Apple and its counsel. Nary a citation supports those accusations—because they are untrue. But Appellants' sparse citations are illuminating nonetheless. To suggest they pleaded the prerequisites to their claims, they cite the Complaint's unadorned recitations of the elements—not facts. To then suggest that is sufficient, they invoke an outdated pleading standard. None of Appellants' arguments establishes error in the district court's considered order.

Appellants' inability to state a claim was not for lack of opportunity. Carving a tortuous path across the country's courts, they amended their allegations again and again—with the benefit of Apple's arguments—until arriving at their self-described "best theory." The district court rightly recognized that the Complaint had not been salvaged because it was unsalvageable. The judgment should be affirmed.

2

# STATEMENT OF ISSUES

**I.**  Whether Appellants fail to allege (A) an antitrust market, (B) antitrust injury, or (C) other essential elements of their antitrust claims, including (1) standing to bring a tying claim and the existence of a tie, (2) exclusionary conduct, and (3) concerted action.

**II.**  Whether Appellants fail to allege a claim for breach of contract or breach of the covenant of good faith and fair dealing where the Complaint identified no contractual provision that was breached or frustrated.

**III.**  Whether Appellants (A) fail to plead with specificity a cause of action under the Racketeer Influenced Corrupt Organization Act (RICO) or for common law fraud or (B) fail to plead a RICO enterprise distinct from the defendant in this litigation.

**IV.**  Whether the district court abused its discretion in declining to grant Appellants leave to file an eighth iteration of the same complaint against Apple.

**V.**  Whether the district court abused its discretion in denying Appellants' motions for preliminary injunction, which were based on claims that fail as a matter of law and unsupported by any evidence.

## STATEMENT OF THE CASE

Apple's App Store is "an economic miracle," sustaining "almost 2 million [jobs] in the U.S." ER2163.[2] Appellants seek to dismantle and expropriate the platform that Apple invented and developed. *See* ER746–48. The district court recognized the Complaint's threshold deficiencies and dismissed it with prejudice. ER10–43. The court also rejected the Entities' two motions for preliminary injunctions and Appellants' subsequent motions for reconsideration. ER2–43.

Appellants' opening briefs do not describe the court's rulings now on appeal or the saga that brought their case to this Court. *See* EOB 5–6; IOB 7–10. What they do say is incomplete and incorrect in significant respects. Apple sets out below the history of this case with references to the record. *See* Fed. R. App. P. 28.

## I. Apple Develops a Revolutionary Ecosystem

Apple "reinvent[ed] the phone" when it released the iPhone in June 2007. ER2120. It was a revolution in hardware and software technology, providing access to the internet, a real web browser, and an innovative touchscreen—features that continue to define smartphones today. ER2140–42. Users could not download third-party apps on the original iPhone; it was only with the 2008 launch of the App

---

[2] Citations to "ER" refer to the Excerpts of Record (No. 22-15166, ECF 18). Citations to "EOB" refer to the Entities' Opening Brief (No. 22-15166, ECF 17). Citations to "IOB" refer to Isaacs' Opening Brief (No. 22-15167, ECF 8).

Store—a two-sided transaction platform connecting app developers with customers—that Apple began allowing third-party developers to distribute native apps on iOS (the iPhone's operating system). ER2145–47; ER2176.

In the App Store, Apple adopted a curated ecosystem designed to benefit customers *and* developers. To develop and distribute apps on the platform, as well as to gain access to Apple's proprietary software and tools, developers enter into two agreements with Apple—a Developer Agreement and a Developer Program License Agreement (DPLA). ER11; *see also* ER825–912. In so doing, developers agree that Apple has "sole discretion" to approve or reject apps. ER11. Developers also consent to develop apps that conform to Apple's App Review Guidelines, which "set out the standards Apple applies when exercising [its] discretion to review and approve apps for distribution." *Id.*; *see also* ER914–37.

By any measure, the App Store has been a remarkable success. The number of apps, volume of app transactions, and amount of revenue earned by developers have skyrocketed since the App Store's inception. ER2438–39; ER2473; ER2703–04. Apple has outpaced its competitors in protecting consumers' privacy. ER2330. And it has done all that while remaining the undisputed leader in security. The iPhone platform accounted for just 0.85% of malware infections in 2018 compared to 47.15% for Android and 35.82% for Windows. ER2506; *see also* ER2488–2504 (similar 2019 and 2020 data).

5

## II. Appellants' Apps Are Approved for Distribution Except Where They Run Afoul of Apple's Published Policies

Appellants are alleged app developers, three entities—Coronavirus Reporter, CALID Inc., and Primary Productions LLC—and their principal, Jeffrey Isaacs. ER17.  While the Entities obscured their organizational composition below by refusing to file the required disclosures, *see* ER459, each is helmed by Isaacs, who has waged a series of unsuccessful litigation campaigns across the federal courts.  *See* ER544–615; ER2513–36; ER2710–11.[3]

Appellants allegedly developed five apps.  The Coronavirus Reporter app "sought to collect 'bioinformatics data' from users about COVID-19 symptoms" to "share with 'other users and [unidentified] epidemiology researchers.'"  ER12 (alteration in original) (quoting ER974–76).  Other apps included CALID, a now-abandoned "cross-platform scheduling," "online marketplace platform"; Bitcoin Lottery, an "edutainment . . . blockchain giveaway app"; Caller-ID, a "Reverse [Phone Number] Lookup"; and WebCaller, a "cross-platform videoconferencing utility." ER964; ER988–89; ER992–94; ER1038.

Apple rejected Coronavirus Reporter under its policy allowing only government organizations, health-focused NGOs, medical or educational institutions, and

---

[3]  Apple objected below to Isaacs' attempt to proceed *pro se*, ER123, and continues to do so now, ECF 30 at 4 n.2.  He cannot represent himself while also serving as the represented principal of the three entity plaintiffs.  *See* 28 U.S.C. § 1654.

similarly credentialed health companies to distribute COVID-19 apps.  ER977–81;

*see also* ER2370, 2510, 2705–11 (explaining Apple's policy to limit the spread of

false, misleading, and dangerous information about the COVID-19 pandemic).

Bitcoin Lottery was rejected under Apple's alleged policy "generally block[ing]

blockchain apps."  ER987; *see also* ER964.  Appellants' other apps—CALID,

Caller-ID, and WebCaller—were approved for distribution.  ER991–92.[4]

## III.  Appellants File Scattershot Complaint After Complaint

This litigation began with a suit filed in New Hampshire by Coronavirus Re-

porter and then a copycat suit in Maine by Primary Productions.  ER16–17.  After

forestalling adjudication through a series of amendments, both cases made their way

to the Northern District of California and eventually merged through additional dis-

missals and amendments.  *Id.*  All told, the Complaint is the seventh filed in these

matters by Isaacs, his Entities, or both.  ER17; ER1009.

Confusion and contradiction are endemic to the Complaint.  In one breath, this

case is a putative class action on behalf of "free app developers," IOB at 4, challeng-

ing alleged "censorship of free apps," EOB 6; in the next, it is a case that "span[s]

---

[4]  Contrary to Appellants' Complaint, CALID, not a supposed "Coronavirus Re-
porter" entity, submitted the Coronavirus Reporter app.  ER2710–11.  As far as Ap-
ple can tell, there is no actual "Coronavirus Reporter" entity—meaning Apple is
being sued by at least one null party to whom no relief could be awarded.

both free and paid app classes," IOB 7. Appellants call their case "[n]otably differentiated from other pending Apple antitrust litigation," ER955, yet seek to incorporate swaths of those very cases, ER970; ER997; ER1029—some of which do not even exist, *see* ER951–1487 (attempting to incorporate nonexistent findings of fact from *Pepper v. Apple Inc.*, No. 11-cv-6714-YGR (N.D. Cal.)). The shifting nature of Appellants' theories is underscored by their failure to file as an "exhibit" the supposed "international consensus documents" and "Subcommittee Report," EOB 7; *see* IOB 5—on which they now rely—until *after* Apple had briefed its motion to dismiss, *see* ER233–408.

Cutting through the Complaint's endless inconsistencies, indecipherable flowcharts, and irrelevant asides, Appellants' "claim theory" appears to be that Apple monopolizes an "institutional smartphone application software marketplace" in which Apple "purchase[s]" apps from developers—by approving or rejecting them through the App Review process—and then resells them to consumers. ER955–56. Appellants contend that Apple's ecosystem is in fact "the property of the citizens— the end users of Apple's iPhone," such that Apple should be barred both from imposing *any* restrictions on the distribution through the App Store and from charging developers *any* fee to license its intellectual property. ER953–54; ER1028–29. The ecosystem Apple created instead apparently "should exist as a 'common carrier' free from Apple's control." ER983.

According to the Complaint, Apple rejected two of Appellants' apps from the App Store and subjected their approved apps to "ranking suppression" in App Store search results. ER964, 991–96, 1048. Appellants assert seven antitrust claims under Sections 1 and 2 of the Sherman Act, implicating fifteen supposed markets, ER13–15—at least some of which are "hypothetical," ER961, or "redundant," EOB 27, by Appellants' own admission. Appellants also allege claims for breach of contract, breach of the covenant of good faith and fair dealing, RICO violations, and fraud. ER16.

Appellants demand at least $200 billion in damages and seek a permanent injunction that would require Apple to redesign its proprietary software, license its intellectual property for free, abandon all standards for moderating content, and cede control of the App Store to an "Independent App Court" of Appellants' design. ER947; ER1052–56.

## IV.    The District Court Dismisses the Case

The district court dismissed Appellants' claims with prejudice on November 30, 2021. ER10–43. In a thirty-four page order, the district court explained in great detail how Appellants' theories foundered at the threshold for failure to allege a relevant market or antitrust injury. ER18–19. The court also rejected Appellants' other theories of liability and requests for relief. ER36–39.

The district court identified fatal defects with Appellants' various alleged

markets. First, the scrambled "references [to] at least fifteen markets"—many of which were neither defined nor differentiated from one another—deprived the court of "sufficient clarity" to even assess whether a cognizable market had been pleaded. ER21–22. Second, the court found Appellants' markets implausible: Almost all are disfavored single-brand markets, most are not "market[s] for products or services," and none was supported by competent allegations of fact. ER22–31. Throughout, Appellants sought to disavow the "economic reality" they conceded in their Complaint—that the App Store is a two-sided platform "for *transactions*." *Id.*

Appellants' theory of antitrust injury was no better. Supported only by "conclusory" allegations amounting to "threadbare recitals of the elements," the district court recognized the alleged facts asserted supposed harms to Appellants "or a small group of competitors"—not, as required, to the market as a whole. ER31–33. Nor did Appellants' theories take into account the two-sided nature of the App Store, in which rules must be imposed on one side to best serve the platform as a whole (increasing output, lowering prices, and enhancing competition). ER34. This too doomed Appellants' antitrust claims, all of which were dismissed. ER18.

The court also dismissed Appellants' contract, RICO, and fraud claims. The contract claims failed because Appellants did "not identify any contractual provision that they allege was breached" or "frustrated." ER36–37. The RICO claim failed

because it was not pleaded with particularity, no predicate acts were adequately al-leged, and Appellants had not identified an "enterprise" separate from the RICO defendant (Apple). ER37–39. The "derivative fraud claim" failed "for the same reason." ER39.

In the same order, the district court denied the Entities' two preliminary in-junction motions, neither of which was supported by any evidence; Appellants' "'motion to strike' Apple's motion to dismiss," which "did not cite any legal author-ity authorizing" such relief; as well as Appellants' attempt to summon via state-law notices "Apple executives and Lina Khan, Chair of the Federal Trade Commission, to appear for live examination" during the hearing on Apple's motion to dismiss. ER17, 42–43. The court later rejected Appellants' motions for reconsideration. ER5–8.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's order granting a motion to dismiss for failure to state a claim." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1175 (9th Cir. 2021). It reviews for abuse of discretion the decision to dismiss a case with prejudice, the denial of a preliminary injunction, and the denial of a motion for reconsideration. *See Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012) (dismissal with prejudice); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010) (preliminary injunction); *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (motion for reconsideration).

Appellants invite the Court to apply a bygone pleading regime in which conclusory and implausible assertions could suffice. *See* EOB 9; IOB 11, 16. That standard "earned its retirement" long ago. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). Today, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). Appellants must "plead not just ultimate facts . . . but evidentiary facts" that would prove up their claims. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

## SUMMARY OF ARGUMENT

In a lengthy, careful order, the district court identified several, independent defects that foreclose each of Appellants' claims as a matter of law. Appellants hardly engage with that order on appeal. None of their arguments has merit.

**I.** Appellants' antitrust claims fail on multiple, independent grounds.

    **A.** All of Appellants' antitrust claims fail because they do not allege a plausible, relevant market (§ I.A.1). Appellants advanced fifteen confused and contradictory markets that failed to delineate a plausible field of competition in which their claims could be assessed (§ I.A.2). Not one of the fifteen markets was supported by sufficient allegations of fact (§ I.A.3). And Isaacs' judicial estoppel argument is meritless (§ I.A.4).

    **B.** All of Appellants' antitrust claims also fail because they do not plead antitrust injury. Appellants' assertions of "censorship" (§ I.B.1), an "international consensus" (§ I.B.2), and "ranking suppression" (§ I.B.3) are forfeited, unsupported by the record, contrary to law, or some combination of the three.

    **C.** Appellants' lengthy arguments about the merits of their claims highlight alternative grounds for dismissal. Appellants lack standing to bring their tying claim, which nevertheless fails under any standard (§ I.C.1). Appellants' Section 2 claims are based on inactionable, purported refusals to deal (§ I.C.2). Appellants concede that they challenge unilateral conduct, defeating their Section 1 claim

(§ I.C.3). And Appellants' attempt to incorporate by reference the entirety of another case runs afoul of basic procedural rules (§ I.C.4).

**II.** Appellants' claims for breach of contract and breach of the implied covenant of good faith and fair dealing fail because there is no contractual provision that was breached or frustrated. Apple has absolute discretion to approve or reject apps; the exercise of that discretion does not implicate or breach any contractual obligation.

**III.** Appellants' RICO and derivative fraud claims fail on multiple grounds. Appellants do not allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b) (§ III.A). Appellants' RICO claim also fails because the Complaint does not describe an enterprise distinct from Apple—the defendant in this case (§ III.B).

**IV.** The district court did not err in dismissing this case with prejudice. The Complaint was Appellants' seventh, and they identify no additional allegations that would salvage their claims. Their attempts to supplement below instead made clear that amendment would add only futile claims and allegations.

**V.** The district court did not err in denying Appellants' preliminary injunction motions, neither of which was supported by any evidence.

# ARGUMENT

Appellants' claims reduce to dissatisfaction with Apple's decision not to support two of their apps. They would, through litigation, remake the App Store into a "common carrier" obligated to distribute every app from every developer. ER983. But "the antitrust laws are not a price-control statute or a public-utility or common-carrier rate-regulation statute." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995). As a result, Appellants' antitrust claims fail at the threshold and every step thereafter. Nor can Appellants' fraud, racketeering, or contract theories be used to circumvent "the long recognized" right to decide with whom to deal and on what terms. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (cleaned up). Apple has no obligation to approve and distribute on its proprietary platform apps that are developed using its proprietary software but are inconsistent with its policies. The judgment should be affirmed.

## I. Appellants' Antitrust Claims Were Properly Dismissed

The district court correctly held that Appellants' antitrust claims suffered from two threshold defects—failure to plead market definition and antitrust injury. Each is sufficient to affirm the dismissal of all antitrust claims. Appellants provide no basis to reverse either finding; rather, they focus on the issues the district court had

15

no need to reach.  Those arguments cannot lead to reversal even if Appellants' arguments had merit (they do not) and instead underscore alternative grounds to affirm the dismissal of each antitrust claim.  *See Jones v. Allison*, 9 F.4th 1136, 1139 (9th Cir. 2021) (the Court "may affirm a District Court's decision granting a motion to dismiss on any ground supported by the record").

## A. Appellants Do Not Allege a Plausible Relevant Market

The district court rejected Appellants' asserted markets on multiple grounds. First, the Complaint failed to "provide sufficient clarity" to even "assess the threshold question of whether there is a relevant market." ER22.  Second, the "narrow[ed]" markets Appellants belatedly devised in their briefing, pressed here on appeal, were insufficient under blackletter antitrust law.  *Id.*  Appellants hardly grapple with the district court's analysis—altogether failing to address many of its dispositive rulings. In the few instances Appellants join issue, their arguments are contrary to law, the record, or both.

### 1. Appellants' Argument that They Need Not Allege a Market Is Forfeited and Wrong

Appellants suggest that they were not required to define a relevant market either because "the restraint is deemed *per se* anticompetitive" or because there are other "'ways to prove' competitive effects." *See, e.g.*, EOB 8–9; IOB 14.  Appellants never opposed dismissal on these bases, forfeiting any such argument.  *See Nova*

*Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1090 (9th Cir. 2000). Appellants instead argued at length that they had alleged relevant markets without ever suggesting they need not do so. ER690–93 at 5–8; SER37–38. That makes "a finding of waiver . . . particularly appropriate here." *Allen v. Ornoski*, 435 F.3d 946, 961 (9th Cir. 2006).

Regardless, Appellants' argument is wrong. As this Court has held time and again, "[a] threshold step in any antitrust case is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *accord Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018); *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983). After all, "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Amex*, 138 S. Ct. at 2285.

The potential exceptions to this rule are few, and Appellants do not claim any apply here. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). To the extent Appellants suggest that the assertion of a *per se* tying claim is such an exception, EOB 8–9; IOB 19, they are wrong. They do not allege a *per se* theory. *See infra* pp. 40–43. But even if they did, the "unique per se rule for illegal tying arrangements" requires definition of a relevant market too. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008); *see also Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35–46 (2006) (requiring plaintiff asserting a *per se*

17

tying claim to "defin[e] the relevant market"); *Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 131–32 (9th Cir. 2007) (same).  All of Appellants' antitrust claims thus require a cognizable market, and the district court did not err in dismissing those claims when they failed to allege one.

### 2.  Appellants' Scattered Markets are Ill-Defined and Contradictory

A relevant antitrust market defines "the field in which meaningful competition is said to exist."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).  This includes "both a geographic market and a product market," the latter of which must include "the product at issue as well as all economic substitutes for the product."  *Hicks*, 897 F.3d at 1120.

By their own admission, Appellants presented a "complex" series of markets. IOB 30; *see* EOB 29.  The district court recognized fifteen: (1) a "Smartphone Enhanced National Internet Access Devices" market; (2) a "smartphone market"; (3) a "single-product iOS Smartphone Enhanced Internet Access Device" market; (4) "[t]he iOS market"; (5) the "market for smartphone enhanced commerce and information flow (devices and apps) transacted via the national internet backbone"; (6) the "institutional app market"; (7) the "iOS institutional app market"; (8) the "iOS notary stamps" market; (9) the "iOS onboarding software" market; (10) the market for access rights to the iOS userbase; (11) the "national smartphone app distribution market"; (12) the "iOS App market"; (13) the "US iOS Device App market"; (14)

18

the "market of COVID startups"; and (15) "the App Market." ER13, 20; *see also* ER955–60, 983, 999, 1003–06, 1013, 1026, 1028–29 & n.1. Because Appellants failed to "define the boundaries of or differences between those markets," the district court rejected their allegations as insufficient. ER20.

This was not a "minor technicalit[y]" or "count shaming." EOB 52. As the district court observed, the Complaint mentions markets it "do[es] not define," leaves unclear "whether [certain markets are] the same as, or distinct from or over-lapping with [others]," and articulates apparent definitions that "would seem to con-tradict [other] allegations." ER20. Worse, "depending on the boundaries of the al-leged markets, they do not seem to correspond with the products subject to the al-leged antitrust conduct." *Id.*; *see also Hicks*, 897 F.3d at 1120.

Appellants do not seek to defend their actual allegations, nor do they contest the propriety of dismissal where a complaint fails to define a clear and coherent relevant market. *See Hicks*, 897 F.3d at 1120; *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063–64 (9th Cir. 2001). Appellants instead insist that they "plainly delineated" two alternative foremarkets for smartphone devices and five "[d]ownstream" markets. EOB 26; *see* IOB 32. This argument fails for two reasons.

First, the district court recognized this argument as an improper attempt to "amend the[] complaint through motion practice." ER21. The notion that "the App Market," for example, was the same as the "iOS App market," the "US iOS Device

App market," the "wholesale 'institutional app market,'" the "iOS institutional app market," and the "national smartphone app distribution market" defies credulity and is not apparent from the face of the Complaint. And it is the *Complaint's* allegations, not Appellants' attempt to "veer from the[m]" in their briefs, that controls. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022); *see also BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, No. 21-30622, 2022 WL 4298764, at *9 (5th Cir. Sept. 19, 2022) (affirming dismissal because a plaintiff "can't change horses midstream" where "the complaint already chose which market to allege"); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 632–33 (5th Cir. 2002) (similar).

Second, Appellants' attempted redefinition still leaves a set of incongruous markets. *See* ER20–21. For example, the Entities seek to delimit the "downstream" markets by reciting a series of tautologies—"[t]he product of the notary stamps market is the notary stamps," "[t]he product of the onboarding software market is the software onboarding," and so on. EOB 27. They then compound the problem by describing these very definitions as "redundant mechanisms to describe Apple's sale of userbase access"—which is itself supposed to be a *different* market with a *different* product of "access rights to the iOS userbase." *Id.* at 27–28; *see also* IOB 9 (conflating "userbase access" and "enterprise loaders"). In so arguing, the Entities

establish the very incongruity that led the district court to reject these purported market definitions in the first instance.

Indeed, Appellants only sow further disarray by attempting to wave away the Complaint's *dozens* of references to ostensible markets as "contextual background," "not directly" relevant, or merely inserted "to reinforce understanding." IOB 9; *see* EOB 27. As the district court queried, does the still-undefined "market for smartphone enhanced commerce and information flow (*devices and apps*) transacted via the national internet backbone," ER1028 (emphasis added), correspond to the new device foremarket or one of the downstream markets? ER21. Which of the single-brand markets now asserted is "[t]he iOS market" in which Apple supposedly has monopoly power? *Id.* And as but one more example, how can Appellants claim injury in a "market of COVID startups" that is not apparently one of the markets they now purport to allege? *Id.* The record supplies no answers to these questions. *See Tanaka*, 252 F.3d 1063–64 (affirming dismissal where the alleged markets were undermined by inconsistent allegations); *Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 708 F. App'x 29, 31 (2d Cir. 2017) (similar).

This incoherence continues to permeate Appellants' arguments on appeal. At the highest level, Appellants cannot even seem to agree about whether the relevant competition is between *app stores*, *see* EOB 24, or *apps themselves*, *see* IOB 5–6.

Nor can they settle on the scope of their case, flitting back and forth between a relevant "app market" that includes free apps versus one that houses both free and paid apps. *Compare* IOB 7, 19 n.3, 20 (free and paid apps), *with id.* at 19 *and* EOB 11, 31–32 (free apps only). In the same vein, the Entities now assert a foremarket for "smartphones," EOB 25, even though the Complaint includes tablets as well. *See* ER1001, 1012–13.

Additional examples abound. As but one more, Isaacs now asserts there are five "diverse sub-markets." IOB 10, 32. That includes the purported submarket for COVID-19 apps Appellants disavowed below, ER696; ER761, as well as "telephone directory reference and videoconferencing app submarkets" they never even mentioned, IOB 6. The other two of these supposed submarkets remain a mystery. Of course, none is supported by alleged practical indicia that would show they, "in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Indeed, that notion is inconsistent with Isaacs' assertion elsewhere that all free apps are "substitutable." IOB 19; *see also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989).

A proper market definition "provide[s] the framework" for the case. *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016). Appellants' vague, overlapping, and conflicting definitions precluded any such analysis. The district court therefore did not err in concluding

22

appellants' proposed markets, in every form they were offered, failed to "provide sufficient clarity." ER22. Appellants' antitrust claims were properly dismissed.

### 3. Appellants' Asserted Markets Are Otherwise Implausible

The district court also identified "several [independent] problems" with the "narrowed" markets Appellants press on appeal. ER23. Relevant here are the five supposed "[d]ownstream" aftermarkets. EOB 26; *see also id.* at 9 (asserting the alleged foremarket is merely "contextual"). With one potential exception ("the institutional app market"), each is a single-brand market—that is, they imply Apple's products are markets unto themselves. The district court rejected these markets both because Appellants did not allege the prerequisites to a single-brand market, ER25, and because Appellants otherwise failed to put forth "*any* well-pleaded allegations that support the boundaries they seek to define[]," ER31. Appellants do not challenge the former conclusion, and the district court was correct on both scores in any event.

#### a. Appellants Do Not Allege the Prerequisites of a Single-Brand Market

Single-brand markets are "presumptively" wrong, P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 563d (4th and 5th Ed. 2020), and courts receive them with deep skepticism. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956); *see also*,

*e.g.*, *Tanaka*, 252 F.3d 1063–64 (affirming dismissal of alleged single-brand market).  Indeed, "attempts to limit a product market to a single brand" are among the "[c]ases in which dismissal on the pleadings is appropriate [most] frequently." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.).

This Court has recognized single-brand markets in one situation: A "wholly derivative" aftermarket in which the defendant derives market power "from its relationship with its consumers," not "through contractual provisions"; the challenged restraints "relate only to the aftermarket"; and "market imperfections . . . prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008).  The district court recognized these prerequisites, ER25, and Appellants do not contend that anything less was required.

Nor do Appellants contest their failure to allege the necessary predicate facts. To the contrary, Appellants concede the App Store has *always* used a distribution model in which developers know that each app must be reviewed and approved by Apple.  EOB 29; IOB 7; *see also* ER966–67, 968, 1038.  Thus, Appellants offer no "factual allegations to rebut the economic presumption that [developers] make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter a [licensing] contract" with Apple.  *Newcal*, 513 F.3d at 1050; *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th

24

Cir. 1997) (aftermarket theory "cannot succeed . . . when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and . . . policies"). That is fatal to every alleged single-brand market, and any contrary argument is now forfeited. *See Retlaw Broadcasting Corp. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995).[5]

Moreover, Appellants all but concede that their theory is implausible by acknowledging "competitor[s]" for alleged "userbase access subscriptions." IOB 23 (quoting ER1006); *see also* EOB 27–28 (appearing to argue that all alleged aftermarkets describe some form of a userbase access market). The existence of competing products is by definition antithetical to a single-brand market. *Newcal*, 513 F.3d at 1051; *see also Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993) (single-brand market can exist only where the plaintiff adequately alleges "no reasonable substitutes exist").

Rather than defend the Complaint, Isaacs tries to jettison these alleged markets—arguing they are "not necessary for the case to prevail." IOB 32. But Appellants alleged that their theory only "flow[s] logically" if "Apple itself" is "[t]he only marketplace." ER961. That is presumably why the Complaint describes "access to

---

[5] Appellants abandon their argument below that a single-brand aftermarket flows from their alleged single-brand foremarket for iPhones. ER26. It cannot be resuscitated now. *Retlaw Broadcasting*, 53 F.3d at 1005 n.1. Nor is there any basis to conclude—in the law or record—that such a foremarket is plausible or that it gives rise to any of the alleged aftermarkets. *See* ER26.

the iOS market" as so significant to Appellants, deeming "the iOS smartphone internet access device market [as] a relevant market" and "the iOS Institutional App marketplace [as another] relevant market." ER1001. By Appellants' admission, the alleged single-brand markets are thus "relevant to the Sherman Act causes of action." ER1003; *see also* ER1013–28 (further allegations that at least one single-brand market was relevant to Appellants' antitrust claims). Appellants cannot unwind these allegations now.

> **b.** **Appellants Fail To Allege the Requisite Facts To Support a Plausible Market**

The district court also rejected Appellants' alleged markets—single-brand or otherwise—"under the standard rules for *any* market." ER26. A market analysis begins by "look[ing] at all relevant sources of supply," *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979), and then draws the market's boundaries to "encompass the product at issue as well as all economic substitutes for the product," *Hicks*, 897 F.3d at 1120. As Isaacs acknowledges, "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'" IOB 13 (quoting *Kaplan*, 611 F.2d at 291); *see also Hicks*, 897 F.3d at 1120 ("Economic substitutes

have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of de-
mand' with the relevant product."). [6]

Applying these principles, the district court found three fatal deficiencies in
all of Appellants' alleged markets. First, Appellants failed to allege a market con-
sistent with the admitted "economic reality" that the App Store is a two-sided trans-
action platform. ER29. Second, none of the alleged markets encompass actual, rel-
evant products. *Id.* And third, Appellants failed to offer "*any* well-pleaded allega-
tions that support the [alleged markets'] boundaries." ER31. Each of these is
grounds for affirmance.

**i.** Appellants tie themselves in knots to try to avoid "their own admission and
economic reality that the 'iOS App market is two-sided.'" ER29. As the district
court explained, Appellants' "*theory*" about the relevant market "does not align with
the economic reality" because, as the Complaint admits, the App Store is a two-sided
platform facilitating "transactions between developers and consumers." ER30. As
a matter of law, the relevant market therefore must be some category of "transac-
tions" between developers and consumers. *Amex*, 138 S. Ct. at 2280. But Appellants

---

[6] The practical indicia discussed in *Brown Shoe* are merely "proxies for direct proof
of substitutability" (*e.g.*, cross-elasticity of demand). *Rothery Storage & Van Co. v.
Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). There is therefore no
"two-step test for market definition." IOB 12. The ultimate inquiry is whether Ap-
pellants allege "evidentiary facts" that support the alleged economic boundaries.
*Kendall*, 518 F.3d at 1047; *see also Malaney v. UAL Corp.*, 552 F. App'x 698, 702
(9th Cir. 2014) (market must be supported by "specific [alleged] facts").

27

allege no such market.

Appellants attempt to save their claims by trying to distinguish their allegations about "two-sided markets" from "two-sided transaction platforms."  EOB 28–30; IOB 29–32.  But this is a distinction without a difference in this case.  The crux of this case concerns alleged restrictions on Appellants' ability to *transact* with consumers on the App Store.  This is clear from Appellants' own alleged experience.  They complain that Apple imposed a restriction on *developers'* distribution of COVID-19 apps to *users* on the App Store under a policy designed to protect *users* from harmful misinformation about the pandemic peddled by *developers*.  ER978; *see also Amex*, 138 S. Ct. at 2286 (explaining that restrictions "on one side of the platform . . . do not suggest anticompetitive effects" because they often benefit the other side of the platform).

Thus, Appellants' own allegations confirm the inescapable commercial reality that the App Store is a two-sided transaction platform.  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1016 (N.D. Cal. 2021); *see also* David S. Evans & Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms* at 101–19 (Harv. Bus. Rev. Press 2016).  Because Appellants assert no two-sided transactions market, their market definitions are implausible as a matter of law.  *See Amex*, 138 S. Ct. at 2285–87 & n.7.

**ii.**  Even setting aside this defect, Appellants cannot overcome the allegations

demonstrating that their markets are otherwise artificial and untethered to commercial reality. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982). They focus most on the alleged "Institutional App Market," an imagined paradigm in which Apple, by reviewing and either approving or rejecting apps, "buys" them to then resell on the App Store. EOB 29–30; *see also* IOB 8. For all the ink they spill, they identify no error in the district court's analysis. *See* EOB 20–21; IOB 19–24.

As the district court explained, the premise of Appellants' theory is contrary to the facts they allege as well as the governing contractual documents their Complaint incorporates:

> [Appellants] acknowledge that Apple's app review process is not one in which Apple buys the apps of developers, but, rather the "DPLA and App Store employ language that a free app is 'For Sale' or 'Available' through the App Store after gaining 'approval' by Apple for 'adherence to iOS standards.'" The DPLA confirms this arrangement, explaining that "Applications that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store" and if "selected by Apple, Your Applications will be digitally signed by Apple and distributed[.]" The DPLA does not include any provisions indicating that Apple pays developers or "buys" apps through the app review process. Rather than buying apps, . . . Apple enables the distribution of apps to end users through the app review process.

ER28 (internal citations omitted). What is more, the Complaint *admits* that Appellants' alleged market is "largely theoretical," "hypothetical," and untethered to the licensing arrangement on which the App Store is actually predicated. *Id.* (quoting

ER960, 961, 999–1000).  Appellants' incoherent attempt to walk back these admissions on appeal, EOB 30, merely confirms that the district court's careful analysis was correct.

Attempting to save the nonsensical market definition, Isaacs argues that the Complaint "focused on the positive valuations found with wholesale institutional purchase of apps."  IOB 8.  This assertion is similarly impenetrable.  And Appellants are wrong to the extent they mean to argue that the occasional acquisition of developers' intellectual property—like Apple's alleged acquisition of a weather app called Dark Sky, ER962—suggests that there is a relevant "wholesale" market for the purchase of apps (or at least the intellectual property of which they are comprised).  Appellants' antitrust claims are focused on restrictions about distribution in Apple's ecosystem; there are no alleged restrictions on what "[v]enture capitalists and [p]rivate [e]quity firms" acquire in the world at large.  IOB 8 (quoting ER959); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1272–73 (9th Cir. 1975) (rejecting antitrust claim premised on irrelevant market).

So too for the alleged notary stamps, userbase access, and application loader markets.  While the Complaint is far from clear on what these things are supposed to be, they are all alleged parts "of the iOS kernel"—part of Apple's proprietary software system (that is not licensed or sold to anyone).  ER1024–25.  Appellants appear to misapprehend the district court's ruling rejecting these markets on that

basis, ER30, suggesting that the court "found it impossible (facially unsustainable) that a market could exist for zero-priced apps," IOB 21; *see* EOB 30–31. The district court made no such ruling. Rather, it recognized that a plaintiff may not "define one small component of the overall product as the relevant product market." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194 (10th Cir. 2009). To that ruling, Appellants have no answer.

As a last resort, Isaacs contends that "merely asserting [the] existence" of a market "is sufficient to survive" a pleadings challenge. IOB 21. No citation accompanies this argument. That is because it is contrary to law. *Kendall*, 518 F.3d at 1047; *see also Hicks*, 897 F.3d at 1120 (affirming dismissal of claims where market was unsupported by sufficient allegations of evidentiary facts); *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016) (rejecting argument that a plaintiff may "[m]erely assert[]" a relevant market).

**iii.** In any event, none of Appellants' proposed markets are drawn according to reasonable interchangeability of use and cross-elasticity of demand—a point Appellants did not dispute below. ER27. This defect remains clear from the constant vacillation between an alleged market for free apps versus one for all apps. *See supra* pp. 7–8. For its part, the Complaint's few economic references—"there are vast barriers in terms of price elasticity," for example, ER1000—are unintelligible.

Rather than argue that these allegations are sufficient, Isaacs maintains that

31

markets may be dismissed only when they are too narrow, not too broad. IOB 19–22 & n.3. This argument was not preserved. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). It is wrong in any event: There is no basis in law or logic to apply different rules for markets that do not conform to commercial reality because they are overinclusive or underinclusive. *See*, *e.g.*, *Golden Gate Pharm. Servs. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (rejecting alleged "pharmaceutical industry" market as too broad); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (rejecting alleged "women's accessories" market as too broad). To endorse this argument would undermine the very purpose of market definition—to draw "narrowly" the "circle . . . to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *du Pont*, 351 U.S. at 415 n.1.

### 4. Isaacs' Judicial Estoppel Argument Is Baseless

Issacs' theory of judicial estoppel is meritless. *See* IOB 24–25. Isaacs first targets Apple's contention in a subsequent case that the markets alleged there had been "alleged (and rejected)" in this case. IOB 24. That statement is true. The plaintiff in that case—another of Isaacs' purported entities—alleged "Smartphone App Distribution" and "Smartphone App" markets just as Appellants did here. *Compare* ER956, 1022 *with* ER195, 197. That Apple argued the markets here were ill-defined did not preclude it from arguing *res judicata* in a successor case involving

32

the same ill-defined markets.

Nor did Apple "concede[]" at the hearing in this case that Appellants pleaded a plausible market. IOB 25–26. Apple pointed out that Isaacs' lengthy arguments about market definition were contradictory, failed to delineate "the outer boundaries" of any relevant market, and that the apparent market he was trying to describe would be a "disfavored . . . single-brand market" besides. SER18–19, 26–27. There is no factual or legal basis for the Court to apply any theory of estoppel here.[7]

## B. Appellants Do Not Allege Plausible Antitrust Injury

Antitrust injury is another prerequisite to any antitrust claim. *Somers v. Apple, Inc.*, 729 F.3d 953, 963–64 & n.5 (9th Cir. 2013). That is because the federal antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (quotation marks omitted). Antitrust law instead "focus[es] on protecting the competitive process and not on the success or failure of individual competitors." *Cascade Health Sols.*, 515 F.3d at 902. A plaintiff must allege injury to "competition in the market as a whole," "not merely injury to itself as a competitor" in the market. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust*

---

[7] Isaacs' false accusations about the supposed "dishonesty" of Apple's counsel, IOB 26, have been roundly rejected throughout the federal courts—including the long-denied "SCOTUS petitions" to which he refers. *See Isaacs v. USC Keck Sch. of Med.*, 142 S. Ct. 762 (Jan. 10, 2022); *Isaacs v. USC Keck Sch. Of Med.*, 142 S. Ct. 592 (Dec. 6, 2021).

*Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013).

Over several pages, the district court explained that Appellants failed to allege antitrust injury under any of their disconnected theories. ER31–36. Once again, Appellants do not meaningfully engage with this analysis. Isaacs ignores it altogether, thereby forfeiting the issue and conceding a ground for affirmance. *See Hillis v. Heineman*, 626 F.3d 1014, 1019 n.1 (9th Cir. 2010). The Entities' total reliance on conclusory allegations, EOB 14, underscores the absence of any error in the district court's order.

### 1. "Censorship Harm" Is Not Antitrust Injury

The Entities' chief theory is that Apple's "censorship" of their apps—a euphemism for their apps' rejections from the App Store—is antitrust injury. EOB 6–7, 15. But the antitrust laws protect "*competition* not *competitors*," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), and "plead[ing] injury to [one]self" does not lead to the "conclusion that competition has been harmed," *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987). The Entities cannot wring marketwide harm from their personal grievances.

To start, they *concede* that they pleaded only "injuries to themselves and other competitors." EOB 14. This is dispositive, for "[i]t is not enough . . . to show that a competitor . . . was injured." *McDaniel v. Appraisal Inst.*, 117 F.3d 421, 423 (9th Cir. 1997); *see also Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 336–

34

39 (3d Cir. 2018) (medallion-holding taxis driven out of business did not allege harm to the local taxicab market overall).

To suggest otherwise, the Entities point to paragraphs 81, 173, 174 179, and 200 of the Complaint. EOB 14. Those paragraphs offer nothing more than a "formulaic recitation of the elements," *Twombly*, 550 U.S. at 555, declaring with no factual content that Apple "intended to harm competition app developers [sic]," did "much damage . . . to the overall competition," "harm[ed] a market," and the like. ER1015, 1016, 1020. Such "conclusory language regarding the elimination of competition and improper purpose" simply does not suffice. *Rutman Wine*, 829 F.2d at 735.[8]

Nor does any inference of marketwide harm flow from Appellants' allegations. At bottom, the Entities assert that every rejection of an app is "censorship" that "suppress[es] output of the market"—thereby injuring competition. EOB 6. That is wrong, among other reasons because it fails to take into account the two-sided nature of the App Store platform. Apple's curated experience creates a safe, reliable, and trusted environment for users and developers to transact, *enhancing* the

---

[8] The Entities' two allegations concerning a purported market for "COVID startups" suffer from the same defects. EOB 14 (citing ER983, 1016). Both are "threadbare recitals." *Iqbal*, 556 U.S. at 678. Moreover, the Entities acknowledge there is no discrete market for "COVID startups," which "are just participants in [another] market." EOB 14; *see also Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 705 (9th Cir. 2001) (affirming dismissal because alleged injury was "not experienced in the [asserted relevant] market").

appeal of the App Store and *increasing* the output of transactions. The Guidelines thus benefit consumers and developers even if Appellants would prefer that different (or no) rules applied to their apps. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995); *see also Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) (rejecting "conclusory" allegations of marketwide harm where "the thrust of [the] complaint points the opposite way").

It is therefore not enough to suggest, as the Entities do, that certain developers lose their "person-hours of work" when their app is rejected. EOB 15 (citing ER954, 955–56). To the contrary, "[t]he mere fact of reduced sales" by one seller "is not enough to establish an impact on competition." *Rutman Wine*, 829 F.2d at 735; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115 (1986) ("The loss of profits to . . . competitors . . . [is] not of concern under the antitrust laws."). That is because such rejections may merely transfer "business from one company to another . . . without an accompanying effect on competition." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*, 433 F.3d 1024, 1031–32 (7th Cir. 2006); *see also LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (affirming dismissal because platform merely prevented "consumers from accessing" the plain-

36

tiff's product on the defendant's own platform, not their ability to use other plat-forms).[9]

Were Appellants right, no platform could *ever* refuse to distribute content. A newspaper would have to allow every advertisement, a gallery every work of art, and a ride-sharing platform every driver—no matter how unseemly, uncouth, or un-safe. That would undermine platforms, not enhance competition; the district court rightly rejected this wrongheaded attempt to manufacture antitrust injury out of pro-competitive conduct with no alleged marketwide harm to competition. ER34–35; *see also* Evans & Schmalensee, *supra*, at 35–37, 135–48 (explaining that "prevent-ing low-quality entrants from joining" can be critical to the success of a platform like a mobile app store).

### 2. There Is No "International Consensus" Relevant to Antitrust Injury

In an effort to circumvent the inadequacies of their allegations, the Entities repeatedly invoke a so-called "international consensus" against Apple's business model—insinuating that this "consensus" somehow establishes antitrust injury. *See*,

---

[9] Without Coronavirus Reporter on the App Store, for example, consumers may download COVID-19 apps developed by governments or established hospital net-works. That does not imply a marketwide diminution in output or increase in price. *See Somers*, 729 F.3d at 965–66 (antitrust injury cannot be "speculated" where merely "conceivab[le] or possib[le]"). Rather, Apple's enforcement of its Guide-lines produces a store with higher quality apps that are more attractive to consum-ers—increasing output and ultimately benefitting both users *and* developers in the aggregate. *See*, *e.g.*, *Amex*, 138 S. Ct. at 2281, 2289–90.

*e.g.*, EOB at 4, 7, 13. But they never explain—as the district court noted below, ER35—how unenacted bills, a subcommittee report, and other litigation involving different theories and different markets have any legal significance *for them*.

The Entities focus most on the House subcommittee report. *See* EOB 14–16. Yet the Complaint and briefing below never linked any specific portion of that report to the theories advanced in this case. So while they fault the district court for not connecting the report to their theory and allegations, EOB 13, they can point to no spot in the record in which they identified information to support *their* theory of marketwide injury deriving from the conduct *they* challenged. *See Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (litigants cannot "heave[] the entire contents of a pot against the wall in hopes that something would stick"). They still have not done so on appeal, apparently expecting the Court to act "like pigs, hunting for truffles buried in [the record]." *Id.* (quotation omitted).

Nor could Appellants have linked the report to their allegations had they tried. The relevant portion of the subcommittee report does not share any of the theories expressed by Appellants here. *See* ER2914–58. It does not express any view on the relevant market, much less bolster Appellants' purported "institutional app market." It says nothing about any "COVID startups." And it does not suggest, as Appellants do, that every app rejection is a restriction of output constituting antitrust injury. The report—and any "international consensus" it supposedly embodies—is irrelevant.

38

### 3. Appellants' "Ranking Suppression" Theory Is Forfeited and Meritless

Appellants first argued "ranking suppression" as antitrust injury in a motion for reconsideration. ER6. They therefore cannot cite this theory in arguing the district court erred in dismissing the Complaint. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995). Nor do they contend that the district court abused its discretion in declining to consider this argument for the first time in a motion for reconsideration, EOB 2—forfeiting any such argument too. *See WildEarth Guardians v. EPA*, 759 F.3d 1064, 1072 n.3 (9th Cir. 2014). Appellants' theory is meritless at any rate.

Rankings by nature place some apps higher and some apps lower. Thus, the alleged suppression of any app in search rankings lifts another app's visibility. For example, the Complaint alleges that Isaacs' Caller-ID app was suppressed in order to lift up an "Apple crony['s]" app in the rankings. ER1043. As with Appellants' censorship theory, whatever harm alleged suppression does to particular developers does not imply reduced output, increased prices, or other marketwide harm—as the district court observed. ER6; *see also Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579, at *3 (N.D. Cal. Jan. 28, 2019) (no antitrust injury where Google allegedly suppressed plaintiff's position in search rankings); *Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596, at *8 (N.D. Cal. July 13, 2006) (similar).

Rather than address their own allegations, the Entities pepper their brief with

brand new assertions and posit that they might be able to substantiate them "via discovery." EOB at 16–17. But this Court "does not permit plaintiffs to rely on anticipated discovery to satisfy Rules 8 and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to discovery." *Whitaker*, 985 F.3d at 1177; *see also Somers*, 729 F.3d at 966 (rejecting argument that plaintiff "'might later establish some set of undisclosed facts' supporting antitrust injury"). A complaint must stand on its own feet, and the district court correctly concluded that this one did not.[10]

### C. Appellants' Antitrust Claims Fail for Myriad Other Reasons

The district court correctly held that Appellants' failure to adequately define the relevant market or plead antitrust injury is fatal to all of their antitrust theories. Yet every one of Appellants' antitrust claims also fails on its own terms. Appellants' lengthy arguments about the merits of their claims only highlight these alternative grounds for dismissal. *See Jones*, 9 F.4th at 1139.

#### 1. Appellants' Tying Claim Fails

Appellants allege that Apple violated Section 1 of the Sherman Act by tying "access to iOS device[s]" to three supposed products: "Apple's App Store," "notary stamps," and "onboarding software." ER1023–26. Although these "products" are

---

[10] Whatever argument Appellants intend to make by accusing Apple of taking "other companies['] innovative features," EOB 16; IOB 27, is likewise forfeited because it was neither raised in any of their briefing below nor fleshed out on appeal.

scarcely defined or described in the Complaint, the essence of Appellants' theory appears to be that Apple ties the sale of iPhones to consumers to their use of the App Store. *See* EOB 17–18; IOB 18–19. These arguments only highlight the flaws in Appellants' tying theory.

To start, Appellants are wrong that "*per se* analysis" applies to these claims. EOB 17, 19; IOB 18–19. "[T]ying arrangements may promote rather than injure competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199–200 (9th Cir. 2012). Because that is true for "novel business practices . . . in technology markets" in general, *Qualcomm*, 969 F.3d at 990, and "arrangements involving platform soft-ware products" in particular, *United States v. Microsoft*, 253 F.3d 34, 84 (D.C. Cir. 2001) (en banc), the rule of reason applies here.

Regardless, Appellants' claims fail. Even a *per se* tying claim requires the plaintiff to allege standing. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). A plaintiff also must define both a tying and tied product mar-ket—which Appellants fail to do, *see supra* pp. 17–18—as well as a tie of "two distinct products" in those two markets. *Cascade Health*, 515 F.3d at 913; *see also Ill. Tool Works*, 547 U.S. at 35–37, 46. Appellants' allegations fail across the board.

First, Appellants lack standing to assert this claim. Standing inheres only to "purchasers who are forced to buy the tied product to obtain the tying product" or a

"competitor who is restrained from entering the market for the tied product." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1266 n.10 (10th Cir. 2006); *accord Glen Holly*, 352 F.3d at 372. Appellants are neither. They are *app developers*, not the "iOS device *user*" who purchases an iPhone. ER963–66, 1023–24 (emphasis added); *see also* ER1024–25 (acknowledging Appellants do not purchase either "notary stamps" or "onboarding software").

Nor are Appellants "competitor[s] . . . restrained from entering the market for the tied product." *Abraham*, 461 F.3d at 1266 n.10. While the Entities claim standing as competitors because they allegedly "*could* open their own app stores" and provide "notary stamps," EOB 24 (emphasis added), there is no allegation they would do so absent the alleged tie. The suggestion that it would be "trivial" for an app developer to "launch [an app store] on their website," ER1024, is therefore irrelevant. *See Cyntegra Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210–11 (C.D. Cal. 2007).

Second, Appellants fail to allege two "separate and distinct product[s]." *Rik-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008). Smartphones, in Appellants' telling, are "an amalgamation of sensors, operating software, and communication devices." EOB 3; *accord* ER953, 968. Notary stamps are "digital encryption signature[s]" that are "algorithmically bound" through "the iOS kernel," ER1003–04, and "onboarding software" is an "installation program to

launch an app." ER1025–26. These allegations make clear that what Appellants call "tied" products are "integral components of the business method being" provided—the iOS platform—and hence cannot be tied. *Rik-Mik Enters.*, 532 F.3d at 974; *see also Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 253 (3d Cir. 2022) (rejecting attempt to "recast[] the [alleged] contract restriction as a product"); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996) (rejecting alleged tie of operating system to computers).[11]

For both of these additional reasons, the Court may affirm the dismissal of Appellants' tying claim.

### 2. Appellants' Section 2 Claims Fail

Appellants' Section 2 claims are likewise deficient because Appellants fail to allege "exclusionary conduct." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). Appellants' briefs make plain that their main Section 2 theory is one of refusal to deal—in their words, "refus[ing] to sell notarization stamps, onboarding software, or access to userbases to harm competing app developers." EOB 34; IOB 19–20; *accord* ER1014–15. But Apple has "no duty to deal"

---

[11] The Entities further claim that they "explain the consumer interest/demand for each of th[e] tied products on the face of the" Complaint. EOB 22–23; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19–23 (1984). But the one paragraph they cite for this supposed explanation is just a string of conclusory allegations that consumers are "clearly interested in purchasing" the alleged tied product "separately." ER1027. That is inadequate. *See Iqbal*, 556 U.S. at 678–79.

43

with Appellants or any app developer, much less under "the terms and conditions" they would prefer. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

Seeking to circumvent this "long recognized" principle, *Aerotec Int'l*, 836 F.3d at 1183, the Entities cite the Supreme Court's observation in *Trinko* that a "refusal to cooperate with rivals can constitute anticompetitive conduct" under "certain circumstances." EOB 35 (quoting *Trinko*, 540 U.S. at 408). But such circumstances are "limited." *Qualcomm*, 969 F.3d at 993–94. First, Appellants are not a competing platform and therefore lack standing to bring this claim. *See Trinko*, 540 U.S. at 411; *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988). Second, Apple did not "unilaterally terminat[e] a voluntary and profitable course of dealing" with Appellants; some entities never allegedly entered into a contract with Apple, and the rest never had their license agreements cancelled. *Qualcomm*, 969 F.3d at 993–94; *see also* ER981; ER987; ER991; ER995. Third, Appellants allege no facts showing Apple's "only conceivable . . . purpose" in rejecting Appellants' apps was to "sacrifice short term benefits" to profit from excluding competition. *Qualcomm*, 969 F.3d at 993–94. All three are fatal.

Nor can Appellants' claims survive under the so-called "essential facilities" doctrine or cases about product improvement. EOB 35–36. An essential-facilities theory is just "a variation on a refusal to deal claim" and fails for the same reasons.

*Aerotec Int'l, Inc.*, 836 F.3d at 1184. And cases like *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP* underscore that Apple's conduct is "necessarily tolerated by the antitrust laws" as there is no argument that the App Store was anything but an "improvement" that provided consumers and developers with value. 592 F.3d 991, 998–1002 (9th Cir. 2010); *see also* ER1007–08.

### 3. Appellants' Section 1 Claim Fails

Appellants also claim that Apple's license agreement is an unreasonable restraint of trade under Section 1 of the Sherman Act. *See* ER1019–22. But Section 1 prohibits only "concerted action" that "joins together independent centers of decisionmaking." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190, 196 (2010). Appellants admit that the challenged restraints here are "unilateral," EOB 12–13; *see* IOB 7; the license agreement merely reflects the "absolute discretion" Apple reserves to approve apps, ER972, 1013. This much is clear from the fact that Primary Productions "never even signed the DPLA," EOB 12, yet takes aim at all the same conduct, ER1012–30 (alleging all antitrust claims on behalf of all plaintiffs). Appellants are thus forced to argue against one of the most well-established principles in antitrust law: That unilateral conduct is beyond the scope of Section 1. EOB 13. That argument is without merit. *See*, *e.g.*, *Am. Needle*, 560 U.S. at 190; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988).

#### 4. Appellants May Not Incorporate a Separate Class Action Complaint by Reference

There also is no basis for Appellants to incorporate by reference "th[e] causes of action" and "all supporting facts" from another putative class action complaint relating to the App Store.  *See* EOB 37; IOB 27–28.  "[W]hile [Federal Rule of Civil Procedure] 10(c) permits references to pleadings and exhibits in the same case," there is "no rule permitting the adoption of [claims] in a separate action in a different court by mere reference."  *Muttathottil v. Gordon H. Mansfield*, 381 F. App'x 454, 456–57 (5th Cir. 2020) (cleaned up); *see also* Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1326 (4th ed.) ("[A]llegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference.").  That is particularly true here as Appellants did not use "direct and explicit" references that would enable "the responding party [to] ascertain the nature and extent of the incorporation," as Rule 10(c) requires.  5A Wright & Miller § 1326; *see also Shelter Mutual Ins. Co. v. Pub. Water Supply Dist. No. 7*, 747 F.2d 1195, 1198 (8th Cir. 1984) ("A pleading incorporating allegations from other documents must clarify which statements are to be incorporated.").

Rather than address these elementary defects, Isaacs misrepresents the record by claiming (without citation) that his Complaint "incorporat[ed] about four pages of *Cameron* . . . by direct exhibit" and "directly referenced" those portions.  IOB 28.  All three assertions are false.  The Complaint referenced all "causes of action" and

46

"all supporting facts" without differentiation. ER1030. Appellants did not attach the *Cameron* complaint. And the Complaint does not "directly reference" a single paragraph from the *Cameron* complaint. *See* ER970; ER1003; ER1029–30. Thus, there is no basis to reinstate this attempt to incorporate wholesale another lawsuit into this one.

## II. Appellants' Contract Claims Fail Because They Identify No Contractual Term that Was Breached or Frustrated

The Complaint asserts two contract claims—one for breach of contract and the other for breach of the implied covenant of good faith and fair dealing—arising out of the alleged rejection of the Coronavirus Reporter app for distribution on the App Store. ER1031–35. The alleged basis for these claims is a supposed "promise[]" from Apple in its "Developer Agreement . . . that entities with 'deeply rooted medical credentials' were permitted to publish COVID apps on the App Store." ER1031. Because no such promise exists in any contract, the district court dismissed both claims. ER36–38.

Appellants again point to no particular error in the district court's analysis, instead parroting allegations that recite the elements of a contract claim. *See* EOB 37–38. For instance, Appellants say they "pleaded damages" and cite paragraphs 260 and 266 of the Complaint. *Id.* Yet these paragraphs are unadorned allegations that "Apple's breach of the covenant caused substantial damages to Plaintiff and well beyond" and that "Coronavirus Reporter would have generated no less than two

hundred million dollars of income, had it been properly allowed." ER1034–35. Missing are any well-pleaded *facts* that would substantiate these "threadbare recitals." *Iqbal*, 556 U.S. at 678.

Appellants do not even address the primary reason for dismissal—the Complaint's failure to identify any specific provision in a specific contract that Apple has breached or frustrated. ER36–37; *see also Miron v. Herbalife Int'l, Inc.*, 11 Fed. App'x 927, 929 (9th Cir. 2001); *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004). Any such argument is thus forfeited. *See WildEarth Guardians*, 759 F.3d at 1072 n.3.

Regardless, the district court was correct. No provision exists in the "Developer Agreement," or any other contract, "promis[ing]" that Apple would distribute COVID apps like Coronavirus Reporter on the App Store. ER1031. This much is beyond doubt. The agreement, incorporated by the Complaint, is in the record. As the district court noted, Appellants' allegations are expressly contradicted by the license agreement's provision that app approval decisions are left to Apple's "*sole discretion,*" ER36–37 (quoting ER846, 866) (emphasis added); *see also Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1116 (9th Cir. 2014) (courts do not accept as true allegations contradicted by properly considered exhibits). Having agreed to this term in exchange for access to Apple's proprietary software, tools, and services, ER832; ER1020, Appellants cannot now complain that Apple exercised its

48

agreed-upon discretion. *See Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 836 (9th Cir. 1996) (the "words of the contract" control).

Appellants cannot change that result by arguing that "the contract" is an "adhesion agreement." EOB 38; *see* IOB 35. Putting aside that "adhesive contracts are generally enforced," *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 591 (2007), this argument is self-defeating. If adhesive agreements are somehow "legally void," ER962, there is no contract to breach. *See City Lincoln-Mercury Co. v. Lindsey*, 52 Cal. 2d 267, 276 (1959).

Nor does *Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855 (C.D. Cal. Apr. 6, 2020), help Appellants. Citing that case, the Entities argue that "breach of a specific provision of the contract is not a necessary prerequisite" for their implied covenant claim. EOB 39. This argument betrays a fundamental misunderstanding of the relevant "breach" in an implied-covenant claim. In that context, the "breach" is not of a contractual term but of the implied covenant itself. To show a breach of the covenant, in turn, a plaintiff must show that the defendant has *frustrated* a "specific [contractual] term[]." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349–50 (2000). *Soundgarden* confirms as much. 2020 WL 1815855, at *17. Because the Complaint identifies no such term that has been frustrated, Appellants fail to state a claim. *See* ER37.

## III. Appellants' RICO and Fraud Claims Fail for Multiple Reasons

The Complaint alleges that Apple and mostly unnamed "individuals within Apple" formed a RICO enterprise and "engaged in a distinct pattern of predicate acts over a multi-year timespan," including "wire fraud and mail fraud by assigning junior App Review members to issue false, pretextual reasons for rejection to small developers," ER1036–39. The Complaint also asserts a "derivative" civil fraud claim. ER38–39. The district court dismissed these claims for multiple independent reasons, including that they were not pleaded with particularity, no fraudulent acts were alleged, and (for the RICO claim) the Complaint does not allege a distinct enterprise. *See* ER37–39. The district court was correct.

### A. The Complaint Fails to Allege the Claims or Predicate Acts with Particularity Under Rule 9(b)

Appellants' RICO and fraud claims sound in fraud and must be pleaded with particularity. *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc); *see also* Fed. R. Civ. Proc. 9(b). The Entities appear to resist this requirement by citing decades-old decisions from the Seventh Circuit, EOB 40–44, but the law in this Circuit is clear. To avoid dismissal under Rule 9(b)'s "heightened" standard, a complaint "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, *and why it is false*." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (cleaned up and emphasis added).

50

As the district court held, the Complaint "rel[ies] on vague, conclusory allusions to Apple's alleged practice of 'assigning junior App Review members to issue false, pretextual reasons for rejection to small developers.'" ER38 (quoting ER1039). None of these identify a specific who, what, when, where, or how—and Appellants do not point this Court to any allegations that might substantiate their broad accusations.

The few allegations that Appellants cite as purported "false" statements, EOB 44; IOB 33, prove the point. They consist of a series of alleged screenshots of communications between Apple and Isaacs about his various apps. *See* ER1039–42. But Appellants merely characterize them as "false" or "pretext"; they do not allege facts demonstrating so. *See* ER1039–43. Such conclusory recitals do not discharge Appellants' obligation to explain *how* or *why* the alleged communications were false. *Depot*, 915 F.3d at 668.

For example, the Complaint points to a communication from Apple to Isaacs that his Coronavirus Reporter app was rejected because it contained "data that has not been vetted for accuracy by a reputable source" and was not associated with a "recognized institution." ER1040. There is no plausible allegation that these statements were false. In fact, the Complaint elsewhere *concedes* that they were true, alleging that the app would have made use of unvetted, "user reported symptoms,"

ER976, and that the app was developed without an established affiliation to any recognized institution, ER973, 981–82; *see also Somers*, 729 F.3d at 964–65 (holding that plaintiff's theory was "implausible in the face of contradictory . . . facts alleged in her complaint").

Appellants' real complaint is that they disagree with the content of the communication because they think that their credentials should have been adequate. EOB 3. But a "disagreement[]" over "judgments about the appropriate . . . methodology to be used" cannot show *falsity*. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877–78 (9th Cir. 2012). Nor does a belief that *other* apps *might* violate Apple's Guidelines, IOB 33, do anything to show that the alleged communications were false. ER38. This alone is fatal to Appellants' RICO and fraud claims.[12]

Appellants also contend that they have alleged fraudulent acts. *See* EOB 44, 46–47 (citing ER1039, 1049); IOB 33. Once again, they do so in summary fashion, stating only that fraudulent acts were "specifically alleged in the [Complaint]." EOB 44–45. Such an underdeveloped argument is forfeited. *See Retlaw*, 53 F.3d at 1005 n.1. Regardless, the cited allegations do not come close to alleging with particularity

---

[12] Isaacs misidentifies the Guideline cited by the district court. IOB 34. The district court noted that Apple's Guidelines state that "[a]pps that provide services in highly-regulated fields (such as . . . healthcare . . . ) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer." ER12 (quoting ER932). On its face, this Guideline governs health apps like Coronavirus Reporter.

a cause of action for mail, wire, or common law fraud.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020); Cal. Civ. Code § 1709.

The most obvious failure is that no allegations support a reasonable inference that Apple or its employees acted with specific intent to deceive or defraud.  The only goal or intent that the Complaint (wrongly) attributes to Apple or its employees is to "limit competition and reward business partners (cronies)."  ER1050.  But that alleged goal is far afield from the required allegation that Apple acted *with the intent to* "deprive a victim of money or property."  *Miller*, 953 F.3d at 1101.  For the same reason, the Complaint does not allege any intentional "scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises," *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (quotation marks omitted), or to induce anyone to injuriously change their position, Cal. Civ. Code § 1709.  This too is reason enough to affirm dismissal of the RICO claim.

## B.    The Complaint Fails to Allege a RICO Enterprise Distinct from the Defendant

To sustain a RICO claim, a plaintiff also must allege an enterprise that is separate from the RICO defendant.  *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) ("If [a corporation] is the enterprise, it cannot also be the RICO defendant.").  The district court held that Appellants failed to do so because the alleged RICO enterprise and defendant are one and the same: Apple.  ER39.  This ruling was well

supported by the Complaint, which states that the enterprise consists of "Apple," "Apple's App Review team," and "senior Apple management," and was "official[ly] sanction[ed]" by Apple. ER1036–37. Appellants make two arguments, neither persuasive.

First, Isaacs argues that only a "small percentage of Apple employees" participated in the enterprise. IOB 35. The import of this argument is unclear, but it is unmoored from the Complaint in any event. Indeed, he elsewhere betrays his real theory that "Apple informed Coronavirus Reporter" of defects in the app and "Apple . . . sent developers demoralizing criticism of their apps." *Id.* at 33–34. The alleged enterprise is therefore, as the district court held, Apple. ER39.

Second, Appellants argue that the district court should have recognized a distinct enterprise with Apple's "crony app developers," "law firms," and "PR firms." ER1037–38; *see also* EOB 45–46; IOB 35–36. These unadorned allegations are implausible and conclusory. Moreover, the Complaint does not actually allege that any third parties *participated* in the alleged enterprise's wire and mail fraud—just as the district court held in rejecting this same argument. ER39; *see also* ER1039. Nor could naming as a separate defendant a "director or shareholder" fix Appellants' defective enterprise, for there is no basis to presume this hypothetical, unnamed defendant would or could have participated in the alleged enterprise's conduct. IOB

36; *see also Depot*, 915 F.3d at 668 (plaintiff must identify the enterprise's members); *Baumer v. Pachl*, 8 F.3d 1341, 1344–45 (9th Cir. 1993) (plaintiff must allege how individuals "operat[ed] or manage[d]" the enterprise).

Appellants erect further barriers to their claim to the extent they contend that counsel or lobbyists are part of the enterprise. The *Noerr-Pennington* doctrine forecloses any attempt to state a claim based on counsel's litigation activity. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929, 932 (9th Cir. 2006). Nor would such conduct suffice even if unprotected. *See Baumer*, 8 F.3d at 1344–45 (law firm "providing legal services" cannot be part of enterprise); *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) (similar). The same is true for the Entities' attempt to draw support from an article about lobbying in Georgia. EOB 45. These accusations were part of an "addendum"—a nullity filed long after the Complaint. ER40. In any event, the allegations it contains have "nothing to do with" Appellants or their claims and describe "protected lobbying activity." ER41–42; *see also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380–81 (1991).[13]

For all these reasons, Appellants cannot fault the district court for refusing to

---

[13] Isaacs references a "Motion for Sanctions" pending "while the Motion to Dismiss was under active adjudication" that he claims the district court "simply ignored." IOB 35–36. But no such motion was ever filed. To the extent Isaacs refers to the two motions for sanctions he filed *after* dismissal, those motions were summarily denied—in an order among the very few documents Appellants conspicuously omit from their excerpts of record. SER2. The purported "evidence spoliation" he refers to is likewise nonexistent. SER5.

recognize a *respondeat superior* theory. *See* EOB 46; IOB 35–36. That doctrine applies only "when the employer is distinct from the enterprise." *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992). No such distinction was alleged here, and the RICO claim was properly dismissed.

## IV. The District Court Did Not Abuse its Discretion in Denying Leave to Amend

After its extensive analysis of the Complaint and the procedural history, the district court determined that further amendment would be futile. ER39–40. The district court observed that Apple had already briefed multiple motions to dismiss, which pointed out the key deficiencies in Appellants' Complaint and prompted Appellants to amend several times. *Id.* Given these amendments, "[t]he district court's discretion" was "particularly broad." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989). And Appellants' failure to fix the Complaint's core deficiencies—which lay at the heart of their theories—demonstrated that "an *eighth* amended complaint" would be no different than its predecessors. ER40.

There is no merit to Appellants' assertion that the district court failed to exercise its discretion in a reasoned manner. *See* EOB 50; IOB 27. Contrary to Appellants' assertions, a district court need not offer *any* explanation where futility is "apparent from the record." *Ascon Props., Inc.*, 866 F.2d at 1160. But here, the court explained at length why amendment would be futile. ER39–40. This puts to rest the notion that "[t]here is no discussion of the *Foman* factors whatsoever." EOB 50

56

(footnote omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (citing "futility of amendment" as one "justifying reason" to deny leave).

The remainder of Appellants' arguments boil down to a complaint that the district court called them "out" on "one strike." IOB 20; *accord* EOB 48–49. But the Complaint was in fact Appellants' seventh, ER40, prefaced by *six* motions to dismiss from Apple. *See id.* Appellants therefore had ample opportunity to make whatever adjustments they wanted to address the defects Apple pointed out time and again. Indeed, they acknowledge at least two "fundamental" rewrites before dismissal, EOB 51, and represented to the district court that they had used "the last few amendments . . . to come up with this monopsony theory," SER12. That was their self-avowed "best theory." SER14. Having settled on it across several pleadings—whether seven (as the record shows) or "three true 'iterations'" (as the Entities assert), EOB 52—the district court did not abuse its discretion in finding another amended complaint would have been futile. ER40; *see also McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996) (district court properly dismissed complaint based on the lack of "strength of a plaintiff's case" and the burden that another lengthy, multi-count complaint would impose on a defendant).

Critically, Appellants foreshadowed any proposed amendment by filing an "addendum" that tried to insert not only new claims but also allegations to backfill their existing ones. ER40–41. The district court found multiple legal defects in this

addendum—none of which Appellants contest on appeal. ER40–42. Nor have Appellants ever identified any non-futile amendment that could fix the fundamental defects in their Complaint. *See Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1300 (9th Cir. 2015) (no abuse of discretion where plaintiff fails to proffer new facts "that would cure the deficiencies"); *Okwu*, 682 F.3d at 846 (no abuse of discretion where plaintiff fails to identify a viable "amendment consistent with the facts she has already alleged"). The district court did not abuse its discretion in denying leave to amend.

## V. There Is No Basis for a Preliminary Injunction

The district court did not abuse its discretion in denying the Entities' motions for preliminary injunctions given that their deficient pleadings refute any notion that they are "likely to succeed on the merits." *Assoc. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (plaintiff seeking mandatory injunction has "doubly demanding" burden). But even setting aside the lack of merit in Appellants' antitrust claims as pleaded, there is no basis for an injunction.

The most basic reason is that the Entities submitted *no* evidence to support their requests. ER715–17. It is hornbook law that a movant must rely on "[e]vidence that goes beyond the unverified allegations of the pleadings." 11A Wright & Miller § 2949. Yet Appellants made no attempt to do so, foreclosing any possibility of

relief. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.* 736 F.3d 1239, 1250 (9th Cir. 2013). By the same token, the Entities could not overcome the substantial testimonial, documentary, and affidavit evidence demonstrating that they were unlikely to succeed, would suffer no irreparable harm, and sought an injunction that would prejudice Apple and harm the public. *See* ER462–78.

## CONCLUSION

Apple respectfully requests the Court affirm in its entirety the judgment below.

Dated: October 14, 2022

Respectfully submitted,

/s/ *Rachel S. Brass*
Rachel S. Brass

Cynthia Richman
Zachary B. Copeland
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105
(415) 393-8200
RBrass@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 13967 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2019.

Dated:  October 14, 2022

/s/ *Rachel S. Brass*
Rachel S. Brass

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **Response Brief of Appellee Apple Inc.** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 14, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 14, 2022

/s/ *Rachel S. Brass*
Rachel S. Brass