UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

PhantomALERT,
  Plaintiff

v.

Apple, Inc.,
  Defendant

Jury Trial Demanded
Case No. 1:24-cv-00786
Judge Trevor N. McFadden

# FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

*Thomas C. Willcox*
Thomas C. Willcox, Attorney at Law
DC Bar No 445135
1701 16th Street, N.W
Suite 211
Washington DC   20009
Tel: 202.239.2762
202.234.0892
thomaswillcox@willcoxlaw.com.co

Richard Wolfram
Richard Wolfram, Esq.
845 Third Avenue, 6th Fl.
New York, New York 10022
Tel:  917-225-3950
rwolfram@rwolframlex.com
http://www.rwolframlex.com
Pro Hac Vice

Counsel for Plaintiff and the Proposed Class

Table of Contents

I. NATURE OF CASE ................................................................................................................... 3

II. THE PARTIES ........................................................................................................................... 7

III. JURISDICTION AND VENUE ................................................................................................ 8

IV. FACTS ....................................................................................................................................... 8

   A. Apple, Inc. and its Apple Store Monopoly .......................................................................... 8

   B. The Relevant Markets ......................................................................................................... 10

   C. The Background of Apple's Anticompetitive Conduct ...................................................... 12

   D. PhantomALERT and its Successful Traffic App ............................................................... 12

   E. The Pandemic Explosion and PhantomALERT's Efforts to Develop a Covid Tracing App 13

   F. Apple and Google Launch Their Own Apps and Form a Joint Venture for a Tracing App. 18

   G. Apple and Google Terminate Their Apps and Dissolve Their Joint Venture.................. 25

   H. Apps That Apple Permitted on the App Store Demonstrate How Powerful PhantomALERT's Covid-19 App Could Have Been. ........................................................... 26

V. Summary of Claims ................................................................................................................. 26

VI. Class Action Allegations ........................................................................................................ 27

VII. PRAYER FOR RELIEF .......................................................................................................... 37

Plaintiff PhantomALERT ("Plaintiff"), by and through its counsel, brings this action against the defendant named above (the "Defendant") and alleges the following based upon information, belief and the investigation of counsel:

## I.    NATURE OF CASE

This is an antitrust class action brought on behalf of a group of app developers **who** were denied access to defendant Apple's $25 billon per year internet-based app store (the "App Store"), which is a monopoly, to provide their Covid-19-related apps to the public during the pandemic. The Defendant arbitrarily invoked one of at least two, if not more, sets of guidelines that Apple created and on which it purported to rely in deciding which Covid-19-related apps, at issue in this case, it would allow onto the App Store.  On information and belief, while invoking one set, a higher bar, to exclude the vast majority of such apps, Apple failed to disclose the existence of an alternative, lower-bar, set of guidelines, except to a handful of developers, which it then allowed onto the App Store.  Thus, the vast majority of the class members herein were not informed of the lower-bar for admission to the App Store.  Had they known, they could have complied with the lower-bar and quite possibly obtained access to the relevant marketplace.

Defendant's actions occurred as it introduced not just its own competing version of the app at issue, but also while it entered into and carried on a joint venture with a major competitor, Google, to introduce another app.  Defendant thus increased the sales of its own competing app at the expense of apps the class was never permitted to so sell, as the result of Defendant's denying them access to its App Store.

The Defendant has market power in the market for "smart phones," by far the most popular means of access to the apps in question.  Defendant has monopoly power over its App Store, which provides a platform for selling apps providing various functions, including the apps

at issue in this case. Before any app developer can market its products through the App Store, it must sign a contract with the Defendant, in part agreeing to the Defendant's guidelines for the submission of apps.

Plaintiff is the creator and vendor, first, of a popular crowd-sourced navigation, road hazard and traffic map app. This app has features including, but not limited to, live DOT traffic cams, crowd-sourced road hazard and natural disaster location-based alerts for accidents, speed traps, red light cameras, speed cameras, school zones, dangerous curves, dangerous intersections, traffic accidents, flooded roads and fire on the road, nearby tornadoes, severe weather. Individuals could report and share their own points of interest and other information relevant to road hazards, akin to WAZE, another popular traffic app.

Plaintiff's traffic app was sold in the App Store for approximately nine years prior to the time period described below.

In March 2020, the worldwide Covid-19 pandemic created major new opportunities for apps whose function was essentially to track, map and contain the pandemic. Because Plaintiff had spent the last nine years perfecting the practice of vending what is in fact a crowdsourced navigation and traffic, it was well positioned to create -- and by modifying its existing app - - an app to track, map and trace Covid-19 via crowdsourced data.  These were highly sought after datasets at the beginning of the pandemic, when governments, health officials, media and public were trying to track and obtain visibility on the Covid-19 pandemic spread.

However, in mid-March 2020, the Defendant issued revised guidelines requiring any Covid-19 app to be submitted in the name of a health-related institution, as defined by Apple. Thus, when, a few days later, Plaintiff submitted its Covid-19 app to Apple, with the intent of raising awareness by displaying credible and valuable Covid-19 hotspot map data from a leading

medical institution, Johns Hopkins. Defendant rejected it by claiming the data source was not credible.

Defendant has admitted it invoked these guidelines hundreds of times to deny Covid-19-related apps access to the App Store. And it did so based on these guidelines. On May 4, 2020, Apple issued lower-threshold, apparently alternative guidelines, that required not issuance through a health institution, but simply endorsement such as a municipality or state. While rejecting hundreds of apps that did not satisfy the first, higher-bar, guidelines, Apple nonetheless allowed a few apps that satisfied only the lower-bar endorsement guidelines issued by Apple, the existence of which was not known to the vast majority of the class.

At the time of these actions, Defendant developed and sold its own Covid‑19 app, and entered into a joint venture with Google to provide a Covid-19 app that would be distinct and not compete with Apple's apps. Google, which had initially admitted Plaintiff's Covid-19 app, then changed course and declared that no 'monetizing' Covid-19 related apps would be allowed in its app store.

On May 4, 2020, Apple issued lower-threshold, apparently alternative guidelines, that required not issuance through a health institution, but simply endorsement such as a municipality or state. Notwithstanding the substantial communications back and forth between Apple and the Plaintiff in mid-March as to the potential for Plaintiff's Covid-19 app to obtain access to the App Store, Plaintiff has no recollection of ever having been notified of the endorsement requirements. On information and belief, Apple made no effort to follow up with Plaintiff and disclose these newer requirements under which his app may have been acceptable. Had Plaintiff been aware of them, it would have pursued the easier path of obtaining such an endorsement. Further, on

information and belief, Apple did not make them known to the majority of the class members or prospective users.

In June 2020, many state attorneys general inquired of the Defendant whether the Covid-19 apps sold through the App Store were professionally run and therefore safe. In response, Defendant invoked not the higher-threshold guidelines, but the lower-threshold, apparently alternative, guidelines, discussed in the above paragraph.

Further, according to the Defendant's representations in its letter responding to the states' inquiry, only seven US Covid-19 apps had complied with the second guidelines and were therefore sold through its store.

Also in the letter responding to the attorneys general, the Defendant admitted that the apps would be instrumental in helping fight the pandemic, even as it was banning such apps from the App Store. But Defendant's letter confusingly cites to both sets of guidelines, reflecting inconsistent reliance on them by Apple. However, Defendant was unquestionably aware it was invoking two sets of guidelines at different times.

Later conduct of the Defendant indicates it continued to invoke the first guidelines, and downplayed the second. Notably, when the Defendant proffered its guidelines as exhibits to its first motion to dismiss, it introduced only the primary rules for the App Store (in existence since the store opened), and the first guidelines. Defendant made no mention of the second guidelines anywhere in the Motion to Dismiss; Plaintiff and the undersigned are only aware of them through the extensive research required to prepare the instant filing.

Plaintiff PhantomALERT and the Class have been damaged proximately through the loss of access to Apple smartphone users for the collection of valuable user-generated Covid-19 data and sales it could have made through the App Store, and if not through the App Store then

directly through consumer (i.e., individual and institutional) access to its app on the web. This loss, and the resulting damage, occurred particularly during the peak of the Covid-19 crisis, when data related to the pandemic was valued and sought by governments, health professionals, the media and the general public.

The effect of this conduct has been to harm competition among potentially viable, useful Covid-19 related apps, to the detriment of the public at a time when access to such apps may have increased awareness, reduced infection, reduced deaths, slow down the spread, contain the pandemic, shortened lockdowns and help with global economic recovery.

PhantomALERT and the Class herein seek treble damages, attorney's fees, and injunctive relief.

The complaint pleads one class, comprised of all developers of Covid-19-related apps who were denied possible access to the App Store as the result of disparate, inconsistent, pretextual application of the first, higher-bar, guideline, and/or denied possible access to the App Store for their Covid-19-related apps as the result of Apple's failing to notify them of the institution and application of the lower-bar guidelines, under which their apps might have qualified for the App Store. As the two guidelines were blurred in their application by Apple, that blurred application compels the definition of one class. The class satisfies the four elements of Rule 23: numerosity, typicality, commonality and representativeness.

## II.   THE PARTIES

1.  Plaintiff PhantomALERT, Inc. is a Delaware corporation located in the District of Columbia. The inventor and CEO of PhantomALERT is Yoseph Seyoum, a resident of Maryland.

2.  Defendant Apple, Inc. is an international purveyor of various electronic devices located in Cupertino, California and incorporated in the state of Delaware.

## III. JURISDICTION AND VENUE

3.   This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton

Antitrust Act of 1914, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

4.  This Court has personal jurisdiction over Apple, as it derives substantial revenues via sales of

its products within the jurisdiction from its own stores.

5.  In addition, the District of Columbia is the primary place of business of the plaintiff.

## IV.  FACTS

### A.     Apple, Inc. and its Apple Store Monopoly

6.  From 1984 to present, Apple, Inc. has evolved from a fledging computer company to a

behemoth in the markets for smartphones and certain related products and services, the effect

of which has been the suppression of competition and innovation.

7.  At a market cap of over $2 trillion, Apple's size and reach far exceed those of any technology

monopolist in history.

8.  A major source of Apple's profits stems from the insatiable demand from purchasers of its

iPhone smartphones and iPad tablets (collectively "Devices") for software applications

("apps"), such as for music, entertainment, movie, TV, messaging, games, email,

photos/videos editing, camera, news, internet, notes, calendar, GPS-enabled maps, health

monitoring, banking, and retail.

9.  Apple develops many of its own apps and includes for sale through its own app store (the

"App Store"), thousands of apps from third-party developers.

10. Apple sells these apps to users of its Devices through the App Store.

11. This case concerns Apple's use of various restraints and monopolistic practices restricting iPhone users in the U.S. to accessing apps on their phones only through the App Store, and not directly from the web.

12. The App Store is reportedly Apple's main source of profit. The key reason is that Apple prevents iPhone users from accessing apps directly from the web (a practice known as "sideloading"), thus coercively limiting them to access apps only through the App Store. At the same time, however, evidence shows the feasibility, practicability and even history of sideloading, both to the iPhone and Google/Android phones. Thus, for instance, in the first year after the 2007 introduction of the first iPhone, before Apple created the App Store, iPhone users could download apps directly from developers' websites. Also, Google/Android, while limiting which apps it allows in Google Play Store (its own app store), permits users of its devices to download apps directly from developer websites, albeit with constraints on developers' promotion of their apps. Furthermore, subsequent to the recent implementation of the Digital Markets Act ("DMA") of the European Union ("EU"), Apple is now required to allow its EU users to "sideload" apps directly from the web and its allegedly inadequate changes have led to its becoming the first company charged with violating the EU's DMA rules.[1]

13. Any developer wishing to submit apps to Apple so that the Company may consider it for inclusion in the App Store must sign its "Developer Program License

---

[1] https://retail.economictimes.indiatimes.com/news/consumer-durables-and-information-technology/mobiles/apple-becomes-first-company-to-be-charged-with-violating-eus-dma-rules/111251755.

License Agreement".[2] ("DPLA"). The terms of the DPLA relevant to this case are set forth below; at Section 14.10, "Dispute Resolution; Governing Law," which applies California law to the transactions at issue herein:

> This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law.

14. Also, Section 6, "Application Submission and Selection," requires that each developer submit any proposed App to Apple for review and Compliance with the "Documentation and Program Requirements then in effect as well as with any additional guidelines that Apple may post on the Program web portal or in App Store."

### B. The Relevant Markets

15. As of early 2020, Apple had a market share of approximately 60% of the U.S. smartphone market, with the remaining 40% held by manufacturers of Android smartphones. The U.S. smartphone market is distinct; smartphones are not reasonably interchangeable by use with, do not substitute for, and thus do not compete with other devices. As the Department of Justice has alleged in its June 11, 2024 First Amended Complaint against Apple, in United States of America v. Apple, Inc., No. 2:24-cv-04055 (JXN-LDW) (D.N.J.) ("June 2024 DOJ Complaint").[3]

> 172. Smartphones are a relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer

---

[2] https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.
[3] https://www.justice.gov/d9/2024-06/423137.pdf.

displays, less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

173. Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and
portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

174. Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

16. The June 2024 DOJ Complaint further alleges that the United States is the relevant geographic market, in part as follows:

176. The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the United States demand services offered by U.S. retailers when they purchase a smartphone. For example, consumers who purchase a smartphone from their mobile carrier can get assistance with activating their new device, setting it up, and transferring important content like apps, messages, photos, and video to their new smartphone. A smartphone purchased abroad for use in the United States might be incompatible with the consumer's domestic carrier, may not have the necessary radio technology to take advantage of the carrier's highest speed connections, the carrier might not be able to offer support during setup or subsequently, or the phone's warranty may be invalid.

177. Consumers must also purchase smartphones through a U.S. retailer if they want to take advantage of valuable promotions offered by their mobile carrier. These same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries.

178. Finally, potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

179. Consumers in the United States could not avoid or defeat an increase in the price of performance smartphones or smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China than they do in the United States due to less competition.

### C.      The Background of Apple's Anticompetitive Conduct

17.  In order to maintain profitability, Apple imposes unreasonable and pretextual restraints, arbitrarily and discriminatorily, to exclude apps written by third-party developers such as Plaintiff, PhantomALERT, which it views or has viewed as potential competitors to itself for the subject of such apps, thus violating federal and state antitrust law and state unfair competition law.  One key vehicle for these restraints is the Apple Store Guidelines ("ASG"), Exhibit to Declaration of Julian Kleinbrodt, in Support of Motion to Take Judicial Notice, filed June 4, 2023, Doc 14-3.

### D.      PhantomALERT and its Successful Traffic App

18. Since 2010, PhantomALERT, a crowdsourced navigation, road hazard and traffic map app very similar to WAZE, has experienced a healthy demand on the App Store for displaying live traffic safety information, road hazards, natural disaster alerts and other information to help drivers drive alert, safely and thus ticket free.

19.  PhantomALERT is a freemium app monetized by selling in-app subscriptions on a monthly ($2.99/month), annual ($4.99/year), or lifetime ($9.99) basis following a 30-day free trial with premium features. The subscription allows users to submit their own points of interest and view live streams from DOT live traffic camera feeds.

20. The application displays points of interest and provides audible and visual alerts to raise drivers' situational awareness of nearby hazards. The app includes several features such as live DOT traffic cam feeds, traffic accidents, speed traps, school zones, speed cameras, red light cameras, dangerous intersections, dangerous curves, flooded roads, tornadoes, severe weather, and fire on the road alerts, with the overarching goal of saving lives. PhantomALERT also offer push notifications of above-mentioned features based on proximity. The PhantomALERT crowdsourced app has been successful, enthusiastically embraced and used by drivers, and generating quality and reliable data while producing considerable revenue. PhantomALERT's data have been purchased, licensed and "OEMed" by personal navigation devices manufacturers, device owners, navigation apps and auto infotainment systems.

### E. The Pandemic Explosion and PhantomALERT's Efforts to Develop a Covid Tracing App

21. In the first two weeks of March 2020, the Covid-19 pandemic exploded, infection increased, deaths mounted, and world governments, medical experts, the media and the general public made a global call to action to tech companies to help fight the pandemic. In response, PhantomALERT's experienced developers and medical advisors retooled its existing traffic app to help track, map and contain the global spread of Covid-19. Building on its years of experience in collecting valuable user-generated data from the global public via app technology, PhantomALERT modified its existing apps and submitted the revamped apps, initially including Covid-19 hotspot map data and reporting to be followed with symptom, test result and vaccination reporting, tracking, tracing and mapping features, to the App Store and the Google Play Store.

22. The newly revamped PhantomALERT App ("App") now permitted iPhone users from
    anywhere in the world to view Covid-19 data and hotspots on a map; and it was planned to
    enable reporting of Covid-19 symptoms, hot spots and incidence information by location,
    with the goal of raising awareness of Covid-19 spread, identifying hot spots and collecting
    valuable user-generated biostatic data to help contain the pandemic.  PhantomALERT
    utilized algorithms to collect accurate and verified data, with user consent and allowed
    user control of the same by allowing consumers to sunset points of interest if they did not
    receive sufficient confirmation from users.  Additionally, the app had the capability to add
    another layer of review for self-reported symptoms by emailing users to confirm their
    submission of a COVID point of interest.  The collected data were initially intended to be
    made available to health officials, government agencies, scientists, virologists,
    epidemiologists, the media and, after verification and user consent, to the general public.

23. PhantomALERT's goal was to aid in the global pandemic fight. The intent was to save lives,
    slow down the pandemic, and lead to more users installing the apps, which would, in turn,
    increase downloads, user participation, and eventually subscription conversions.  The app
    was intended to collect information from consenting users and supplement it with credible
    Johns Hopkins data sets.

24. PhantomALERT's Covid-19 app satisfied in substance all the requirements of Apple's
    guidelines for Covid-19 apps: among other respects, it was supervised and developed in
    conjunction with respected physicians, such as a respected virologist, a (redacted for privacy)
    email from whom is forth below:



25. These doctors, pursuant to the proposed app, would closely monitor and analyze the data reported by users and made available to governments, health officials, the media and general public.

26. Importantly, at that time, there were very few Covid-19 tracking apps available on the App Store for purchase by consumers.

27. On March 14, 2020, Apple announced changes to the App Store Review Guidelines to prohibit the distribution of apps "related to COVID-19" unless published by "recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions." These guidelines further added Section 5.1.1(ix), which states that apps "providing services in highly-regulated fields (such as banking and financial services, healthcare, and air travel) or that require sensitive user information should be submitted by a legal entity that provides these services, and not by an individual developer." (Hereinafter the "Issuance Requirement.")

28. The March 14, 2020 revisions to the App Store Guidelines were not generally known to consumers who purchased iPhones before that date.

29. On March 16, 2020, Google initially approved the PhantomALERT Covid App.

30. Also on that date, PhantomALERT submitted a version of its app with the COVID points of interest feature to the Apple App Store.

31. Apple's initial response was as follows:

**Key Points of the Update:**

- **Approval Only for Recognized Entities**: Apple announced that only apps from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions would be allowed.
- **Prohibition on Profiteering**: Apps that attempted to profit from COVID-19 or spread misinformation were explicitly prohibited.
- **Focus on Credibility**: The update emphasized the importance of apps being credible sources of information.

**Official Announcement:**

Apple made this update public in March 2020 through their communications with developers and an official announcement. The specific guideline update was to ensure that all COVID-19-related apps in the App Store were from trusted sources, providing accurate and useful information to users during the pandemic.

**Guideline Reference:**

- **Guideline 1.1 - Objectionable Content**: This section of the App Store Review Guidelines was reinforced to include specific prohibitions on apps attempting to exploit the COVID-19 pandemic.

32. On March 19, 2020, Apple informed PhantomALERT that this version of the app would be rejected, citing the Issuance Requirement. (The safety and traffic alert-only version of the app remains available on the App Store.) PhantomALERT's COVID app was similarly rejected by the Google Play Store under its existing "sensitive events" policy.

33. The exact language of Apple's rejection of the PhantomAlert Covid-19 app, in a message dated March 25, 2020, is set forth below:

> From Apple
> •                                         1. 4 Safety: Physical Harm
> •                                         2. 1 Performance: App Completeness
> Hello Joe,
>
> Thanks for your time on the phone today.
>
> As discussed, your app has been rejected for guideline 5.1.1.
>
> It would be appropriate to remove the Virus Alert feature from your app.
>
> We're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19.
>
> For additional detail, please refer to the news regarding Ensuring the Credibility of Health & Safety Information on the Apple Developer web site.
>
> We hope you will consider making the necessary changes to be in compliance with the App Store Review Guidelines and will resubmit your revised binary.

34. PhantomALERT was not alone in being denied the opportunity to mobilize, compete, innovate, and save lives via crowdsourced Covid-19 apps. At least hundreds of other Covid-19-related apps from independent developers, including COVID Trace, NextTrace, Coronavirus Reporter, Antidote, and FaceAlert, as well as an informational game designed by Florian Mueller of FOSS Patents, were also blocked by Apple and Google.

**F.      Apple and Google Launch Their Own Apps and Form a Joint Venture for a Tracing App.**

35. On March 24, 2020, Google banned many, if not all, Covid-19 apps from the Google Play Store.[4]

36. On March 27, 2020, Apple launched its own Apple-branded Covid-19 screening app in collaboration with the CDC, the White House, and FEMA. Apple executives later boasted about the millions of downloads their COVID-19 app and websites received.  Soon thereafter, Apple launched another Apple-branded Covid-19 app geared towards first responders. Both of these Apple-branded Covid-19 apps had similar features to PhantomALERT's App and garnered millions of "installs" within days.

37. On March 30, 2020, Google also banned PhantomALERT's Android app, on the grounds that Google had modified its Covid-19 app policy by imposing a blanket ban of Covid-19 related apps.  Despite the huge interest, and need for reliable global Covid-19 data, this newly Covid-related policy stated, "[W]e don't allow apps that lack reasonable sensitivity towards or capitalize on a natural disaster, atrocity, conflict, death, or other tragic event."[5]

38. As Apple admits in its Motion to Dismiss filed June 4, 2024[6], at least hundreds, if not more, app developers from around the world with similar app ideas and with the intent to raise awareness and help fight the global pandemic in their communities were denied access to global Apple and Android device users as a result of Apple's and Google's actions:

> PhantomALERT acknowledges that Apple applied Guideline 5.1.1 to hundreds, if not more developers who would otherwise have flooded the market with apps featuring similar functionality and likewise devoid of institutional backing. . .  By the same token, apps

---

[4] https://www.forbes.com/sites/thomasbrewster/2020/03/24/google-bans-coronavirus-apps-but-after-400000-downloads/.
[5] https://www.forbes.com/sites/thomasbrewster/2020/03/24/google-bans-coronavirus-apps-but-after-400000-downloads/.
[6] Dkt 14-2.

> that did comply with the requirements - such as Aarogya Setu, which
> was backed by the Indian government, and Zoe, which was backed
> by King's College, London - were allowed in the App Store, where
> they allegedly achieved extraordinary success.

MTD at 4-5 (cleaned up).

39. Furthermore, after banning PhantomALERT and other app developers for Covid-19 related

apps, on April 10, 2020, Apple and Google, in a joint press conference, announced a

partnership to develop Covid-19-related contact tracing technology, as follows:

UPDATE
April 10, 2020

# Apple and Google partner on COVID-19 contact tracing technology





Across the world, governments and health authorities are working together to find solutions to the COVID-19 pandemic, to protect people and get society back up and running. Software developers are contributing by crafting technical tools to help combat the virus and save lives. In this spirit of collaboration, Google and Apple are announcing a joint effort to enable the use of Bluetooth technology to help governments and health agencies reduce the spread of the virus, with user privacy and security central to the design.

40. The Apple-Google jointly developed technology would use Bluetooth, with open-source APIs enabling interoperability for government-backed contact tracing apps between ecosystems. This strategy, named Google Apple Exposure Notification (GAEN), required

20

each state government to develop its own COVID tracking app based on the GAEN protocol. The GAEN implementation and adoption were plagued with technical difficulties, and many initial implementations were not interoperable with apps from other states, fragmenting the solution. Despite all of the above-mentioned issues GAEN achieved over 80% share in Covid-19 apps.

41. In short, apparently, while banning apps like PhantomALERT, both Apple and Google were working together to launch their own competing apps with the intent to monopolize the tech response to the Covid-19 pandemic.

42. On May 4, 2020, Apple issued an "Exposure Notification Addendum)[7] ("ENA") which added several rules relevant to Covid-19 tracing apps.

43. ENA Section 3.2 prohibited exposure notification apps from, *inter alia*, from including any advertising, product promotion, or marketing.

44. Also, the ENA included a requirement that a contact tracing app be endorsed and approved by a governmental entity (the "Endorsement Requirement").

## 2. Entitlement Request; License and Restrictions

2.1    In order to use the Exposure Notification APIs, You must be a government entity, such as a government health services organization, or a developer who has been endorsed and approved by a government entity to develop an Application on behalf of a government for COVID-19 response efforts. Entitlement Profile(s) are limited to one (1) Application per country unless the country has a regional approach, or as otherwise agreed by Apple. If You are a developer who has been endorsed or approved by a government entity, You agree to provide documentation to Apple evidencing the authorization and endorsement of the government entity upon Apple's request. Further, developers endorsed or approved by a government entity must have a written agreement with such government entity that obligates the government entity to abide by the terms of this Addendum and the Developer Agreement.

Id. at 1.

---

[7] https://developer.apple.com/contact/request/download/Exposure_Notification_Addendum.pdf.

45. PhantomALERT never received notice of the ENA. Had it been notified of the Endorsement Requirement as a sufficient basis for acceptance on the App Store, it would have pursued this option.

46. However, on June 16, 2020, multiple state attorneys general sent a letter to Apple and Google expressing concern about the accuracy of third-party contact tracing apps.

47. In an undated response,[8] Apple contended its guidelines were sufficient, stating that "only appropriate entities may offer such apps," and citing the ENA as evidence of its quality control and commitment to consumer privacy.

48. In addition, Apple invoked the Endorsement and Issuance Requirements in the alternative; that is, either submission or endorsement by a governmental entity, Apple stated, was sufficient:

> Apple's requirements for contact tracing and exposure notification apps are even more strict-- they must be submitted or endorsed by a government entity.

Id. at 2 (emphasis added).[9]

49. Also, Apple contended there were only seven contact tracing apps intended for use in the United State available in the App Store:

---

[8] https://www.naag.org/wp-content/uploads/2020/10/Apple-Response-EN-and-CT-Apps-NAAG-FINAL.pdf.
[9] To the extent the quoted language sets forth the Issuance Requirement, it omits the fact that it was not limited to issuance by a governmental entity but could be a "health institution" of sorts, viz. a private company such as Lysol, which had a Covid-19 app in the App Store pursuant to this language.

| Endorsing Govt. Entity | App Title | Developer |
|---|---|---|
| New York, Florida, Puerto Rico | PathCheck SafePlaces | Path Check, Inc. |
| North Dakota | Care19 | State of North Dakota |
| Pittsburgh, PA | NOVID | Expii, Inc |
| Rhode Island | CRUSH COVID RI | State Of Rhode Island, Department of Administration |
| San Joaquin Country, CA | Citizen SafeTrace | sp0n, Inc |
| Utah | Healthy Together - COVID-19 | Twenty Holdings, Inc. |
| Daly City, CA | Contact Tracing | Piusworks LLC |

Id. at 2.

50. Next, Apple invoked the Issuance Requirement, by citing to its Review Guidelines:

> Furthermore, like all apps offered on the App Store, contact tracing apps and exposure notification apps must comply with the App Store Review Guidelines, available at https://developer.apple.com/app-store/review/guidelines/. The Guidelines provide a number of rules related to privacy that developers must follow, including:
>
> - Identify the data the app collects, how it collects that data, and all uses of that data.
>
> - Apps are prohibited from using, transmitting, or sharing personal data without obtaining the user's permission.
>
> - Apps may not use or disclose to third parties data gathered in the health, fitness, and medical research context for advertising, marketing, or other use-based data mining purposes other than improving health management, or for the purpose of health research, and then only with permission.

Id. at 2.

51. Apple did not note, however, that the Review Guidelines cited in the hyperlink in the second

line of the inserted text above, highlighted in yellow ("Hyperlink"), contain not the ENA,

which contains the Endorsement Requirement, but the March 14 Guidelines, which contain the Issuance Requirement. Hyperlink at 5.1.1.(ix).[10]

52. Also, in response to a query by NAAG as to an application by an app called "Piusworks," which on its face expressly violates the Issuance requirement, Apple cited the Issuance requirement and then said it had requested that Piusworks remove ads and in-app purchases, and was therefore in compliance. Apple never explained how Piusworks' contact tracing app met the Issuance requirement:

> they can get help if needed or provide assistance to their neighbors.
>
> To help fulfill these expectations, we're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19. Entertainment or game apps with COVID-19 as their theme will not be allowed."
>
> We informed Piusworks, LLC on May 28, 2020 that Contact Tracing would be rejected from the App Store under Guideline 1.1 (which prohibits objectionable content) due to its attempt to profit from COVID-19 in contravention of the policy referenced above.
>
> On June 4, 2020, Piusworks, LLC submitted a new version of Contact Tracing which removed the advertisements and in-app purchase. We approved the app the same day.
>
> As of this time, Contact Tracing is in compliance with Apple guidelines, policies, and technical requirements.

Id. at 5.

53. Even further, Apple falsely represented that each contact tracing app in the App Store met the Issuance Requirement, even though Piusworks showed no evidence of such compliance, and Apple cited no basis for any purported compliance.

54. Next, when the attorneys general asked about Apple's policy with respect to verifying a contact tracing App's connection with an appropriate institution, Apple simply invoked the

---

[10] https://developer.apple.com/reviewguidelines/.

Endorsement Requirement:

C. Responses to concerns highlighted in June 16, 2020 letter.

Your letter asks that Apple take certain steps to ensure that both exposure notification apps and contact tracing apps protect consumer information, and that users can provide informed consent. I address each of these requests in turn below:

**1. Verify that every app labeled or marketed as related to contact tracing, COVID-19 contact tracing, or coronavirus contact tracing or exposure notification is affiliated with a municipal, county, state or federal public health authority, or a hospital or university in the U.S. that is working with such public health authorities;**

As explained above, pursuant to Apple policy, contact tracing and exposure notification apps can only be offered in the App Store to consumers by public health authorities verified by Apple. Contact tracing apps must be submitted or endorsed by a government entity.

Id. at 5.

55. This "smoke and mirrors" appeared to satisfy the attorneys general. Only when PhantomALERT tracked down this letter this year, and counsel reviewed it, did PhantomALERT become aware of the existence of the two Requirements.

56. Consistent with the apparent intent of Apple to convey the impression that it had only one requirement, when Apple filed its Motion for Judicial Notice, discussed in Paragraph 38, *supra*, it included only the March 14, 2020 supplement with the Issuance Requirement; the May 4, 2020 ENA with the Endorsement Requirement is nowhere to be found.

### G.    Apple and Google Terminate Their Apps and Dissolve Their Joint Venture.

57. Apple terminated its own Covid-19 apps in November 2021 after receiving huge backlash from the app developer community alleging unfair and self-serving practices.

58. Apple/Google's joint venture. which amassed over 90 million installs initially, also fell apart after the worst of the pandemic due to its complexity and low developer support.

### H. Apps That Apple Permitted on the App Store Demonstrate How Powerful PhantomALERT's Covid-19 App Could Have Been.

59. Apple's Covid-19 apps achieved millions of downloads from March 2020 until November 2021 when, as noted above, due to complaints and scrutiny over self-favoring its own Covid-19 apps, Apple removed them. However, other apps, such as the Indian government-backed mobile app Aarogya Setu, launched in April 2020 (and developed by a former Google executive), garnered 50 million downloads in just 13 days amid the pandemic, making it one of the fastest apps to hit 50 million installs in a very short time.

60. Similarly, Zoe, a private app developed by "a health science company working in partnership with doctors and scientists at King's College London," experienced significant growth and employed user-generated data to uncover the correlation between Covid-19 symptoms and the loss of smell. Zoe's findings were instrumental in the early days of the pandemic, demonstrating the power of user-generated data.

61. Unlike PhantomALERT, neither Apple, Zoe nor Aarogya Setu had years of experience in developing apps that collect user-generated data. Moreover, PhantomALERT had marketing, PR and investor support which could have resulted in significant success, and thus benefits to the public, but for Apple's interference.

62. Apple's stringent requirements appear to have been based on its plans to launch its own Covid-19 apps and to favor its joint venture with Google for a Covid-19 app.

## V.    Summary of Claims

63. The May 2020 implementation of the ENA and Endorsement Requirement demonstrate that the March 2020 Guidelines and Issuance Requirement therein were overly broad. Furthermore, Apple applied the Endorsement Requirement inconsistently by its failure to make it known to the Class.

64. As a result of Apple's conduct, Plaintiff and the Class have suffered damages in the form of lost profits and seeks reimbursement of same, trebled, as well as injunctive relief.

65. Further, Apple's conduct has harmed competition through exclusionary, anticompetitive conduct, depriving consumers of the benefit of competition among a larger variety of apps, whereas Apple's permission to non-conforming apps reflected its ostensible pretextual rejection of apps that might have served the public.

66. Apple's anticompetitive conduct with respect to iOS app access has resulted in sweeping harms to (i) app developers who are denied choice on how to distribute their apps (ii) iPhone users, who are denied apps Apple bars from distribution except exclusively through the App Store, whereas sideloading has been shown to be feasible and successfully implemented by consumers

## VI.   Class Action Allegations

67. This is an action brought under Federal Rule of Civil Procedure 23, which permits a plaintiff to represent a class if the following criteria are met: numerosity, typicality, commonality and representativeness.

68. Defendants have engaged in a common course of conduct giving rise to violations of the legal rights sought to be enforced uniformly by Plaintiffs and Class members. Similar or identical statutory violations, business practices, and injuries are involved. The injuries sustained by members of the proposed Classes flow, in each instance, from a common nucleus of operative fact, namely, Defendants' operation of the App Store, using different guidelines and unlawfully abusing market and monopoly power.  Each instance of harm suffered by Plaintiffs and Class members has directly resulted from a single course of illegal conduct. Each Class member has been exposed to the same anticompetitive practices, as

Apple abused its market and monopoly power Class wide. Therefore, individual questions, if any, pale in comparison to the numerous common questions presented in this action.

69. Plaintiff, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), brings this action on behalf of the following (the "Class"):

> All developers of Covid-19-related apps who were denied possible access to the App Store as the result of disparate, inconsistent, pretextual application of the Issuance Guideline, and/or denied possible access to the App Store for their Covid-19-related apps as the result of Apple's failing to notify them of the institution and application of the Endorsement Guideline, under which their apps might have qualified for the App Store.

70. Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors; all persons who make a timely election to be excluded from the Classes; the judge to whom this case is assigned and any immediate family members thereof; and any persons who assert claims for personal injury.

71. Plaintiffs reserve the right to modify or amend the definition of the proposed Class after having had an opportunity to conduct discovery.

Numerosity: The proposed Class is so numerous that joinder of all members would be impractical. Apple has admitted to denying hundreds of Covid-19 Apps on the basis of the Issuance Requirement, and at least several on the grounds of the Endorsement Requirement. Accordingly, Class members are so numerous that their individual joinder herein is impractical. While the precise number of Class members and their identities are unknown to Plaintiffs at this time, these Class members are identifiable and ascertainable.

Common Questions Predominate: There are questions of law and fact common to the proposed Classes that will drive the resolution of this action and will predominate over questions affecting only individual Class members. These questions include, but are not limited to, the following:

- Whether Defendant issued two sets of guidelines for the banning of Covid-19 Apps from the App Store;

- Whether Defendant failed to notify many developers of the Endorsement Requirement/Guideline, thereby forcing these developers to try to meet the higher-bar Issuance Requirement;

- Whether Defendant has monopoly power over the relevant markets and used that monopoly power to compel developers to satisfy inconsistently applied guidelines for placement of their Covid-19-related apps on the App Store;

- Whether the above conduct violated Section 1 of the Sherman Act for unlawful tying;

- Whether the above conduct violated Section 2 of the Sherman Act and the Cartwright Act for monopolization;

- Whether the above conduct violated the California Unfair Competition Law; Whether Plaintiff and the Classes are entitled to damages and/or restitution, and in what amount;

- Whether Defendants are likely to continue using arbitrary guidelines and tying such that an injunction is necessary; and

- Whether Plaintiffs and the Classes are entitled to an award of reasonable attorneys' fees, interest, and costs of suit.

<u>Superiority:</u> Because of the tremendous expense of an antitrust case for an individual developer, few if any Class members could afford to seek legal redress on an individual basis. Furthermore, individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. A class action is superior to any alternative means of prosecution.

<u>Typicality:</u> The representative Plaintiff's claims are typical of those of the proposed Class, as all members of the proposed Class are similarly affected by Defendant's uniform unlawful conduct as alleged herein.

<u>Adequacy:</u>  Plaintiff will fairly and adequately protect the interests of the proposed Class as its interests do not conflict with the interests of the members of the proposed Classes it seeks to represent, and it has retained counsel competent and experienced in class action litigation. The interests of the members of the Classes will be fairly and adequately protected by the Plaintiff and counsel.

<u>Declaratory and Injunctive Relief:</u> Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**Count 1**
**Violation of the Sherman Act, 15 U.S.C. Section 1**
**Unreasonable Restraint of Trade – Tying**

72. Plaintiff incorporates the allegations of Paragraphs 1 through 71 as though fully set forth

herein, and alleges further:

73. At all relevant times, Apple had market power in the market for smartphones.

74. Consumers have demonstrated and continue to demonstrate separate demand for the iPhone, on the one hand, and, on the other hand, access to apps on the iPhone, i.e., not exclusively through the App Store. For instance, as previously explained, (a) Apple sold the iPhone separately for a year after it was first launched, (b) Google permits its customers to sideload apps, with no apparent negative consequences for Android devices, and (c) subsequent to the recent implementation of the DMA of the EU, Apple is now required to allow its EU users to "sideload" apps directly from the web and has implemented changes to enable such users to do so. Consequently, the iPhone constitutes a tying product and the App Store, the exclusive means through which consumers may obtain access to apps on the iPhone, constitutes a tied product (as a service). In this sense, the tied product/service may be analogized to a toll road for which Apple, as gatekeeper, sets the tolls and decides who may use it to reach its iPhone users.

75. Apple forces users of Apple's devices to acquire apps exclusively through the App Store, preventing any "sideloading," such as permitted by Android Phones. Apple thus coerces purchasers of the tying product, the iPhone, to accept the App Store as the exclusive means to obtain apps on their iPhone

76. Apple's tying conduct at all relevant times has had an anticompetitive effect on a not insubstantial amount of commerce in the tied product/service, inasmuch as Apple completely controls access to the App Store as gatekeeper charging commissions to consumers via the app developers, and suppressing commerce from app developers excluded from the App Store.

77. Apple had a financial interest at all relevant times in the tied product market (as a service), that is, Apple's exclusive access for consumers to apps via the App Store.

78. Apple's tying of these two products lacks sufficient business justification, as evidenced in part by its pretextual justifications for restrictions of Covid-19-related apps permitted on the App Store, in addition to lacking legitimate justification for denying iPhone users access to apps directly from the web.

79. As a result of the foregoing tying conduct, PhantomALERT has suffered antitrust injury and Apple has caused harm to competition among potentially viable, acceptable Covid-19-related apps, including PhantomALERT, that should not have been excluded had Apple applied its guidelines in a non-pretextual, non-discriminatory manner, consistent with the very terms of, and timely disclosure of, the guidelines.

**Count 2**
**Violation of the Sherman Act, 15 U.S.C. Section 2**
**Monopolization of Access to Apps on iPhones**

80. Plaintiff incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein, and alleges further:

81. Apple has market power for smartphones. Apple has monopoly power over access to its iPhone for apps through the iPhone, i.e., via the App Store.

82. iPhone users are constrained from switching to android phones for access to apps by virtue of the multiplicity of Apple products and services they use, high switching costs, and resulting "lock-in" effect within what is commonly described as Apple's "walled garden." The App Store thus constitutes a relevant market itself, over which Apple has a monopoly, because iPhone users are substantially locked-in to their iPhones and thus cannot practicably switch to alternative access to apps, such as through android phones or other devices.

83. The March 14, 2020 revisions to the App Store Guidelines were not generally known to consumers who purchased iPhones before that date.

84. At all relevant times, Apple has monopolized consumers' access to apps on the iPhone, including PhantomALERT, both (a) by imposing pretextual, inconsistent and discriminatory requirements for access to apps through the App Store, that fail even to follow uniformly Apple's own guidelines, and (b) by denying iPhone users access to apps on their phones outside of the App Store, i.e., directly from the web. In these ways, Apple has engaged in unlawful monopoly maintenance with respect to access to apps other than through the App Store – that is, monopoly maintenance over the App Store. And notably, in contrast, Apple allows consumers of its desktops and notebooks to download third-party apps without significant restriction.

85. Such monopolization has caused and continues to cause antitrust injury to Plaintiff. Further, by such monopolization, Apple has caused harm to competition among potentially viable, acceptable Covid-19-related apps, including PhantomALERT, that should not have been excluded had Apple applied its guidelines in a non-pretextual, non-discriminatory manner, consistent with the very terms of, and timely disclosure of, the guidelines.

**Count 3**
**Violation of the Sherman Act, 15 U.S.C. Section 2**
**Monopolization of Access to Covid-19-Related Apps on iPhones**

86. Plaintiff incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein, and alleges further:

87. Within the relevant market of the App Store is a relevant submarket of access to Covid-19-related tracing apps in the App Store for use in the United States. Such apps are not substitutable for other apps, whether or not generally health-related, because they perform/ed a specific purpose relating only to Covid-19 tracing and related actions. Consumers are constrained from switching from, and locked in to, the App Store for accessing such apps,

just as they are with respect to accessing apps generally within the App Store, as alleged above.

88. From Apple's introduction of its own apps to termination of the joint venture and Apple's apps, after which neither Apple nor Apple in conjunction with Google had Covid-19 tracing apps available to users, Apple had monopoly power over access to Covid-19-related apps through the App Store (the "Relevant Time Period").

89. During the Relevant Time Period, Apple anticompetitively maintained its monopoly over access to Covid-19-related apps through the App Store, both (a) by imposing pretextual, inconsistent and discriminatory requirements for access to Covid-19-related apps through the App Store, that fail even to follow uniformly Apple's own guidelines, and (b) by denying iPhone users access to Covid-19-related app on their phones outside of the App Store, i.e., directly from the web. Apple's conduct, even after it abandoned its own Covid-19-related apps and after the Apple-Google Covid-19-related app was abandoned, has continued its exclusionary conduct, by the same means stated in (a) and (b) immediately above.

90. Such monopolization has caused and continues to cause antitrust injury to Plaintiff. Further, by such monopolization, Apple has caused harm to competition among potentially viable, acceptable Covid-19-related apps, including PhantomALERT, that should not have been excluded had Apple applied its guidelines in a non-pretextual, non-discriminatory manner, consistent with the very terms of, and timely disclosure of, the guidelines.

**Count 4**
**Violation of The Cartwright Act**
**California Bus. & Prof Code Sections 17200 et seq**.

91. Plaintiff incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein, and alleges further:

92. Apple's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

93. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

94. Apple's anticompetitive conduct, as described above, compels app developers including PhantomALERT, to adhere involuntarily to Apple's anticompetitive scheme.

95. Apple's restraint of trade, under the Cartwright Act, had no legitimate or pro-competitive purpose or effect, and has unreasonably restrained competition in the relevant markets. Apple's conduct has caused and continues to cause antitrust injury to Plaintiff. Further, by such conduct, Apple has caused harm to competition among potentially viable, acceptable Covid-19-related apps, including PhantomALERT, that should not have been excluded had Apple applied its guidelines in a non-pretextual, non-discriminatory manner, consistent with the very terms of, and timely disclosure of, the guidelines.

**Count 5**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200**

96. Plaintiff incorporates the allegations of paragraphs 1 through 71 as though fully set forth herein, and alleges further:

97. California's Unfair Competition Law ("UCL") prohibits business practices that constitute "unfair competition," which is defined, in relevant part, as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each of these

descriptions provides a separate "variety" of unfair competition. Thus, "a practice may be deemed unfair even if not specially proscribed by some other law" and even if not violating an antitrust statute. *See Cel- Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 187 (1999).

98. The UCL permits claims to be brought by any "person," which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code §§ 17201, 17204. To bring a claim under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to quantify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original); see also Cal. Bus. & Prof. Code § 17204.

99. California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.,, prohibits any unlawful, unfair, or fraudulent business act or practice.

100. A non-insubstantial portion of the unlawful conduct under the California Unfair Competition Law took place in California.

101. PhantomALERT and the Class have standing to bring this claim because they has suffered injury in fact and lost money as a result of Apple's unfair competition, as described above.

102. Apple's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

103. Apple's conduct is also "unfair" within the meaning of the California Unfair Competition Law.

104. Apple's conduct harms PhantomALERT and the Class which, as a direct result of

Apple's anti- competitive conduct, was and is unreasonably prevented from freely distributing its Covid-19 Apps.

105.     Apple's previously described conduct has no legitimate or pro-competitive purpose or effect, and unreasonably restrains competition in the relevant market, resulting in antitrust injury to PhantomAlert and the Class.  In particular, by such conduct, Apple has caused harm to competition among potentially viable, acceptable Covid-19-related apps, including PhantomALERT and the Class, that should not have been excluded had Apple applied its guidelines in a non-pretextual, non-discriminatory manner, consistent with the very terms of, and timely, full disclosure of, the guidelines.

106.     PhantomALERT and the Class seek injunctive relief under the Unfair Competition Law.

## VII.  PRAYER FOR RELIEF

WHEREFORE,

As to Counts 1-4 of the Complaint, Plaintiff and the Class ask this Court to award:

actual damages, trebled injunctive relief and attorney's fees; and:

As to Count 5 of the Complaint,

an injunction against the Defendant's violations of the California Unfair Competition Law; and

Any other relief this Court deems just and proper.


Dated:  July 10, 2024

Respectfully Submitted,

*Thomas C. Willcox*
Thomas C. Willcox, Attorney at Law
DC Bar No 445135
1701 16th Street, N.W
Suite 211
Washington DC   20009
Tel: 202.239.2762
202.234.0892
thomaswillcox@willcoxlaw.com.co

Richard Wolfram
Richard Wolfram, Esq.
845 Third Avenue, 6th Fl.
New York, New York 10022
Tel:  917-225-3950
rwolfram@rwolframlex.com
http://www.rwolframlex.com
Pro Hac Vice

Counsel for Plaintiff and the Proposed Class