1  RACHEL S. BRASS
2  rbrass@gibsondunn.com
   JULIAN W. KLEINBRODT
3  jkleinbrodt@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
4  One Embarcadero Center
   Suite 2600
5  San Francisco, CA  94111-3715
   Telephone:    415.393.8200
6  Facsimile:    415.393.8306

7  *Attorneys for Defendant Apple Inc.*

8

9              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                    SAN FRANCISCO DIVISION

11 | Coronavirus Reporter Corporation, Calid Inc., | CASE NO. 3:24-CV-08660-EMC |
12 | Greenflight Venture Corporation | **DEFENDANT APPLE INC,'S MOTION** |
   | | **TO DISMISS FIRST AMENDED** |
13 | *on behalf of themselves and all others similarly* | **COMPLAINT; SUPPORTING** |
   | *situated.* | **MEMORANDUM OF POINTS AND** |
14 | | **AUTHORITIES** |
15 | Plaintiffs, | |
   | | Date: May 22, 2025 |
16 | v. | Time: 1:30 p.m. PT |
   | | Place: Courtroom 5, 17th Floor |
17 | Apple Inc. | |
18 | Defendant. | |
   | | The Honorable Edward M. Chen |
19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 22, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, Courtroom 5, 17th Floor, Federal Courthouse, Defendant Apple Inc., through its undersigned counsel, will, and hereby does, move to dismiss Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation's First Amended Complaint. *See* Fed. R. Civ. P. 12(b)(1) & 12(b)(6).  This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Julian W. Kleinbrodt and exhibits thereto; the Proposed Order filed herewith; the pleadings and papers on file herein; and such other matters that may be presented to the Court at the hearing.

By: /s/ *Julian W. Kleinbrodt*
Julian W. Kleinbrodt

GIBSON, DUNN & CRUTCHER LLP
RACHEL S. BRASS
rbrass@gibsondunn.com
JULIAN W. KLEINBRODT
jkleinbrodt@gibsondunn.com
One Embarcadero Center
Suite 2600
San Francisco, CA  94111-3715
Telephone:      415.393.8200
Facsimile:      415.393.8306

*Attorneys for Defendant Apple Inc.*

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Fist Amended Complaint should be dismissed with prejudice because:

I.      Claim preclusion bars Plaintiffs' claims.

II.     Plaintiffs lack standing because:

      A.      Plaintiffs fail to allege antitrust injury associated with their app rejection and suppression claims (Claims 5–9).

      B.      Plaintiffs (a) fail to allege a concrete, redressable injury, as required for Article III standing, or (b) direct theory of harm suffered in the allegedly restrained market, as required for antitrust injury and standing, for their smartphone monopolization claims (Claims 1–4).

      C.      Plaintiff Greenflight Venture Corporation independently lacks antitrust standing (Claims 1–9).

III.    Plaintiffs' fail to allege the essential elements of their claims, including:

      A.      A plausible relevant market (Claims 1–8).

      B.      A plausible theory of anticompetitive conduct under the Sherman Act (Claims 1–8).

      C.      Additional elements required to state a claim under the California Unfair Competition Law (UCL) or Wyoming Consumer Protection Act (WCPA) (Claim 9).

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    **I.**      **This Court Dismisses *Coronavirus I*** ...................................................... 2

    **II.**    **Plaintiffs File Duplicative Cases, Including this Case in the District of Wyoming** ........................................................................................................ 3

LEGAL STANDARD ............................................................................................................... 5

ARGUMENT ............................................................................................................................. 5

    **I.**      **Plaintiffs' Claims Are Precluded by This Court's Judgment (Claims 1–9)** .......... 5

          A.    There Is an Identity of Claims with *Coronavirus I* ...................................... 6

          B.    The Court Rendered a Final Judgment on the Merits in *Coronavirus I* ........... 7

          C.    There Is an Identity of Parties with *Coronavirus I* ....................................... 8

    **II.**    **Plaintiffs Lack Article III and Antitrust Standing (Claims 1–9)** ........................ 10

          A.    Plaintiffs Lack Standing for Their App Rejection and Suppression Claims (5–9) ................................................................................................ 10

          B.    Plaintiffs Lack Standing for Their Smartphone Monopolization Claims (1–4) ............................................................................................... 12

          C.    Greenflight Independently Lacks Standing (Claims 1–9) ............................. 15

    **III.**    **Plaintiffs' Claims Fail Many Times Over on Other Grounds (Claims 1–9)** ........ 16

          A.    Plaintiffs' Federal Claims Fail on Several Grounds (Claims 1–8) ................ 16

                1.    Plaintiffs Do Not Allege a Plausible Relevant Market (Claims 1–8) ................................................................................................ 16

                2.    Plaintiffs Fail to Allege Anticompetitive Conduct (Claims 1–8) ....... 18

                       (a)    Plaintiffs Fail to State a Refusal-to-Deal Claim (Claims 1–4) ................................................................................ 18

                       (b)    Plaintiffs Fail to State a Tying Claim (Claim 5) ................... 20

                       (c)    Plaintiffs Fail to State a Claim for Supracompetitive Fees (Claim 6) ........................................................................ 22

                       (d)    Plaintiffs Fail to State an "Essential Facilities" Claim (Claim 7) .............................................................................. 22

                       (e)    Plaintiffs Fail to State a "Ranking Manipulation" Claim (Claim 8) .............................................................................. 23

           B.    Plaintiffs' State Law Claim Fails (Claim 9) ................................................ 25

CONCLUSION ........................................................................................................................ 25

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998) ................................................................................................ 24

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) .......................................................................... 19, 20, 22, 23

*Alaska Airlines v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ................................................................................................ 24

*Alivecor, Inc. v. Apple Inc.*,
    2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ........................................................................ 25

*Allen v. Wright*,
    468 U.S. 737 (1984) .............................................................................................................. 13

*Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*,
    876 F.2d 266 (2d Cir. 1989) ................................................................................................... 9

*Am. Ad Mgmt., Inc. v. Ge. Tel. Co.*,
    190 F.3d 1051 (9th Cir. 1999) .............................................................................................. 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................................ 5

*Ass'n of Wash. Pub. Hosp. Dists. v. Phillip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) .......................................................................................... 14, 15

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
    127 F.4th 178 (10th Cir. 2025) ............................................................................................. 11

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .............................................................................................................. 14

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) .............................................................................................................. 11

*Bakay v. Apple Inc.*,
    2024 WL 3381034 (N.D. Cal. July 11, 2024) ................................................................. 13, 14

*Beard v. Sheet Metal Workers Union*,
    908 F.2d 474 (9th Cir. 1990) .................................................................................................. 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................... 5, 11

*Beverage v. Apple Inc.*,
    101 Cal. App. 5th 736 (2024) ............................................................................................... 25

*Bhan v. NME Hospitals, Inc.*,
    772 F.2d 1467 (9th Cir. 1985) ................................................................................................ 1

v

Gibson, Dunn &
Crutcher LLP

*Blix Inc. v. Apple Inc.*,
    2021 WL 2895654 (D. Del. July 9, 2021) ................................................................. 20

*Brignac v. Yelp Inc.*,
    2019 WL 2372251 (N.D. Cal. June 5, 2019) ........................................................... 16

*Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................................. 11

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ................................................................................................. 11

*Cetacean Cmty. v. Bush*,
    386 F.3d 1169 (9th Cir. 2004) ................................................................................... 5

*Cont'l Auto. Sys. Inc. v. Avanci, LLC*,
    485 F. Supp. 3d 712 (N.D. Tex. 2020) .................................................................... 22

*Coring Co. v. Apple Inc.*,
    2022 WL 22762009 (S.D. Fla. Feb. 18, 2022) .......................................................... 3

*Coronavirus Reporter v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ....................... 1, 2, 3, 6, 7, 8, 11, 12, 16, 17, 18, 23

*Coronavirus Reporter v. Apple Inc.*,
    85 F.4th 948 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024)
    .................................................................................... 1, 2, 3, 8, 11, 12, 16, 17, 18

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
    520 F. Supp. 2d 1199 (C.D. Cal. 2007) ................................................................... 21

*Dreamstime.com, LLC v. Google, LLC*,
    2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ........................................................... 24

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ................................................................................................. 25

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) .......................................................... 18, 22, 23

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) ......................................................................... 12, 20, 23

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................... 14

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ............................................................................. 18, 20

*Gamboa v. Apple Inc.*,
    2025 WL -----, at *-- (N.D. Cal. Feb. 28, 2025) .................................................... 21

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
    723 F.3d 1019 (9th Cir. 2013) ................................................................................. 11

*In re Gottheiner*,
   703 F.2d 1136 (9th Cir. 1983) ................................................................................. 10

*Greenflight Venture Corp. v. Google LLC*,
   2025 WL 385476 (S.D. Fla. Feb. 4, 2025) ............................................................... 9

*Headwaters Inc. v. U.S. Forest Serv.*,
   399 F.3d 1047 (9th Cir. 2005) ................................................................................. 10

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ................................................................................. 18

*Hiser v. Franklin*,
   94 F.3d 1287 (9th Cir. 1996) ..................................................................................... 7

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) ................................................................................................. 16

*Hynh v. Quora*,
   508 F. Supp. 633 (C.D. Cal. 2020) ......................................................................... 25

*Ill. Tool Works, Inc. v. Ind. Ink, Inc.*,
   547 U.S. 28 (2006) ................................................................................................... 20

*Intergraph Corp. v. Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999) ............................................................................... 19

*John Doe 1 v. Abbott Lab'ys*,
   571 F.3d 930 (9th Cir. 2009) ................................................................................... 22

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 987 (N.D. Cal. 2019) ..................................................................... 14

*Kane v. Donovan*,
   2017 WL 6541362 (S.D. Cal. Dec. 21, 2017) ........................................................... 4

*Kellam Energy, Inc. v. Duncan*,
   668 F. Supp. 861 (D. Del. 1987) ............................................................................. 21

*Kendall v. Visa*,
   518 F.3d 1042 (9th Cir. 2008) ................................................................................. 21

*Key v. Qualcomm Inc.*,
   --- F.4th ---, 2025 WL 597604 (9th Cir. Feb. 25, 2025) .......................................... 22

*Kloth v. Microsoft Corp.*,
   444 F.3d 312 (4th Cir. 2006) ................................................................................... 15

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   791 F.2d 1356 (9th Cir. 1986) ................................................................................. 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................................. 14

vii

*Littlejohn v. United States*,
   321 F.3d 915 (9th Cir. 2003) ............................................................................................. 5

*Lorenzo v. Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................................................... 14

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ......................................................................................... 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................................... 12

*Motul S.A. v. USA Wholesale Lubricant, Inc.*,
   686 F. Supp. 3d 900 (N.D. Cal. 2023) ............................................................................. 2

*Mpoyo v. Litton Electro-Optical Sys.*,
   430 F.3d 985 (9th Cir. 2005) ............................................................................................. 8

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023) ......................................................................................... 20

*Nicklas v. Prof. Ass'n, LLC.*,
   2018 WL 8619646 (D. Wyo. Sept. 26, 2018) ................................................................. 25

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ................................................................................. 19, 20

*Official Airline Guides, Inc. v. FTC*,
   630 F.2d 920 (2d Cir. 1980) ........................................................................................... 24

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ......................................................................................... 16

*Or. Laborers-Emps. v. Philip Morris Inc.*,
   185 F.3d 957 (9th Cir. 1999) ........................................................................................... 15

*Owens v. Kaiser Found. Health Plan, Inc.*,
   244 F.3d 708 (9th Cir. 2001) ................................................................................... 5, 6, 7, 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ................................................................................................... 19, 20

*Parr v. Cougle*,
   --- F.4th ---, 2025 WL 444834 (5th Cir. Feb. 10, 2025) ................................................. 13

*PhantomALERT v. Apple Inc.*,
   2025 WL 71888 (D.D.C. Jan. 10, 2025) ............................................................. 13, 18, 25

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
   890 F.2d 139 (9th Cir. 1989) ........................................................................................... 16

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................................................... 12, 17, 18

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ........................................................................................ 2

*Rick-Mik Enters., Inc. v. Equilon Enters., Inc.*,
  532 F.3d 963 (9th Cir. 2008) ...................................................................................... 21

*Robi v. Five Platters, Inc.*,
  838 F.2d 318 (9th Cir. 1988) ...................................................................................... 11

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) ...................................................................................... 11

*Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers*,
  888 F.2d 604 (9th Cir. 1989) ...................................................................................... 14

*Sayre v. Google, Inc.*,
  2019 WL 6036703 (N.D. Cal. Nov. 14, 2019) ............................................................. 23

*In re Schimmels*,
  127 F.3d 875 (9th Cir. 1997) ........................................................................................ 8

*Serv. Empls. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
  249 F.3d 1068 (D.C. Cir. 2001) .................................................................................. 21

*In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2022 WL 710192 (W.D. Mo. Mar. 9, 2022) ................................................................ 25

*Solinger v. A. & M. Recs., Inc.*,
  718 F.2d 298 (9th Cir. 1983) ................................................................................. 15, 16

*Somers v. Apple Inc.*,
  729 F.3d 953 (9th Cir. 2013) ...................................................................................... 11

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ...................................................................................... 25

*Sports Racing Servs. Inc. v. Sports Car Club of Am., Inc.*,
  131 F. 3d 874 (10th Cir. 1997) .................................................................................... 21

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ......................................................................... 25

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) ...................................................................................... 11

*Summit Health, Ltd. v. Pinhas*,
  500 U.S. 322 (1991) .................................................................................................... 21

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  322 F.3d 1064 (9th Cir. 2003) .................................................................................. 8, 9

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ........................................................................................... 7, 9, 10

*Theme Promotions, Inc. v. News Am. Mktg.*,
   546 F.3d 991 (9th Cir. 2008) ................................................................................ 14

*Thompson v. Barrett Daffin Frappier Treder & Weiss*,
   2021 WL 5002414 (9th Cir. 2021) .......................................................................... 7

*Townshend v. Rockwell Int'l Corp.*,
   2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ......................................................... 19

*Turtle Island Restoration Network v. U.S. Dep't of State*,
   673 F.3d 914 (9th Cir. 2012) .................................................................................... 6

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ............................................................................................... 19

*United States v. Liquidators of Eur. Fed. Credit Bank*,
   630 F.3d 1139 (9th Cir. 2011) .................................................................................. 7

*Unlockd Media, Inc. Liquidation Trust v. Google LLC*,
   2025 WL 563460 (N.D. Cal. Feb. 20, 2025) .......................................................... 12

*Verizon Commc'ns v. L. Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004) ............................................................................... 19, 22, 23, 24

*Whitepages, Inc. v. Isaacs*,
   196 F. Supp. 3d 1128 (N.D. Cal. 2016) .................................................................... 9

*Zoslaw v. MCA Distrib. Corp.*,
   693 F.2d 870 (9th Cir. 1982) .................................................................................. 24

**Statutes**

Wyo. Stat. §20-4-114 ................................................................................................ 25

Wyo. Stat. §40-12-108(a) .......................................................................................... 25

Wyo. Stat. §40-12-110(a)(ii) ..................................................................................... 25

**Other Authorities**

Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles
   Applied to Intellectual Property* §13.03 (3d ed. 2020 supp.) .................................. 22

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013-2023) ............... 15

**Rules**

Fed. R. Civ. P. 19 ...................................................................................................... 10

Fed. R. Civ. P. 20 ...................................................................................................... 10

Fed. R. Civ. P. 41(b) ................................................................................................... 8

N.D. Cal. L.R. Civ. 3-15(b)(2) .................................................................................. 10

x

**INTRODUCTION**

This case is déjà vu all over again.  In 2021, Jeffrey Isaacs and entities with which he is affiliated sued Apple Inc. claiming that it violated the antitrust laws by rejecting or suppressing their apps on the App Store.  This Court put an end to those meritless claims in *Coronavirus Reporter v. Apple Inc.*, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021), and the Ninth Circuit affirmed.  *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 953 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024).  But for the fifth time in four years, Isaacs' entities have filed suit rehashing the same grievances: that "Apple rejected the Coronavirus Reporter app," "suppressed [the WebCaller app] in rankings," and otherwise denied users "unrestricted use of their smartphones."  FAC ¶¶ 37, 102, 119.  The Court should enforce its judgment's preclusive effect and dismiss this case with prejudice.

*First*, Plaintiffs' claims are barred by *res judicata*.  This case arises from the same alleged injuries, presses the same theories of anticompetitive conduct, and borrows the same alleged markets from *Coronavirus I*.  The only differences are those manufactured by Plaintiffs' amendment, which added a new entity, Greenflight Ventures Corporation, and copied swaths of allegations from the Department of Justice's unrelated complaint in *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.).  Neither suffices.  Greenflight shares an identity with the *Coronavirus I* plaintiffs, including Isaacs, its sole owner, director, and CEO; and the claims concerning alleged monopolization of a smartphone market, cribbed from the government's complaint, could have been brought in Plaintiffs' prior suit.  Nor can Plaintiffs escape preclusion with the audacious argument that Plaintiff Coronavirus Reporter Corporation is not the "Coronavirus Reporter" corporation that prosecuted *Coronavirus I*—a frivolous assertion Plaintiffs have previewed in past filings.  *See, e.g.*, Dkt. 39 at 6–12.

*Second*, Plaintiffs lack standing.  As this Court held in *Coronavirus I*, Plaintiffs' app-rejection and ranking-suppression theories do not give rise to antitrust injury—a prerequisite to antitrust standing.  2021 WL 5936910, at *14–15.  The lifted monopolization claims fare no better because Plaintiffs are developers, not "participant[s] in the [allegedly monopolized smartphone] market." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).  And Greenflight has another problem: It is a mere "investor," FAC ¶ 250, that lacks antitrust standing under decades of blackletter law.

*Third*, Plaintiffs' claims fail for myriad other reasons.  Like *Coronavirus I*, Plaintiffs fail to

allege plausible relevant markets.  *See* 2021 WL 5936910, at *7.  The problems with their theories of anticompetitive conduct also are legion: They allege Section 1 claims for which they identify no agreement, claim violations of Section 2 based on the settled right of a firm to decide the terms on which it will deal, and otherwise run afoul of bedrock antitrust law.  Apple respectfully requests that the Court dismiss the First Amended Complaint with prejudice.

## BACKGROUND

In 2020, Apple rejected the submission of the Coronavirus Reporter app to the App Store because it violated Apple's App Review Guidelines regarding COVID-related apps.  *Coronavirus I*, 85 F.4th at 957.  In the five years since, Jeffrey Isaacs and his affiliated entities have filed successive suits arguing that Apple violated the antitrust laws in doing so.  New window dressing aside, Plaintiffs now press the same claims, under the same theories, that this Court rejected in *Coronavirus I*—bringing the total to five cases, and nine complaints, against Apple.

## I.     This Court Dismisses *Coronavirus I*

Through a series of transfers, dismissals, and amendments, many of Plaintiffs' prior suits merged into one: *Coronavirus I*.  *See Coronavirus I*, 2021 WL 5936910, at *1.  The four plaintiffs were Jeffrey Isaacs, Primary Productions LLC, CALID Inc., and "Coronavirus Reporter," which the Complaint described as "a Wyoming Corporation with officers based in New Hampshire, Vermont, and Upstate NY."  *Coronavirus I*, Dkt. 1 ¶ 41; *see also id.* ¶¶ 16, 41 (alleging additional facts about the "corporation" Coronavirus Reporter).[1]  Plaintiffs did not file corporate disclosures required by the Federal and Local Rules even after Apple pointed out the deficiency.  *See*, *e.g.*, *Coronavirus I*, Dkts. 32 at 6, 62 at 6, 91-2 at 9.  Apple thus proceeded on the express assumption that "Coronavirus Reporter" was the Wyoming corporation Coronavirus Reporter Corporation.  *Coronavirus I*, Dkt. 32 at 6.

While obscuring the real parties in interest, Plaintiffs litigated their claims that Apple violated the antitrust (and other) laws by rejecting Plaintiffs' apps or "suppressing" them in search results.

---

[1]  References to the "*Coronavirus I* Dkt." refer to Case No. 3:21-cv-05567-EMC (N.D. Cal.).  References to the "*Coronavirus I* CA9 Dkt." refer Case No. 22-15166 (9th Cir.).  And references to the "*Coring* Dkt." refer to Case No. 3:22-cv-01044 (S.D. Fla.).  The Court may take judicial notice of these filings and orders.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  The Court also may take judicial notice of Exhibits 1–6, which are records from state Secretaries of State.  *Motul S.A. v. USA Wholesale Lubricant, Inc.*, 686 F. Supp. 3d 900, 910 (N.D. Cal. 2023).

Gibson, Dunn & Crutcher LLP

1    *Coronavirus I*, Dkt. 41 ¶¶ 28, 54–56, 85–86, 104–07.  This, Plaintiffs asserted, violated Sections 1 and

2    2 of the Sherman Act under a variety of theories from tying to "essential facilities."  *Id.* ¶¶ 41, 78, 166–

3    67, 181–82, 210–11, 239, 269–71.  This Court denied Plaintiffs' two motions for preliminary

4    injunctions and dismissed their claims with prejudice.  *Coronavirus I*, 2021 WL 5936910, at *20.  First,

5    "[t]here [were] several problems . . . with the relevant markets," including Plaintiffs' failure to identify

6    the alleged relevant market with any "clarity" or allege facts that could make them plausible.  *Id.* at 8–

7    13.  Second, Plaintiffs alleged no antitrust injury, for their "conclusory [allegations] and 'threadbare

8    recitals'" could not salvage claims predicated on "specific [alleged] harms experienced by Plaintiffs or

9    a small group of competitors, rather than harm to the market."  *Id.* at 13–15.  Third, Plaintiffs' other

10   claims failed for myriad reasons.  *Id.* at 15–20.

11            The Ninth Circuit affirmed in full.  Because Plaintiffs continued to withhold required

12   information about the corporate entities behind the case, Apple noted in a footnote that "[a]s far as

13   Apple can tell, there is no actual 'Coronavirus Reporter' entity—meaning Apple is being sued by at

14   least one null party to whom no relief could be awarded."  *Coronavirus I* CA9 Dkt. 38 at 7 n.4.  But

15   Plaintiffs never suggested that there was in fact a "non-entity" in their midst, and their counsel

16   continued to hold himself out thereafter as the attorney for "Coronavirus Reporter."  *E.g.*,

17   *Coronavirus I* CA9 Dkts. 51-1, 52, 73.  The Ninth Circuit resolved the case on the merits: The "fifteen

18   'relevant markets' . . . alleged in scattergun fashion," the Court held, were insufficiently pled, and

19   Plaintiffs also "did not demonstrate that the Defendant-Appellee undertook anticompetitive conduct in

20   that market sufficient to harm the competitive process as a whole."  *Coronavirus I*, 85 F.4th at 956–57.

21   The Court thus upheld the dismissal with prejudice against "Plaintiffs-Appellants," including

22   "Coronavirus Reporter."  *Id.* at 953.

23   **II.     Plaintiffs File Duplicative Cases, Including this Case in the District of Wyoming**

24            After another scrapped attempt to sue Apple in the Southern District of Florida, *Coring Co. v.

25   Apple Inc.*, 2022 WL 22762009, at *3 (S.D. Fla. Feb. 18, 2022), Plaintiffs Coronavirus Reporter

26   Corporation and Calid Inc. filed this duplicative lawsuit on March 5, 2024 in the District of Wyoming.

27   *See* Dkt. 1.  They challenged the same alleged rejection and "suppression" of the same apps under the

28   same theories—lifting almost-verbatim from *Coronavirus I* that Apple implemented an "interstate

restriction" of smartphone "userbase access" (*compare* Dkt. 1 ¶¶ 141–53 *with Coronavirus I*, Dkt. 41 ¶¶ 160–79); restricted access to "essential facilities" (*compare* Dkt. 1 ¶¶ 154–72 *with Coronavirus I*, Dkt. 41 ¶¶ 180–94); imposed an "unreasonable restraint of trade" through its Developer Program License Agreement (*compare* Dkt. 1 ¶¶ 173–84 *with Coronavirus I*, Dkt. 41 ¶¶ 195–206); engaged in "ranking suppression as restraint of interstate trade" (*compare* Dkt. 1 ¶¶ 185–190 *with Coronavirus I*, Dkt. 41 ¶¶ 207–12); "t[ied] the App Store, notary stamps, and software onboarding to the iOS device market" (*compare* Dkt. 1 ¶¶ 191–205 *with Coronavirus I*, Dkt. 41 ¶¶ 213–30); and "violat[ed] . . . [the] Sherman Act § 2 - $99 fee illegality" (*compare* Dkt. 1 ¶¶ 206–15 *with Coronavirus I*, Dkt. 41 ¶¶ 231–40). Conceding the duplication, Plaintiffs since have asserted that "counsel's paralegal accidentally filed the original Complaint with several draft sections from an older antitrust lawsuit clients [sic] – including *Coring* and *Primary Productions*." Dkt. 32 at 6.

Plaintiffs then vied to keep this case out of this Court. After Apple moved to transfer (Dkt. 19), Plaintiffs filed an amended complaint adding another entity plaintiff, Greenflight Venture Corporation (FAC ¶ 49), and copying portions of the Department of Justice's unrelated suit against Apple (*id.* ¶¶ 1–3, 8–20, 23–35, 40–43, 45–46, 50–53, 79–86, 134–60, 167–204, 231–34, 238–48, 264–86, and p. 138 at B–D, F[2])—without removing the claims cribbed from *Coronavirus I* (*id.* ¶¶ 287–354). Plaintiffs next petitioned the JPML to move the case to the District of New Jersey, where private actions paralleling the Department of Justice's case are pending. *See* Dkt. 37 at 1. The JPML rejected that request, concluding the "plaintiffs, markets, and injuries at issue here are distinct from the MDL." *Id.* at 2. The Wyoming Court then ordered this case transferred here, where the Court related it to *Coronavirus I*. Dkts. 44 & 53.

The Amended Complaint now before the Court is a mishmash borne of this tortuous history. At its core, this case remains a clone of *Coronavirus I*: The bulk of Plaintiffs' claims (claims 5–9) concern alleged "censoring . . . and downranking" of their apps. FAC ¶ 343. Plaintiffs specifically challenge Apple's alleged "tying [of] app distribution to [the] iPhone," denials of access to "essential

---

[2] Plaintiffs also purport to incorporate by reference the entirety of the Government's complaint. FAC ¶ 31. That is improper under Federal Rule of Civil Procedure 10(c). *See Kane v. Donovan*, 2017 WL 6541362, at *3 (S.D. Cal. Dec. 21, 2017) (collecting cases). Regardless, none of those allegations could save Plaintiffs' case for the reasons the reasons set forth below.

facilities," "ranking manipulation," and "requir[ing] developers to pay $99" through which, Plaintiffs say, Apple unlawfully restrained or monopolized markets for "US Smartphone Apps," "App Stores," and "iPhone Notary Stamps." *Id.* ¶¶ 6, 205, 213, 219, 308, 320, 332.  But the first, second, third, and fourth claims repeat allegations from the Department of Justice's complaint concerning Apple's alleged monopolization of a smartphone market (or, in the alternative, "performance smartphone" market)— even though Plaintiffs, who are not alleged iPhone purchasers, have no discernible connection to the government's allegations. *Id.* ¶¶ 264–86; *see also* Dkt. 37 at 2 (observing Plaintiffs seek "to challenge Apple's rejection of plaintiffs' (and other developers') apps—not supracompetitive prices or less functional iPhones").  Plaintiffs bring their federal (but not state-law) claims on behalf of two putative classes, one for "[a]ll U.S. Smartphone developers of any free app (zero-priced) that suffered economic losses through disallowance, censorship, and/or ranking suppression on the App Store" and another for "[a]ny US [Performance] Smartphone developer who paid a $99 annual subscription fee to Apple for access to its userbase and/or app 'notarization.'" FAC ¶¶ 252, 254 (emphasis omitted).

## LEGAL STANDARD

A complaint should be dismissed if the plaintiff does not allege "sufficient factual matter, accepted as true," to establish subject-matter jurisdiction or "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

## ARGUMENT

Plaintiffs' endless attempts to bring antitrust claims against Apple must stop.  They cannot relitigate a case they already lost on the merits (§ I).  And even if Plaintiffs were not estopped from doing so, they lack standing to bring their claims (§ II)—all of which fail on the merits anyways (§ III).

## I.    Plaintiffs' Claims Are Precluded by This Court's Judgment (Claims 1–9)

"After a claim or issue is properly litigated, that should be the end of the matter for the parties to that action." *Littlejohn v. United States*, 321 F.3d 915, 919 (9th Cir. 2003).  The doctrine of claim preclusion bars a party from relitigating a claim or cause of action "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quotation marks omitted).  This Court's

1    decision in *Coronavirus I* precludes relitigation of Plaintiffs' claims here.

2        **A.    There Is an Identity of Claims with *Coronavirus I***

3        Claims are barred where they "arise out of the same transactional nucleus of facts" as those

4    in a predecessor case.  *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918

5    (9th Cir. 2012).  This turns on whether the "two suits . . . are related to the same set of facts and

6    whether they could conveniently be tried together."  *Id.*  Thus, claims share an identity where, as

7    here, they "are related to the same set of facts" even if there is "some difference in the nature of the

8    claims."  *Owens*, 244 F.3d at 713–14.

9        The gravamen of Plaintiffs' claims in this case are no different than in *Coronavirus I*.  As

10   the JPML put it, this case was "brought to challenge Apple's rejection of plaintiffs' (and other

11   developers') apps" with a "primary focus" on "Apple's control over access to the App Store," Dkt.

12   37 at 2—just as *Coronavirus I* was "br[ought] . . . to challenge Apple's allegedly monopolist

13   operation of its 'App Store' through 'curation' and 'censor[ship]' of smartphone apps."  2021 WL

14   5936910, at *1.  Great swaths of the complaints are nearly identical.  *Compare Coronavirus I*, Dkt.

15   42 ¶¶ 4, 5, 27, 40, 46–67, 95–97, 105–06, 135, 140, 148–59, 181–94, 196, 210–11, and p. 106 n.5

16   *with* FAC ¶¶ 36, 37, 47, 69, 94–114, 129–32, 228–30, 251–62, 320–31, 333–35, and p. 104 n.1.

17   And at its core, the Complaint here objects to the same rejection or alleged suppression of apps

18   (FAC ¶ 343) involving the same alleged "US smartphone" foremarket alongside aftermarkets for

19   "App[s]," "Notary stamp[s]," and "app distribution services," FAC ¶¶ 205, 257, 311, 233, 305; *see*

20   *also Coronavirus I*, Dkt. 41 ¶¶ 11, 109, 124, 144, 183, 234 (alleging same markets).

21       The identity of claims is clearest among those that are direct carryovers from *Coronavirus I*.

22   *See* FAC ¶¶ 287–354.  In claims 5–9, Plaintiffs parrot the same theories they pressed and lost: that

23   Apple engaged in monopolistic practices in operating the App Store in violation of Section 2 of the

24   Sherman Act (*compare Coronavirus I*, Dkt. 41 ¶¶ 160–79 *with* FAC ¶¶ 263–86); restricted access

25   to the App Store or notary stamps, which they deem "essential facilities" (*compare Coronavirus I*,

26   Dkt. 41 ¶¶ 180–94 *with* FAC ¶¶ 315–31); imposed the Developer Program License Agreement as

27   an "unreasonable restraint of trade," including by charging a $99 fee to developers who wished to

28   distribute apps on the App Store (*compare Coronavirus I*, Dkt. 41 ¶¶ 195–206, ¶¶ 231–40 *with*

FAC ¶¶ 287–314); engaged in "ranking suppression" (*compare Coronavirus I*, Dkt. 41 ¶¶ 207–12 *with* FAC ¶¶ 332–37); and tied the App Store or notary stamps to iPhones (*compare Coronavirus I*, Dkt. 41 ¶¶ 213–30 *with* FAC ¶¶ 287–305. The Court's "final judgment forecloses 'successive litigation of the very same claim[s].'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).[3]

Plaintiffs' other claims (1–4), copied from the Department of Justice's complaint, are precluded too. These claims arise from the same grievance—Apple's alleged rejection or suppression of Plaintiffs' apps, *see* FAC ¶¶ 161–65, 263–86—and give rise to the same supposed injury (a loss of "goodwill, sponsorship, costs, and charges") at issue in *Coronavirus I*. *Compare* FAC at 104 part E *with Coronavirus I*, Dkt. 41 at 106 part B. As a result, there is no reason Plaintiffs could not have brought their current claims in *Coronavirus I*, where they likewise maintained that Apple controlled a smartphone market, "disadvantaged developers," and "inhibit[ed] the introduction of novel and potentially disruptive technologies." FAC ¶¶ 164–65; *see also Coronavirus I*, Dkt. 41 ¶¶ 89, 234, 269–70. Where, as here, "the injury [a plaintiff] seeks to redress remains the same," claim preclusion bars subsequent relitigation even if "the labels and forms of [the] claims vary at times from those raised in [the] earlier actions." *Thompson v. Barrett Daffin Frappier Treder & Weiss*, 2021 WL 5002414, at *1 (9th Cir. Oct. 28, 2021); *see also United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir. 2011) (claims precluded where "there was no reason why the plaintiff could not have brought the claim in the first action" as "the harm arose at the same time"); *Owens*, 244 F.3d at 714 (claims precluded though brought under different statutes because they sought to redress the same alleged discrimination).

**B.     The Court Rendered a Final Judgment on the Merits in *Coronavirus I***

The second element of claim preclusion is easily met. The Court dismissed Plaintiffs' prior antitrust claims for failure to allege a relevant market or antitrust injury—both necessary elements of antitrust claims—and reduced that decision to judgment. *Coronavirus I*, 2021 WL 5936910, at

---

[3] Nor can Plaintiffs evade preclusion by asserting a derivative claim under state law. *See* FAC ¶¶ 338–54. The "concern behind claim preclusion is that a plaintiff should not be able to relitigate the same facts under a different legal theory." *Hiser v. Franklin*, 94 F.3d 1287, 1292 (9th Cir. 1996). Plaintiffs' ninth claim, which merely duplicates the same theories based on the same alleged injuries (*see, e.g.*, FAC ¶¶ 339, 341–43, 346) under different statutes, also could have been brought in *Coronavirus I*. *See Coronavirus I*, 2021 WL 5936910, at *19 (noting Plaintiffs attempted to bring a state-law claim).

*13–14.  The Ninth Circuit affirmed.  *Coronavirus I*, 85 F.4th at 953.  By rule, the Court's dismissal with prejudice "operates as an adjudication on the merits," Fed. R. Civ. P. 41(b), and is a final judgment that "bars a later suit under res judicata."  *Beard v. Sheet Metal Workers Union*, 908 F.2d 474, 477 n.3 (9th Cir. 1990); *see also, e.g.*, *Owens*, 244 F.3d at 714 (dismissal with prejudice is an adjudication on the merits); *In re Schimmels*, 127 F.3d 875, 884 (9th Cir. 1997) (same).

## C.     There Is an Identity of Parties with *Coronavirus I*

Finally, the three plaintiffs here are bound by *Coronavirus I*.  There appears to be no dispute that Plaintiff Calid Inc. was a party to *Coronavirus I*.  *See Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005) (identity of parties is obvious where "[t]he plaintiff and defendant are identical in both actions").  The two other Plaintiffs, Coronavirus Reporter Corporation and Greenflight Venture Corporation, also were parties to *Coronavirus I* or are in privity with parties that were.  *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (*res judicata* applies where "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest").

**1.**  It should be beyond reasonable dispute that Plaintiff Coronavirus Reporter Corporation also was a party to *Coronavirus I*.  After all, the "Coronavirus Reporter" that brought *Coronavirus I* said it was a "Wyoming Corporation," for whom "Dr. Robert Roberts" was the "Chief Medical Officer," that developed the eponymous app at the center of that case.  *Coronavirus I*, Dkt. 41 ¶ 27. The "Coronavirus Reporter Corporation" prosecuting this case likewise is a "Wyoming C Corporation," for whom Dr. Roberts is the chief medical officer, that developed the same "Coronavirus Reporter . . . iPhone application."  FAC ¶ 47.  For good measure, Wyoming's Secretary of State has records for only one entity with "Coronavirus Reporter" in its name: Coronavirus Reporter Corporation, the treasurer and director of which is Plaintiffs' counsel. Kleinbrodt Decl. Exs. 1–5 (search results, corporate listing, and 2022–24 annual reports).

Yet Plaintiffs now maintain the "Coronavirus Reporter" from *Coronavirus I* is a "legal non-entity" and therefore not "identical" to the "Wyoming-registered Coronavirus Reporter Corporation" prosecuting this case.  Dkt. 39 at 6.  But that would mean Plaintiffs' counsel filed dozens of documents, and issued subpoenas, on behalf of a client that did not exist.  *See, e.g.*,

*Coronavirus I*, Dkts. 1, 20, 41, 51, 66-1, 83. While Plaintiffs have sought to blame Apple—suggesting their counsel learned Coronavirus Reporter was a non-entity when, on appeal, Apple noted Plaintiffs' failure to properly disclose the corporate entities behind the lawsuits, Dkt. 39 at 7–8—this outlandish assertion cannot be squared with Apple's objections earlier in the litigation (*e.g.*, *Coronavirus I*, Dkts. 32 at 6, 62 at 6, 91-2 at 9) or the filings "Coronavirus Reporter" made *after* that point (*e.g.*, *Coronavirus I* CA9 Dkts. 51-1, 52, 73). There is only one Wyoming entity called "Coronavirus Reporter," and it was the plaintiff in the last case as well as this one.

      **2.** Greenflight also is bound by the Court's judgment because it shares a "substantial identity" with the *Coronavirus I* plaintiffs. *Tahoe-Sierra*, 322 F.3d at 1081. Privity in this context "is a flexible concept dependent on the particular relationship between the parties" and exists "[e]ven when the parties are not identical . . . when there is sufficient commonality of interest." *Id.* at 1081–82; *see also Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989) ("The issue is one of substance rather than the names in the caption of the case; the inquiry is not limited to a traditional privity analysis."). For example, it includes "a non-party whose interests were represented adequately by a party in the original suit" as well as one with an "express or implied legal relationship by which [the party] to the first suit [is] accountable to [the non-party] who file[s] a subsequent suit with identical issues." *Tahoe-Sierra*, 322 F.3d at 1082. This ensures "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Taylor*, 553 U.S. at 895.

      Greenflight is a stand-in for Jeffrey Isaacs, the serial litigant (and *Coronavirus I* plaintiff) behind these cases. Greenflight not only is "a startup company founded by CEO Jeffrey Isaacs," *Whitepages, Inc. v. Isaacs*, 196 F. Supp. 3d 1128, 1130 (N.D. Cal. 2016), but also (in Isaacs' own words) is "own[ed] and control[led]" by him. *Greenflight Venture Corp. v. Google LLC*, 2025 WL 385476, at *1 (S.D. Fla. Feb. 4, 2025); *see also* Kleinbrodt Decl. Ex. 6 (corporate filing listing Isaacs as the CEO and sole officer and director of Greenflight). The alleged acts and injuries ascribed to Greenflight in this case (*e.g.*, FAC ¶ 130 & p. 104 E.b), were attributed to Isaacs or his other entities in *Coronavirus I* (*e.g.*, *Coronavirus I*, Dkt. 41 ¶¶ 97, 30, 106). And Greenflight's interest in this case is merely "[a]s a financial backer of the CR App." Dkt. 39 at 12; *accord* FAC

9

¶ 49.  Greenflight thus was represented by Isaacs (and the other plaintiffs) in *Coronavirus I* and is bound by the judgment.  *See Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005) (explaining "corporations and their officers or shareholders" are in privity); *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983) ("When a person owns most or all of the shares in a corporation and controls the affairs of the corporation, it is presumed that in any litigation involving that corporation the individual has sufficient commonality of interest.").

To exempt Greenflight from the judgment's preclusive effect would reward Plaintiffs for gamesmanship.  According to the Complaint, Greenflight "provided the entire funding for Calid and [Coronavirus Reporter Corporation's] development."  FAC ¶ 49.  If true, that fact should have been disclosed in *Coronavirus I*.  *See* N.D. Cal. L.R. Civ. 3-15(b)(2) (requiring disclosure of entities with "a financial interest of any kind in the subject matter in controversy or in a party to the proceeding").  Greenflight then could have been joined to the case to the extent it had any colorable claim.  *See* Fed. R. Civ. P. 19 & 20.  But Plaintiffs repeatedly refused to make the relevant disclosures.  Worse, they now admit they did so in order for Greenflight to "opt out" of the prior case and later "litigate its claims independently."  Dkt. 39 at 13.  Allowing Greenflight to prosecute duplicative claims now not only would reward Plaintiffs' dereliction of this Court's rules but also force Apple to shoulder the precise kind of "relitigat[ion] through a proxy" that claim preclusion seeks to abate.  *Taylor*, 553 U.S. at 895.  The Court therefore should dismiss the entire complaint as barred by *res judicata*.

## II.    Plaintiffs Lack Article III and Antitrust Standing (Claims 1–9)

Plaintiffs also lack Article III and antitrust standing.  As in any case, the threshold inquiry is whether a plaintiff satisfies Article III's standing requirements.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998).  If so, an antitrust plaintiff must "meet[] the more demanding standard for *antitrust* standing."  *Id.* (cleaned up).  Plaintiffs do not.

### A.    Plaintiffs Lack Standing for Their App Rejection and Suppression Claims (5–9)

The antitrust standing doctrine limits the "class of persons" who can sue to ensure that a plaintiff is an efficient party to enforce the antitrust laws.  *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1363 (9th Cir. 1986).  To that end, causal antitrust injury is "necessary, but not always sufficient,

to establish" antitrust standing.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986).  It is therefore "a substantive element of an antitrust claim" that "must be alleged at the pleading stage."  *Somers v. Apple Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  Plaintiffs are precluded from rearguing that their allegations of app rejection or suppression give rise to antitrust injury, an issue this Court resolved in *Coronavirus I*, 2021 WL 5936910, at *14–15.  *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) ("The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding.").  But even if they were not barred from making these arguments again, the same result should follow, as the Ninth Circuit's conclusions in *Coronavirus I* are still binding here.  *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1074 (9th Cir. 2021) (legal rulings have "preclusive effect" on "overlapping facts and claims").

To allege antitrust injury, a plaintiff must identify substantial harm to "competition in the market as a whole," *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013), and allege their own injury was "attributable to an anti-competitive aspect of the practice," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  But Plaintiffs allege only that Apple rejected apps pursuant to its Guidelines or suppressed certain apps in search rankings in favor of others.  *See* FAC ¶¶ 5–6, 69, 71, 102, 105, 129–30, 132, 218.  As the Ninth Circuit held, "[d]isapproval of [Plaintiffs'] apps on grounds ostensibly designed to protect consumers, absent factual allegations to believe that these disapprovals occurred for pretextual reasons, does not suffice to demonstrate anticompetitive conduct."  *Coronavirus I*, 85 F.4th at 957; *see also Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 192 (10th Cir. 2025) ("Declining to enter a business relationship with a nascent startup is not a cognizable antitrust injury.").  That is because merely shifting sales from one seller to one another (*see* FAC ¶ 162–63) "is not enough to establish an impact on competition."  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987); *see also Cargill*, 479 U.S. at 115 ("The loss of profits to . . . competitors . . . [is] not of concern under the antitrust laws.").  After all, antitrust law protects "competition[,] not competitors."  *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Plaintiffs' references to marketwide injury are conclusory.  *See Twombly*, 550 U.S. at 555.  Plaintiffs allege, for example, that "Apple's practices . . . stifled innovation by creating insurmountable

barriers for smaller developers," which "led to a homogenization of available apps" and "reduc[ed] consumer choice."  FAC ¶ 164.  They likewise claim that Apple somehow "depress[ed] the overall demand for apps" because "[c]onsumers lowered expectation[s] from App Store inefficiencies" and thereby (somehow) "disadvantage[d] developers."  *Id.* ¶ 165.  But these allegations are no different than those this Court deemed "conclusory" and "insufficient" in *Coronavirus I*, 2021 WL 5936910, at *14; missing still are plausible allegations explaining how the challenged conduct increased prices or decreased output in the relevant markets.  *See Unlockd Media, Inc. Liquidation Trust v. Google LLC*, 2025 WL 563460, at *4 (N.D. Cal. Feb. 20, 2025) (dismissing app-rejection claim because "Plaintiff's argument collapses into a single conclusory point: Google's conduct caused harm to the market because consumers, advertisers, and publishers were unable to benefit from Plaintiff's innovative business model."); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) (similar).

Plaintiffs cannot allege marketwide injury because, as the Ninth Circuit held, Apple's curation is procompetitive.  *Coronavirus I*, 85 F.4th at 957.  The App Store is a two-sided transaction platform, and Apple's enforcement of "'Guidelines' regarding security, functionality and reliability . . . is consistent with 'normal circumstances of free competition' and may well serve the best interests of consumers."  *Coronavirus I*, 2021 WL 5936910, at *14; *see also Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 994 (9th Cir. 2023).  Indeed, this approach differentiates Apple from its competitors and thus "ultimately increases consumer choice."  *Coronavirus I*, 2021 WL 5936910, at *14.  Yet Plaintiffs' "alleged theory of antitrust injury fails to give any consideration of the consumer-side of the two-sided transaction market"—"undermin[ing] Plaintiffs' theory of antitrust injury."  *Id.*

**B.    Plaintiffs Lack Standing for Their Smartphone Monopolization Claims (1–4)**

Plaintiffs also lack standing to bring their remaining claims, copied from the Department of Justice's complaint.  To start, Plaintiffs do not allege the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), because allegations that Apple inflated the prices paid by *consumers* for *iPhone devices* have no connection to Plaintiffs' claims as *developers* of allegedly rejected or suppressed *apps*.  Nor can Plaintiffs satisfy the more demanding threshold for statutory standing.

**1.**  Plaintiffs fail to draw a "line of causation between the [alleged] illegal conduct and injury."

APPLE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:24-CV-08660-EMC

*Allen v. Wright*, 468 U.S. 737, 752 (1984).  They allege that Apple used its alleged "control of app distribution or control of APIs" (application programming interfaces, which are software tools that make development more efficient) to suppress certain kinds of apps or technologies.  FAC ¶ 15.  This, the Complaint says, "increase[s] switching costs" between smartphones—"reinforc[ing] the moat around [Apple's alleged] smartphone monopoly."  *Id.* ¶¶ 86, 241.  The government alleges this allows Apple to maintain a monopoly over smartphones and thereby charge consumers supracompetitive prices for iPhones.  *See* Dkt. 37 at 1–2.  But therein lies the problem: Plaintiffs are not iPhone purchasers, and they allege no injury traceable to alleged monopolization of a smartphone market.  That is a "fundamental, and fatal, disconnect" between the alleged "injury and [Apple's] challenged conduct."  *Parr v. Cougle*, 127 F.4th 967, 975 (5th Cir. 2025).

    **2.**  For similar reasons, Plaintiffs lack antitrust standing because they did not "suffer[] [their alleged] injury in the market where competition is being restrained."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999).  Plaintiffs challenge Apple's alleged "control of app distribution or control of APIs," which, they say, "prohibit[s] . . . alternative app distribution channels" and bar[s] . . . apps."  FAC ¶¶ 15, 162–63.  That is wrong, but those are neither restraints nor injuries in an alleged market in which smartphone "devices" are "independent[ly]" bought and sold, *id.* ¶¶ 202, 226; rather, they appear to operate in the alleged "market for US Smartphone App Distribution Services" or "app market," *id.* ¶¶ 205–12.  Either way, "there is a mismatch between the market allegedly controlled by Apple and the market where [Plaintiffs are] allegedly injured."  *PhantomALERT v. Apple Inc.*, --- F. Supp. 3d ---, 2025 WL 71888, at *6 (D.D.C. Jan. 10, 2025).

    Plaintiffs themselves acknowledge that *PhantomALERT* is "similar" to this case.  Dkt. 32 at 3.  There, like here, a developer sued Apple for rejecting its COVID-19 app.  *PhantomALERT*, 2025 WL 71888, at *1.  And there, like here, the developer "copy-and-past[ed] language" from the government's suit, including allegations about an alleged "smartphone market."  *Id.* at *6.  The court recognized the problem: The alleged smartphone market was "not the market from which PhantomALERT's asserted harms derive[d]," nor had "PhantomALERT, as an app developer," suffered "injury in the smartphone market."  *Id.*  The Court therefore dismissed the complaint and deemed amendment futile.  *Id.* at *9; *see also*, *e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *7 (N.D. Cal. July 11, 2024) (dismissing

developer's claims challenging Apple's WebKit guideline because that restraint was in a different market than the alleged injury of paying supracompetitive prices for iPhones); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009) (similar); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015) (similar).  This Court should do the same.

**3.**  Even setting aside these problems, Plaintiffs lack antitrust standing to challenge Apple's alleged monopolization of a smartphone market under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–45 (1983).   This standard "incorporate[s] a requirement of proximate causation."   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  But Plaintiffs' claims go far beyond the "first step," *AGC*, 459 U.S. at 534, and are instead "'derivative and indirect' or 'secondary, consequential, or remote.'" *Theme Promotions, Inc. v. News Am. Mktg.*, 546 F.3d 991, 1004 (9th Cir. 2008).

Plaintiffs' causal theory is anything but clear, but it appears to go something like this.  Plaintiffs claim Apple "suppress[ed]" "COVID-19 Tracking Apps" and "Cross-Platform Video Apps" like theirs. FAC ¶ 15.  If Apple (and, presumably, Google) did not "impair[]" these apps, Plaintiffs say third parties would develop them for both iOS and Android.  *Id.* ¶ 136.  Plaintiffs then assume that these apps would "provide a high-quality user experience on any smartphone." *Id.* ¶ 13.  If that is so, Plaintiffs presume, a critical mass of consumers would become "less reliant on the iPhone" or more prone to switching "to a non-Apple smartphone." *Id.* ¶ 1.  And for some inexplicable reason, consumers' newfound desire to buy non-Apple devices would somehow increase "the overall demand for apps" to the benefit of "COVID-19 Tracking" and "Cross-Platform Video" app developers. *Id.* ¶¶ 15, 165.  At best, "between that cause and purported effect" in this multi-chapter story "lies a gulf of uncertainty." *Bakay*, 2024 WL 3381034, at *6; *see also Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 703 (9th Cir. 2001) (hospital districts lacked standing for derivative injuries suffered by smokers in the absence of a "*direct* link between the alleged misconduct" of defendant tobacco companies and plaintiffs' damages); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 987, 912–13 (N.D. Cal. 2019) (purchasers of final products such as cell phones and computers lacked antitrust standing to sue manufacturers of chip components).

The Complaint also is replete with allegations that belie this theory—making it too "speculative and complex." *Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec.*

*Workers*, 888 F.2d 604, 608 (9th Cir. 1989). For example, Plaintiffs spend much of the Complaint bemoaning Apple's alleged impediments to third-party messaging services (on which they cannot premise their own claims as they did not develop a messaging app). *See, e.g.*, FAC ¶¶ 15, 28, 38, 134, 149. But if messaging is "one of the biggest reasons iPhone users do not switch," *id.* ¶ 146, then it does not follow that lifting alleged restraints on COVID-19 tracking and cross-platform video apps would induce the switching Plaintiffs presuppose. To the contrary, Plaintiffs say Apple's native COVID-tracing app "failed to obtain a user base in the United States"—without any apparent impact on how many customers purchased iPhones. *Id.* ¶ 108. Plaintiffs similarly concede that Apple *permits and "promote[s]"* cross-platform videoconferencing apps—also without any apparent, appreciable effect on switching between smartphone devices. *Id.* ¶¶ 120, 122, 124. The Complaint offers no basis to believe Plaintiffs' many just-so assumptions are plausible.

On top of all this, courts routinely conclude plaintiffs lack standing where damages are based on "the sheerest sort of speculation" given the attendant "difficulty of ascertaining" and "complexity involved in calculating" them. *Or. Laborers-Emps. v. Philip Morris Inc.*, 185 F.3d 957, 965 (9th Cir. 1999). Plaintiffs assert they alone are entitled to over $4 billion in goodwill and revenue. FAC ¶¶ 15, 165 & p. 104. Tracing the goodwill and revenue each developer would have obtained but for Apple's alleged restrictions would require the Court "to create in hindsight a technological universe that never came into existence"—an exercise courts recognize is "entirely speculative and beyond the competence of a judicial proceeding." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006). This too militates in favor of dismissal. *See Ass'n of Wash. Pub. Hosp. Dists.*, 241 F.3d at 701–04; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335c5 (4th and 5th eds. 2013–2023) (dismissal is appropriate "[o]nce it becomes clear— especially early in the litigation—that damage measurements will be unduly speculative").

## C.    Greenflight Independently Lacks Standing (Claims 1–9)

Greenflight lacks antitrust standing for another reason: Its alleged injury is only the squandered investment it made in other entities' development of the Coronavirus Reporter, CALID, and WebCaller apps. *See* FAC ¶¶ 49, 128, 131. It is long-established in this Circuit that a plaintiff cannot use the antitrust laws to recover for the reduced value of an investment in "the offended corporation." *Solinger*

1   *v. A. & M. Recs., Inc.*, 718 F.2d 298, 299 (9th Cir. 1983).  That is because the entity subjected to the

2   alleged anticompetitive practices, not its investor, is "the injured party, if anyone."  *Id.*; *see also*, *e.g.*,

3   *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (a "receiver of

4   royalties does not establish antitrust standing by showing its receipts are down").  Were it otherwise,

5   plaintiffs "at too remote a distance" could sue based on "complain[ts] of harm flowing merely from the

6   misfortunes visited upon a third person."  *Holmes v. Securities Investor Protection Corp.*, 503 U.S.

7   258, 268–69 (1992).  Plus, "there would be the possibility of a double recovery," *Brignac v. Yelp Inc.*,

8   2019 WL 2372251, at *3 (N.D. Cal. June 5, 2019) (Chen, J.)—an acute problem here since Greenflight

9   claims damages for the same goodwill and revenues demanded by other plaintiffs.  FAC at 104 E.b.

10  **III.    Plaintiffs' Claims Fail Many Times Over on Other Grounds (Claims 1–9)**

11          There are myriad other reasons to dismiss Plaintiffs' claims.  To start, Plaintiffs do not allege

12  plausible relevant markets—a threshold defect in each antitrust claim.  Plaintiffs' individual theories

13  of anticompetitive conduct also are foreclosed by well-established antitrust law.  And Plaintiffs' final

14  derivative claim under California and Wyoming state law falters for all the same reasons and more still.

15          **A.    Plaintiffs' Federal Claims Fail on Several Grounds (Claims 1–8)**

16                  **1.    Plaintiffs Do Not Allege a Plausible Relevant Market (Claims 1–8)**

17          "A threshold step in any antitrust case is to accurately define the relevant market."  *Coronavirus*

18  *I*, 85 F.4th at 955.  The relevant market "defines the relevant field in which meaningful competition is

19  said to exist."  *Id.* (internal quotation marks omitted).  It has two components: a product market and a

20  geographic market.  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).  The product

21  market "includes the pool of goods or services that enjoy reasonable interchangeability of use and

22  cross-elasticity of demand."  *Id.*  "The principle most fundamental to product market definition is

23  'cross-elasticity of demand' for certain products or services."  *Coronavirus I*, 85 F.4th at 955.  As with

24  antitrust injury, Plaintiffs should be collaterally estopped from rearguing the plausibility of their alleged

25  markets—an issue this Court decided thrice over in *Coronavirus I*, 2021 WL 5936910, at *6–12.

26  Regardless, Plaintiffs' allegations fare no better this time around.

27          As in *Coronavirus I*, the Complaint "lacks clarity as to the relevant product markets for

28  Plaintiffs' antitrust claims."  2021 WL 5936910, at *7.  Plaintiffs focus most on an alleged

"smartphone" (or "performance smartphone") foremarket and alleged aftermarkets for "US Smartphone Apps," "App Stores," and "iPhone Notary Stamps." FAC ¶¶ 6, 205, 213, 219, 308, 320, 332. But even still, other undefined markets dot the Complaint. For example, Plaintiffs allege "Apple has maintained its dominance in the video communication market"—a purported market Plaintiffs do not define or revisit when setting out their claims. *Id.* ¶ 133. They also allege Apple "will likely extend and entrench its iPhone monopoly to other markets and parts of the economy." *Id.* ¶ 3. This appears to include "automative, content creation and entertainment, and financial services industries," about which Plaintiffs make various allegations but define no actual alleged markets. *See*, *e.g.*, *id.* ¶¶ 20, 63, 142. And in several other cases, it is anyone's guess what Plaintiffs mean with their unadorned references to "markets" or "marketplaces." *See*, *e.g.*, *id.* ¶¶ 127, 162. These "scattergun" allegations do not suffice. *Coronavirus I*, 85 F.4th at 956.

Even the alleged markets on which Plaintiffs focus are inherently contradictory. For example, Plaintiffs allege a market for "App Stores." FAC ¶ 205. Plaintiffs first appear to limit this alleged market to mobile stores. *See id.* (alleging market is limited to "apps for installation to users in the aforementioned US smartphone market"). But in their next breath, Plaintiffs allege the market is broader: "This market is plead for digital app stores," the Complaint says, including PC "[a]lternatives" like the "Microsoft Store." *Id.* ¶¶ 207–08. Then, Plaintiffs pivot yet again to say the market may "be a single-brand downstream market." *Id.* ¶ 210. Irreconcilable allegations like these are enough to dismiss Plaintiffs' claims. *Coronavirus I*, 2021 WL 5936910, at *8. But Plaintiffs also do not explain why the alleged market can include mobile and PC stores while excluding "[d]istribution . . . through web apps [or] by web access"—no less "fatal to [Plaintiffs'] proposed market definition," as this Court held when confronted with similar allegations. *Reilly*, 578 F. Supp. 3d at 1108.

These problems are only the start. If Apple's App Store competes with PC stores like the Microsoft Store, for example, then why is the alleged app market limited to "US smartphone/performance *smartphone* apps"? FAC ¶ 218 (emphasis added). The Complaint does not say. Nor do Plaintiffs coherently explain how this "app market" is distinct from the alleged "App Store market." *See id.* ¶¶ 205–18. Plaintiffs allege that in the "U.S. Smartphone Apps" market, Apple "is a monopsony purchaser of US smartphone apps, at least on the retail side." *Id.* ¶ 217. But elsewhere,

Plaintiffs say the "retail side of [the] app market" is a synonym for the "Smartphone App Distribution Services" (i.e., "App Store") market. *Id.* ¶ 212. What is more, Plaintiffs' market definitions continue to push a "theoretical framework [that] does not align with the economic reality." *Coronavirus I*, 2021 WL 5936910, at *12. Plaintiffs' definitions assume that Apple buys apps from developers and resells them to consumers. FAC ¶¶ 217, 257. But as the Court already observed, the App Store is a two-sided transaction platform through which "[d]evelopers are engaged in a transaction with consumers, not selling to Apple." *Coronavirus I*, 2021 WL 5936910, at *12. The list of problems goes on. *See*, *e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) (finding a market for "game transactions, rather than app transactions in general," contrary to Plaintiffs' allegations).

At bottom, Plaintiffs' allegations do not make sense because they are not drawn by reference to cross-elasticity of demand. *See Coronavirus I*, 85 F.4th at 955. Had Plaintiffs done so, the Complaint would not brim with inconsistencies about which products or services are included in each market or where one market ends and others begin. Nor would there be multiple, admitted instances in which Plaintiffs' alleged markets have indeterminate boundaries. *See* FAC ¶¶ 205, 208, 216. While Plaintiffs suggest a jury can sort all this out at trial, *id.*, the Ninth Circuit has made clear that Plaintiffs must "demonstrate the cross-elasticity" at the pleadings. *Coronavirus I*, 85 F.4th at 956; *accord Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Once again, Plaintiffs' failure "to adequately allege a relevant market" requires dismissal. *Coronavirus I*, 2021 WL 5936910, at *7; *see also*, *e.g.*, *Reilly*, 578 F. Supp. 3d at 1108 (dismissing case where plaintiff failed to analyze cross-elasticity of demand in its complaint); *PhantomALERT*, 2025 WL 71888, at *8 (similar).

### 2.    Plaintiffs Fail to Allege Anticompetitive Conduct (Claims 1–8)

To state an antitrust claim, a plaintiff also must plead anticompetitive conduct. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). Section 1 of the Sherman Act requires "*concerted* anticompetitive conduct" while Section 2 "targets *independent* anticompetitive conduct." *Id.* at 989–90 (emphasis added). Plaintiffs allege neither here.

### (a)    Plaintiffs Fail to State a Refusal-to-Deal Claim (Claims 1–4)

Plaintiffs' Section 2 claims for monopolization or attempted monopolization of a smartphone market or, alternatively, performance smartphone market run afoul of well-established antitrust law.

*See* FAC ¶¶ 263–86. For over a century, the Supreme Court has held that a "trader or manufacturer" has "the long recognized right . . . freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *accord Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *Verizon Commc'ns v. L. Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004). That is because "experience teaches" that a company's unilateral decisions about the parties with which it will deal "almost never harm[s] consumers." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013). Absent rare cases, then, antitrust law does not impose a "duty to deal"—and "certainly . . . no duty to deal under terms and conditions that [third parties] find commercially advantageous." *linkLine*, 555 U.S. at 450.

This bedrock principle forecloses Plaintiffs' claims for monopolization or attempted monopolization of a smartphone or performance smartphone market. Plaintiffs claim that Apple monopolized this market by "impos[ing] stringent criteria" on COVID-19 apps; "restrict[ing]" access to certain "APIs that would allow for cross-platform videoconferencing" and "cross-platform messaging" apps; and failing to enable "capabilities" that developers can access to create other "third-party apps and services." FAC ¶¶ 88, 115, 136. In other words, Plaintiffs fault Apple for disallowing certain apps from its platform and withholding access to certain proprietary software tools. That is the precise kind of conduct to which refusal-to-deal law applies. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (withholding "technical data" is a lawful refusal to deal); *Novell*, 731 F.3d at 1067–69 (withholding access to APIs); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999) (refusing "access to proprietary information . . . and technical services").

This alleged conduct is inactionable for several reasons. To start, Apple has not *refused* to deal: Plaintiffs acknowledge that Apple allows COVID-19 and "cross-platform video" apps pursuant to specific "criteria." FAC ¶¶ 87, 122. That Apple will not give developers "unrestricted use" of its intellectual property, *id.* ¶ 37, is merely a refusal to deal on the "terms and conditions" Plaintiffs prefer—which does not violate the antitrust laws. *Aerotec*, 836 F.3d at 1184; *see also Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000) (because intellectual property carries "the legal right to refuse to license . . ., the existence of a predicate condition to a license agreement cannot state an antitrust violation"). Nor can Plaintiffs establish the "one, limited" exception

Gibson, Dunn &
Crutcher LLP

to the general lawfulness of refusals to deal. *Qualcomm*, 969 F.3d at 993. Plaintiffs are not, as required, rival smartphone makers. FAC ¶¶ 47–49; *see linkLine*, 555 U.S. 448–49. And Apple did not terminate a voluntary course of dealing (since some entities never allegedly entered into a contract with Apple, and the rest never had their license agreements canceled) or offer the relevant services to similarly situated customers—each a prerequisite to a duty to deal. *See Qualcomm*, 969 F.3d at 993–94.

Courts have rejected such claims like Plaintiffs' time and again. In *New York v. Meta Platforms, Inc.*, the D.C. Circuit held that a policy disallowing developers from publishing certain apps or offering them in certain ways was a lawful refusal to deal. 66 F.4th 288, 306 (D.C. Cir. 2023). In *Novell*, the Tenth Circuit rejected a claim against Microsoft for withdrawing access to certain Windows APIs a rival wanted to use for its own office software suite. 731 F.3d at 1067–74. And in *Blix Inc. v. Apple Inc.*, the court rejected a claim that Apple "abus[ed] power over key distribution channels" by removing an app from the Mac App Store for violating Apple's Guidelines. 2020 WL 7027494, at *1, 8 (D. Del. Nov. 30, 2020). So too here: Because Apple has "no antitrust duty to deal," it "is under no obligation to provide [third parties] with a 'sufficient' level of service." *Meta*, 66 F.4th at 306 (citation omitted).

### (b)     Plaintiffs Fail to State a Tying Claim (Claim 5)

A tie "conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Aerotec*, 836 F.3d at 1178. This alone does not raise competitive concerns as many "tying arrangements may well be procompetitive." *Ill. Tool Works, Inc. v. Ind. Ink, Inc.*, 547 U.S. 28, 36 (2006). Rather, a tie may give rise to liability where "a seller with 'market power in one market'" uses the tie to "extend[] its market power to an entirely distinct market" by foreclosing competition for the tied product. *Aerotec*, 836 F.3d at 1178. Plaintiffs allege that Apple violates Section 1 of the Sherman Act by unlawfully tying "App Store distribution service and/or digital Notary Stamps" to the iPhone. FAC ¶¶ 288–89. Because Plaintiffs' claim implicates "software that serves as a platform for third-party applications," the rule of reason, not the *per se* rule, governs. *Epic*, 67 F.4th at 997 (cleaned up). Regardless, each of Plaintiffs' theories fail under either analytical framework.

**1.** Plaintiffs' first theory appears to be that Apple ties the App Store to the iPhone. *See* FAC ¶ 289. But only "two types of parties may have standing to challenge illegal tying arrangements—the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying

plaintiff), and the competitor who is restrained from entering the market for the tied product." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 887 (10th Cir. 1997). Plaintiffs are neither users who "purchase" the App Store nor developers of competing app stores. FAC ¶¶ 47–49; *see Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210–11 (C.D. Cal. 2007) (plaintiff lacked antitrust standing when it neither sold nor purchased the tied product). Their alleged injuries— loss of app revenue—is not the result of Apple's inclusion of the App Store on iPhones. *See, e.g.*, *Serv. Empls. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001).

Even if Plaintiffs had standing to assert this claim, they do not allege a violation of Section 1. The "essence of any violation of § 1 is the illegal agreement itself." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991). But the Complaint says Apple "has exclusive control over iOS," FAC ¶¶ 38, 187, 210, and nowhere suggests that Apple agreed with anyone to put the App Store on iPhones, let alone set out "who, did what, to whom (or with whom), where, and when." *Kendall v. Visa*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also Gamboa v. Apple Inc.*, 2025 WL 660190, at *5 (N.D. Cal. Feb. 28, 2025) (rejecting tying claim for lack of agreement). Moreover, "[t]he App Store is installed *free* on all iPhone smartphone devices"—giving users free access to a wide variety of apps, the vast majority of which also are available at no cost. FAC ¶ 210 (emphasis added). This, too, forecloses Plaintiffs' tying claim. *See Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) (no tie where consumers do not "actually purchase or lease the unwanted product").

**2.** Plaintiffs' second tying theory is that Apple violates Section 1 of the Sherman Act by unlawfully tying "digital Notary Stamps" to the iPhone. FAC ¶¶ 288–89. Again, there is no alleged agreement that could give rise to liability under Section 1; "[w]hat Plaintiffs are really challenging is Apple's product design decision." *Gamboa*, 2025 WL 660190, at *6; *see* FAC ¶ 219, 222, 295 (alleging notary stamps are a "hardware constraint[] implemented by Apple" "[t]hrough its algorithmic control of the iOS kernel" as part of "the iOS platform"). Nor is this a cogent tying theory at all. *Consumers* buy iPhones while *developers* allegedly buy "notary stamps." *Id.* ¶ 295. Because these are "independent purchase[s]," *id.* ¶ 226, Apple does not coerce anyone into buying notary stamps as part of an iPhone purchase—as required for a tie. *See Rick-Mik Enters., Inc. v. Equilon Enters., Inc.*, 532 F.3d 963, 971 (9th Cir. 2008). And even if it did, this purported tie would not foreclose any competition

in the allegedly tied market: Plaintiffs allege that notary stamps are "an unnecessary single-brand" market as no other "platform in history required a notary stamp," FAC ¶¶ 219, 305, so absent the alleged tie, developers would not buy them from anyone. *See Key v. Qualcomm Inc.*, --- F.4th ---, 2025 WL 597604, at *6 (9th Cir. Feb. 25, 2025) ("[F]orcing a consumer to buy something that he or she would not buy elsewhere does not injure competition.").

### (c)     Plaintiffs Fail to State a Claim for Supracompetitive Fees (Claim 6)

The Complaint further claims that Apple's $99 annual Developer Program fee is "supra-competitive" and unlawful. FAC ¶¶ 308–11. This claim rests on the mistaken premise that Apple's intellectual property should be "free from Apple's control" altogether. *Id.* ¶ 92. But the antitrust laws do not require Apple to give away its intellectual property for free or at a price that Plaintiffs subjectively believe to be fair. *See Epic*, 559 F. Supp. 3d at 1042 ("Apple is entitled to license its intellectual property for a fee, and to . . . guard against the uncompensated use of its intellectual property."). Even if Apple were a monopolist (which it is not) and the fee were supracompetitive (which it is not), "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. Thus, "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2." *John Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009); *see also*, *e.g.*, *Cont'l Auto. Sys. Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 732–34 (N.D. Tex. 2020) (rejecting Section 2 for "extract[ing] supra-competitive royalty rates"). Plaintiffs' claim should be dismissed.

### (d)     Plaintiffs Fail to State an "Essential Facilities" Claim (Claim 7)

Plaintiffs next allege that Apple's rejection of Coronavirus Reporter is an unlawful refusal to deal or violation of the essential facilities doctrine. FAC ¶¶ 315–31. But as explained above, Plaintiffs cannot establish that Apple has a duty to deal under this Court's precedent. *Supra* 18–20. Nor can they state an essential facilities claim, an even rarer "variation on a refusal to deal claim." *Aerotec*, 836 F.3d at 1184. Indeed, this doctrine has never been recognized by the Supreme Court, *Trinko*, 540 U.S. at 411, and there is "no case in which a United States court consciously held that an intellectual property right was itself an essential facility that must be licensed on reasonable and nondiscriminatory terms." Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to*

*Intellectual Property* § 13.03 [C][2] (3d ed. 2020 supp.).  This Court should not be the first.

To begin, Plaintiffs claim "[n]otary stamps and sideloading utilities" are essential facilities. FAC ¶ 323.  But "a facility is essential only if control of the facility carries with it the power to eliminate competition in the downstream market" and "is otherwise unavailable."  *Aerotec*, 836 F.3d at 1185 (internal quotation marks omitted).  Neither is true here.  For one thing, Apple's alleged control of these facilities does not eliminate competition "in the US smartphone app market."  FAC ¶ 323.  As Plaintiffs allege, "Apple competes with developers" in that market, *id.* ¶ 323, and Apple's control over its *own* App Store cannot foreclose competition in a *multibrand* market in which developers can distribute software through Google Play, the Microsoft Store, and other "[a]lternatives," *id.* ¶ 207; *see also Epic*, 559 F. Supp. 3d at 1050–51 (recognizing developers have "multiple avenues" for "distribution of mobile apps").  What is more, Plaintiffs can sideload on Google, "a free bypass . . . for developers to reach their audience."  FAC ¶ 229; *see also id.* ¶ 313.  "The availability of these other avenues of distribution, even if they are not the preferred or ideal methods, is dispositive of [Plaintiffs'] claim."  *Epic*, 559 F. Supp. 3d at 1051; *see also Sayre v. Google, Inc.*, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019) (recognizing access to "Google Play is not essential because [plaintiff's app] could reach consumers by employing potential alternative channels of distribution").

Moreover, Plaintiffs *do have* "access to the iOS userbase."  FAC ¶ 324.  Developers need merely comply with Apple's App Review Guidelines to submit apps for distribution through the App Store, FAC ¶ 35, and at least three of Plaintiffs' apps were approved for distribution.  *See Coronavirus I*, 2021 WL 5936910, at *2.  Plaintiffs' real gripe is that they do not like the *terms* of access.  Merely refusing to deal in a manner "conducive to [Plaintiffs'] existing business model" or on their preferred terms is not unlawful.  *Aerotec*, 836 F.3d at 1185; *see also Epic*, 559 F. Supp. 3d at 1051 ("The [essential facilities] doctrine does not demand an ideal or preferred standard.").  Because "access exists" here, "the [essential facility] doctrine serves no purpose."  *Trinko*, 540 U.S. at 411.

### (e)    Plaintiffs Fail to State a "Ranking Manipulation" Claim (Claim 8)

Plaintiffs also challenge Apple's alleged "ranking manipulation" under Sections 1 and 2 of the Sherman Act.  FAC ¶¶ 332–37.  Again, any Section 1 theory fails for lack of an agreement: The Complaint asserts that Apple alone "manipulat[es]" and "control[s]" search rankings.  *Id.* ¶ 127.

23

Regardless, Plaintiffs' claim fails multiple times over.

According to Plaintiffs, Apple uses ranking suppression to "leverage[] its monopolies in the US Smartphone/Performance smartphone markets, and US app distribution services markets" to "protect all of their monopolized interests" in other "critical markets." FAC ¶ 337. That theory fails at the outset because Plaintiffs do not explain what "these critical markets" are, *id.*, much less allege that ranking suppression gives Apple "a dangerous probability of success in monopolizing a second market." *Trinko*, 540 U.S. at 415 n.4 (internal quotation marks omitted). Nor does the Complaint explain why Apple would try to do so: Degrading search functionalities would *disadvantage* Apple because it prevents "consumers [finding] developers through their preferred means of search," making the App Store less attractive on one side of the platform and diminishing the "network effects" that Plaintiffs say "protect" Apple's alleged monopoly in the first place. FAC ¶¶ 238, 335; *see also Alaska Airlines v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) ("Every act exploiting monopoly power to the disadvantage of the monopoly's customers hastens the monopoly's end by making the potential competition more attractive."). "Antitrust claims must make economic sense," *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998), and this one does not.

In any event, the alleged ranking suppression does not harm competition in any market for the reasons discussed above. *Supra* 10–12. Judge Alsup reached the same conclusion in *Dreamstime.com, LLC v. Google, LLC*, where a stock image company sued Google under Section 2 after its website plummeted in Google's search rankings. 2019 WL 341579, at *3 (N.D. Cal. Jan. 28, 2019). The plaintiff claimed that Google's suppression of stock photo suppliers allowed it to maintain a monopoly in the market for search advertising. *Id.* But the court rebuffed this argument, concluding that such conduct is "not in and of itself injurious to competition in the relevant market"; rather "the only harm to competition alleged is that [Google] hurt [the Plaintiff] and [its] ability to act as a consumer in that market." *Id.* at 6. Other courts similarly have rejected claims based on allegations that a company "favor[s] strategic partners." FAC ¶ 344; *see Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 886–87 (9th Cir. 1982) (charging more favorable prices to plaintiff's rivals did not violate the Sherman Act); *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 925–28 (2d Cir. 1980) (rejecting claim that dominant flight schedule-provider favored major airlines over smaller carriers). This Court should do so too.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    Plaintiffs' State Law Claim Fails (Claim 9)

Last, Plaintiffs assert a violation of the California Unfair Competition Law (UCL) or Wyoming Consumer Protection Act (WCPA).  FAC ¶ 338.  These "[s]tate [c]ompetition" theories are derivative of, and fail for the same reasons as, Plaintiffs' federal claims.  *Id.*; *see* Wyo. Stat. § 40-12-110(a)(ii); *Beverage v. Apple Inc.*, 101 Cal. App. 5th 736, 747 (2024).  Each also fails on independent grounds.

There are three additional defects in Plaintiffs' WCPA claim.  First, Wyoming has a separate antitrust statute (Wyo. Stat. § 20-4-114), and the state has "declined to extend the reach of the WCPA where the legislature has elsewhere addressed the problems identified by a plaintiff."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. 2008).  Second, Plaintiffs have no right of action because they are not consumers under the WCPA: "[D]evelopers are primarily commercial entities" who allegedly purchase Apple's "notarization fee products" to "engage in transactions with Apple that have significant consumer implications," FAC ¶¶ 353, not consumers who "purchase the product for personal use," *In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2022 WL 710192, at *25 (W.D. Mo. Mar. 9, 2022); *see also* (Wyo. Stat. § 40-12-108(a).  Third, Plaintiffs do not allege, as they must, reliance on any representations by Apple.  *See, e.g.*, *Nicklas v. Prof. Ass'n, LLC.*, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018).

Plaintiffs cannot state a UCL claim for the additional reason that they do not allege an entitlement to equitable remedies, including the lack of adequate remedy at law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *see also Hynh v. Quora*, 508 F. Supp. 3d 633, 662 (N.D. Cal. 2020) (collecting cases).  Plaintiffs seek $4.2 billion in pre-trebled damages, Dkt. 1 at 104–05, and nowhere explain why that sum would be "inadequate."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also PhantomALERT*, 2025 WL 71888, at *9 (dismissing developer's similar UCL claim for failure to plead inadequacy of damages).  Nor do Plaintiffs explain how the Court could "micromanage" Apple's APIs, Guidelines, and overall ecosystem—as Plaintiffs' sweeping claims contemplate—without potentially chilling competition.  *Alivecor, Inc. v. Apple Inc.*, 2024 WL 591864, at *16 (N.D. Cal. Feb. 13, 2024).  Each of these problems dooms Plaintiffs' UCL claim.

### CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.

1    DATED: March 6, 2025                    Respectfully submitted,

2

3                                            GIBSON, DUNN & CRUTCHER LLP

4

5                                            By: */s/ Julian W. Kleinbrodt*

6                                               Julian W. Kleinbrodt

7

8                                               RACHEL S. BRASS
                                                rbrass@gibsondunn.com
9                                               JULIAN W. KLEINBRODT
                                                jkleinbrodt@gibsondunn.com
10                                              GIBSON, DUNN & CRUTCHER LLP
                                                One Embarcadero Center
11                                              Suite 2600
                                                San Francisco, California  94111-3715
12                                              Telephone:    415.393.8200
                                                Facsimile:    415.393.8306
13

14                                           *Attorneys for Defendant Apple Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28