Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs*.<br><br>APPLE INC.<br><br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................................................**II**

**INTRODUCTION**................................................................................................................**1**

**LEGAL STANDARD**..........................................................................................................**2**

**ARGUMENT**.......................................................................................................................**3**

    I.     THE PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY NULL PARTIES ..........................3

        *A.*   *Judicial Estoppel Bars Apple's Contradictory Positions* ............................................ 3

        *B.*   *Res Judicata Requires a Valid Adverse Party and Identification in the First Action* ................. 4

        *C.*   *A Pro Se Appearance Cannot Bind A Corporation* ................................................. 6

        *D.*   *No Identity of Claims: New Transactions Are Independently Actionable Under Lawlor* ........... 8

    II.    PLAINTIFFS HAVE ARTICLE III STANDING ...................................................9

        *A.*   *App Censorship Harms Marketwide Competition*....................................................... 9

        *B.*   *Plaintiffs Have Standing to Challenge Apple's Smartphone Monopolization(Counts 1-4)* ....... 11

        *C.*   *Apple's "Speculative Causation" Improper at the Motion Stage* ............................... 13

        *D.*   *Greenflight Has Independent Standing as a Repeated Fee-Paying Apple Developer* ............... 14

    III.   TYING A SMARTPHONE DEVICE TO SEPARATE PRODUCTS (APP STORE AND NOTARY STAMPS) IS *PER SE* CONDUCT UNDER *NORTHERN PACIFIC* ...................... 15

    IV.   PLAINTIFFS PLAUSIBLY ALLEGE FOUR DISCRETE RELEVANT MARKETS ................. 18

    V.    APPLE'S CONDUCT FITS THE ASPEN EXCEPTION ........................................... 20

    VI.   APPLE'S $99 DEVELOPER FEE IS A SUPRA-COMPETITIVE TOLL ..................... 21

    VII.  AN ESSENTIAL FACILITY EXISTS IN APPLE'S NOTARY STAMPS................. 22

    VIII. RANKING MANIPULATION IS ANTICOMPETITIVE CONDUCT ........................ 23

    IX.   UCL CLAIM SEEKS NON-MONETARY RELIEF FOR UNFAIR PRACTICES ............... 24

**CONCLUSION**..................................................................................................................**25**

**CERTIFICATE OF SERVICE**..........................................................................................**26**

# TABLE OF AUTHORITIES

### CASES

*Agostini v. Felton,*
   521 U.S. 203, 215 (1997)..................................................................................................... 9

*Ashcroft v. Iqbal,*
   556 U.S. 662, 678 (2009)..................................................................................................... 2

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
   472 U.S. 585 (1985) .......................................................................................................... 20

*Blue Shield of Va. v. McCready,*
   457 U.S. 465, 478–79 (1982) ............................................................................................ 12

*Brown Shoe Co. v. United States,*
   370 U.S. 294, 324 (1962)..................................................................................................... 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) .......................................................................................................... 10

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
   20 Cal. 4th 163, 180 (1999) .............................................................................................. 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992) .......................................................................................................... 17

*Epic Games, Inc. v. Apple,*
   559 F. Supp. 3d 898, 1019 (N.D. Cal. 2021) ................................................................... 23

*Gonzalez v. Banco Cent. Corp.,*
   27 F.3d 751, 755 (1st Cir. 1994)......................................................................................... 4

*Headwaters Inc. v. U.S. Forest Serv.,*
   399 F.3d 1047, 1053 (9th Cir. 2005) .................................................................................. 6

*Illinois Tool Works, Inc. v. Independent Ink, Inc.,*
   547 U.S. 28, 37 (2006)....................................................................................................... 16

*In re High-Tech Emp. Antitrust Litig.,*
   856 F. Supp. 2d 1103, 1120–21 (N.D. Cal. 2012)............................................................ 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   580 F. Supp. 2d 896 (N.D. Cal. 2008) .............................................................................. 25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
   466 U.S. 2, 14–15 (1984)................................................................................................... 18

*Kellam Energy, Inc. v. Duncan*,
   668 F. Supp. 861 (D. Del. 1987)............................................................................................. 16

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179, 189 (1997)........................................................................................................ 9

*Lawlor v. Nat'l Screen Serv. Corp.*,
   349 U.S. 322, 328 (1955)..................................................................................................... 8,24

*Mintz v. Mark Bartelstein*,
   906 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012) ...................................................................... 4

*New Hampshire v. Maine*,
   532 U.S. 742, 749–51 (2001)................................................................................................. 3

*Newcal Indus. v. Ikon Office Sols.*,
   513 F.3d 1038, 1045 (9th Cir. 2008) .................................................................................... 2

*Rowland v. Cal. Men's Colony*,
   506 U.S. 194, 201–02 (1993)................................................................................................. 6

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574, 577 (1999)....................................................................................................... 5

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422, 431 (2007)....................................................................................................... 6

*Sonner v. Premier Nutrition*,
   971 F.3d 834, 844 (9th Cir. 2020) ........................................................................................ 24

*Steel Co. v. Citizens for Better Environment*,
   523 U.S. 83, 94–95 (1998)..................................................................................................... 5

*Stewart v. U.S. Bancorp*,
   297 F.3d 953, 957 (9th Cir. 2002) ........................................................................................ 5

*Taylor v. Sturgell*,
   553 U.S. 880, 893–95 (2008) ................................................................................................ 5

*United States v. High Country Broad. Co.*,
   3 F.3d 1244, 1245 (9th Cir. 1993) ........................................................................................ 7

*United States v. Microsoft Corp.*,
   253 F.3d 34, 84 (D.C. Cir. 2001)........................................................................................... 16

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

This is an antitrust case which affects almost every American's freedom to access the internet. It asks a deceptively simple but profoundly significant question: whether an iPhone owner truly owns their device or remains perpetually subject to Apple Inc.'s ("Apple") unilateral control over what software can run on it. Plaintiffs Coronavirus Reporter Corporation ("CRC"), CALID Inc. ("CALID"), and Greenflight Venture Corporation ("Greenflight") allege Apple uses a digital "notarization" scheme to censor and block innovative apps while perpetuating an artificially locked computing platform.

The controversy surrounding notarization has been around nearly as long as the iPhone itself. In 2010, the U.S. Copyright Office explicitly recognized consumers' right to bypass Apple's notarization restrictions—then known as "jailbreaking"—because notarization unlawfully restricted consumers' control over their purchased iPhones. Instead of complying, Apple doubled down, strengthening its notarization system, circumventing federal intent, and ensuring that this very problem persists fifteen years later.

This particular motion concerns a lawsuit filed in this Court in 2021, which Apple labels "Coronavirus I" or "CR I." In that proceeding, Plaintiffs' founder was the first to attempt to define a Sherman Act relevant market as straightforward as Apple's notarization digital product itself. Apple claimed that the notarization function was too "integrated" to be considered a separate product. But no sooner than the ink had dried on CR I, Apple began to implement line-item charges called "Core Technology Fees" for these stamps in Europe. The company has similarly engaged in "malicious compliance" to defy the *Epic* UCL anti-steering injunction by effectively charging for notarization services within the United States (see *Exhibit A*).

In short, all recent attempts to curb Apple's conduct – and the largest monopoly in the history – have met intense resistance. Beyond the DMA and *Epic*, the "Open App Markets Act," once enjoyed bipartisan support, but was oddly removed from the Senate floor. Apple invoked "market mismatch" and "copy-and-paste" arguments (identical to this motion) to defeat *PhantomALERT*, a similar COVID-app class action which was filed as a result of the *Coronavirus I* Ninth Circuit affirmance. As here, that developer simply sought a forum to challenge Apple's lockdown on iOS app distribution, a matter that continues to gain urgency as more developers, legislators, and even foreign regulators push back against Apple's singular control.

The Court may properly take judicial notice and view the current motion in light of recent promotional material published on Opposing Counsel's website, featuring a Law360 article titled "Competition Group of the Year" (Feb. 26, 2025). In that article, Gibson Dunn specifically highlights it "got Apple out of a $200 billion" claim in the original *Coronavirus Reporter* litigation, characterizing it as representative of the complex, high-stakes litigation responsible for earning the firm national recognition.  This matter is not raised to impugn Opposing Counsel's accolades for defending exceptionally challenging antitrust cases. However, both positions cannot simultaneously be correct. Either Gibson Dunn's endorsement of the Law360 article significantly exaggerates the plausibility of the case, raising potential discrepancy under ABA Model Rule 7.1 litigation results advertising, or Apple has materially understated the accuracy of Plaintiffs' claims to this Court. This inconsistency warrants judicial scrutiny and weighs against granting Apple's motions for dismissal at the pleading stage. If CR I truly merits celebration as a landmark antitrust victory, the present litigation likewise deserves thorough judicial consideration—not summary dismissal for *failing to state a claim for relief.*

The Court should permit this matter to proceed on the merits, thereby either ending Apple's grievances of "déjà vu" – the inevitable result of its own repeated success in squashing legitimate antitrust suits and subverting regulatory initiatives – or finally ending the notarization monopoly itself. This is not a question to be kicked down the road any longer.

## LEGAL STANDARD

Under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw every reasonable inference in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In antitrust cases, courts are especially reluctant to resolve questions of relevant market boundaries on the pleadings. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (market definition often involves "deeply fact-intensive inquiries," thus inappropriate at the motion to dismiss stage). *Brown Shoe* factors—such as industry recognition or cross-elasticity of demand—are matters for fact-finding, not early dismissal. *Newcal Indus. v. Ikon Office Sols.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

1

2
## ARGUMENT

3
### A. Apple Is Judicially Estopped From Its Res Judicata Argument

4
Apple's invocation of *res judicata* founders on its own prior litigation stance, in which it disclaimed

5
any corporate plaintiff's legal existence in *CR I*. There, Apple's counsel maintained that no valid entity had

6
sued it, stressing that the named plaintiffs were incorrectly identified and mere "null parties" incapable of

7
receiving damages. See, e.g., Apple App. Br. at 7 n.4 (9th Cir. 2022) (stating "as far as Apple can tell, there

8
is no actual 'Coronavirus Reporter' entity—meaning Apple is being sued by *at least one* null party *to whom*

9
*no relief could be awarded*"). The practical outcome of Apple's argument was that the CR I dismissal would

10
never bind or benefit any actual corporation, since, by Apple's own logic, no legal entity was before the

11
Court. Defendant's unopposed insistence that no legally cognizable corporate plaintiff existed estops a 180-

12
degree pivot claiming, for *res judicata* purposes, that a "non-entity" in *CR I* is in fact identical to *CRC*.

13
### I.      THE PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY NULL PARTIES

14
### A.      Judicial Estoppel Bars Apple's Contradictory Positions

15
The equitable doctrine of judicial estoppel precludes a litigant from asserting a position in one

16
proceeding, prevailing on that basis, and then adopting an inconsistent stance in a subsequent case simply

17
because its interests have changed. See *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001) (identifying

18
factors for judicial estoppel, including that (1) a party's current position is "clearly inconsistent" with its prior

19
stance, (2) it previously succeeded in persuading a court to accept that earlier position, and (3) the

20
inconsistency would grant the party an unfair advantage). Apple's posture here meets all three criteria. First,

21
Apple now contradicts its earlier unequivocal representations that no corporate entity existed in CR I. Apple

22
had informed the Ninth Circuit that CR I's "plaintiffs" were improperly named and lacked legal identity, thus

23
meriting dismissal. Second, Apple succeeded with that argument. Undersigned counsel conceded and did not

24
oppose[1]. Apple's insistence that no one could be paid damages plainly fortified the USCA's conclusion to

25
affirm a case that purportedly made "no effort" to define interchangeability and didn't even properly identify

---

[1] That a subsequent SCOTUS petition was filed concerning leave to amend *CR I* is consistent. Undersigned counsel proceeded in an abundance of caution to reserve all possibilities for curing the defect.

the parties. Third, Apple would now gain an unfair advantage were it free to claim that the exact corporate entity it labeled a non-entity is in fact the same corporation over which it now invokes claim preclusion. See *New Hampshire*, 532 U.S. at 751 ("courts must guard the judiciary's integrity by preventing litigants from playing fast and loose"). Apple should not be permitted to reap the benefit of res judicata by asserting diametrically opposite assertions about CR I's corporate plaintiffs.

The Motion's conflicting stance on party identification is unfortunately not Apple's only full reversal that occurred since 2022. Apple also incredulously seeks to equate corporate identity by pointing to Dr. Robert Roberts' involvement in both cases, implying that both CR and CRC must be the same "Coronavirus" entities because Dr. Roberts serves as a "Chief Medical Officer" for both. That is demonstrably inconsistent with Apple's prior stance in CR I, where it insisted that the plaintiff's "only connection to medicine" was Dr. Jeffrey Isaacs—dismissing *any* separate medical leadership on multiple occasions. Apple cannot now fill that gap in by citing Dr. Roberts' presence here as proof that CR I indeed had a legitimate corporate existence. This abrupt reversal violates the principle that a party "cannot blow hot and cold as the occasion demands." *New Hampshire*, 532 U.S. at 749 (paraphrased).

### B.    Res Judicata Requires a Valid Adverse Party and Identification in the First Action

Res judicata fundamentally necessitates that the prior lawsuit involved an actual legal entity capable of asserting or defending rights. See *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 755 (1st Cir. 1994) (holding the party against whom preclusion is asserted must have been a party or privy in the first action). By designating the CR I plaintiffs as a "null party" or "non-entity," Apple undercut the essential premise that *CR I's* dismissal can bind a real corporate plaintiff. The Court should reject Apple's belated attempt to resuscitate the previously disclaimed "non-entity" into a valid corporate litigant for res judicata purposes. Gibson Dunn had it right – a lawsuit against "Mc'Donalds" or "Burger-King," with no identification of the corporation type (Corp, Inc, LLC) and incorrect punctuation clearly could not proceed unless corrected through amendment. In *CR I*, all three named corporate entities had such defects. Gibson Dunn simply has buyer's remorse – wishing it hadn't pointed out the obvious: no jurisdiction exists over an entity that is not correctly identified.  When a corporate name is so flawed or incomplete that no lawful corporation was joined, prior dismissal cannot now preclude a distinct Wyoming corporation's claims. *Mintz v. Mark Bartelstein*, 906 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012), while discussing misnomer in the context of defendants, stands

4

for the broader point that a court does not obtain jurisdiction over an entity—plaintiff or defendant—if it is not actually named or is misnamed to the point of being a "null party." Where a non-entity is named as the plaintiff, the real corporation never effectively appears as a litigant. Any judgment "in its favor" or "against it" is illusory and incapable of res judicata effect. See *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (res judicata requires the same parties or parties in privity).

Per Gibson Dunn's own declaration, there never existed jurisdiction over the non-entities in CR I. Although a Rule 12(b)(6) dismissal typically operates "on the merits" under Fed. R. Civ. P. 41(b), that principle assumes the dismissed action featured an actual, properly identified party. Apple effectively stymied any "merits" adjudication in CR I by an unopposed assertion to the Ninth Circuit that no real corporate entity could be paid. Having done so, it cannot now claim that CR I validly adjudicated the interests of the real Wyoming corporation. Under *New Hampshire v. Maine*, Apple's reversal is precisely the type of "blatant inconsistency" that judicial estoppel aims to prevent.

It is axiomatic that "before a federal court can adjudicate the merits of a claim, it must first establish jurisdiction over the parties." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999); see also *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998) (Without jurisdiction the court cannot proceed at all in any cause.). A Rule 12(b)(6) dismissal—such as the *CR I* ruling Apple now relies upon for res judicata—presupposes that the parties before the court were properly named and identified, enabling the court to lawfully exercise jurisdiction. If a party is defectively identified to the point that it constitutes a "null party," jurisdiction never attaches in the first instance, and any dismissal under Rule 12(b)(6) is ineffective for purposes of res judicata. *Citizens for Better Environment*, 523 U.S. at 94–95. By explicitly challenging and highlighting jurisdictional defects, Apple confirmed that jurisdictional issues were antecedent to any merits decision under Rule 12(b)(6). Where jurisdiction is defective due to party misidentification, as Apple itself argued, the law is clear that no substantive judgment can issue. Indeed, the Ninth Circuit explicitly holds that jurisdictional defects preclude subsequent invocation of res judicata: "[A] dismissal for lack of jurisdiction is not an adjudication on the merits and therefore cannot operate as res judicata." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 957 (9th Cir. 2002). Thus, Apple's own successful arguments regarding non-existent plaintiffs in CR I compel the conclusion that the prior dismissal—rooted in an antecedent jurisdictional defect—cannot bind CRC. Where jurisdictional impediments bar initial adjudication on the merits,

1    subsequent litigation by properly formed, validly identified entities remains unaffected. *See Ruhrgas*, 526

2    U.S. at 577; *Stewart*, 297 F.3d at 957.

3        Even if Apple were to emphasize that the District Court's dismissal in *Coronavirus Reporter I*

4    referenced Rule 12(b)(6), reliance on such labels overlooks the settled principle that jurisdictional defects

5    are logically antecedent and must be resolved before reaching merits questions. See *Sinochem Int'l Co. Ltd.*

6    *v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (Without jurisdiction the court cannot proceed at

7    all in any cause; jurisdiction is power to declare the law.)

8        Apple previously raised precisely this issue of defective identification as grounds that "no relief could

9    be awarded" – not, as they now purport, to complain about non-compliance with judicial recusal procedures

10   unrelated to the litigation itself. The motion before the court is fatally flawed. It states "there is only one

11   Wyoming entity called 'Coronavirus Reporter,' and it was the plaintiff in the last case as well as this one."

12   That is simply not what opposing counsel told the Ninth Circuit.  Not by any stretch of the imagination.

13       **C.    A *Pro Se* Appearance Cannot Bind A Corporation**

14       Apple erroneously argues that Plaintiffs have all effectively been represented by Dr. Jeffrey Isaacs,

15   *pro se*. Indeed, "a corporation may appear in federal court only through licensed counsel." *Rowland v. Cal.*

16   *Men's Colony*, 506 U.S. 194, 201–02 (1993). *Pro se* representation of a corporation is an impermissible feat.

17   Hence, no identity of parties or "privity" can be established; the law does not permit an individual to identify

18   as, nor represent, a corporation.

19       Apple's reliance on *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1053 (9th Cir. 2005), to

20   show that Greenflight Venture Corporation was "represented" by Dr. Isaacs in *CR I* is fundamentally

21   misplaced. Although *Headwaters* recognizes that certain relationships between corporate officers or

22   shareholders and their businesses can establish privity for purposes of res judicata, it presupposes that the

23   corporation itself was *properly* represented in the prior litigation. That predicate is missing here because Dr.

24   Isaacs appeared *pro se* in CR I.  Apple has not provided a single citation of a case where a *pro se* officer's

25   appearance resulted in res judicata against the company itself – because none exist. Any claim that Dr.

26   Isaacs—appearing *pro se*—could have "represented" Greenflight runs directly afoul of black-letter federal

27   law.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

Recently, in *Greenflight & Isaacs v. Google*, the Southern District of Florida *sua sponte* severed Dr. Isaacs from the litigation to eliminate potential concerns about *pro se* representation of a corporation. If Isaacs' and Greenflight's claims had been truly interchangeable, there would be no need to separate them— yet that District Court recognized that an individual cannot simply represent the claims of a distinct corporate entity. Apple's attempt to bundle Dr. Isaacs's *pro se* litigation with Greenflight's separate corporate interests contravenes basic federal procedure. Apple's privity argument improperly asks this Court to treat Dr. Isaacs as though he had full authority to bind every corporate entity in which he is an officer, a programmer (Primary Productions), or a shareholder—something that federal courts explicitly forbid for good reason. *United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993) (holding default judgment proper because corporation could not appear *pro se* through its president).

Apple's similar suggestion that Greenflight Venture Corporation was somehow obligated to appear or disclose itself in *CR I* is misplaced for multiple reasons. Merely funding a programming project (here, an app) does not trigger the stringent requirements of Federal Rule of Civil Procedure 19 (mandatory joinder) or Local Rule 3-15(b)(2) (certification of interested entities). Greenflight had no direct stockholder stake in the case as filed, let alone an obligation to disclose itself as an interested party in litigation which Apple itself insisted was brought by a "non-entity." Apple's protest that Greenflight "could have been joined" overlooks a core principle of civil litigation: potential plaintiffs are ordinarily free to bring or withhold their claims. *See* Fed. R. Civ. P. 20 (permissive, not compulsory, joinder). By analogy, *Phanto*mAlert acted autonomously, as did *Coring*, independently choosing (as of right) when to file their own action, rather than interject themselves in different lawsuits. If anything, Greenflight's "opt-out," a misnomer as it wasn't really an opt-out at all, avoided the confusion of having a third-party funder or distinct corporate interests entangled with an already murky *pro se* suit, which transpired in Florida Southern District.

Moreover, Apple entirely omits that Greenflight, representative of the class members, suffered losses when "Apple censored its apps, Sherlocked its ideas, restricted and/or manipulated app search rankings, and charged over $1000 in supra-competitive DPLA fees." FAC ¶ 49. Apple's alleged conduct regarding Greenflight's Top Ten Caller-ID app is simply not subject to res judicata. Greenflight is a direct signatory to the DPLA and pays Apple $99 each year in supra-competitive fees. Even if Greenflight's first decade of fees were mentioned by reference in *CR I* ("Dr Jeffrey D. Isaacs paid nearly a decade in these fees, either directly

1   or through [his] controlled entities" (*CR I* FAC ¶ 175), by Apple's own admission, a shareholder does not

2   have antitrust standing for such investment losses, hence res judicata cannot apply from *CR I*'s mere

3   discussion of Greenflight's. Once again, Apple cannot have it both ways. In their Motion they simultaneously

4   assert Greenflight had representation in CR I through a shareholder (presumably with no standing), but also

5   assert such investors lack antitrust standing in the present CRC lawsuit. Apple must choose a position on

6   shareholder antitrust standing *before* Plaintiffs, let alone the Court, can engage in a fair analysis.

7       Greenflight paid its annual fees via its direct DPLA contractual obligations. Dr. Isaacs was not a party

8   to that contract, he didn't have standing to represent the corporate claim, and therefore there is no res judicata

9   with respect to Greenflight.  In any case, each independent annual $99 fee transaction is ongoing conduct per

10  *Lawlor*, so the court need not engage the circular complexities of this five-year old matter, because new

11  transactions have accrued. These complexities are precisely why a 12(b)(6) dismissal is a 'particularly

12  disfavored procedure.' Nearly all the confusion Apple has stirred – from shifting views on everything from

13  corporate nomenclature to investor standing – would have been easily and promptly resolved had CR I

14  progressed to discovery. Summary judgement or trial is the appropriate place to determine such issues with

15  finality.

16      **D.    No Identity of Claims: New Transactions Are Independently Actionable Under *Lawlor***

17      Even if the Court were inclined to entertain Apple's res judicata arguments on corporate identity,

18  there is plainly no identity of claims between *CR I* and the current litigation. Res judicata bars only those

19  claims arising from the same nucleus of operative facts. It does not preclude claims based on new, subsequent

20  transactions.

21      Apple's assertion of claim preclusion fails under the Supreme Court's clear directive that "res judicata

22  does not bar claims arising from conduct occurring after the prior judgment." *Lawlor v. Nat'l Screen Serv.*

23  *Corp.*, 349 U.S. 322, 328 (1955). The FAC and the DOJ's parallel allegations show that Apple's allegedly

24  anticompetitive practices—censorship, "Sherlocking", forced notarization, and retaliatory measures—

25  persisted and materially expanded post-CR I. Apple's suppression of COVID-19 and other health-critical

26  apps continued *beyond* the CR I timeframe, "cost[ing] lives." As *Lawlor* held, a subsequent suit is not barred

27  when "the conduct complained of in the second suit was all subsequent." 349 U.S. at 328.  Plaintiffs allege

28  Apple *escalated* notary stamp restrictions (i.e. DMA and UCL malicious compliance) and retaliated against

developers *after* CR I. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) similarly recognizes that each new act of anticompetitive conduct can give rise to a fresh claim.

The Department of Justice's antitrust research reveals new acts and deeper patterns of Apple's conduct, i.e. Tim Cook's crooked instruction to demand a "grandmother buy an iPhone" to communicate with her grandchildren. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("each overt act that is part of the [violation] … starts the statutory period running again and brings with it the damages."). These novel facts were unavailable at the time of CR I and thus cannot be *res judicata*. Apple's "malicious compliance" with new regulations including EU DMA and *Epic* UCL injunction further anticompetitive tying and notarization allegations in ways not possible at the time of *CR I.* This matter is the entire subject of a Ninth Circuit Rule 60 appeal incorporated fully herein. *Agostini v. Felton*, 521 U.S. 203, 215 (1997) recognizing that a prior judgment does not encompass subsequent events that changed the legal context.

## II.    PLAINTIFFS HAVE ARTICLE III STANDING

### A.    App Censorship Harms Marketwide Competition

The FAC cites evidence from Plaintiffs' own experiences and the DOJ's parallel allegations to demonstrate Apple's "Guidelines" block entire classes of apps, including cross-platform and public-health apps, under the guise of "protecting consumers." Far from "conclusory," the FAC (1) supplies extensive allegations that Apple has deployed its review Guidelines as a self-interested, pretextual tool to exclude, delay, or degrade competing and cross-platform apps, (2) identifies plausible marketwide harm to innovation and consumer choice, and (3) delineates how Apple's conduct increased switching costs, dampened cross-platform interoperability, and thereby reduced total market output.

Building on the Government's well-researched theories, the operative complaint spells out Apple's recurring pattern of app approval denials designed not to ensure "security, functionality, and reliability," but to undercut potential competition and impose "self-preferencing." The FAC incorporates DOJ claims describing how Apple "selectively enforces its distribution rules" to penalize or delay third-party apps, especially those that might facilitate easy migration off iOS or challenge Apple's services. FAC ¶¶ 13–14, 15, 79–86. Plaintiffs cite cross-platform video apps that Apple suppressed or refused under Guidelines, only to introduce near-identical functionality in FaceTime. Id. ¶¶ 115–26. Similarly, Apple's blanket rejection of

COVID-19 startup apps while favoring its own underbaked COVID tool evidences Apple's refusal to allow an entire class of pandemic-tracking competitors, thereby bottlenecking the app market and sub-sectors. Id. ¶¶ 87–114. Plaintiffs specifically allege that Apple's refusal to allow certain COVID-19 apps "cost lives" (FAC ¶ 341), and potentially blocks or deters future environmental or health-critical apps (¶ 342). Apple's own data shows COVID-tracking apps can in fact save lives (¶ 341), reinforcing that the suppression of entire categories was an antitrust injury, if not moral injury stemming from the iOS ecosystem. That is not a trivial "one-competitor-loses" scenario, but classic marketwide damage to new entry and essential consumer information. These allegations refute Apple's position that there is no "factual basis" to believe Apple used its Guidelines pretextually. On the contrary, the Complaint provides a specific pattern of Apple exploiting review policies to monetize its ecosystem and preserve iPhone lock-in.

Apple insists that the allegations do not show marketwide harm—that the claimed injuries concern only "one competitor displacing another." But the FAC goes well beyond "shifting sales," explaining that Apple's systematic self-preferencing chills innovation and reduces overall app availability, thereby harming consumers and developers at large. FAC ¶¶ 162–65. For instance, Plaintiffs illustrate how Apple's review-based censorship limits essential new products (e.g., epidemiological data-collection apps) and deters cross-platform apps from even entering the iOS market. Id. ¶¶ 88, 129–32, 149. Apple's claim that Plaintiffs simply want to "shift sales" misunderstands the complaint. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), does not preclude liability where, as here, "competition itself" is restrained. By removing key app categories, or self-preferencing their own inferior products, Apple diminishes overall output and variety on iOS, harming developers and consumers. FAC ¶¶ 164–65: "stifled innovation," "reduced consumer choice."

By blocking entire classes of apps and cross-platform services, Apple diminishes the total number of meaningful offerings on iOS. This not only reduces the "output" of new apps to consumers but also hampers cross-platform competition. The complaint alleges that these artificially limited app offerings maintain Apple's inflated prices and lock-in strategies. Id. ¶¶ 28, 136, 161–65.

*CR I* found the prior complaint "conclusory" because it lacked the kind of broad category factual specificity now included. Relying on language from CR I that Apple's curation "may well serve the best interests of consumers" overlooks the Court's caveat that such curation is lawful absent factual allegations

1   of pretext. 85 F.4th at 957. Here, Plaintiffs do provide factual support for pretext—namely, Apple's decision

2   to reject or bury rival apps while offering or developing its own competing solutions (¶¶ 88, 112), or pushing

3   strategic partners instead (¶ 344). Nothing in *CR I* or the Ninth Circuit's ruling forbids the current allegations

4   with newly available evidence and enhanced factual support. The Ninth Circuit has never held that all

5   curation is inherently procompetitive or immune from scrutiny. Rather, these are factual inquiries unsuited

6   for a Rule 12 motion.

7       **B.    Plaintiffs Have Standing to Challenge Apple's Smartphone Monopolization(Counts 1-4)**

8       Apple's attempt to confine Plaintiffs' smartphone monopolization claims to an allegation of "inflated

9   iPhone device prices" misunderstands both the Complaint and the Department of Justice's parallel

10  allegations. Contrary to Apple's assertion, the Government has not narrowly claimed that Apple's monopoly

11  power manifests only in higher device prices; the DOJ Complaint explicitly identifies Apple's contractual

12  and technological restrictions on *app creation, app distribution, and API access*—restraints that harm

13  developers and consumers alike. See FAC ¶ 202 highlighting app creation, distribution and API access.

14  Plaintiffs here allege precisely that these same "anticompetitive acts" in the smartphone market not only raise

15  consumer switching costs but also directly curtail the viability of competing apps and services, inflicting

16  cognizable antitrust injury on developers. Apple unreasonably lumps the DOJ allegations into a "device-

17  price" theory (¶¶ 86, 241). But as the Complaint clarifies (¶¶ 15, 202, 205–12), the Government's suit

18  includes claims that Apple's smartphone monopoly power harms developers by restricting app creation,

19  distribution, and cross-platform innovations. Plaintiffs, who incorporate that same leveraging theory formally

20  in FAC ¶ 202, thereby suffer direct competitive injury. In reality, the DOJ Sherman cause of action—

21  incorporated verbatim into Plaintiffs' FAC at paragraph 202 —targets Apple's practice of "imped[ing] apps

22  and technologies" and enumerates multiple categories of developer-facing restrictions.

23      Apple asserts there exists a "fundamental disconnect" because Plaintiffs are not iPhone purchasers.

24  But the FAC (like the DOJ complaint) explains how Apple leverages its smartphone dominance to impose

25  unilateral constraints on third-party developers—including barriers to app distribution, self-preferential

26  policies, and API gating—that reduce the overall supply and quality of apps. These measures do not merely

27  affect iPhone prices: they prevent developers (such as Plaintiffs) from launching or monetizing their own

28  innovative products, thus chilling competition within—and emanating from—the smartphone foremarket.

Apple plainly errs in the notion that "the government alleges *only* that Apple maintains a smartphone monopoly to charge consumers supra-competitive prices." (Mot. at 12.) Thus, the Government has put Apple on notice that these same anticompetitive behaviors harm innovation and entry from developers—just as Plaintiffs plead. Apple can hardly dismiss these integrated allegations as limited to iPhone pricing, when it has itself defiantly complained in public statements that the DOJ has cast too broad a net, encompassing Apple's tight control over iOS and its harmful effects for the app economy.

The Supreme Court in *Blue Shield of Va. v. McCready*, 457 U.S. 465, 478–79 (1982) recognized that a plaintiff need not buy the alleged tying product if they are otherwise *directly harmed* by the defendant's monopoly in that product. Here, Apple leverages its iPhone dominance to impose constraints on developers (¶ 162–65). The fact that Plaintiffs are not iPhone purchasers does not preclude them from pleading that Apple's device-level power inflicts direct injury on their intertwined app businesses.

Apple labels the smartphone foremarket and "app creation/distribution" aftermarkets as "mismatched.[2]" Yet the Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) directly refutes that argument: *Kodak* embraced a primary product market (copiers) plus derivative service/parts aftermarkets where the defendant's power in the first market let it monopolize the second. Likewise, Apple's power over iPhone devices (the foremarket) enables it to set restrictive conditions for iOS app development (the aftermarket). (FAC ¶¶ 12–15, 205–12.) In any case, there is no mismatch under *McCready* when the markets, and injuries, are intertwined.

Plaintiffs' incorporation of the meticulously researched DOJ lawsuit is not a defect—such practice is routine, and in the interest of judicial economy. Imagine if every JPML participant overhauled the lead complaint— the result would be entirely cumbersome and inefficient. The Court should be wary of Apple's attempt to paint the FAC as a "lifted" hack.  Plaintiffs refined comprehensive improvements and supplemented the DOJ's FAC to serve as a class action for developers. Opposing Counsel consistently derides undersigned counsel's allegations as amateur— then boasts how a victory merits their national #1

---

[2] Opposing Counsel similarly convinced The Honorable Trevor McFadden "there is a mismatch between the market allegedly controlled by Apple and the market where PhantomALERT is allegedly injured." But like CRC, that case invoked straightforward Section 2 leveraging concepts: "The App Store thus constitutes a relevant market itself, over which Apple has a monopoly, because iPhone users are substantially locked-in to their iPhones" (24-cv-786, Dkt.17, ¶81-82).

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

1   Competition ranking.  Notably, Apple has filed a pending 12(b)(6) motion in the DOJ case, asserting that its

2   performance smartphone market simply doesn't cover the alleged conduct in the app space. Plaintiffs'

3   supplemental allegations of new single-brand notary stamp claims, SSNDQ metrics on software, and app

4   distribution tying conduct, yield a powerful augmentation to the DOJ work-product, not a mere hack.

5   **C.     Apple's "Speculative Causation" Improper at the Motion Stage**

6       Apple urges dismissal by recasting Plaintiffs' alleged damages as "speculative" and "too complex"

7   (Mot. at 13–14). The Supreme Court has long recognized that antitrust plaintiffs need only plausibly allege

8   a "reasonably direct" link between the challenged conduct and harm. See *Associated Gen. Contractors*, 459

9   U.S. at 534. Plaintiffs do precisely that here: Apple's gating of iOS app creation and distribution directly

10  reduces available app choices, raises barriers for rival innovations, and locks consumers more deeply into

11  iPhone usage. *FAC* ¶¶ 28, 136, 164–65. This case fundamentally challenges whether Apple's restrictive

12  practices—its curation, notary-stamp requirement, and "App Store–only" policy—diminish the

13  independence of developers and stifle the output of innovative apps. *FAC* ¶¶ 15, 162–65, 343. It covers a vast

14  sum of damages when the putative class is counted. Gibson Dunn won Competition Group of the Year for

15  their work in getting Apple off the hook for $200 billion (a conservative amount) in CR I. Under well-settled

16  Rule 12 standards, a court must accept these factual allegations as true, even if Apple believes them

17  "complex" or "impossible."

18      Apple's long-winded theory that it is all too "speculative" overlooks the FAC's specificity. First of

19  all, there are direct comparable damages available here. A London teaching hospital launched a similar app

20  months after CRC's "first mover," and obtained "peak usage of five million daily users." FAC 106. This is

21  hardly speculative by any definition, and such comparable damage estimates are *routine* in litigation, and

22  financial software valuations in general.  More generally, suppressed cross-platform technologies (¶¶ 15,

23  129–30) show immediate and measurable developer harm—not some chain-of-causation leap. Reduced

24  consumer choice (¶ 164) is a recognized antitrust injury, not a "far-fetched hypothetical." Lock-in and higher

25  overall app distribution costs (¶¶ 162–63) naturally flow from Apple's single mandated channel. The fact

26  that DOJ links this conduct back to higher iPhone prices doesn't negate the underlying damage done to the

27  app markets, which are an integral – and novel – part of Plaintiffs' Complaint.

The mere fact that quantifying such injuries may be complex and, like all damages estimates, requiring skilled due diligence, does not justify a Rule 12(b)(6) dismissal. See *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120–21 (N.D. Cal. 2012) (complex causation issues are reserved for later factual development). Apple essentially argues it is too late to imagine a freer smartphone ecosystem. That is precisely the *status quo* a monopolist invokes to fend off antitrust scrutiny. But the law demands that allegations of artificially constrained innovation and output (¶¶ 15, 343) receive a merits determination— especially where Apple's own conduct is alleged to block entire categories of critical apps (¶ 341). Courts are not permitted to adopt a defendant's self-serving view of "complex impossibility" at the pleading stage. Apple's "speculation" attack is no basis for dismissal. Plaintiffs offer specific factual detail, show a plausible chain of injury, and cite Apple's own policies restricting independence of developers and app availability. Whether Apple's restraints truly degrade output, hamper cross-platform apps, and entrench inflated prices is a fact question ill-suited for a Rule 12 motion.

### D.    Greenflight Has Independent Standing as a Repeated Fee-Paying Apple Developer

Apple's less than candid challenge to Greenflight's standing relies on mischaracterizing it solely as a "financier." But the record, including Apple's own jurisdictional arguments supporting transfer from Wyoming, shows that Greenflight "repeatedly" signed the DPLA and paid Apple Developer Fees over the past decade. Like Calid, it has its own relationship with Apple. If they were "identical," Apple would only charge them as a single entity. They are, by every definition, legally distinct entities, with different owners, different products, and different damage allegations. Apple will have the opportunity to fully discover these differences as the case progresses. Far from being just a financial backer of the COVID-19 app, Greenflight has entered into Apple's DPLA "again and again," incurring over $1,000 in forced annual fees. Each of those independent transactions as per *Lawlor* constitutes a fresh injury giving rise to antitrust claims. The transactions are entirely distinct from any transactions in CR I, and took place *after* CR I was filed.

Although Greenflight provided emergency funding for the Coronavirus Reporter app (FAC ¶¶ 49, 128), that is not the primary basis of its standing here. Its standing stems from the repeated fees Apple extracted through the DPLA and from Greenflight's *continuing* inability to freely access the iOS userbase without Apple's anticompetitive conditions. *Id*. ¶¶ 308–15. Its "Top Ranked" Caller-ID app was subject to ranking suppression and the retaliatory conduct described in the State Competition causes of action.

Greenflight's claims target Apple's ongoing developer fees and notary-stamp constraints—not simply investment losses from the early COVID era. This presents a direct business injury under antitrust and consumer-protection theories and makes Greenflight a prime candidate to represent the putative classes in Sherman Act and UCL claims. As Apple is fully aware, res judicata cannot reach an entity that never litigated its damages. Greenflight's independent claims about developer fees, its own Caller-ID app, and the general rights of DPLA signatories per UCL and WCPA must go forward.

In short, Greenflight's claims alone warrant full adjudication of the forced App Store and Notary Stamp agreements it has repeatedly signed over the years, not just its minor *pro bono* emergency investment meant to help bootstrap 'Coronavirus Reporter.'

## III. TYING A SMARTPHONE DEVICE TO SEPARATE PRODUCTS (APP STORE AND NOTARY STAMPS) IS *PER SE* CONDUCT UNDER *NORTHERN PACIFIC*

Apple's "product design" defense does not shield what amounts to tying under the Sherman Act. *Microsoft*, too, attempted to label the bundling of Internet Explorer into Windows as a mere "design choice," but the D.C. Circuit treated it as tying, not purely internal integration. See *United States v. Microsoft Corp.*, 253 F.3d 34, 84–95 (D.C. Cir. 2001). Once a defendant with market power requires a second product or service be taken with the tying product, whether by code integration or contract, the "choice of design" characterization does not exempt it from scrutiny. The key inquiry is coercion—does the defendant leverage its dominance in one market (iPhone devices) to force consumers or developers to accept a second, separate product (App Store/notarization) with no meaningful alternative? If so, it is tying, even if engineered as "design." Just as Microsoft's bundling of IE foreclosed competing browsers, Apple's "design" locking iPhones to the App Store forecloses competing app-distribution channels. This is textbook tying subject to antitrust scrutiny.

Apple's motion mistakenly applies a "rule of reason" analysis borrowed from *Epic* Games (and *Microsoft* tying precedent) on the theory that "software platforms" cannot trigger a *per se* rule. But the tying product here is not iOS software alone; it is Apple's iPhone hardware device—as Apple's CEO Tim Cook made clear in the *Epic* trial, testifying that Apple "sells devices, not operating systems." That distinction is decisive. Apple cites *Epic* to argue that all "platform tying" is subject to rule-of-reason. But the *Epic* panel specifically addressed tying *software to software* (the iOS in-app payment system) and concluded it fell under

15

1    the *Microsoft* line of "platform" tying. Here, the tie is fundamentally an iPhone *device*—a physical good—

2    to a distinct product or service (the App Store or notary stamps). Because iPhone devices and app distribution

3    (or notary stamps) are separate products with discrete consumer/developer demand, *per se* liability is properly

4    triggered. Cf. *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 37 (2006) (recognizing per se

5    rule for product-to-product tie, absent a showing the products are functionally inseparable).

6          When a defendant conditions the purchase of a physical product on also obtaining a separate product

7    or service, *per se* tying principles apply. See *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

8    Furthermore, as discussed in the pending *CR I* Rule 60 appeal to the Ninth Circuit, neither the District Court

9    nor the appellate affirmance discussed tying claims. This *per se* tying claim is a valid and novel issue.

10          Apple contends Plaintiffs do not adequately plead "who, what, when, where, and how" of the alleged

11    anticompetitive agreement tie, but the FAC expressly states Apple's *EULA* and *DPLA* prohibit developers

12    from distributing iOS-compatible apps outside the App Store by imposing "notarization" and other

13    constraints. FAC ¶¶ 15, 228–30, 292. Without Apple's "stamp of approval," no iPhone can run third-party

14    code, thereby coercing developers to distribute apps exclusively via Apple's Store. (Id. ¶¶ 295, 298–99.) But

15    for these "coercive" restrictions, Plaintiffs (and others) could trivially offer independent app distribution

16    channels (e.g., a web-based store). *Id*. ¶ 292. Even assuming *arguendo* that an agreement did not exist, the

17    tying conduct would be covered under the Section 2 leveraging claims.

18          In short, Apple "conditions the sale of" or "use of" an iPhone (tying product) on mandatory use of

19    the App Store (tied product). The fact that the App Store is nominally zero-priced to end users does not

20    eliminate a tie. Modern antitrust doctrine recognizes that intangible and free products can still be tied under

21    the Sherman Act. See *United States v. Microsoft Corp*., 253 F.3d 34, 84 (D.C. Cir. 2001) (browser offered

22    "free" to consumers still subject to tying analysis). Here, iPhones are sold, while the App Store—though

23    "free" at point of download—operates alongside notarization procedures as Apple's tollbooth for app

24    distribution, generating direct and indirect revenues (commissions and fees) from developers and ultimately

25    restricting competition.

26          Apple cites *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861 (D. Del. 1987), suggesting no tie exists

27    if "consumers do not actually purchase or lease the unwanted product." But *Kellam* involved a completely

28    unwanted product that consumers never paid for, never used, and had no reason to acquire. By contrast, the

App Store is far from "unwanted"; consumers must use it (to get apps), and developers must engage with it to reach iPhone owners—given no lawful sideloading alternative. Courts have recognized that "forcing" a zero-priced product on consumers can indeed be actionable tying if it "substantially forecloses competition" for an alternative distribution channel. *See* DOJ 2020 Vertical Merger Guidelines (acknowledging vertical integration can harm competition even with nominally "free" add-ons). Apple's argument fails to grapple with the reality that the App Store is effectively mandatory for iOS distribution and thus "coerced" onto users and developers alike. Logically, it follows that were Apple to stop bundling the App Store with the iPhone, consumers would seek out alternatives, and if that failed (because Apple prohibited third-party app stores or notary stamps), iPhone sales would halt, as they would be rendered into 'bricked' devices.

Apple cites the dictum "forcing a consumer to buy something [they] would not buy elsewhere does not injure competition," attempting to trivialize the notary stamp tie. This argument not only misconstrues *Key v. Qualcomm* but also ignores classic tying law under *Kodak* and *Northern Pacific*. Under *Northern Pacific*, and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the critical harm in a tying arrangement is foreclosure—i.e., whether the tying party's monopoly power in one market leverages sales or purchases of a distinct product in a second market, depriving potential rivals of access. It is no defense to say consumers or developers "wouldn't buy the product elsewhere" if such an alternative never arises because the monopolist prevents competitive entry. In other words, 'lack of present alternatives' is precisely the outcome that the Sherman Act forbids when it flows from unlawful tying.

Apple suggests that because no one competes to sell alternative "notary stamps," there is no competition to harm. But the absence of competing notary stamp providers proves the foreclosure: Apple's iOS kernel code enforces a *strict requirement* that only Apple-issued digital signatures will function on the iPhone. (FAC ¶¶ 219, 228–29.) This wholly precludes any rival from entering a "digital signing" or "notarization" market. Thus, developers are compelled to accept Apple's stamp if they want to access the billions of iOS users—an archetypal tying scenario. The fact that forced demand does not spontaneously arise in a foreclosed market is the harm itself. *See Eastman Kodak*, 504 U.S. at 488 (holding that tying can exist despite the absence of present competition in the tied product, because the defendant's conduct "prevented it from emerging").

Apple misapplies *Key v. Qualcomm*, which dealt with patent licenses—purely artificial rights that consumers would never independently buy, with no potential rival suppliers being excluded. By stark contrast, notarization stamps are digital services inherently valuable to consumers and developers, who would immediately purchase them from third-party vendors if Apple permitted competition. They let consumers run software – the main (and sole) reason to buy an iPhone. Apple's exclusive tie thus directly forecloses actual and potential rivals, causing precisely the competitive injury *Key v. Qualcomm* found lacking. Apple distorts *Key v. Qualcomm* to claim no injury if "consumers would not buy [the tied product] elsewhere." In *Key*, there was neither an enforced requirement nor a separate product market that Qualcomm's customers were being forced to enter. By contrast, Apple's notary stamp is a mandatory second product (or service) that developers (the "consumers" in this context) must "buy" or procure—there is no optional route, nor any other firm that can compete to offer iOS signatures. *Key* simply does not control a scenario where the defendant has effectively walled off all rival notarization or code-signing solutions.

Indeed, Apple's recent introduction of a distinct, monetized "Core Technology Fee" in the European Union conclusively shows that notarization is neither a technical necessity nor inseparable from the iPhone's design. Thus, Plaintiffs' allegations do not arise from Apple's internal design choices, but from Apple's extrinsic contractual restraints and commercial practices that condition access to end-user devices upon additional purchases of a separate and unnecessary service. Whether the second product is "unwanted" or "free" is immaterial if the arrangement forecloses a potential rival market and burdens consumers or developers with no alternative. See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14–15 (1984) (tying liability can arise even if the second product is not individually purchased in a separate transaction, so long as it is "forced" or coerced). Apple's notary-stamp practice functionally erases any rival's ability to supply iOS code signing, thereby harming innovation, raising fees for developers, and—ultimately—reducing competition in app distribution. That is precisely the textbook tying harm the Sherman Act targets.

## IV.    PLAINTIFFS PLAUSIBLY ALLEGE FOUR DISCRETE RELEVANT MARKETS

Apple reverts to its *Coronavirus I* playbook by cherry-picking references to "markets" and portraying them as a chaotic jumble. In reality, Plaintiffs' Complaint carefully delineates four discrete markets—(1) the smartphone or (alternatively) performance smartphone foremarket, (2) U.S. smartphone apps (i.e., the software application market), (3) U.S. smartphone app distribution services ("app stores"), and (4) iPhone

18

notary stamps. Each is plausibly alleged with reference to cross-elasticity of demand and interchangeability and reasonably defines all representative substitutes, if they exist. Apple's claims of internal contradictions stem from misunderstanding or mischaracterizing basic distinctions.

The Performance Smartphone market, nearly verbatim to the DOJ's alleged market, cites reasonable substitutes and explains the minimal cross-elasticity with low-end phones. The U.S. Smartphone Apps market is a separate (downstream) market comprising software applications (apps) for smartphones. Plaintiffs specifically reference the unique "zero-price" dimension of many consumer-facing apps and discuss how conventional SSNIP tests are inapplicable, thus employing an SSNDQ (Small but Significant Non-Transitory Decrease in Quality) analysis. *Id*. ¶¶ 214–16. App Distribution Services ("App Store" market) concerns the distribution of apps to end users. To clarify, the relevant distribution channels are limited to smartphone apps, not desktop PC app storefronts. The lone reference to a "Microsoft Store" was to Microsoft's former phone app store—*not* a PC software store. Apple devotes a page to discrediting any notion that PC stores and smartphone app stores are in the same market. But the Complaint never lumps them together. Plaintiffs consistently limit the app distribution services market to "U.S. smartphone" channels. (*Id*. ¶¶ 205, 208.) Apple's suggestion that Plaintiffs propose merging PC software distribution is a misreading.

Lastly, iPhone Notary Stamps is a single-brand aftermarket because only Apple's proprietary code signature can unlock iOS usage. *Id*. ¶¶ 219–30. By design, no interchangeable substitute exists, rendering it a separate relevant market. Plaintiffs allege there are no functional substitutes (id. ¶¶ 219–26), meeting the single-brand rule recognized in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 462–63 (1992).

Apple seizes on passages like "Apple . . . has maintained dominance in the video communication market" (FAC ¶ 133) to claim Plaintiffs "fail to define" that as a Sherman market. But that line is *not* pled as a relevant antitrust market; it is a factual observation illustrating one of the many technologies that Apple restrains to protect its smartphone monopoly. *Id*. ¶¶ 115–26. Likewise, references to "content creation," "automotive infotainment," or "financial services" illustrate Apple's reach and potential future expansions— not additional distinct "Sherman markets." Nothing in the FAC states or implies that every mention of "market" is a *standalone antitrust market*.

Apple's manufactured confusion over "U.S. Smartphone Apps" vs. "U.S. Smartphone App Distribution Services" ignores the straightforward difference: "U.S. Smartphone Apps" are the software

products themselves. Plaintiffs define this market by examining cross-elasticity among different apps for the iOS ecosystem. *Id.* ¶¶ 213–19. "App Stores" are the distribution channels, i.e., the mechanism by which those apps are delivered to end users. *Id.* ¶¶ 205–12. These are obviously distinct, with separate purposes, like a car dealer is different from a car. Plaintiffs briefly allege that Apple exerts *monopsony* power in the app market from a developer's perspective—only to point out that Apple alone sets terms and is the only entity that actually pays developers for iOS apps. Id. ¶¶ 217, 231–34.

The fact that Plaintiffs define more than one market—encompassing a smartphone foremarket plus separate aftermarkets for apps, distribution, and single-brand stamping—does not violate antitrust pleading standards. *See Newcal Indus. v. Ikon Office Sols.*, 513 F.3d 1038, 1044–46 (9th Cir. 2008) ("[A] complaint may allege alternative relevant markets reflecting potential submarkets or aftermarkets.").

In short, Apple again attempts to instill confusion out of routine references and factual illustrations. The FAC plainly sets forth four relevant markets. Apple's "scattergun" accusation replicates a tactic it used in *CR I* but overlooks the far more detailed, DOJ-informed allegations in the present complaint. The Court should reject Apple's mischaracterization and allow these properly alleged markets to proceed.

## V.    APPLE'S CONDUCT FITS THE ASPEN EXCEPTION

Apple's argument that it owes "no duty to deal" under *Colgate* and *Trinko* overlooks *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985). In *Aspen*, the Supreme Court recognized a "limited exception" to the general rule where the defendant (1) forgoes short-term benefits and (2) competes with the excluded party in a secondary market. *Id*. at 608–11. Plaintiffs' allegations (FAC ¶¶ 88, 102, 112, 265) demonstrate precisely that scenario.

The Complaint explains that Apple launched its own COVID-19 solution, thereby competing with third-party COVID apps (e.g., Coronavirus Reporter). FAC ¶¶ 87–88, 102. Thus, Apple was not merely refusing to deal with random developers; it refused to distribute Plaintiffs' COVID app while pushing its own competing product, which ultimately failed. Apple thereby relinquished immediate developer fees and commissions it otherwise would have collected on Plaintiffs' COVID-19 app, choosing to focus on their own brand goodwill. *Id.* ¶¶ 265, 271–72. This short-term sacrifice parallels *Aspen Skiing*, where the defendant turned away profitable lift-ticket transactions to disadvantage a competitor, signifying "exclusionary" rather than "benign" refusal to deal. *Aspen Skiing*, 472 U.S. at 608.

## VI.    APPLE'S $99 DEVELOPER FEE IS A SUPRA-COMPETITIVE TOLL

Apple's defense of its $99 annual Developer Program fee relies on a conflation of "intellectual property licensing" with a monopolistic toll on developers who have no alternative means to reach iPhone users. Five years ago, a bipartisan House Subcommittee concluded Apple's $99 annual developer charge yields over $20 billion in supra-competitive revenue—money that far exceeds any legitimate cost-based rationale. This legislative finding undercuts Apple's narrative that the fee merely compensates for intangible IP or covers Apple's overhead. While Apple cites *Epic* and *Trinko* to say it can charge for its IP, the reality is that Apple's $99 fee does not reflect a simple "licensing" choice but a compulsory imposition on developers—one that multiple investigations have identified as an anticompetitive extraction amounting to billions of dollars in aggregate.

Apple's invocation of "IP licensing" ignores the fundamental question central to this lawsuit: Who owns the iPhone—Apple or the user who purchased it? If users truly own their devices, then developers should be able to access that userbase without paying Apple a forced entry fee. Apple's contrived claim of "protecting IP" rings hollow because developers do not seek to use Apple's intellectual property gratuitously; they seek to provide software to iPhone owners who already paid Apple for the device and thus are entitled to run programs of their choosing. That Apple imposes an additional $99 simply to access a consumer who already purchased the phone illustrates how the fee departs from legitimate IP protection and becomes a barrier to competition.

In *Epic*, the court recognized Apple can lawfully charge for the direct use of its proprietary code or brand. But that principle presupposes a genuine license for actual IP, such as Apple's frameworks or trademark usage. By contrast, the Developer Program membership is a pervasive requirement that every developer must pay annually—regardless of whether they rely on advanced Apple patents or simply want their code to run on a piece of hardware the consumer owns. This structure does not reflect a voluntary IP arrangement. In any case, the facts alleged here differ substantially from *Epic* and warrant discovery.

Apple quotes *Trinko* to emphasize that "mere possession of monopoly power" or "charging monopoly prices" is not unlawful. But *Trinko* also recognizes that exclusionary or anticompetitive conduct that entrenches that power is actionable. 540 U.S. at 407. The Complaint details how Apple's restrictions on alternative app channels, combined with the $99 mandatory fee, *excludes* lower-priced or free developer

1  paths, thereby magnifying Apple's control over its iOS platform. *FAC* ¶¶ 308–14. Thus, the relevant question

2  is not merely whether Apple can charge for its IP but whether Apple wields its iPhone distribution monopoly

3  to force an artificially high developer subscription fee which bundles notarization.

4     Many smaller or independent developers cannot afford to repeatedly pay a $99 barrier for

5  experimental or low-margin apps, which chills new entrants and diminishes overall app output, itself

6  constituting a considerable antitrust injury. This is the exact scenario the Sherman Act aims to prevent—

7  leveraging device-market dominance to impose supra-competitive fees that curb new competitors. Apple's

8  attempt to categorize every mandatory payment as a permissible IP license ignores these concrete market

9  effects. Plaintiffs do not demand that Apple "give away its IP for free."

10  **VII.    AN ESSENTIAL FACILITY EXISTS IN APPLE'S NOTARY STAMPS**

11     Apple dismisses Plaintiffs' essential facilities claim by pointing to *Trinko's* skepticism about the

12  doctrine and asserting developers can distribute via "other avenues." But the FAC (¶¶ 219–30, 315–31)

13  details how Apple's notary stamps form a unique gatekeeping mechanism for iOS. FAC ¶ 219 highlights that

14  "no other platform in history required a notary stamp," detailing how Apple alone provides these digital

15  signatures essential to launching any iOS app. See *MCI Commc'ns v. AT&T*, 708 F.2d 1081, 1132

16  (7th Cir. 1983) (facility "essential" if "competitors cannot practically or reasonably duplicate" it). If there is

17  a case for essential facility, notary stamps prevail: they are essential to executing each piece of software code

18  on every iPhone – a task that happens billions of times each day. Apple's notarization control eliminates a

19  direct path to launching applications. And Apple's straw-man about other distribution channels (Android,

20  web) is unavailing, as those platforms do not allow iPhone software to launch, which is the fundamental

21  conduct at issue here that affects over 80% of Americans and 100% in this single-brand market.

22     FAC ¶ 323 alleges "Apple competes with developers" for app distribution and blocks them from

23  directly distributing iOS apps without Apple's stamp. That forecloses potential alternative "stamp providers"

24  or open-sideload methods. Apple's references to Google Play or Microsoft Store (FAC ¶ 207) are irrelevant

25  because they do not access the iOS user base nor do they permit software to run on the vast majority of

26  smartphones that implement iOS. Hence, Apple's "control of the facility carries with it the power to eliminate

27  competition." *Aerotec*, 836 F.3d at 1185. Notary stamps are essential precisely because the iPhone ceases to

28  function without them.

1    Apple incorrectly equates 'existence of some limited access' with no essential facility. But *MCI*

2    confirms that imposing onerous or unfair terms on a crucial input can violate the Sherman Act. FAC ¶ 324

3    specifically pleads that Apple's mandated "terms of access" are so restrictive and censored that they

4    effectively block or degrade competitor apps— i.e. Apple has not provided "meaningful access" on fair

5    terms. In short, Apple's proprietary notary stamps are a single-brand essential facility for iOS distribution:

6    no rival 'unlock code' exists. By denying or conditioning them under pretextual guidelines, supposed IP

7    licensing fees, and forced supra-competitive developer fees, Apple leverages its smartphone monopoly to

8    exclude or impair rivals in downstream app markets. That is precisely the scenario the essential facilities

9    doctrine addresses. The Court should reject Apple's attempt to dismiss this claim at the pleading stage.

10    **VIII.  RANKING MANIPULATION IS ANTICOMPETITIVE CONDUCT**

11    Apple reduces Plaintiffs' ranking-manipulation claim to a single premise—"Apple alone manipulates

12    search"—but the Complaint identifies agreements (e.g., Developer Licensing Terms, EULA, strategic partner

13    arrangements) that facilitate Apple's preferential search outcomes. Moreover, *Dreamstime* does not bar such

14    claims: the Ninth Circuit emphasized Section 1 liability could arise when linked to properly alleged facts

15    demonstrating harm to competition. The FAC "game theory" allegations (¶ 337) explain that search

16    suppression is not a zero-sum scenario. That critical allegation separates Plaintiffs' allegations from

17    *Dreamstime*, and warrants independent adjudication on Section 2. In any case, the Ninth Circuit recognized

18    ranking manipulation can support antitrust claims if it plausibly restricts competition beyond a single

19    competitor. (See *Dreamstime*, 2019 WL 341579, at *3.) Plaintiffs describe a broader pattern than

20    *Dreamstime* did—Apple consistently burying or demoting cross-platform or threatening apps—thus

21    impacting competition in various app categories, not merely "hurt[ing] one developer."

22    FAC ¶¶ 332–37 describe Apple's App Store ranking manipulation intertwined with the DPLA and

23    Apple's pacts with favored large apps. Where Apple "contractually" imposes rules skewing search results

24    (¶ 335), it is not purely unilateral. See *Epic Games, Inc. v. Apple*, 559 F. Supp. 3d 898, 1019 (N.D. Cal. 2021)

25    (recognizing Apple's developer agreements as "contracts" within Section 1's ambit).

26    Apple's argument that "degrading search" would disadvantage Apple is unavailing. It also defies the

27    House Subcommittee's findings that the App Store is already "inefficient" and fosters missed or buried apps.

28    FAC ¶ 344. By selectively harming competitive threats while maintaining major partner apps, Apple may

1    protect its long-term ecosystem dominance. See *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,

2    141 F.3d 947, 952 (9th Cir. 1998) (recognizing strategic short-term "loss" can preserve long-term monopoly).

3    **IX.    UCL CLAIM SEEKS NON-MONETARY RELIEF FOR UNFAIR PRACTICES**

4         Apple's cursory two-paragraph challenge to Plaintiffs' California UCL claim ignores multiple

5    detailed allegations in the FAC (¶¶ 340–354) showing post-*Coronavirus I* ongoing misconduct, much of

6    which cannot be redressed by monetary damages. Apple thus forfeits its argument by failing to grapple with

7    the core UCL allegations. Apple's conduct "cost lives." Apple's "Censorship of Apps" has had lethal

8    consequences – which are also alleged in PhantomAlert. Plaintiffs identify the risk that Apple's "censorship

9    mechanism" similarly blocks crucial new apps—e.g., those examining "environmental risks of microwave

10   radiation (i.e. 5G) … potential harm to marine and aviary life," etc. ¶ *342*. This is ongoing and beyond the

11   scope of conventional damages. Under *Lawlor*, continuing misconduct is actionable despite prior litigation.

12        Apple's notary requirement "imposes an unfair barrier to entry for developers, and [is] unfair to

13   consumers who pay for their devices." Plaintiffs seek injunctive relief enjoining Apple from continuing that

14   gatekeeping. FAC ¶ *346*. Money alone cannot remedy a nation locked down by selective notarization.

15        The alleged conduct—censorship, "Sherlocking" (¶ 348), retaliatory measures (¶ 350), and $99 fees

16   (¶ 351)—all qualify as "unfair or fraudulent" under the UCL. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel.

17   Co.*, 20 Cal. 4th 163, 180 (1999) (UCL sweeps 'anything that can be called a business practice' that offends

18   public policy or is substantially injurious). Plaintiffs' claim is not "derivative" tethered solely to the Sherman

19   Act. Apple's continuing censorship, developer lockout, and forced fees harm the public interest in open

20   innovation and crisis-related apps (¶¶ 341–42). Apple wrongly insists Plaintiffs seek "adequate" $4.2 billion.

21   FAC ¶ *342* explicitly demands an injunction to prevent Apple's censorship of scientifically important or

22   emergency-related apps. FAC ¶ *351* seeks "an order enjoining Apple from continuing its unlawful, unfair,

23   and fraudulent business practices," including the $99 notary fee barrier. This is precisely the kind of structural

24   remedy the UCL contemplates.

25        Here, pursuant to *Sonner v. Premier Nutrition*, 971 F.3d 834, 844 (9th Cir. 2020), these ongoing

26   harms—costing lives, blocking critical environmental/health apps, censoring all software —demonstrate the

27   inadequacy of purely monetary relief, making injunctive relief essential. The "private attorney general"

28   purpose of the UCL contemplates injunctive relief to halt unfair practices that harm broader consumer

welfare. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003). Plaintiffs' request for injunctions against Apple's anti-competitive conditions—such as requiring open distribution channels—precisely fits this rationale.

Apple's arguments about the WCPA fail for similar reasons. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) does not hold that *all* anticompetitive conduct is barred from WCPA coverage; it merely recognizes that state law might not permit duplicative suits. FAC ¶ *353* clarifies that developers "are consumers of Apple's notarization fee products" under Wyo. Stat. § 40-12-108(a), debunking Apple's claim that Plaintiffs are automatically excluded because they are "commercial entities." Many developers are students and are *not* commercial entities- they just want to develop apps for their friends, family, schoolwork, and are blocked from doing so.

Apple is conspicuously silent on FAC ¶ 350 allegations "illegal conduct under the definitions of WCPA and UCL such as retaliation against antitrust advocates and discovery into improper lobbying tactics." Because Apple's motion to dismiss lumps these allegations under a short "derivative" label, it effectively overlooks the WCPA's broad bar against "unfair or deceptive acts" and thus waives its argument on the substance of these claims.

### CONCLUSION

After two decades of controlling how Americans access the internet, it is time for proper adjudication of the underlying conduct. Apple's motion should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend.

Submitted on this 7th day of April, 2025.

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Opposition was delivered via ECF to all interested parties.

Executed on this 7th day of April, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS
CASE NO. 3:24-CV-8660-EMC