Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>          Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br><br>          Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' MOTION FOR RULE 12(d) CONVERSION AND LEAVE TO FILE SUR-REPLY**<br><br><br>Date: July 10, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A LIMITED SUR-REPLY AND TO CONVERT DEFENDANT'S RULE 12(b)(6) MOTION AS ONE FOR SUMMARY JUDGMENT UNDER RULE 12(d)**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Civil Local Rule 7-3(d), Plaintiffs hereby respectfully move this Court for an order granting leave to file the attached proposed Sur-Reply (attached hereto as Exhibit A) in response to Defendant Apple Inc.'s Reply in Support of its Motion to Dismiss (Dkt. No. 64).

Pursuant to Federal Rule of Civil Procedure 12(d), Plaintiffs further request that, because Apple's Reply relies on materials outside the pleadings—including over $20 billion of disputed Annual Developer, link-tax, and CTF fees, accrued between 2022 and 2025, and fresh (disputed) factual assertions regarding corporate ownership and privity—the Court (i) treat Apple's Rule 12(b)(6) motion as one for summary judgment, or, in the alternative, (ii) strike or disregard those extra-pleading materials until the parties have had an opportunity for discovery consistent with Rule 56(d).

Plaintiffs request that this Motion be heard at the Court's earliest convenience, or at such date and time as may be set by the Court. The underlying motion is scheduled for July 10, over six weeks from now. This motion is timely filed under the same time allocation granted to Apple's Reply. This motion may be heard in consolidation with Apple's motion, or adjudicated earlier to streamline the hearing process. This Motion is based upon this Notice, the Memorandum of Points and Authorities below, the attached proposed Sur-Reply (Exhibit A), the pleadings and papers on file, and any further evidence or argument the Court may receive.

This combined request promotes judicial economy by ensuring that the Court and the parties address the evidentiary posture of Apple's motion in a single, orderly proceeding.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................................................ **1**

**INTRODUCTION** ........................................................................................................... **1**

**LEGAL STANDARD**....................................................................................................... **2**

**ARGUMENT** ...................................................................................................................... **3**

    I.    APPLE'S MOTION AND REPLY ARE REPLETE WITH DIRECT OR UNDERLYING FACTUAL ASSERTIONS THAT TRIGGER RULE 12(D). ........................................................................................................... 3

    II.    RELEVANT MARKET DEFINITIONS DESERVE FURTHER EXPERT SCRUTINY ................................. 6

    III.    RES JUDICATA ARGUMENTS IGNORE FOUR YEARS OF NEW CONDUCT.................................... 9

    IV.    NEWLY-RAISED *BEVERAGE* CITATION DOES NOT DEFEAT VALID UCL CLAIMS................................ 11

        *The UCL "Unlawful" Prong Precisely Captures Apple's Ongoing Malicious Compliance; The FAC Precedes Microsoft amicus and Hagens Berman Class Action by One Year* ....................................... 13

**CONCLUSION** .............................................................................................................. **16**

**CERTIFICATE OF SERVICE**............................................................................................. **16**

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

# TABLE OF AUTHORITIES

Cases

*Amadeo v. Principal Mut. Life Ins. Co.*,
   290 F.3d 1152, 1159 (9th Cir. 2002) .................................................................... 11
*Beverage v. Apple Inc.*,
   93 Cal. App. 5th 1049 (2023) ............................................................................ 11
*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982) ........................................................................................ 8
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163, 187 (1999) ............................................................................. 12
*Dale v. S & S Builders, LLC*,
   188 P.3d 554, 559-60 (Wyo. 2008) ................................................................... 13
*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155, 173 n.19 (2004) .......................................................................... 15
*Hamilton Materials, Inc. v. Dow Chem. Corp.*,
   494 F.3d 1203, 1207 (9th Cir. 2007) .................................................................... 2
*Hennegan v. Pacifico Creative Serv., Inc.*,
   787 F.2d 1299, 1301 (9th Cir. 1986) .................................................................. 10
*Hill v. Opus Corp.*,
   841 F. Supp. 2d 1070, 1082 (C.D. Cal. 2011) ....................................................... 2
*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
   11 F.3d 1460 (9th Cir. 1993) .............................................................................. 9
*Kaiser Found. v. Abbott*,
   552 F.3d 1033, 1042-43 (9th Cir. 2009) ............................................................... 9
*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988, 999 (9th Cir. 2018) ....................................................................... 6
*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal.4th 1134, 1148 (2003) ........................................................................... 14
*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310, 322-323 (2011) ........................................................................ 14
*Lawlor v. National Screen Service Corp.*,
   349 U.S. 322 (1955) ..................................................................................... 9,15
*Lee v. City of Los Angeles*,
   250 F.3d 668, 688 (9th Cir. 2001) ..................................................................... 2, 4
*MetroNet v. Qwest*,
   383 F.3d 1124, 1131-33 (9th Cir. 2004) ............................................................... 8
*Nationwide Biweekly Admin., Inc. v. Superior Ct.*,
   9 Cal. 5th 279, 303 (2020) ............................................................................... 12
*New Hampshire v. Maine*,
   532 U.S. 742, 749-51 (2001) ............................................................................ 13
*Nilsson v. Louisiana Hydrolec*,
   854 F.2d 1538, 1548 (9th Cir. 1988) .................................................................... 6
*Provenz v. Miller*,
   102 F.3d 1478, 1483 (9th Cir. 1996) .................................................................... 2
*Pure Sweat Basketball v. Apple*,
   No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025) ............................................ 15

1

*Retlaw Broad. Co. v. NLRB*,
    53 F.3d 1002, 1005 n.1 (9th Cir. 1995) ................................................................... 6

*Rubert-Torres v. Hospital San Pablo*,
    205 F.3d 472, 475-76 (1st Cir. 2000) ...................................................................... 2

*SaurikIT, LLC v. Apple Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) ........................................................... 9

*SEC v. Sabrdaran*,
    252 F. Supp. 3d 866, 889 (N.D. Cal. 2017) ............................................................ 2

*United States v. Dreyer*,
    804 F.3d 1266, 1277 (9th Cir. 2015) ..................................................................... 12

*United States v. Ritchie*,
    342 F.3d 903, 907 (9th Cir. 2003) ........................................................................... 3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321, 338 (1971) ...................................................................................... 11

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

Apple's over-loaded[1] Rule 12(b)(6) motion rests on a host of disputed facts outside the pleadings and factual incongruities Apple is judicially estopped from advancing. It asks the Court—on a paper record—to extinguish a comprehensive developer class action that challenges the most profitable monopoly in history for ongoing, industry-wide exclusionary conduct. This DOJ-complaint based antitrust/developer-protection lawsuit alleges that Apple weaponizes its notarization gate to censor scientists, publishers, and developers broadly, retaliates against antitrust complainants (conduct the *Epic* court found credible enough to label "developer intimidation"); and openly defies regulatory orders—so brazenly that it was found in civil contempt earlier this month. Dismissing such claims on a pleading technicality before discovery would squander the Court's prior investment in understanding Apple's platform practices (*Epic*, *CR I*) and risk compounding the "Big Tech oligarchy" concerns President Biden identified as a national priority in his farewell speech.  A measured Rule 56 process, by contrast, will elucidate the issues through targeted discovery, allow the parties and the Court to compile a coherent evidentiary record, and preserve appellate review on a full, not piecemeal, foundation.

Pursuant to Civil Local Rule 7-3(d), Plaintiffs respectfully request leave of the Court to file the attached proposed Sur-Reply (attached hereto as Exhibit A) in response to Defendant Apple Inc.'s Reply in Support of its Motion to Dismiss (Dkt. No. 64). Plaintiffs seek leave because Apple's Reply raises significant new arguments, inaccurately characterizes Plaintiffs' claims, and introduces previously unmentioned legal authority and factual matters not raised in Apple's original Motion to Dismiss (Dkt. No. 50).

In addition, Rule 12(d) mandates that a motion to dismiss "must" be converted to one for summary judgment when matters outside the pleadings are presented and not excluded.  Apple's Reply attaches and relies upon documents never referenced in, or integral to, the First Amended Complaint—e.g., outdated Wyoming corporate filings, internal counsel e-mail chains, and contested assertions regarding ownership and control of the plaintiff entities.  (See Reply at 3–6 & Exs. 1-6.)  Ninth Circuit precedent holds that such

---

[1] Apple's Reply introduces over fifteen new cases, and advances over one hundred conceptually independent arguments. This extraordinary density is atypical even for complex antitrust cases. In a Reply, sandbagging new arguments is especially improper, and warrants striking the document or deferring this motion until thorough discovery has concluded for all relevant issues.

submissions trigger conversion or exclusion.  See *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Rubert-Torres v. Hospital San Pablo*, 205 F.3d 472, 475-76 (1st Cir. 2000).  Accordingly, Plaintiffs respectfully request that the Court either (a) convert the motion and allow targeted discovery under Rule 56(d), or (b) exclude the extra-record evidence; if the Court elects the latter course, the attached Sur-Reply is necessary to rebut Apple's newly injected factual matter and legal authorities.

Granting this limited relief accords with the strong public interest in adjudicating, on a complete factual record, claims that challenge the competitive practices of the world's largest corporation—especially where the same defendant has recently been found in contempt for withholding material information and providing misleading testimony in related antitrust litigation.  Resolving Apple's Rule 12(b)(6) motion on an incomplete and contested factual predicate would risk premature dismissal of issues central to the competitive integrity of the smartphone ecosystem.

## LEGAL STANDARD

If matters outside the pleadings are submitted, the motion must be treated as one for summary judgment under Rule 56. See *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007).

Under Civil Local Rule 7-3(d), once a reply brief has been filed, "no additional memoranda, papers or letters may be filed without prior Court approval," except under specific, enumerated circumstances. Courts in this District routinely grant leave to file a sur-reply when the moving party's reply brief raises new arguments, new authorities, or mischaracterizes prior filings, which the non-moving party has had no opportunity to address. See, e.g., *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1082 (C.D. Cal. 2011) (holding a district court may allow a sureply when the moving party in a reply brief introduces new arguments or evidence); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (affirming district court's consideration of a sur-reply filed in response to new issues raised in reply).

Granting leave to file a sur-reply ensures fairness, promotes judicial efficiency, and facilitates a fully informed decision on the merits. See *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 889 (N.D. Cal. 2017). Such leave is appropriately granted when a party would otherwise lack an adequate opportunity to respond to new and potentially dispositive arguments raised for the first time in a reply brief. Id.

1    **ARGUMENT**

2    **I.    APPLE'S MOTION AND REPLY ARE REPLETE WITH DIRECT OR UNDERLYING**
3    **FACTUAL ASSERTIONS THAT TRIGGER RULE 12(D).**

4    Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c),

5    matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as

6    one for summary judgment." A defendant may not rely on extra-pleading evidence to dispute the complaint's

7    well-pled allegations while simultaneously seeking the procedural advantages of a Rule 12 dismissal. Apple

8    has done exactly that. Its motion and reply contain factual averments, exhibits, and litigational narratives

9    that reach far beyond the four corners of the FAC and beyond documents of which judicial notice is

10   proper. In substance—if not in label—Apple has already crossed the Rule 56 line and the Court must either

11   (a) exclude the extrinsic material or (b) convert the motion and allow discovery. See *United States v. Ritchie*,

12   342 F.3d 903, 907 (9th Cir. 2003).

13   Apple's resources dwarf those of the independent developers and public-interest plaintiffs suing

14   here. Granting a premature dismissal would reward a defendant already adjudged willing to "reverse-

15   engineer justifications" and "tolerate perjury" to defend its business model. Apple's is aware of its resources

16   and part of its playbook appears to be wearing down enforcement efforts. This is evidenced by last week's

17   Ninth Circuit stay request that incredulously seems to fault USDJ Gonzales Rogers for Defendant's own civil

18   contempt. Apple's tactics must be uniformly challenged if there is any hope of standing up to this monopoly

19   which opportunistically uses courts, political parties, and nations to preserve the *status quo*. Allowing limited

20   discovery under Rule 56 imposes minimal incremental burden on Apple but affords Plaintiffs a fair chance

21   to prove allegations that, if true, directly affect competition, innovation, and consumer choice for hundreds

22   of millions of Americans. Accordingly, the Court should, pursuant to Rule 12(d), convert the motion into

23   one for summary judgment and set an orderly discovery schedule. Anything less would risk dismissing a

24   serious challenge to a single company that controls the global internet, without the factual transparency that

25   justice and the public interest demand.

26   Apple now argues for the first time that it "proceeded throughout the [2021] litigation on the express

27   assumption that the 'Wyoming Corporation' that wrote the 'Coronavirus Reporter' app was 'Coronavirus

28   Reporter Corporation.'" (Reply Br. at 3.) This belated – and highly inconsistent – assertion constitutes a

significant factual representation that necessarily exceeds the scope of a Rule 12(b)(6) motion. A motion to dismiss under Rule 12(b)(6) must be decided based solely on the facts as pled in the complaint and judicially noticeable materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Apple's attempt to introduce extrinsic factual allegations—its purported "express assumption"—not only definitively transforms its Rule 12 motion into one for summary judgment under Rule 56, but it further highlights how Apple's subjective belief regarding the identity of the plaintiffs in *Coronavirus I* is sharply disputed, by their own divergent statements, and cannot be resolved on the pleadings. Defendant's assertion is not found anywhere in the Complaint or judicially noticeable documents. It is certainly not found, nor consistent, with an assertion made to the Ninth Circuit. It is clearly a new factual assertion, reliant upon internal beliefs or unexpressed assumptions about Apple management. By making this statement, Apple places at issue facts about its internal litigation assumptions, intentions, and understandings. This is exactly the kind of assertion that would typically require affidavits, depositions, discovery, or at least a factual hearing to resolve.

The Reply rings of rationalizations that the CAND court has seen in recent weeks with this same Defendant. Apple's pronouncement is not a legal argument drawn from the FAC; it is a brand-new factual claim about Apple's own state of mind[2]. And it flatly contradicts the position Apple and Gibson Dunn championed in the Ninth Circuit, where they told the panel that no 'Coronavirus Reporter' entity existed and that, if that named Plaintiff somehow prevailed, there would be no one to whom damages could be paid. Apple cannot have it both ways. Either the "mis-spelling" was so trivial that Gibson Dunn's jurisdictional footnote was a calculated attempt to discredit the Plaintiffs, tip the appeal, and/or avoid paying a judgment, or the original footnote was accurate—meaning Apple's present story is contrived. There are no other reasonable possibilities. Resolving which of those two mutually exclusive narratives is true turns on internal

---

[2] Apple further argues that because "scores" of litigation filings exist in *Coronavirus Reporter*, the plaintiffs must have properly existed as legal entities. This reasoning is fundamentally flawed. Defects in party identification are routine in American jurisprudence and regularly lead to the nullification of litigation and judgments. Courts nationwide dismiss or nullify actions and citations every day due to failures to properly identify legal entities or parties. The volume of filings does not cure a fundamental defect in party identification. Identification is a basic tenet in litigation, critical for jurisdiction and enforceability. Apple's new factual allegation about its own "express assumption" implicitly concedes that the precise identity of "Coronavirus Reporter" was indeed contested and unclear during the underlying litigation.

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC

emails, litigation memoranda, and witness testimony that lie well beyond the pleadings. The contradiction also echoes the misconduct catalogued in *Epic v. Apple*, where Judge Gonzales Rogers found Apple had "reverse-engineered, litigation-ready justifications" and Gibson Dunn tolerated "lies on the witness stand" to defend the very business practices at issue here. Given that history, Apple's new 'we always assumed CRC existed' assertion only demonstrates why a Rule 12(b)(6) dismissal would be improper: the Court must permit discovery to test Apple's credibility before it can credit any story about who was—or was not—believed to be Plaintiff in *CR I*.  The Court must thus reject Apple's belated factual assertions as procedurally improper and substantively disputed, or else afford Plaintiffs a fair opportunity for discovery and an evidentiary determination as required under Rule 56. In any case, as detailed in the proposed Sur-Reply, this case is a comprehensive developer lawsuit for significant post-2022 conduct. Apple conflates the importance of the purported identity between Plaintiffs; even if discovery somehow proved Apple's new position[3], the substantial Class Action Developer Compensation Fund would be largely unaffected (a pro se developer's share of App Version 1.0 damages would be carved out; it is a negligible piece of the prayer for relief).

In its reply Apple quotes (and characterizes) private e-mails between Gibson Dunn and Plaintiffs' counsel to argue that Plaintiffs "conceded" certain corporate-identity points.  Private communications are obviously outside the pleadings; Apple uses them to create a factual narrative about what both sides "understood" or "assumed."  Those are disputed inferences, improper on a motion to dismiss. Apple also states as fact that CRC's programmer "owns" or "controls" each plaintiff, that he is the "sole officer," and thus that every entity is in privity with him for res-judicata purposes.  None of that appears in the complaint; it depends on corporate minutes, stock ledgers, and other evidence Plaintiffs have never had a chance to test.  It is also not true and doesn't reconcile Apple's divergent statements on Dr. Roberts' ownership and control. Party-identity and privity issues necessarily turn on record evidence, not facial pleading. Moreover, Apple seems to improperly suggest that these entities are shell corporations meant to cloak litigation. That is unfair, and untrue. All corporations were founded by differing shareholders between 2012-2016, long before this litigation existed. They developed unrelated apps, each encountering development fees approaching hundreds of thousands of dollars, and/or months or years of work by differing owners, had apps used by

---

[3] Undersigned counsel is prepared to submit corporate documentation, at the Court's request, showing shareholder diversity and business activity clearly distinguishing the different entities.

1  millions of distinct users, and so forth. This is not the simplistic one-entity litigation Gibson Dunn pretends
2  it is, and that matter alone should press for discovery.

3       The Ninth Circuit permits notice of public records only for "the existence of the document, not for
4  the truth of the matters asserted." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir.
5  2018). Apple relies on a jumble of mis-placed quotations and auxiliary documents to establish the truth of
6  disputed facts (e.g., that EU CTF fees don't impact US developers, that Dr. Roberts was ever an officer of
7  CRC, that annual transactions don't accrue new harms to DPLA signatories, etc.). That exceeds the Rule 12
8  boundary and triggers Rule 12(d).[4] Plaintiffs respectfully request that the Court exclude all material beyond
9  the pleadings and decide the motion strictly on the FAC and documents properly incorporated therein or
10  convert Apple's Rule 12(b)(6) motion to one for summary judgment under Rule 56, defer ruling, and set a
11  discovery schedule so that Plaintiffs may rebut Apple's factual assertions. Apple cannot have it both ways—
12  using evidentiary matter to attack the complaint while insisting on the narrow Rule 12(b)(6) lens.

13  ## II.    RELEVANT MARKET DEFINITIONS DESERVE FURTHER EXPERT SCRUTINY

14       Apple's over-loaded Reply purports that the FAC's four markets 'fail' – even the government's
15  smartphone market – because the "smartphone device market is not relevant here." And its reasoning, if it
16  can be called that, relies upon a wholly disingenuous reading of Supreme Court *McCready* standards, along
17  with baseless criticism of a straightforward truism that "[n]othing in the FAC states or implies that every
18  mention of 'market' is a standalone antitrust market." The Reply is part and parcel of an attempt to over-
19  complicate this proceeding via dozens of new case references and densely packed but thinly argued
20  assertions, which Plaintiffs estimate to exceed over one-hundred distinct conceptual arguments in a fifteen
21  paged double-spaced Reply, which consistently violates *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1
22  (9th Cir. 1995). See also *Nilsson v. Louisiana Hydrolec*, 854 F.2d 1538, 1548 (9th Cir. 1988) (issues not
23  "specifically and distinctly argued" are waived).

---

[4] The Reply alleges "knots" in Plaintiffs arguments, but ironically it is Apple and opposing counsel who are tied in knots trying to escape the very simple jurisdictional defect they pointed out to the Ninth Circuit in 2022. Cross-allegations of "gamesmanship" only raise the obvious question: why did opposing counsel wait to raise a critical naming defect discovery to the USCA, when its client had the "express assumption" that there was no naming defect? These are not trivial matters, and need to be investigated, particularly if they represent a pattern of misrepresentation.

In order to reduce the burden of Apple's congested MTD, Plaintiffs submit to the Court that although four relevant markets have been pled, all causes of action could survive under the guidance of the DOJ-defined smartphone market. The remaining markets – for Apps, App Stores, and Notary Stamps, have been pled out of an abundance of caution and in efforts to define a comprehensive developer class action complaint. Experts will debate these in due course, but the Court should rest assured that the DOJ's Smartphone market suffices for stating a claim. The underlying DOJ complaint simply if not elegantly alleges just one relevant foremarket: the smartphone (or alternative performance smartphone). The DOJ pleading infers that a singular smartphone market adequately captures all the anticompetitive conduct alleged (Sherlocking, retaliation, API restrictions, etc) towards consumers and developers. Even if Apple were to succeed in dismissing our additional markets, the primary foremarket is sufficient for the class claims to proceed under leveraging principals. Apple leverages its monopoly in the smartphone market through the profitable and exclusionary practice of notarization. Under *Kodak* and *McCready*, one need not prove that "notary stamps" independently compete or previously existed as a standalone market. Instead, a claim simply needs to show that 1) Apple has monopoly power in smartphones, 2) Apple imposed notarization requirements as an exclusionary practice leveraging that monopoly and 3) Developers and consumers are directly harmed by that exclusionary practice (again, plausibly alleged).

The FAC explicitly describes notarization as an artificial and exclusionary practice, not a genuine product or service for which independent consumer or developer demand would naturally arise. (FAC ¶¶ 295–297. Nonetheless it is now a multi-billion dollar economic reality. Apple "created an artificial demand" for notarization stamps by imposing technological and contractual requirements that no previous smartphone or computing device required. (FAC ¶ 297, 299). Apple leveraged monopoly power in the smartphone market (around 75% U.S. market share) into mandatory notarization requirements, directly harming developers who cannot distribute apps and consumers who cannot freely access software. (FAC ¶ 290–293, 299–305). These allegations suffice under *Kodak* and *McCready*, without separately establishing a fully competitive market for notarization. A leveraging antitrust theory does not strictly require the existence of a fully independent, recognized market for the secondary product or service. Rather, leveraging occurs when a monopolist uses its dominance in one market (e.g., smartphones) to harm competition, exclude rivals, or extract additional

1  revenue or control from another product or related practice, even if that second "product" isn't independently

2  competitive or previously existing in commerce.

3  Hence, even assuming *arguendo* the validity of Apple's critiques on the notarization market, the

4  FAC's leveraging theory serves as a back-stop pursuant to *McCready*. Developers do not need to compete

5  directly in smartphones to have standing. As developers, class members are injured precisely by Apple's

6  leveraging conduct—its mandatory notarization practices (and app store exclusivity)—which block app

7  distribution unless developers acquiesce to Apple's monopolistic demands. Similarly, consumers are harmed

8  by artificially limited app availability and increased prices or diminished quality of apps—classic antitrust

9  injuries. Thus, the FAC describes exactly the type of leveraging conduct and direct harm recognized as

10  actionable antitrust injuries under *McCready* and *Kodak*.

11  Apple's "back-to-front" critique confuses direction with mechanism. The gravamen of our theory is

12  that Apple wields its entrenched fore-market power (iPhones) both (i) to extract rents in two captive after-

13  markets (App-Store distribution and notarization) and (ii) to preserve that very device monopoly by stifling

14  disruptive apps. That is the archetype of monopoly leveraging the Ninth Circuit described in *Alaska Airlines

15  v. United*—"use of power in Market A to impose restraints in Market B in order either to monopolize B or

16  to reinforce A." 948 F.2d 536, 549 (9th Cir. 1991). Apple's reply seizes only on branch (ii) and claims it is

17  "reverse" leveraging because the challenged restraints lie outside the smartphone market. But *Alaska

18  Airlines*, *Kodak*, and post-*Kodak* decisions—including *MetroNet v. Qwest*, 383 F.3d 1124, 1131-33 (9th Cir.

19  2004)—make clear that leveraging can proceed in either causal direction so long as the monopolist's conduct

20  in the secondary sphere "tends to entrench or enlarge" its primary monopoly. Id.

21  Nor does *McCready* help Apple. To be sure, Apple fundamentally misstates the Supreme Court's

22  holding in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). The Supreme Court there conferred

23  standing on a plaintiff injured downstream when Blue Shield used market power in the plan-administration

24  market to punish psychologists and their patients—actors wholly outside the defendant's own market. 457

25  U.S. 465, 479-80 (1982). What mattered was that Blue Shield's exclusion of psychologists was a reasonably

26  foreseeable and necessary step in protecting its dominance. Id. at 479. Here, the FAC pleads exactly that

27  nexus: Apple's censorship and notarization padlock are the essential instruments by which Apple (a) extracts

28  supra-competitive fees from developers and (b) throttles rival functionality (cloud gaming, super-apps,

COVID safety apps) that would lower switching costs and erode iPhone share. FAC ¶¶ 13-15, 266-273, 295-305. Apple's rejection of our COVID tracker was not an "incidental" injury; it was the very means of maintaining the walled garden the DOJ now labels anticompetitive.

Finally, Apple misreads *Brunswick* and *Philip Morris*, after improperly introducing them, along with dozens of other new case citations. Those cases reject claims where plaintiffs suffer only derivative or "ripple" effects unconnected to the challenged restraint. Here, developers are the direct target of Apple's scheme: they are compelled to buy Apple's tied notarization (or pay 30 % commissions) because Apple commands the only lawful path to reach iPhone users. That is classic antitrust injury. See *Kaiser Found. v. Abbott*, 552 F.3d 1033, 1042-43 (9th Cir. 2009) (generics excluded by patented formulations had standing although they did not sell in the monopolized brand-drug market).

In short, the FAC alleges a straightforward leveraging paradigm recognized by *Kodak*, *Alaska Airlines*, and *McCready*: Apple's smartphone monopoly is leveraged through exclusionary notarization and App-Store rules that both monetize and perpetuate that monopoly. Apple's "directionality" objection is therefore no basis for dismissal.

## III.    RES JUDICATA ARGUMENTS IGNORE FOUR YEARS OF NEW CONDUCT

Apple fundamentally misconceives the doctrine of res judicata, misapplies controlling Supreme Court and Ninth Circuit precedents, introduces numerous waived and contradictory arguments, and ultimately seeks to evade meaningful adjudication by exploiting procedural technicalities. Under opposing counsel's theory, Plaintiffs are somehow at fault for accepting—or believing—Apple's own (black letter law) assertion that a party naming defect must be properly cured before jurisdiction may be conferred. The Court should reject Apple's attempt to invoke preclusion against Plaintiffs' current, independently actionable claims under the Sherman Act, particularly given Apple's own previous assertions and the applicable standards under *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955).

In its Reply brief, Defendant Apple Inc. introduces new and previously unmentioned authorities—specifically *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460 (9th Cir. 1993), and *SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023)—to escape that Plaintiffs' *Lawlor* applicable claims; Apple contends the annual $99 Developer Fee constitute the "same conduct" previously litigated. (Reply at 2.) This eleventh-hour argument, conveniently tucked away in a footnote, was not raised

in Apple's original Motion to Dismiss, thus depriving Plaintiffs of an opportunity to address these authorities and Apple's interpretation thereof. A Sur-Reply is therefore appropriate to provide the Court with complete briefing on these new and critical issues.

Contrary to Apple's representation, each year's fee constitutes a "newly actionable event," legally and factually distinct from the previous years' fees. Indeed, the Ninth Circuit has explicitly recognized that ongoing periodic payments made pursuant to an evolving contractual or licensing relationship may trigger new actionable claims. See, e.g., *Hennegan v. Pacifico Creative Serv., Inc*., 787 F.2d 1299, 1301 (9th Cir. 1986) (holding periodic payment obligations constitute separate actionable events for purposes of claim accrual).

Apple's invocation of the "every day is a new day" principle from *Dual–Deck* fundamentally misconstrues the facts and legal circumstances underlying Plaintiffs' claims. *Dual–Deck* concerned the defendants' alleged ongoing anticompetitive conduct—specifically, a conspiracy to prevent the plaintiff from selling its dual-deck videocassette recorders (VCRs). The Ninth Circuit held that *res judicata* barred the plaintiff's second suit because it alleged essentially the same continuous unlawful prevention of sales. Even though plaintiffs alleged ongoing harm each "new day," the court found this to be the continuation of the same underlying conspiracy rather than distinct new actionable events or transactions. Critical distinction exists from this case. *Dual-Deck* was ongoing, continuous and static restriction imposed passively by defendants' conspiracy—no new affirmative sales transactions occurred between the parties day-to-day. But in the case of the DPLA, developers affirmatively pay a new, discrete $99 membership renewal fee to Apple, constituting a distinct transactional injury rather than passive, continuous harm.

In sharp contrast, here, the annual $99 fee is imposed under *annually revised* Developer Program Licensing Agreements ("DPLAs") terms which Apple *unilaterally* revises. Indeed, Plaintiffs' FAC specifically alleges Apple's imposition of new conditions, new restrictions, and materially altered obligations associated with the DPLA and corresponding fee payment each year since the dismissal of Coronavirus Reporter I. (FAC ¶¶ 99–106, 251–259). Thus, Apple's reliance on *Dual–Deck* is categorically misplaced. Extending it to this conduct would have the effect of reversing *Lawlor*.

Apple's Reply inaccurately asserts for the first time that this Court previously adjudicated and resolved the legality of the annual $99 fee in *Coronavirus I,* when, in fact, the Court's ruling in CR I expressly

focused on insufficient market allegations, not on the legality or merits of the Developer Program License Agreement or the $99 fee itself. (Reply at 2–3.) Plaintiffs' Sur-Reply is thus necessary to correct Apple's misleading characterizations, to clarify the Court's actual rulings, and to ensure that the present motion is adjudicated on an accurate and fully developed record. The *Coronavirus I* dismissal, upheld by the Ninth Circuit (85 F.4th 948 (9th Cir. 2023)), hinged on the plaintiffs' failure to adequately allege a viable relevant market for antitrust injury. At no point did the district court's substantive analysis directly resolve the legality, reasonableness, or lawfulness of the annual $99 fee itself, nor did it address or dismiss this fee-based claim on the merits. Instead, *Coronavirus I* explicitly turned on broader issues of market definition and antitrust standing—issues distinct from whether each annual fee constitutes newly actionable conduct. A prior judgment cannot have preclusive effect for issues neither explicitly nor implicitly adjudicated. See *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002) (Res judicata does not bar claims that the court explicitly declined to adjudicate.).

If Apple's position were accepted, it would effectively immunize it from ever being challenged for ongoing monopolistic or abusive practices—precisely the outcome the Supreme Court warned against in *Lawlor*. Courts typically interpret *Dual–Deck* narrowly to avoid nullifying *Lawlor's* protective policy for plaintiffs. Each year, Apple issues new DPLA terms[5], forcing developers to repeatedly accede to altered and often more restrictive conditions under threat of market exclusion. To foreclose challenges based on these annual changes merely because Apple describes the fee as the same nominal amount would grant Apple precisely the kind of "perpetual immunity from antitrust accountability" explicitly rejected by controlling precedent. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

## IV.    NEWLY-RAISED *BEVERAGE* CITATION DOES NOT DEFEAT VALID UCL CLAIMS

The Reply mis-casts *Beverage v. Apple Inc*., 93 Cal. App. 5th 1049 (2023)—a California Court of Appeal decision affirming dismissal of purely price-based antitrust/UCL claims brought by iOS consumers who alleged that Apple's 30 percent commission was supracompetitive. *Beverage* held only that, on those pleadings, the UCL "unfair" prong did not survive once the parallel Sherman-Act price-fixing theory failed,

---

[5] *SaurikIT* concerned one paragraph which had not changed. The $99 fee represents consideration paid for the DPLA agreement in totality, which has changed each and every year since its inception.

1   because the complaint alleged no independent unfairness beyond Apple's allegedly excessive price.  Id. at

2   1061-62.

3       Apple conspicuously fails to substantively respond to numerous central allegations set forth in

4   Plaintiffs' FAC, thereby forfeiting its opportunity to dispute critical aspects of Plaintiffs' claims. Specifically,

5   Apple makes no meaningful reply regarding Plaintiffs' detailed allegations regarding Apple's deceptive and

6   fraudulent "Sherlocking" practices, through which Apple allegedly misappropriates developers' intellectual

7   property without fair compensation (FAC ¶¶348-349). Plaintiffs' allegations that Apple "chilled the free

8   expression of app developers" (FAC ¶343) and related post-CR I conduct is not addressed in any substantive

9   way and similarly forfeited. Likewise, Apple is silent on retaliation against developers (¶350) and related

10  conduct meant to punish or prevent them from benefitting from antitrust enforcement (FAC ¶340, "non-

11  compliance affects US-based developers"). In short, Apple creates a strawman to distract from years of post-

12  CRI conduct, neglecting to address comprehensive recent allegations the FAC invokes. Because Apple failed

13  to directly engage these allegations in its Reply, it has waived or forfeited its ability to meaningfully contest

14  their sufficiency at this stage. See *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) (arguments

15  raised for the first time in reply briefs or inadequately addressed are deemed waived).

16      For these reasons, the narrow *Beverage* holding does not control here; our UCL allegations are

17  qualitatively different. *Beverage* involved no claim of censorship, retaliatory de-ranking, gate-keeping,

18  deceptive "Sherlocking," malicious-compliance fees, or coercive notarization, all of which are conduct with

19  a qualitative component that goes beyond mere market economics.  Plaintiffs allege multiple, non-price

20  forms of unfairness that violate public policy irrespective of Sherman-Act liability.  (FAC ¶¶ 341-349,

21  346.)  The California Supreme Court has expressly recognized that such conduct is independently actionable

22  under the UCL.  See *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 187 (1999);

23  *Nationwide Biweekly Admin., Inc. v. Superior Ct*., 9 Cal. 5th 279, 303 (2020) (holding that overlapping

24  factual allegations do not alone defeat a claim of independent unfairness under the UCL.). *Beverage* turned

25  on price; this case turns on conduct: mandatory notarization padlocks, Core-Technology Fees and link fees,

26  censorship and suppression of pandemic-response and video-calling apps, "Sherlocking" and covert ranking

27  manipulation. No such allegations were before the *Beverage* court.  *Cel-Tech* and *Nationwide Biweekly* make

28  clear that overlapping facts do not bar an independent unfairness theory.  9 Cal. 5th at 303.

1    Apple's own litigation posture confirms unfair-prong independence. In the Ninth Circuit Apple

2  insisted that "<u>censorship is not an antitrust injury</u>." (*Apple Br.*, *Coronavirus I*, No. 21-16785, at 34.) Having

3  disclaimed Sherman Act liability for censorship, Apple cannot now argue that our censorship-based UCL

4  theory rises and falls with the Sherman Act.  Judicial estoppel bars that bait-and-switch.  *New Hampshire v.*

5  *Maine*, 532 U.S. 742, 749-51 (2001).

6    Apple's brief conflates deceptive practices (§40-12-105(a)(i)-(xiv)) with the statute's separate

7  prohibition of unfair practices (§40-12-105(a)(xv)).  The latter mirrors the UCL's "unfair" prong and reaches

8  oppressive or unscrupulous conduct even absent a false statement.  See *Dale v. S & S Builders, LLC*, 188

9  P.3d 554, 559-60 (Wyo. 2008) (recognizing broad remedial purpose).  Our WCPA count pleads both

10  deception (Sherlocking, false neutrality) and unfair coercion (mandatory notarization, malicious

11  compliance).  (FAC ¶¶ 346-349, 352-353.)

12    **The UCL "Unlawful" Prong Precisely Captures Apple's Ongoing Malicious Compliance; The**
13    **FAC Precedes Microsoft amicus and Hagens Berman Class Action by One Year**

14    Apple's reply suggests Plaintiffs' claims must be dismissed because they purportedly "re-litigate"

15  conduct previously raised. Defendant attempts to pigeon-hole this case into *anything* narrower than the

16  generalized present-day developer class action that it is. Apple's characterization ignores well-pled

17  allegations of new, unlawful conduct—including significant regulatory non-compliance that resulted in

18  damages to US-based developers. Plaintiffs are not only first-to-file on these issues but have also

19  appropriately pled actionable claims under the UCL's unlawful prong for which restitutionary monetary

20  relief is available.

21    Events that transpired since Apple filed their Reply validate Plaintiffs' class action UCL claims. The

22  FAC unequivocally alleged Apple's deliberate "malicious compliance" with two distinct legal mandates, the

23  *Epic v. Apple* Injunction and European Union DMA. Plaintiffs specifically alleged that Apple intentionally

24  evaded the *Epic* injunction, harming developers and warranting class action relief under UCL "unlawful"

25  prong. Significantly, over one year after Plaintiffs filed this allegation, the allegation was proven. Thus, not

26  only have Plaintiffs accurately anticipated Apple's unlawful behavior, but they were demonstrably the first

27  private class action to formally bring these allegations – and seek damages under UCL – in a federal lawsuit.

Plaintiffs' UCL cause of action explicitly targets the unlawfulness of Apple's 2023-2025 UCL misconduct.

Plaintiffs expressly pled the following "Unlawful" claim:

> "Apple is similarly [like CTF] in malicious compliance of a verdict in *Epic v. Apple*. This conduct again seeks to charge for notary stamps and IAP fees, through an improper commission on developers (FAC ¶ 76)… Apple is presently in malicious compliance with an *Epic* order from the CAND District, whereby they charge developers for links to non-Apple payment systems. These charges, like the EU CTF, are only feasible and/or enforceable because of Apple's notary stamp padlock on iOS. Apple's malicious compliance with the Epic order therefore serves as evidence that Apple intends to charge, directly or indirectly, for notary stamps and/or notarization services. (FAC ¶ 223) … Apple's CTF practices are similarly unlawful [under UCL] as they contravene the legal rules set out in the European Union's Digital Markets Act (DMA)…. Although the DMA is European legislation, its principles reflect global standards for fair competition, and … non-compliance affects [i.e. damages] US-based developers who wish to distribute apps in Europe, including Greenflight and CRC." (FAC ¶ 340.)

This allegation directly captures Apple's broader 2023-2025 strategy of circumventing regulatory mandates—including the *Epic* injunction. FAC ¶¶ 75-77, 223, and references to "CTF practices" as a notary stamp work-around to regulatory enforcement all encompass Apple's contemporaneous U.S. and European unlawful acts. Thus, the recent *Epic* finding fully corroborates already-pled UCL "unlawful" prong.

The California Supreme Court confirms that plaintiffs alleging UCL claims based on violations of court orders, statutes, or regulations can properly seek restitutionary disgorgement of improperly retained fees—exactly the remedy Plaintiffs pursue here. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003); *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014) (disgorgement/restitution proper for violations of law). Plaintiffs seek precisely that restitutionary relief— recovery of illicit transaction fees (CTF fees, anti-steering fees, and mandatory developer fees)—which Apple only retains by unlawfully evading judicial and regulatory mandates. Plaintiffs CRC and Greenflight both alleged direct injury arising from Apple's unlawful conduct. Under the UCL, standing is available to any plaintiff that "lost money or property as a result of" unfair competition. Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322-323 (2011). Apple's malicious compliance with the *Epic* injunction and DMA directly and demonstrably cost Plaintiffs money, establishing clear standing. This is post-CR I conduct and Plaintiffs are representative of the putative class members.

Two days after the *Epic* Court found Apple guilty of "willfully" evading the *Epic* anti-steering injunction and referring the matter for potential criminal prosecution, a separate developer class, *Pure Sweat*

1  *Basketball v. Apple*, No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025), commenced suit seeking

2  restitution of the very same transaction fees. A week later, Microsoft filed a related *amicus* brief (25-2935-

3  YGR, Dkt 25.1) which details the damages that developer faced from Apple's non-compliance.

4          Apple's newly raised argument under 15 U.S.C. § 6a does not bar the CTF claims (which are not

5  discussed in Microsoft or Pure Sweat) from similarly applying.  Section 6a excludes foreign conduct only

6  when it "does not have a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. 15 U.S.C.

7  § 6a(1)(A). Apple's DMA response plainly clears that bar: all U.S. developers must stay in the worldwide

8  DPLA—a California governed contract—and must accept the EU "Alternative Terms Addendum" through

9  the same developer account before they can publish in Europe. Every Core Technology Fee invoice and link-

10  entitlement fee is therefore issued against the same Cupertino anchored contractual relationship and debited

11  to the same developer account already used to pay the annual $ 99 fee. In no circumstance does § 6a bar the

12  UCL/WCPA unfair-practice counts, which are predicated on Apple's California centric contracting abuse

13  and domestic link-tax scheme.  Once any one domestic component of the conduct survives § 6a, the entire

14  case remains properly before the Court.  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 173

15  n.19 (2004).

16          Microsoft's *amicus* brief and *Pure Sweat's* near-identical class action claim therefore both

17  corroborate that (i) Apple's challenged conduct is post-*Coronavirus I*; (ii) it is regarded by multiple

18  stakeholders as independently actionable; and (iii) the economic harm to developers is concrete and

19  ongoing.  Under *Lawlor v. Nat'l Screen Serv.*, 349 U.S. 322, 328 (1955), such subsequent misconduct is not

20  barred by res judicata, and its contemporaneous recognition by other plaintiffs all but proves the futility of

21  Apple's Rule 12(b)(6) attempt to dismiss new-conduct claims at the pleading stage. The fact that multiple

22  developers now pursue the same post-2023 injunction misconduct completely and totally refutes Apple's

23  suggestion that Plaintiffs 'manufacture' injury. A respected plaintiffs' shop (Hagens Berman – lead counsel

24  in *In re Tobacco*, *e-Books*, etc.) would not file on a frivolous theory. Nor would Microsoft.  The FAC referred

25  to CTF and anti-link conduct as exploitation of notary stamps; the *Epic* Court earlier this month characterized

26  it as "motive to protect its illegal revenue stream and institute a new de facto anticompetitive Structure".

27  Vernacular aside, the Microsoft/Hagens allegations concern the same identical conduct; our FAC simply

28  emphasizes the tie-in to notarization as the technical means by which Apple thwarts enforcement. Their

1  entries vouch for economic substantiality of "unlawful" conduct and more than suggests that Apple's "no
2  market / no injury" refrain is contrived

3  **CONCLUSION**

4      Any reasonable reading of the motion papers and responses indicates that the parties have significant
5  disputed facts and require discovery to support their respective positions. The Court should not devote
6  important resources to Defendant's Rule 12(b)(6) motion but rather should be briefed with all available facts
7  at a Summary Judgement proceeding.

8

9  Executed on this 26th day of May, 2025.

                     Respectfully Submitted,


                     /s/ Keith Mathews
                     Keith Mathews
                     Attorney for Coronavirus Reporter Corporation et al
                     *Pro Hac Vice*
                     NH Bar No. 20997
                     American Wealth Protection
                     1000 Elm Street, Suite 800
                     Manchester, NH 03105


                     **CERTIFICATE OF SERVICE**


    I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Motion for Leave to File Sur-Reply was delivered via ECF to all
interested parties.

    Executed on this 26th day of May, 2025.


                     /s/ Keith Mathews
                     Keith Mathews

Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY
CASE NO. 3:24-CV-8660-EMC