Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>                    Defendant. | Case No. 3:24-cv-8660-EMC<br><br>**PLAINTIFFS' SUR-REPLY IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS** |

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**..................................................................................................................**II**

**INTRODUCTION** .......................................................................................................................................**1**

**ARGUMENT** ................................................................................................................................................**1**

    I.    THE PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA.................................... 1
    II.   APPLE STRIVES TO IMPROPERLY EXTEND EPIC GAMES TYING LAW............................ 5
    III.  PLAINTIFFS ADEQUATELY ALLEGE RELEVANT ANTITRUST MARKETS....................... 8
    IV.  APPLE'S $99 DEV FEE CONSTITUTES ACTIONABLE EXCLUSIONARY CONDUCT ...... 10
    V.   THE UCL CLAIM COVERS EXTENSIVE UNFAIR PRACTICES CONDUCT........................ 12

**CONCLUSION**...........................................................................................................................................**15**

**CERTIFICATE OF SERVICE**................................................................................................................**16**

## TABLE OF AUTHORITIES

CASES

*Agostini v. Felton*,
  521 U.S. 203, 215 (1997) .................................................................................................... 2
*Beverage v. Apple Inc.*,
  101 Cal. App. 5th 736 (2024) ............................................................................................ 13
*Coronavirus Reporter v. Apple Inc.*,
  85 F.4th 948, 958 (9th Cir. 2023) ........................................................................................ 4
*Eastman Kodak Co. v. Image Technical Services*,
  504 U.S. 451, 462–63 (1992) .............................................................................................. 9
*Epic Games v. Apple*,
  67 F.4th 946 (9th Cir. 2023) ................................................................................................ 5
*Golden Gate Pharm. Services v. Pfizer*,
  433 F. App'x 598 (9th Cir. 2011) ...................................................................................... 10
*Gray v. County of Fresno*,
  2019 WL 1746846, at *3 (E.D. Cal. Apr. 18 2019) .......................................................... 14
*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481, 502 n.15 (1968) ............................................................................................ 1
*Hennegan v. Pacifico Creative Serv., Inc.*,
  787 F.2d 1299, 1301–02 (9th Cir. 1986) ............................................................................. 2
*Hospital Building Co. v. Trustees of Rex Hospital*,
  425 U.S. 738, 746 (1976) .................................................................................................... 2
*Illinois Tool Works, Inc. v. Independent Ink, Inc.*,
  547 U.S. 28, 37 (2006) ........................................................................................................ 6
*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,
  11 F.3d 1460 (9th Cir. 1993) ............................................................................................. 11
*Int'l Union of Operating Eng'rs v. Karr*,
  994 F.2d 1426 (9th Cir. 1993) ............................................................................................. 3
*John Doe 1 v. Abbott Lab'ys*,
  571 F.3d 930, 934 (9th Cir. 2009) ..................................................................................... 11
*Kellam Energy v. Duncan*,
  668 F. Supp. 861 (D. Del. 1987) ......................................................................................... 7
*Kendall v. Visa*,
  518 F.3d 1042, 1048 (9th Cir. 2008) ................................................................................... 7
*Key v. Qualcomm*,
  129 F.4th 1129 (9th Cir. 2025) ............................................................................................ 7
*LN Mgmt., LLC v. JPMorgan Chase Bank,*
  957 F.3d 943 (9th Cir. 2020) ............................................................................................... 5
*Media Rights Techs., Inc. v. Microsoft Corp.*,
  922 F.3d 1014, 1021 (9th Cir. 2019) ................................................................................... 9
*Microsoft*,
  253 F.3d at 84–87 ................................................................................................................ 7
*New Hampshire v. Maine*,
  532 U.S. 742, 749–51 (2001) .............................................................................................. 4
*Newcal Indus., Inc. v. Ikon Office Solutions*,
  513 F.3d 1038, 1044–46 (9th Cir. 2008) ............................................................................. 9

*Nicklas v. Prof. Ass'n, LLC*,
   2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018) .................................................................. 14

*Northern Pac. Ry. Co. v. United States*,
   356 U.S. 1, 5–6 (1958) ............................................................................................................. 6

Pure Sweat Basketball v. Apple,
   No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025) ............................................................ 3

*Retlaw Broad. Co. v. NLRB*,
   53 F.3d 1002, 1005 n.1 (9th Cir. 1995) .................................................................................... 6

*Rick-Mik Enters., Inc. v. Equilon Enters.*,
   Inc., 532 F.3d 963, 971 (9th Cir. 2008) .................................................................................... 8

*Rowland v. California Men's Colony*,
   506 U.S. 194, 201–02 (1993) ................................................................................................... 5

*Samsung Electronics Co. v. Panasonic Corp.*,
   747 F.3d 1199, 1203-04 (9th Cir. 2014) ................................................................................ 12

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ................................................................................................. 14

*Sports Racing Servs. v. Sports Car Club of Am.*,
   131 F.3d 874, 887 (10th Cir. 1997) .......................................................................................... 6

*Turtle Island Restoration Network v. U.S. Dep't of State*,
   673 F.3d 914 (9th Cir. 2012) ................................................................................................... 3

*United States v. Dreyer*,
   804 F.3d 1266, 1277 n.2 (9th Cir. 2015) .................................................................................. 3

*United States v. High Country Broadcasting Co.*,
   3 F.3d 1244, 1245 (9th Cir. 1993) ............................................................................................ 5

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP,
   540 U.S. 398, 407 (2004) ....................................................................................................... 11

*Zeller v. Optavia, LLC*,
   2022 WL 17858032, at *6 (S.D. Cal. Dec. 22, 2022) ............................................................ 14

**INTRODUCTION**

At the outset, Apple's reply entirely fails to grapple with the controlling principle articulated by the Supreme Court in *Lawlor*: subsequent lawsuits based upon new, independently actionable transactions or injuries are not precluded merely because similar allegations were raised in prior litigation. 349 U.S. at 328; accord *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968). Instead of addressing this critical authority directly, Apple's reply attempts to dismiss the Plaintiffs' detailed allegations of post-2021 conduct as insubstantial, asserting—without citation or support—that Plaintiffs fail to allege new, subsequent transactions. See Apple Reply at 7–8.

Apple's *res judicata* position fares no better. The Reply makes clear that the company faults Plaintiffs for *conceding* the naming defect their own counsel *discovered* and *raised to the Ninth Circuit*. Put very simply, Apple changes tack on technicality after technicality, in order to drag antitrust litigation on for another two decades. It works[1] – Apple has successfully evaded dozens and dozens of antitrust actions at the 12(b)(6) threshold, post-injunction stage, and even EU national level on thin technicalities. The list is too numerous to cite here. But now, the Court faces a situation where Apple's own technicality allows a case to proceed on the merits, in conjunction with new issues corroborated by DOJ, Microsoft, and Hagens Berman. Why should Apple decide which technicalities matter? This Generalized Developer Class Action, based on meticulously researched anticompetitive conduct compiled by DOJ and undersigned counsel, is ripe for adjudication.

**ARGUMENT**

**I.     THE PLAINTIFFS' CLAIMS ARE NOT BARRED BY RES JUDICATA**

Apple was given a fair chance to reconcile conflicting argument on shareholder antitrust standing, but the Reply failed to address it. It contains no meaningful resolution of Apple's divergent arguments that Greenflight lacks Article III standing as financier of CRC, yet Greenflight's programmer somehow had shareholder standing to represent Greenflight's corporate losses and thereby preclude this case. What's more, Apple somehow claims that Dr. Roberts' damages are precluded by the same *pro se* litigation. None of their

---

[1] At least, it worked until this month, when the Honorable Yvonne Gonzales Rogers made global news for legally recognizing Apple's contempt.

Reply enlightens these arguments, and makes clear that Apple in fact seeks discovery as to who owns CRC. The Supreme Court explicitly recognizes that antitrust defendants frequently misuse Rule 12(b)(6) motions by advancing technical exceptions to evade substantive merits adjudication. See *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976). Apple's reply is plentiful with technical exceptions (over one-hundred approximately) which just don't make any sense when viewed from the perspective of the forest versus the trees.

Contrary to Apple's assertions, Plaintiffs expressly challenge the assertion that this case claims are identical to *any* previous lawsuit. The FAC is a comprehensive developer class action lawsuit that covers millions of developers for *escalating* antitrust conduct. Notably, Apple's claim that "many of those [DOJ] allegations expressly date back many years before Coronavirus I" directly concedes that many claims *do not* date back. And even setting aside the new DOJ allegations, the CR App itself was to launch subsequent versions approximately one and two years after filing of the CR lawsuit. See FAC ¶95, "vaccination status (in version 2.0 late 2021), vaccination details (version 3.0 late 2022)."

Contrary to Apple's bare assertions, the FAC explicitly identifies multiple actionable, new events and subsequent transactions, each independently sufficient to trigger *Lawlor's* rule against res judicata. For instance, Plaintiffs specifically allege ongoing annual renewals of Apple's anticompetitive $99 Developer Program fee, each constituting separate actionable violations postdating the CR I judgment. FAC ¶¶ 308–14. Courts have routinely recognized that each separate renewal or continued payment represents a distinct act of harm sufficient to trigger new claims. See, e.g., *Hennegan v. Pacifico Creative Serv., Inc.,* 787 F.2d 1299, 1301–02 (9th Cir. 1986) (ongoing payments under an anticompetitive agreement constitute new actionable harms).

Introduction of the "Core Technology Fee" and "Malicious Compliance" are unequivocal examples of post CR-I conduct. Apple imposed new technical restrictions and monetization schemes, specifically in response to the European Union's Digital Markets Act (DMA) and the *Epic Games* injunction, that materially expanded and modified Apple's prior challenged conduct. FAC ¶¶ 221–24. Courts explicitly recognize such materially new implementations—even if motivated by earlier regulatory events—as constituting subsequent and separately actionable conduct. See *Agostini v. Felton,* 521 U.S. 203, 215 (1997) (holding subsequent regulatory compliance actions independently actionable despite prior litigation addressing related issues).

The malicious compliance represents anti-enforcement conduct and retaliation against developers, particularly in the case of *Epic* anti-steering link tax. Plaintiffs specifically pled Apple's retaliatory suppression of developers (by no means limited to the above two examples) who pressed antitrust claims in the wake of *Epic* and *Coronavirus I* litigation. FAC ¶¶ 128–32, 332–37, 350. These subsequent retaliatory acts are textbook examples of new actionable antitrust injuries that are never precluded by earlier judgments. See *Lawlor*, 349 U.S. at 328 (affirming subsequent litigation against retaliatory conduct arising post-judgment). Penalties to developers who sought to benefit from the *Epic* anti-steering injunction, and CTF fees are just two (known) components of Apple's retaliation schemes and have spawned similar class actions in the past week, after Apple filed its reply. Apple's failure to substantively address these post-2021 events waives its ability to contest their significance for res judicata purposes. See *United States v. Dreyer,* 804 F.3d 1266, 1277 n.2 (9th Cir. 2015). Accordingly, under *Lawlor*, Plaintiffs' current claims based on these new transactional facts plainly survive res judicata.

Similarly, Apple's reliance on *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914 (9th Cir. 2012), and *Int'l Union of Operating Eng'rs v. Karr*, 994 F.2d 1426 (9th Cir. 1993), is misplaced. Those cases involved static, continuous practices already adjudicated, not distinct transactional injuries recurring annually as in the instant case. And Apple cannot escape liability under 15 U.S.C. § 6a for new conduct in the EU, because the FAC reasonably describes how US app developers routinely distribute apps in Europe, and are impacted by the non-compliance because Apple takes CTF fees from their US-originating platform membership. Similarly (see, infra, UCL section), Apple is wrong that "This case also has nothing to do with the link entitlement program at issue in *Epic*." This class action covers US developer damages for CTF and *Epic* link non-compliance. Numerous filings this month[2] confirm the ripeness of this issue first raised by Plaintiffs over a year ago.

Apple's attempt to downplay its prior USCA statements in *Coronavirus I* as limited solely to judicial recusal procedures (i.e. disclosure statements) is disingenuous and contradicted by the record. Apple's Ninth Circuit filing explicitly argued that "no relief could be awarded" because the plaintiffs lacked proper corporate existence. How could judicial recusal procedures preclude damages payment? Contrary to Apple's

---

[2] See Microsoft *amicus* brief dated May 20, 2025 (25-2935-YGR, Dkt 25.1) and *Pure Sweat Basketball v. Apple*, No. 5:25-cv-03858-NC (N.D. Cal. filed May 2 2025).

current assertions, this was *not* a procedural argument regarding judicial recusal. Instead, it was a substantive assertion directly bearing upon whether Apple would pay a judgment if "non-entity" plaintiffs prevailed on appeal. Put very simply, Apple (or Gibson Dunn) flagged a fairly straightforward (uncommon only in that they chose to wait until appeal to announce the defect) naming defect: each and every corporate plaintiff was mis-spelled. CR was severely defective, missing any corporate type identifier; the other two had punctuation errors that would be analogous to 'Burger-King Whopper' being named a defendant. Curing these defects would have required amendment to cure, which never happened.

Apple's res judicata theory succeeds only if the Court accepts Apple's new story that Coronavirus Reporter Corporation was a properly identified plaintiff in the first suit—precisely the opposite of what Apple told the Ninth Circuit. Judicial estoppel is triggered when a litigant "plays fast and loose with the courts"; resolving it requires a factual look at Apple's earlier representations, not a facial review of Plaintiffs' complaint. See *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001). That inquiry cannot be completed within Rule 12(b)(6)'s four-corner limit.

Specifically, Apple's reply claims that Coronavirus Reporter Corporation (CRC), Calid Inc., and Greenflight Venture Corporation were somehow properly parties or in privity with parties from CR I. Yet Apple previously persuaded the Ninth Circuit to affirm dismissal by characterizing the original corporate plaintiffs as "non-entities" or "null parties" incapable of pursuing any relief. *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 958 (9th Cir. 2023). Apple's assertion now that these entities were validly constituted plaintiffs at the time of CR I contradicts that successful earlier position, triggering judicial estoppel. Judicial estoppel precludes Apple from now asserting that the plaintiffs named in CR I are identical or in privity with those here because Apple explicitly—and successfully—argued before the Ninth Circuit that the CR I plaintiffs were legally nonexistent entities and thus incapable of maintaining the suit or recovering any judgment. See *New Hampshire*, 532 U.S. at 749–51 (judicial estoppel applies when a litigant's earlier position is clearly inconsistent with its current stance, the prior position was successfully advanced, and the party gains unfair advantage from the inconsistency). Apple raises a speculative defense that they never benefitted from their original assertion – but that requires assuming what might have happened on the underlying appeal, had undersigned counsel not conceded the point.

Apple's Reply newly argues privity based solely on Dr. Jeffrey Isaacs' supposed control over Greenflight. Reply 9–10. However, it conspicuously fails to address controlling federal precedent prohibiting a pro se individual from representing a corporate entity. The Supreme Court unequivocally holds that corporations can appear in federal court only through licensed counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993). It is thus legally impossible—and Apple cites no authority otherwise—for Dr. Isaacs' *pro se* appearance in CR I to have effectively represented or bound Greenflight Venture Corporation, an independent corporate entity. Carried to its logical conclusion, this would mean Dr. Isaacs' pro se litigation now precludes Dr. Roberts – whom Apple said was never involved in CR I – from collecting damages. That is inherently unfair and defies common sense. The Ninth Circuit specifically emphasizes that a corporate entity cannot be bound by the pro se appearance of an individual shareholder or officer. See *United States v. High Country Broadcasting Co.*, 3 F.3d 1244, 1245 (9th Cir. 1993). Apple's privity theory thus rests on a legally prohibited premise, failing as a matter of federal procedural law.

Apple cites *LN Mgmt., LLC v. JPMorgan Chase Bank*, 957 F.3d 943 (9th Cir. 2020), but this case does not hold that the existence of one plaintiff automatically establishes jurisdiction over all other improperly identified or nonexistent entities. Apple thus misapplies the case law governing jurisdictional attachment and corporate entity standing. And that case in no way reconciles that larger problem, even if the Court doesn't estop Apple's argument: a shareholder has no antitrust standing to sue for corporate antitrust injury.

## II.   APPLE STRIVES TO IMPROPERLY EXTEND EPIC GAMES TYING LAW

Apple initially argued that *Epic Games v. Apple*, 67 F.4th 946 (9th Cir. 2023), mandates application of the rule of reason to all ties involving software platforms. (Mot. at 20.) In response, Plaintiffs explained *Epic's* holding was explicitly limited to a software-to-software tying arrangement (the App Store platform and In-App Purchase system), and thus did not apply to Plaintiffs' hardware-to-software tying claim (the iPhone hardware device to the App Store or notarization services). (Opp. at 15–16.) Plaintiffs clearly distinguished the FAC's hardware-based tying allegations from the software-platform context discussed in *Epic*, noting Tim Cook's testimony that Apple primarily "sells devices," not operating systems. (Id.)

Critically, Apple's Reply did not substantively address Plaintiffs' core distinction between hardware and software tying. Instead, Apple merely restated—without additional authority or analysis—its earlier

5

1 assertion that *Epic* broadly covers ties involving "highly innovative" software platforms, regardless of hardware involvement. (Reply at 12.) By declining to address Plaintiffs' central argument—that *Epic* was expressly limited to software-to-software tying—Apple effectively conceded this crucial point.

The Court should not permit this improper attempt to alter and expand *Epic*. Under controlling Ninth Circuit precedent, such a failure constitutes forfeiture. See *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995) (Holding that arguments not substantively addressed in briefing are deemed forfeited.) By merely restating its original argument without responding substantively to Plaintiffs' distinctions, Apple waived any attempt to extend *Epic's* holding beyond its stated context. It would now be inappropriate for Apple to seek a surreptitious extension of *Epic's* narrowly cabined ruling through this Court.

Courts applying established Supreme Court precedent recognize per se liability for product-to-service or hardware-to-service ties. See, e.g., *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 37 (2006) (acknowledging per se liability for tying involving physical goods). Apple's attempt to avoid per se scrutiny by recharacterizing this as a "software platform" tie thus misstates both the FAC and controlling Ninth Circuit and Supreme Court precedent. Even if a rule-of-reason standard applied, Plaintiffs' detailed allegations of Apple's substantial foreclosure of approximately 75% of the U.S. performance-smartphone market and roughly 80% share of revenue in U.S. app distribution markets would establish anticompetitive harm sufficient to withstand dismissal. (FAC ¶¶ 290, 298, 305.) Apple's Reply fails to challenge Plaintiffs' detailed market share and foreclosure allegations, effectively conceding them.

Apple additionally argues Plaintiffs are neither "coerced purchasers" nor "excluded competitors" of the allegedly tied products (Apple Reply at 12–13; citing *Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 887 (10th Cir. 1997)). However, this misrepresents the detailed allegations in the FAC. Plaintiffs explicitly plead they are competitors or potential competitors in the tied market—alternative app-distribution services or independent notarization services—who have been unlawfully foreclosed by Apple's contractual and technical restraints. (FAC ¶¶ 289, 292, 297–299, 323.) Plaintiffs detail feasible alternative distribution methods, specifically website-based distribution or third-party code-signing, that would be "trivial" to implement absent Apple's coercive restrictions. (Id. ¶ 292.) Apple's attempt to conflate "PC

stores" with "app distribution websites" should be disregarded by the Court as noise meant to instill confusion and disrupt this proceeding.

Apple asserts the absence of a relevant "agreement" because its EULA and DPLA allegedly contain no specific clause agreeing to preload the App Store. (Apple Reply at 13.) This misses the mark. The FAC explicitly alleges that the DPLA and EULA contain bilateral constraints—developers must exclusively use Apple's notarization and distribution system as a precondition for market access. (FAC ¶¶ 289–295, 298–299.) Under settled antitrust law, such coercive contractual restrictions can indeed constitute actionable agreements. In any case, developers cannot modify users iPhones for open-access, without violating Apple's terms. The D.C. Circuit in *Microsoft* explicitly rejected attempts to label similar restrictions as mere "product design decisions," holding that tying via contractually enforced software integration constitutes actionable tying. *Microsoft*, 253 F.3d at 84–87. Thus, Apple's attempt to portray these restrictions as unilateral design choices ignores settled law recognizing that coercive licensing agreements coupled with technical enforcement mechanisms satisfy the Sherman Act's "concerted action" requirement. Id.; see also *Kendall v. Visa*, 518 F.3d 1042, 1048 (9th Cir. 2008) (recognizing contractual agreements between parties enforced by technology as actionable under Section 1).

Apple's argument that no separate market demand exists for notarization services because the notary stamp is algorithmically bound to iOS (Apple Reply at 13–14, citing *Key v. Qualcomm*, 129 F.4th 1129 (9th Cir. 2025)) misconstrues controlling precedent. The FAC alleges—and Apple's recent practices in the EU confirm—that independent code-signing is a viable, monetizable service market. (FAC ¶¶ 295, 298–299.) Indeed, Apple's introduction of a distinct, monetized "Core Technology Fee" in Europe conclusively demonstrates that notarization is neither inherently tied nor technically indispensable to the iPhone. Rather, it constitutes an artificially created barrier to independent code-signing, exactly the scenario recognized by *Eastman Kodak*. 504 U.S. at 462–64 (finding distinct market for service and parts despite manufacturer's restrictions).

Apple wrongly claims no antitrust injury arises from tying a "free" product to consumers (App Store access) to the iPhone, citing *Kellam Energy v. Duncan*, 668 F. Supp. 861 (D. Del. 1987). Apple again ignores modern antitrust jurisprudence, including the landmark *Microsoft* tying decision; foreclosure, not monetary cost, is central to tying analysis. *Microsoft*, 253 F.3d at 84 (holding that a zero-priced browser bundled with

an OS caused actionable foreclosure). Here, Plaintiffs allege precisely this type of foreclosure: Apple's contractual and technical restrictions effectively force both developers and users to adopt a single, exclusive distribution pathway—eliminating competition in the tied market. The coercion is real, and the injury—foreclosure of rival distribution services—is actionable under current antitrust law, irrespective of the zero-dollar sticker price of the App Store to end users. See *Rick-Mik Enters., Inc. v. Equilon Enters*., Inc., 532 F.3d 963, 971 (9th Cir. 2008) (recognizing coercion even without direct consumer payment).

### III.    PLAINTIFFS ADEQUATELY ALLEGE RELEVANT ANTITRUST MARKETS

Apple's favored tactic of cherry-picking isolated paragraphs (FAC ¶¶ 127, 133, 162) and labeling them as "undefined markets" (Reply 10–11) exemplifies precisely the technical, meritless arguments Rule 12(b)(6) disfavors. Read fairly and in context, these references clearly serve as factual illustrations or background context, not standalone Sherman Act market definitions. See FAC ¶¶ 115–142 (explicitly identifying four defined markets). Plaintiffs unequivocally state that their antitrust claims are predicated on four relevant markets: (1) smartphones/performance smartphones, (2) U.S. smartphone apps, (3) U.S. smartphone app distribution services ("App Stores"), and (4) iPhone notary stamps. (FAC ¶¶ 205–230.) Apple's insistence on ignoring Plaintiffs' explicit framing, to instead extract confusion from ordinary background references, undermines Rule 12's policy preference for adjudication on merits rather than technicalities. Apple selectively highlights isolated phrases from the FAC, questioning every aspect of submarkets and even why general app stores include all "genres of apps." Apple even argues the DOJ defined market for smartphones is "irrelevant" to this case about the iPhone monopoly. Leveraging principles are discarded as "misplaced allusion." Defendant's scattershot Reply is noise to confuse the proceeding.

Apple's persistent invocation of collateral estoppel from CR I (Reply 10–11) is misplaced; collateral estoppel does not apply to allegations concerning new transactions, facts, and conduct occurring after the first suit. Apple newly asserts that the DOJ smartphone market fails under *PhantomALERT v. Apple*. But *PhantomALERT*—an unpublished, non-binding district court decision currently under appeal in the D.C. Circuit—differs markedly in context and scope. That case does not incorporate the entire DOJ complaint, and it is limited solely to the 2020 COVID issue. Plaintiffs here allege a systemic exclusionary scheme starting from Apple's dominance in smartphone markets, leveraging power downstream into app distribution and notarization aftermarkets (FAC ¶¶ 264–286). Such leveraging precisely fits the scenario the Supreme

1  Court endorsed in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 462–63 (1992), and the
2  Ninth Circuit recognized in *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044–46 (9th Cir.
3  2008). Apple completely ignores these precedents.

4  Apple's then turns to purported contradictions involving the Microsoft app store allegations. Apple
5  critiques Plaintiffs' reference to Microsoft's "former" mobile app store, emphasizing the FAC's verb-tense
6  usage as a "fatal" contradiction (Reply 11). Their Reply, as best as undersigned counsel can interpret, posits
7  that verb tense somehow disproves the Microsoft Store (for the defunct Microsoft Phone) ever competed as
8  a smartphone app store. Yet, Plaintiffs clarified this the Microsoft Phone Store was an illustrative example
9  of a failed, past mobile store, not a current competitive alternative (FAC ¶¶ 205–212). Apple's attempt to
10 exploit verb tense as grounds for dismissal precisely exemplifies the type of trivial objection Rule 12(b)(6)
11 disfavors. Under *Brown Shoe*, this is clearly in the turf of fact-finding. The Court should not waste precious
12 resources on Apple's 12(b)(6) but rather should convert the motion under Rule 12(d) and await a more
13 informed basis for adjudication.

14 Defendant's use of hyper-technicalities is problematic because they have a track record of advancing
15 such arguments only to backtrack when it suits them. Indeed, a pattern emerges which embodies precisely
16 the "fast and loose" gamesmanship that the Supreme Court warned against in *New Hampshire v. Maine*.
17 Apple advanced arguments regarding entity naming status to the Ninth Circuit, only to reverse course years
18 later and blame Plaintiffs for accepting Apple's very own technicality. Apple's latest suggestion that minor
19 linguistic variations mandate dismissal starkly conflicts with the liberality afforded pleadings under federal
20 antitrust law. The Ninth Circuit explicitly disfavors premature dismissal of antitrust claims precisely because
21 such procedural entanglements "can often obscure substantial questions" best resolved through discovery
22 and merits adjudication. See *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir.
23 2019).

24 Apple further contends, newly in Reply, that Plaintiffs have not sufficiently pled consumer
25 "awareness" necessary to sustain a single-brand aftermarket for iPhone notary stamps under *Kodak* (Reply
26 12). Yet the FAC pleads meaningful ex-ante awareness of notarization requirements: "iPhone device user
27 often is locked in to their device, or has substantial barriers to exit" (FAC ¶ 290). This is exactly the
28 information-cost lock-in scenario contemplated by *Eastman Kodak*, 504 U.S. at 473–77, which Apple

ignores. And ex-ante awareness cannot extend to cases where an iPhone purchaser has no choice to choose iPhone, based on past purchases dating back a decade ago, where surely *ex ante* awareness didn't exist, in light of the US Copyright decision and allegations about "every other computing platform in history" permitting open access to a purchased device. Finally, even assuming *arguendo* that *ex ante* awareness didn't exist, the conduct is still unfair under UCL (see infra).

Finally, Apple newly cites *Golden Gate Pharm. Services v. Pfizer*, 433 F. App'x 598 (9th Cir. 2011), asserting Plaintiffs' markets are overly broad (Reply 12). But *Golden Gate* invalidated an implausibly vast "all pharmaceuticals" market without functional coherence. Plaintiffs, by contrast, have alleged narrower functional categories—smartphone devices, smartphone apps, app distribution, and notarization stamps—precisely delineated by product function, economic realities, and interchangeability. Apple's broad-brush analogy to *Golden Gate* is therefore unavailing. At some point, the pattern is obvious: Apple is pitching literally hundreds of arguments, hoping one sticks. That alone warrants denial of the motion.

In sum, Apple's Reply exemplifies precisely why Rule 12(b)(6) dismissal is a disfavored mechanism in antitrust litigation. Apple repeatedly advances hyper-technical arguments—verb-tense disputes, isolated factual sentences, and non-binding, factually distinct district court dicta—while ignoring core factual allegations, key precedents, and forfeiting meaningful responses to Plaintiffs' clarifications. Plaintiffs' FAC plainly and plausibly alleges four coherent, economically justified markets. Apple's scattergun attempt to dismiss these serious allegations on technicalities alone warrants denial.

## IV. APPLE'S $99 DEV FEE CONSTITUTES ACTIONABLE EXCLUSIONARY CONDUCT

Apple's reply continues to fundamentally misconstrue the nature of Plaintiffs' claim regarding the $99 Developer Program fee, erroneously characterizing it merely as permissible "monopoly pricing" or a lawful charge for "intellectual property licensing" (Reply at 14). This position overlooks—and thus forfeits—key factual and legal points raised by Plaintiffs, while relying on plainly inapplicable precedent.

First, Apple notably fails to rebut the detailed Congressional findings cited in Plaintiffs' Opposition, which specifically concluded that Apple's mandatory $99 developer fee generates supra-competitive revenues of over $20 billion, significantly exceeding Apple's legitimate costs associated with the provision of such services (Opp. at 21; FAC ¶ 312). The absence of a substantive response on this critical point constitutes forfeiture. Under Ninth Circuit *Retlaw* precedent, arguments raised by the opposing party that

remain unrebutted in reply briefing are waived. Thus, at this stage, the Court must take Plaintiffs' allegations regarding these Congressional findings as undisputed for the purposes of Rule 12 analysis.

Second, Apple likewise leaves entirely unanswered Plaintiffs' well-pleaded allegations that the $99 fee serves as an anticompetitive notarization toll precisely because Apple simultaneously forecloses all alternative channels for app distribution. Plaintiffs explicitly pled that the $99 fee is coercive—not due to a mere preference or convenience, but due to Apple's explicit contractual and technological barriers to any competing app-distribution platforms or sideloading. FAC ¶¶ 308–14. In practical terms, developers face a binary choice: either pay Apple's mandatory fee annually or be completely excluded from the iPhone's installed user base, a critical consumer segment comprising hundreds of millions of individuals (FAC ¶¶ 310–11). This linkage transforms Apple's fee into a vehicle of exclusionary conduct rather than a standard licensing arrangement.

Apple invokes *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004), and *John Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009), reiterating that monopoly power and monopoly pricing alone do not constitute a Sherman Act violation. Yet Apple overlooks *Trinko's* important qualification: monopoly prices coupled with exclusionary conduct designed to maintain or enhance monopoly power do indeed violate antitrust law. *Trinko*, 540 U.S. at 407. Here, Plaintiffs allege precisely such exclusionary conduct—Apple uses the compulsory $99 annual charge in conjunction with a complete prohibition on alternative distribution channels to fortify and maintain its monopoly power. FAC ¶¶ 308–314. Apple's reliance on *Trinko* once again conveniently misses the crux of Plaintiffs' exclusionary conduct argument entirely.

Apple's invocation of *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993), claiming that new $99 transactions constitute nothing more than the repetitive conduct already adjudicated, misstates the nature of the transactions, overlooks essential distinctions in the present litigation, and is unsupported by controlling precedent. Apple incorrectly relies on *Dual–Deck*, asserting that repeated annual payments of the developer fee constitute mere continuation of previously adjudicated conduct. See *Dual–Deck*, 11 F.3d at 1464. However, a careful reading of Ninth Circuit authority clarifies that the $99 annual developer fee is precisely the type of recurrent conduct that creates a distinct transactional basis for new claims. In *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955), the Supreme Court made

clear that "[w]hile the [initial] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." Here, each annual $99 fee constitutes a new payment, made pursuant to annually revised contractual terms and conditions, which inherently cannot be precluded by a prior judgment.

Notably, the Ninth Circuit clarified this point in *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-04 (9th Cir. 2014), stating explicitly that "continuing violations involving periodic charges or changing terms" constitute new and actionable antitrust conduct, distinct from the repetitive daily identical transactions at issue in *Dual–Deck*. Accordingly, the "every day is a new day" defense does not apply because the $99 fee is imposed annually under newly issued contract terms.

In sum, Apple's Reply fails to rebut Plaintiffs' detailed allegations regarding Congressional findings, the mandatory and exclusionary nature of the $99 fee, its chilling effect on innovation, and its distinctness from legitimate IP licensing. Sony doesn't charge movie producers for the technology in viewer's television sets, and Apple's idea would be absurd, applied to any other industry. Apple's invocation of *Epic*, *Trinko*, and *Doe* does not rescue its argument but rather evidences its fundamental strawman mischaracterization of the nature of the challenged fee. Plaintiffs have thus amply stated a plausible claim for exclusionary conduct actionable under Section 2 of the Sherman Act.

## V.     THE UCL CLAIM COVERS EXTENSIVE UNFAIR PRACTICES CONDUCT

Apple attempts to evade the broader and independent fairness principles articulated in *Cel-Tech* and *Nationwide Biweekly* by incorrectly asserting that the notarization and censorship practices at issue cannot constitute independent unfairness if there is no corresponding antitrust violation. This contention misstates the law and mischaracterizes Plaintiffs' allegations. The notarization requirement is independently unfair under the UCL because it arbitrarily restricts consumer and developer rights to freely use devices consumers have lawfully purchased (FAC ¶346). Plaintiffs analogize this unfairness to purchasing a VCR or CD player and then requiring manufacturer permission for each use—a clearly arbitrary and oppressive practice without legitimate justification (Id.). Moreover, the notarization policy enables Apple's censorship practices, allowing Apple to engage in non-transparent, selective suppression of speech, stifling important scientific innovations, public health applications, and chilling independent app developer speech (FAC ¶¶341-344).

12

The FAC also elucidates how notarization enables Apple's malicious compliance with regulatory efforts such as EU DMA and *Epic* anti-steering, thereby exacerbating developer injury. Apple's policies thus inherently implicate deeply rooted public policy concerns about transparency, consumer autonomy, and the free dissemination of ideas, making them precisely the type of practices the UCL independently seeks to redress.

Similarly, Plaintiffs assert that Apple's deceptive representations regarding the App Store's neutrality constitute independently actionable unfairness under both UCL and WCPA (FAC ¶347-349). Consumers and developers reasonably rely upon Apple's marketing of neutrality and fairness; however, Apple's undisclosed practice of "Sherlocking," preferential treatment, and censorship clearly violates consumer expectations and established notions of fairness. In short, Apple does not market what they say in court: that censorship is permissible and practiced by Apple upon 80% of the population. Such conduct constitutes precisely the type of deception and unjust enrichment prohibited by both California and Wyoming consumer protection statutes. (FAC ¶¶ 347-349, Wyo. Stat. §40-12-105(a)(xv)).

Apple's own contempt briefing filed last week confirms the distinction. In its emergency-stay motion (9th Cir. No. 25-2935, Dkt 7-1 at 23-24), Apple cites *Beverage* only for the narrow proposition that courts may hesitate to impose state-law "rate-setting.[3]" Simultaneously, Apple concedes the contempt order rests on new conduct—"a series of contrivances" (malicious compliance) implemented after the original *Epic* trial. Those same contrivances (link tax, CTF, etc) are pled in the FAC as post-2023 unfair practices (FAC ¶¶ 75-78, 221-223, 340). Apple's stay brief therefore illustrates that the UCL/WCPA counts are grounded in fresh misconduct unaddressed in *Coronavirus I* and untouched by *Beverage*.

---

[3] Apple excessively touts *Beverage v. Apple Inc.*, 101 Cal. App. 5th 736 (2024), as though it were a universal solvent for every UCL challenge to—but *Beverage* addressed only a price-based theory (the traditional 30 % commission) and never confronted Apple's newer, non-price restraints, such as (i) the *per-transaction "link fee"* that attaches whenever a user follows a developer's out-of-app link, (ii) *scare-screen friction* inserted to deter such linking, or (iii) the *Core-Technology/Notarization charges* Apple now layers on developers. The Court of Appeal expressly limited its holding to "Apple's uniform commission structure" and did not pass on the legality of Apple's subsequent tactics for preserving that structure. 101 Cal. App. 5th at 746–50. Apple's heavy reliance on *Beverage* therefore highlights exactly why this Court must adjudicate the notarization-enabled link tax: left unchecked, Apple will cite that narrow pricing opinion to cloak any successor scheme—no matter how coercive or deceptive—in presumed legality, and will again argue (as it does in the *Epic* contempt appeal) that *Beverage* compels immunity. A merits determination here on the *unfairness* of the notarization regime is essential to foreclose that maneuver and to prevent further contempt.

The stay motion candidly admits that Apple created the post-injunction fee framework because management feared "hundreds of millions to billions" in lost commission revenue. That is textbook malicious compliance—leveraging monopoly power in smartphones to impose new tolls on developers who attempt lawful steering. Those facts, now sworn in Apple's own appellate filings, directly corroborate FAC ¶¶ 75-78, 221-223, 340 and put Apple's scienter beyond plausibility. Accordingly, *Beverage* offers Apple no safe harbor; our UCL and WCPA claims proceed on well-pled, stand-alone theories of unfairness and deception. *Beverage* is raised for the first time in the Reply; Rule 12 arguments not developed in the opening brief are waived. See *Gray v. County of Fresno*, 2019 WL 1746846, at *3 (E.D. Cal. Apr. 18 2019).

Apple also superficially invokes *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), arguing that Plaintiffs have an adequate remedy at law, and thus, equitable relief under the UCL is unavailable. Apple's reliance on *Sonner*, however, is misplaced. In *Sonner*, the Ninth Circuit specifically addressed the availability of equitable restitution under the UCL only after a party had voluntarily dismissed claims for damages at trial to strategically evade a jury trial (Sonner, 971 F.3d at 837-838). Unlike *Sonner*, Plaintiffs here have consistently pleaded multiple independent forms of equitable and injunctive relief targeting Apple's ongoing unfair and deceptive business practices (FAC ¶351). Crucially, Plaintiffs' claims under the UCL are not solely duplicative of remedies at law because the claims address ongoing and prospective harms, including continued censorship, notarization, regulatory evasion, and unfair marketplace manipulation that monetary damages alone would inadequately remedy (FAC ¶¶346-349). Courts have clarified post-*Sonner* that equitable remedies remain appropriate where legal remedies are incomplete or inadequate, particularly for prospective harm or ongoing unfair conduct (*Zeller v. Optavia, LLC*, 2022 WL 17858032, at *6 (S.D. Cal. Dec. 22, 2022)). Plaintiffs thus adequately plead entitlement to equitable relief distinct from legal remedies.

Finally, Apple says the Wyoming Consumer Protection Act (WCPA) claim fails under *Nicklas v. Prof. Ass'n, LLC*, 2018 WL 8619646, at *3 (D. Wyo. Sept. 26, 2018), because Plaintiffs supposedly plead no deception. But Nicklas merely demands that a complaint allege a "deceptive practice" — i.e., conduct "likely to mislead consumers." Plaintiffs do just that: Apple marketed the App Store as an "open, fair and secure marketplace" (FAC ¶¶ 48-50, 85, 97, 100-102, 114, 124-127) that complies with government laws while imposing misleading and/or secretive arbitrary gate-keeping, retaliatory suppression and anti-steering

1  rules. Those factual allegations fit *Nicklas's* definition of a deceptive or unfair practice, so the case provides
2  no basis to dismiss the WCPA count.

**CONCLUSION**

Apple's Rule 12 motion dissolves once the governing cases are placed beside the facts actually pleaded. *Lawlor* and the Ninth Circuit's decision in *Samsung v. Panasonic* teach that claim-preclusion never bars relief for fresh, independently actionable transactions that occur after an earlier judgment. Here, every restraint we challenge—the annual $99 developer fee, the brand-new Core Technology Fee, the post-*Epic* "link tax," and the revised DPLA clauses—is re-imposed each year under newly drafted contracts. That is the polar opposite of the static, day-to-day conduct in *Dual-Deck*. Each new exaction is a new injury; under *Lawlor* those claims simply could not have been brought in 2021.

Apple's privity argument collapses under its own weight. It simultaneously insists that Greenflight (a corporation) has no standing because it is just a shareholder, and that the same corporation is bound by the prior *pro se* action prosecuted by a *shareholder*. None of the res judicata cases Apple cites involved a *pro se* shareholder. Likewise, Apple previously told the Ninth Circuit that "no Coronavirus Reporter entity existed," securing affirmance on that basis; it may not now pivot and claim the very entity it disavowed is identical to today's plaintiff. Either way, identity-of-parties fails.

On the merits, the First Amended Complaint pleads the same smartphone foremarket DOJ relies on, plus three aftermarkets, complete with unchallenged market share and foreclosure figures. Apple's objections are grammar quarrels and verb-tense nit-picks—not Rule 12 defects. Its own contempt finding in *Epic* confirms that the "malicious-compliance" allegations are real, current, and damaging.

Because the operative complaint targets post-2021 conduct, new contractual terms, and new monetary exactions, and because Apple's privity theory is legally untenable, dismissal under Rule 12(b)(6) is impossible. At most, Apple may test its defenses on a full evidentiary record under Rule 56. The Court should therefore deny the motion to dismiss (or convert it under Rule 12(d)) and permit discovery to proceed.

After two decades of controlling how Americans access the internet, it is time for proper adjudication of the underlying conduct.

Date: May 26th, 2025

Respectfully Submitted,

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

# CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Opposition was delivered via ECF to all interested parties.

Executed on this 26th day of May, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105