Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs*.<br><br>APPLE INC.<br>　　　　　　Defendant. | Case No. 3:24-cv-8660-EMC<br><br>**PLAINTIFFS' REPLY TO MOTION PURSUANT TO RULE 12(d)**<br><br>Date: July 11, 2025<br>Time: 9:00 a.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ............................................................................................................... 1

**TABLE OF AUTHORITIES** ......................................................................................................... 1

**INTRODUCTION** ......................................................................................................................... 1

**ARGUMENT** ................................................................................................................................. 1

    I.    BRASS'S "NULL ENTITY" EMAIL BREAKS APPLE'S "EXPRESS ASSUMPTION" NARRATIVE—A LIVE FACT DISPUTE REQUIRING DENIAL OR RULE 12(D) CONVERSION .. 1

    II.    APPLE NOT ONLY ATTEMPTS TO EVADE *LAWLOR*, BUT TO REWRITE IT ........................ 4

    III.    PLAINTIFFS STATE A CLASSIC TWO-MARKET LEVERAGING CLAIM; *ALASKA AIRLINES* SUPPORTS, RATHER THAN DEFEATS, LIABILITY ........................................................................ 6

    IV.    APPLE'S UCL ATTACK FAILS—*SONNER* IS INAPPOSITE AND *BEVERAGE* DOES NOT IMMUNIZE APPLE'S NON-PRICE CENSORSHIP AND RETALIATION ........................................... 8

**CONCLUSION** ............................................................................................................................ 14

**CERTIFICATE OF SERVICE** ..................................................................................................... 15

## TABLE OF AUTHORITIES

CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536, 549 (9th Cir. 1991) .................................................................................................. 8
*Belton v. Comcast Cable Holdings*,
  151 Cal. App. 4th 1224, 1240 (2007) ............................................................................................ 12
*Bishop Paiute Tribe v. Inyo County*,
  863 F.3d 1144, 1152 n.4 (9th Cir. 2017) ........................................................................................ 9
*Blue Shield v. McCready*,
  457 U.S. 465, 479-80 (1982) ......................................................................................................... 13
*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883, 915-16 (9th Cir. 2008) ............................................................................................ 8
*Cel-Tech*,
  20 Cal. 4th 163, 180-87 (1999) ..................................................................................................... 13
*Coleman v. Brown*,
  922 F. Supp. 2d 1004, 1025 (E.D. Cal. 2013) ................................................................................ 9
*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ................................................................................................................... 6,8
*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898, 1030-31 (N.D. Cal. 2021) ............................................................................ 7
*Harris v. County of Orange*,
  682 F.3d 1126, 1131–32 (9th Cir. 2012) ........................................................................................ 2
*Hennegan v. Pacifico Creative Servs., Inc.*,
  787 F.2d 1299, 1301 (9th Cir. 1986) .............................................................................................. 5
*Hernandez v. Spacelabs Med. Inc.*,
  343 F.3d 1107, 1112 (9th Cir. 2003) ............................................................................................ 10
*Kaiser v. Abbott*,
  552 F.3d 1033, 1042-43 (9th Cir. 2009) ...................................................................................... 13
*Klehr v. A.O. Smith*,
  521 U.S. 179, 189-90 (1997) .......................................................................................................... 5
*Lawlor v. National Screen Serv. Corp.*,
  349 U.S. 322, 328 (1955) ............................................................................................................... 4
*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124, 1131–33 (9th Cir. 2004) ........................................................................................ 6
*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007, 1020-21 (9th Cir. 2020) ...................................................................................... 11
*Nationwide Biweekly*,
  9 Cal. 5th 279, 303 (2020) ............................................................................................................ 13
*New Hampshire v. Maine*,
  532 U.S. 742, 749-51 (2001) ........................................................................................................ 13
*Newcal Indus., Inc. v. IKON Office Solution*,
  513 F.3d 1038, 1045-47 (9th Cir. 2008) ........................................................................................ 7
*People ex rel. Harris v. Sarpas*,
  225 Cal. App. 4th 1539, 1562 (2014) ........................................................................................... 12
*SaurikIT, LLC v. Apple Inc.*,
  2023 WL 8946200, *at *1 (9th Cir. Dec. 28 2023) ........................................................................ 5

*Sierra Club v. Penfold*,
    857 F.2d 1307, 1315-16 (9th Cir. 1988) .................................................................................. 5
*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ................................................................................................ 11
*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................................. 6,8
*Zamani v. Carnes*,
    491 F.3d 990, 997 (9th Cir. 2007) .......................................................................................... 9
*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321, 338 (1971) ....................................................................................................... 5

1  **INTRODUCTION**

2  Apple's position is untenable. The company's counsel told the Ninth Circuit—flat out—that there is "no
3  actual 'Coronavirus Reporter' entity." Now, to prop up a Rule 12(b)(6) dismissal, Apple pretends it always
4  "expressly assumed" the opposite. That reversal is laid bare by a single, contemporaneous email from
5  Apple's lead lawyer calling the prior plaintiff a null entity. Apple never even tries to reconcile that smoking
6  gun admission with its new story. Under Ninth Circuit precedent, a factual clash of that magnitude dooms a
7  motion to dismiss and, at a minimum, compels Rule 12(d) conversion. *Harris v. County of Orange*, 682 F.3d
8  1126, 1131-32 (9th Cir. 2012).

9  The rest of Apple's brief fares no better. It rewrites *Lawlor*, misreads *Alaska Airlines*, and stretches
10 *Beverage* far beyond its price-only holding—all while ignoring the post-2021 contract revisions, escalating
11 fees, and speech retaliation that form the heart of this case. Each misstep reinforces the same bottom line:
12 Apple's defenses turn on disputed facts and selective omissions, not on the four corners of the First Amended
13 Complaint. The Court should deny the Rule 12(b)(6) motion outright; if it entertains Apple's outside-the-
14 pleadings narrative at all, Rule 12(d) requires conversion and limited discovery so the truth—not Apple's
15 shifting litigating positions—decides this case.

16 **ARGUMENT**

17 **I. BRASS'S "NULL ENTITY" EMAIL BREAKS APPLE'S "EXPRESS ASSUMPTION"**
18 **NARRATIVE—A LIVE FACT DISPUTE REQUIRING DENIAL OR RULE 12(D)**
19 **CONVERSION**

20 Nowhere to be found in Defendant's Opposition – or for that matter anywhere in any of their court filings–
21 does Apple provide *any* explanation for Rachel Brass' email to undersigned which unambiguously declared
22 that the *CR I* plaintiffs are null entities. Rather than concede, Apple twists, turns, and manipulates every
23 single assertion on this subject. Their latest claim is that it's all 'irrelevant' under 'objective standards,' which
24 is absurd, because analyzing Brass' email is the objective standard at front and center. The email is an
25 objective record—and it contradicts Apple's story.

1    Doing what they are good at, Gibson Dunn attempts to flip the tables and blame the opposing party, claiming "it is difficult to understate how bizarre" Plaintiff's request to convert to summary judgement on the basis of Brass' contested email. In a way, this is a refreshingly candid statement at their very own surprise. At first glance, it would seem Plaintiffs are objecting to the judicial notice of the very smoking gun email that overcomes Apple's *res judicata* claim. Why on earth would they do that, asks Gibson Dunn? That is not the point of Plaintiffs' request, to clarify. Apple's own incredulity implicitly concedes the email undercuts its res judicata theory—exactly why Rule 12(d) conversion (or outright denial) is warranted.

Plaintiffs invoked Rule 12(d) to raise the fact that there exists dispute over the meaning of the judicially noticed document, i.e., Brass' email and related statements. Opposing counsel claimed in their Reply that it was part of the proof that Apple operated under the "express assumption" that CRC is the same as the *CR App/CR I* plaintiff. Under *Harris v. County of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012), factual disputes over extra-pleading material require conversion. That is precisely the case here. Plaintiffs submit that the most judicially economic outcome is to simply deny the Defendant's Rule 12(b)(6) motion. In the *alternative*, discovery and evidentiary hearing may proceed pursuant to *Harris*.

Moreover, Apple advances false argument to the Court claiming 'Apple cited its brief in the Coronavirus I litigation in which it explicitly stated that it was operating under the assumption that the "Coronavirus Reporter" plaintiff was "Coronavirus Reporter Corporation."' That never happened. There was no explicit statement in Docket entry 32. In fact, Page 6 of that briefing casts all doubt (see *infra*) on the allegations surrounding CR I Plaintiffs' identity. It was the exact opposite of what Apple now claims. Specifically, Apple's Motion to Dismiss (*Dkt. 32* at 6, *Coronavirus I*) *explicitly raised uncertainty* regarding the corporate identity of "Coronavirus Reporter," stating unambiguously that Plaintiffs had "submitted no evidence concerning the nature of their businesses or the identity of their shareholders." Apple highlighted their purported total confusion as to the corporate shareholders, demanding corporate disclosure statements. Rather than unequivocally treating "Coronavirus Reporter" as synonymous with the Wyoming corporation, Apple expressly cast doubt on that fact, questioning whether the "Coronavirus Reporter" entity named in the

1  Complaint was indeed the Wyoming corporation listed in the Wyoming Secretary of State (SoS) records—
2  or instead a mere app name or an altogether non-existent entity.

3  Therefore, Apple's res judicata theory wholly depends on a new, extra-pleading assertion that it
4  "proceeded throughout the 2021 case on the express assumption" that the Wyoming corporation before this
5  Court was the plaintiff in *Coronavirus I*. That "assumption" is nowhere in the complaint, nowhere in the
6  orders that framed the prior judgment, and flatly contradicts Apple's own statements in *CR I Dkt 32* and to
7  the Ninth Circuit ("as far as Apple can tell, there is no actual 'Coronavirus Reporter' entity"). By injecting
8  this brand new fact, Apple triggered Rule 12(d): once the movant asks the Court to credit material outside
9  the pleadings the Court must either exclude it or convert the motion to one for summary judgment and permit
10 discovery. Plaintiffs' request for conversion is therefore hardly "bizarre"; it is the only procedural path that
11 lets them test (should the Court not outright deny the 12(b)(6) which is obviously Plaintiff's preferred
12 outcome) Apple's shifting stories with the smoking-gun emails and briefs Apple now tries to disown. If
13 Apple truly believed the corporate identity issue was undisputed it would have cited the complaint; instead
14 it relies on a post hoc narrative that the rules forbid the Court to accept on a Rule 12(b)(6) record.

15 Apple's conditional reference to these records highlighted Plaintiffs' pleading deficiencies and
16 underscored uncertainty about who the real plaintiff actually was, without waiving its argument (later
17 reiterated emphatically to both the Ninth Circuit and Plaintiffs' counsel Mathews that the plaintiff was merely
18 an app name—a null entity. Apple's re-introduction of the Wyoming extract requesting judicial notice *in*
19 *completely different context* thus further muddied the issue and expressly avoided the kind of unequivocal
20 assumption or concession that Apple now misleadingly claims it made. This is the stuff of an evidentiary
21 hearing, or preferably, a blocked 12(b)(6) that will let this matter finally proceed on the merits. Apple's
22 shifting positions—initially challenging Plaintiffs' corporate identity, conditionally referencing the
23 Wyoming SoS records only to highlight pleading deficiencies, then affirmatively asserting a "null entity"
24 position in the Ninth Circuit, and explicitly correcting Plaintiffs' counsel that he named an app rather than a

1  company—demonstrate clear factual ambiguity about party identity and privity, precisely the type of
2  disputed facts that trigger Rule 12(d) conversion.

3  **II.  APPLE NOT ONLY ATTEMPTS TO EVADE *LAWLOR*, BUT TO REWRITE IT**

4  Apple seeks to impose perpetual immunity for its anticompetitive practices by misrepresenting
5  Plaintiffs' annual $99 fee payments as merely static conduct akin to *Dual-Deck*. It becomes clear that Apple
6  finds *Lawlor* to be inconvenient authority for their monopoly, and subsequently scapegoats Plaintiffs for
7  invoking it, even alleging *Lawlor*-protected filings constitute harassment. In their Response, Apple ignores—
8  and thus forfeits—the key argument raised in the Motion footnote 5: the annual $99 fee is *consideration* for
9  an annually revised and materially different DPLA. Each year Apple unilaterally revises the DPLA terms,
10 imposing new and more restrictive obligations upon developers. (FAC ¶¶ 99–106, 251–259.)

11 This fact alone places Plaintiffs' claim cleanly within *Lawlor v. National Screen Serv. Corp.*, 349
12 U.S. 322, 328 (1955), which held that res judicata does not immunize new contractual transactions or newly
13 actionable conduct—even where the harm arises from similar economic relationships or identical nominal
14 charges. Lawlor safeguards against precisely what Apple seeks here: perpetual immunity to engage in new
15 anticompetitive conduct by deceptively labeling it "unchanged."

16 Apple's continued reliance on *Dual-Deck* remains fundamentally flawed. *Dual-Deck* addressed a
17 single, static, and continuous boycott—an unchanging and ongoing conspiracy with no discrete annual
18 transactions. In stark contrast, even setting aside the issue of consideration, Plaintiffs' claims challenge each
19 annual $99 payment as a distinct transaction. Even if the fee nominally remains $99, each annual payment
20 forms a new contractual transaction, and of course, new consideration for acceptance of a distinct and
21 evolving DPLA. Apple does not rebut or even acknowledge Plaintiffs' consideration argument raised in
22 footnote 5. Nor does Apple dispute the annual revision of the DPLA terms. Perhaps they were hoping nobody
23 would notice, but in any case Apple concedes that Plaintiffs' claims constitute discrete, newly actionable
24 transactions rather than continuous and static conduct.

25 Apple is also silent on the fact that their request would effectively overturn *Lawlor* by treating
26 evolving contractual agreements superficial nominal stability. Such a result directly conflicts with Supreme
27 Court precedent, which consistently holds that renewed transactions under changed contractual terms remain
28 actionable under antitrust law. *Dual-Deck* barred a new suit because the defendants' conspiracy to block the

1 plaintiff's VCR never changed; "[e]very day" of lost sales was merely the continuation of the same restraint. Id. at 1464. The court distinguished cases involving new contractual relationship. Id. Every twelve months Apple (i) tenders a revised DPLA, (ii) demands a fresh $99 consideration for that new offer, and (iii) warns that non-acceptance will result in total exclusion from iOS distribution. FAC ¶¶ 96-106, 251-259. Those newly imposed terms—recently including Apple's anti-steering, "link fee" regimes, and notarization restrictions—did not exist when *Coronavirus I* was filed and were never adjudicated there. Under *Lawlor* precedent a later wrongful act—even if similar in kind and effect—creates a new cause of action. See also *Hennegan v. Pacifico Creative Servs., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986). Apple's analogy to the unchanging boycott in *Dual-Deck* fails at the threshold. *Sierra Club v. Penfold*, 857 F.2d 1307, 1315-16 (9th Cir. 1988), though an environmental case, is routinely cited on the res judicata/recurring-transaction distinction and unambiguously supports the annual DPLA argument. It held that each renewed permit is a discrete agency action that gives rise to a new cause of action notwithstanding earlier litigation. And *SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200, *at *1 (9th Cir. Dec. 28 2023) (mem.) does not save Apple; *Saurik* involved a single royalty paragraph "identical year after year"; the panel contrasted cases—like this one—where the defendant altered the bargain or imposed fresh conditions. Id.

Apple's Opposition asserts that "the 'term in question'—a $99 annual fee—has remained unchanged since well before Coronavirus I." That ignores the consideration doctrine. Even where a dollar figure is nominally identical, the recurring payment is new consideration for a new contract year. Lawlor expressly rejected the notion that a defendant gains perpetual immunity 'merely because it perpetrated the same kind of act before.' 349 U.S. at 329. See also Restatement (Second) of Judgments § 24(f), stating a claim arising from a series of contracts comprises 'all rights up to the date of suit'; a subsequent contract generates a new claim and is not extinguished by the first judgment; accord *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (holding each time a plaintiff is injured by an act of the defendants a cause of action accrues). The continuing violation cases (*e.g.*, *Klehr v. A.O. Smith*, 521 U.S. 179, 189-90 (1997)) reinforce—not replace—*Lawlor*: each new overt act both restarts the limitations clock and escapes claim preclusion. At minimum, Apple's refusal to confront the yearly contract revisions creates a genuine factual dispute that, under Rule 12(d), requires either exclusion of Apple's outside-the-pleadings assertions or conversion to summary judgment with targeted discovery.

### III. PLAINTIFFS STATE A CLASSIC TWO-MARKET LEVERAGING CLAIM; *ALASKA AIRLINES* SUPPORTS, RATHER THAN DEFEATS, LIABILITY

The Ninth Circuit has long recognized monopoly leveraging as the use of monopoly power attained in one market to gain a competitive advantage in a second, separate market. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991); accord *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131–33 (9th Cir. 2004). The plaintiff need not allege that the defendant already monopolizes the second market, only that the challenged conduct "tends to entrench or enlarge" the defendant's existing monopoly. *Alaska Airlines*, 948 F.2d at 549. The Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481–83 (1992), and the D.C. Circuit's opinion in *United States v. Microsoft Corp.*, 253 F.3d 34, 63-65 (D.C. Cir. 2001) (en banc), confirm that a monopolist violates § 2 when it leverages power in a primary market to foreclose rivals or extract rents in a technologically tethered aftermarket—even one the monopolist itself has artificially created.

The First Amended Complaint pleads, with specificity adequate under *Twombly* and *Iqbal*, (a) a foremarket for performance smartphones sold to U.S. consumers, ¶¶ 70-82, in which Apple's share exceeds 75 percent and formidable switching-cost and network-effect barriers protect its dominance; and (b) a derivative aftermarket for iOS app distribution and notarization services, ¶¶ 287-305, which every developer must purchase from Apple to reach iPhone users. No competing firm can lawfully provide those distribution/notary services because (i) Apple's technical architecture rejects unsigned code and (ii) Apple's developer contracts prohibit alternative stores or sideloading. ¶¶ 295-304. The FAC traces plausible leveraging allegations, step by step, how Apple conditions continued access to the lucrative iPhone customer base (Market A) on developers' acceptance of Apple-only app distribution, mandatory notarization stamps, and escalating fees (each Market B) and how those practices both extract supra-competitive rents and insulate the handset monopoly from competitive erosion. ¶¶ 297-305; ¶¶ 332-337. That is exactly the 'use of power in Market A to impose restraints in Market B' condemned in *Alaska Airlines*.

Apple asserts that *Alaska Airlines* requires Plaintiffs to plead Market B as a fully independent, competitively structured market before leverage occurs. The case says the opposite, requiring just a causal

link between the alleged restraint and increased entrenchment of the defendant's power. 948 F.2d at 549-50. Here, Plaintiffs allege a direct causal chain: the notarization gate and App Store exclusivity lock out rival distribution channels, suppress disruptive apps (cloud gaming, super-apps, COVID-safety tools), and thereby raise switching costs that cement the iPhone monopoly. ¶¶ 263-271; ¶¶ 300-305. Those allegations satisfy the very standard Apple invokes.

Whether "performance smartphones" or "iOS distribution/notarization" might, at the margins, include additional substitutes is a quintessentially factual inquiry reserved for expert discovery. *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045-47 (9th Cir. 2008). Courts routinely defer such boundary disputes until summary judgment. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1030-31 (N.D. Cal. 2021). Apple's attempt to resolve them on a motion to dismiss only evidences why, under Rule 12(d), the market details must be adjudicated after conversion to Rule 56.

Apple claims that because Plaintiffs sometimes refer to a unitary smartphone ecosystem, they have pled only one market. The Supreme Court rejected that rigidity in *Kodak*, holding that a monopolist can injure competition in a component aftermarket even when the foremarket remains competitive. 504 U.S. at 481-82. Likewise, *Microsoft* condemned leveraging of operating-system dominance to extinguish nascent browser competition. 253 F.3d at 63-65. Plaintiffs' theory follows that blueprint: iPhone dominance (foremarket) is wielded to tax and choke app distribution (aftermarket) and, in turn, to reinforce the handset stronghold. Plaintiffs correctly paraphrased the *Alaska* opinion's holding that leveraging liability attaches unless the conduct has "no tendency to enlarge or entrench" the monopoly. 948 F.2d at 549. Substance, not punctuation (i.e. single quotation vs. double[1]), governs Rule 12(b)(6).

---

[1] Plaintiffs accurately paraphrased the governing standards from *MetroNet*, *Alaska Airlines*, and *Khoja*. Apple's quibble over *Khoja* is trivial—Plaintiffs correctly summarized the established standard, that judicial notice is improper if it would "entrench or enlarge" disputed factual assertions from noticed materials. Likewise, Plaintiffs have cited the landmark *Microsoft* antitrust litigation repeatedly throughout related proceedings—too many times to list—but inadvertently cited a different *Microsoft* opinion in the motion. These typographical issues do not alter the substantive accuracy of the principles Plaintiffs invoked, nor do they affect the merits or require dismissal. Apple's exaggerated claims of "fabrication" thus amount to empty rhetoric, not substantive objections relevant under Rule 12(d). *Alaska's* quotation in the motion was paraphrased correctly.

1  The FAC pleads both requisite markets, identifies Apple's coercive conduct, and alleges concrete foreclosure and entrenchment effects. Under *Alaska Airlines*, *Kodak*, and *Microsoft*, that is more than sufficient to state a § 2 leveraging claim. Any residual dispute over market contours or competitive effects is fact intensive and cannot be resolved on a bare pleading; at minimum, it mandates Rule 12(d) conversion so that the parties can develop an evidentiary record. Apple's motion should therefore be denied, or converted, on this ground alone.

Apple protests that *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) "concern tying, not leveraging," as though the two doctrines were strangers. That is wrong. Both opinions expressly framed tying as the mechanism by which a monopolist *leverages* dominance in Market A to foreclose competition in Market B—which captures the theory Plaintiffs plead here. See *Kodak*, 504 U.S. at 479 & 481 (describing Kodak's use of copier equipment power "to extend its monopoly" into the aftermarket for service and parts); *Microsoft*, 253 F.3d at 63-65 (holding Microsoft unlawfully used its Windows monopoly to protect and extend that monopoly by tying and other restraints in the browser market). Courts routinely cite these cases as leveraging precedents. *See, e.g.*, *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) (relying on *Kodak* while articulating leveraging rule); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 915-16 (9th Cir. 2008) (same). Whether the restraint is labelled "tying," "exclusive dealing," or "technical lock-in" is immaterial; the gravamen is the use of power in one market to stifle competition in another, exactly what *Alaska*, *Kodak*, and *Microsoft* forbid.

Far from rescuing Apple, *Alaska Airlines* and its progeny confirm the sufficiency of Plaintiffs' leveraging claim. Apple's motion should therefore be denied—or, at minimum, converted under Rule 12(d) so that the factual contours of the two markets and Apple's foreclosure tactics may be explored in discovery.

**IV.    APPLE'S UCL ATTACK FAILS—*SONNER* IS INAPPOSITE AND *BEVERAGE* DOES NOT IMMUNIZE APPLE'S NON-PRICE CENSORSHIP AND RETALIATION**

It is noteworthy that Apple's Opposition, particularly the UCL section, is nearly incomprehensible. Rather than addressing the underlying motion's concern of 'overloaded' legal briefings, Apple doubles down

with their opposition: it is the judicial equivalent of a kitchen sink brief, sometimes called a "blunderbuss" submission. What Apple is doing is not vigorous advocacy, but a last-ditch effort to once again thwart competition law. The tactic is familiar: pack a reply with hundreds of half-developed mini-points, each tied to a different citation, so the opponent must chase every rabbit while the moving party later cherry picks whichever argument gains traction. Courts in this Circuit condemn the practice because it deprives the non-movant, and ultimately the Court, of a fair and focused presentation. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (issues first raised in a reply are waived); *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1152 n.4 (9th Cir. 2017) (same); *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1025 (E.D. Cal. 2013) (striking "blunderbuss filing" full of perfunctory arguments). Judge González Rogers recently labeled Apple's strategy as "whack-a-mole."

Exactly that pattern is on display here: Apple strings together two authorities per sentence, laces the prose with pejoratives, and then polices Plaintiffs' punctuation as a supposed credibility crisis. The Federal Rules require the opposite—"the just, speedy, and inexpensive determination of every action," Fed. R. Civ. P. 1, and Rule 11 forbids briefing intended to harass or needlessly multiply costs. Apple's UCL rejoinder is the paradigm of a blunderbuss brief. In the span of barely two pages it fires off—without developing—at least five distinct propositions, each tied to a different authority, and treats them as mutually reinforcing when they are analytically separate. First and foremost, just like their failed appeal on *Epic* contempt, they claim '*Beverage* bars everything.' Apple cites *Beverage* for the sweeping claim that any UCL count overlapping an antitrust theory must be dismissed—but *Beverage* dealt exclusively with a price-only claim and expressly declined to address other forms of unfairness. 101 Cal. App. 5th at 750 n.15. Apple neither quotes that limitation nor explains why price and censorship injuries are equivalent. Apple drops the *Colgate* doctrine in a single clause yet never grapples with the fact that Colgate protects a *purely unilateral* refusal, not a refusal conditioned on speech restraints and mandatory fees. No analysis, no pin cites, just a buzzword. In the same breath Apple invokes *Belton* to say a UCL claim cannot "restate" an antitrust theory, even though *Belton* limits its bar to cases where the UCL count is "identical in all respects," 151 Cal. App. 4th at 1240—

again, no discussion of the non-price censorship conduct that makes our claim qualitatively different. Apple quotes *Webkinz* for the truism that the UCL protects consumers generally, then insists—without any record reference—that censorship injures only competitors. It ignores the FAC allegations that millions of consumers are denied disfavored apps. Lastly, it claims *Epic* and EU DMA are "irrelevant." Apple dismisses two post-2021 regulatory findings in a single sentence, contending they "have no relevance" because Plaintiffs supposedly never used the link entitlement—an assertion that contradicts FAC ¶ 223 and asks the Court to credit Apple's factual spin on a Rule 12 record.

Five different doctrines, five different rabbit holes—none pursued beyond a citation and a conclusory sentence. That is exactly what the Ninth Circuit labels "blunderbuss advocacy". Because Apple offers only "summary assertions" rather than "reasoned argument," *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003), its UCL defense should be disregarded or deemed waived. The Court should not reward this gamesmanship.

Apple's state competition law volley hinges on a misreading of *Beverage* and an overstatement of the Colgate doctrine. *Beverage* dismissed a price-only UCL claim that was a carbon copy of the Cartwright Act theory before it. 101 Cal. App. 5th 736, 751-52 (2024). The court expressly declined to address any non-price conduct because none was pled. Id. at 750 n.15. Plaintiffs, by contrast, challenge Apple's non-price censorship, retaliatory de-ranking, notarization lock, and post-injunction "malicious-compliance" surcharges—conduct that restrains speech and sabotages regulation. Those practices violate the UCL's "unfair" and "unlawful" prongs even if every federal antitrust count were dismissed. Cel-Tech holds that the UCL reaches business behavior that "may be lawful yet unfair," 20 Cal. 4th 163, 180-87 (1999), and courts have repeatedly sustained UCL claims predicated on deception, coercion, or regulatory evasion where antitrust relief was unavailable. See Nationwide Biweekly Admin., Inc. v. Superior Ct., 9 Cal. 5th 279, 303 (2020).

Objection notwithstanding, undersigned will attempt to address Apple's arguments on the UCL/WCPA claims. Apple again uses *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) to

argue the entire UCL count is foreclosed because Plaintiffs also request damages under the Sherman Act. *Sonner* is far narrower. It bars equitable restitution where the plaintiff already possesses an adequate remedy at law for the *same* loss, id. at 844; it does not bar injunctions aimed at halting ongoing misconduct. Plaintiffs' prayer centers on a prospective injunction that would (i) end Apple's censorship gatekeeping, (ii) bar retaliatory "developer intimidation," and (iii) unwind the mandatory notarization/fee regime—all quintessential equitable remedies that legal damages cannot duplicate. See *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020-21 (9th Cir. 2020) (injunction remains available post-*Sonner*). Restitution is pleaded only in the alternative and addresses illicit Core Technology and link fee charges imposed after the *Epic* injunction and EU DMA—payments for which no Sherman Act damages remedy presently exists. Apple's *Sonner* defense therefore misses the mark.

       Apple then recites *Beverage v. Apple Inc.* as a blanket shield against every UCL claim Apple might face. *Beverage* did one thing: it dismissed a pure price-fixing "unfairness" theory that rose and fell with an identically framed Cartwright count. Id. at 751-52. The court expressly declined to opine on non-price theories because none were pled. Id. at 750 n.15. Plaintiffs' UCL claim is different in kind and in chronology, particularly with Censorship & Speech Suppression. Apple's content policies blocked Plaintiffs' COVID-safety app, de-ranked rival cloud-gaming and super-app offerings, and threatened developers who criticized Apple—conduct that "harms the public at large" irrespective of price.

       Similarly, the *Colgate* cite does not help Apple. *Colgate* shields a purely unilateral refusal to deal; it does not bless a refusal conditioned on developers' surrender of speech, data, and alternate store rights or on payment of a "Core Technology Fee" and link fee that a federal court has already deemed contemptuous. Conditioning access to iPhone users on acquiescence to those restraints is the opposite of unilateral. Nor does *Belton* bar our claim: Belton disallows re-pleading the same antitrust theory as "unfair," but it expressly leaves room for "different conduct" or "additional consumer harm." Id. at 1240. That is exactly what is alleged here.

Apple's fallback—asserting the UCL requires harm to "the public at large" and that censorship somehow affects only competitors—ignores the Complaint. Apple's COVID-app veto, cloud-gaming ban, and link tax stunt injure millions of consumers who never see suppressed apps or must pay higher prices when developers absorb new fees. That is quintessential public harm.

Finally, Apple's feint that European DMA non-compliance is "irrelevant" misstates the theory: the Core Technology Fee is levied through the very California governed developer account that already extracts the $99 charge. The money is taken from U.S. developers for every European download; that domestic transaction is more than enough under *Empagran* and Bus. & Prof. Code § 17204.

In any case, it is clear our UCL claim cites retaliation and developer intimidation – something absent from the Sherman Act causes of action. Judge Gonzalez Rogers has already credited evidence that Apple punishes vocal antitrust complainants. Epic *Findings of Fact* ¶¶ 409-12 (2021). Such intimidation is both unfair and unlawful under Bus. & Prof. Code § 17200. And CTF/Link fee malicious compliance is uniquely pled under UCL. The FAC plainly alleges that US developers are impacted by both the link fee and CTF. Apple's argument that Plaintiffs didn't allege they tried to use the link fee system is immaterial, as they alleged using it would harm them. This is more whack-a-mole on a very straightforward claim. These post-2021 acts comprise a fresh "unlawful" predicate. *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014).

None of these practices—or the 2023-25 link-out and CTF surcharges that fund them—was before the *Beverage* panel. Because Plaintiffs' UCL theory rests on qualitatively distinct conduct, *Beverage* is irrelevant. See *Belton v. Comcast Cable Holdings*, 151 Cal. App. 4th 1224, 1240 (2007) (Chavez rule applies only when UCL claim "seeks to impose liability for the same conduct" as the antitrust claim). Apple tries to spin *Beverage* as misunderstood by Plaintiffs, claiming the 'price-only' concept is incorrect. But this is semantics; Beverage was about price issues which entirely overlapped between the UCL and Sherman act claims. Plaintiffs were never claiming that Beverage's holding could only apply to price.

1    This distinction leads to manufactured confusion Apple instils about censorship. In the Ninth Circuit appeal of *Coronavirus I* Apple insisted censorship injuries were not antitrust harms and could be raised, if at all, only under separate doctrines. (Apple 9th Cir. Br. at 34.) Having prevailed on that position, Apple cannot now argue the converse—that the UCL censorship allegations are derivative of, and fall with, the Sherman Act counts. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001). Apple tries to force a false either-or: if censorship can ground antitrust injury, it cannot also sustain an independent UCL claim—and vice-versa. The law, and Rule 8, permit both.

First, the Sherman Act angle. When Apple blocks or buries lawful apps it directly suppresses output, variety, and innovation in the iOS software market; that competitive harm is textbook antitrust injury under *Blue Shield v. McCready*, 457 U.S. 465, 479-80 (1982), and *Kaiser v. Abbott*, 552 F.3d 1033, 1042-43 (9th Cir. 2009). We plead that injury in Counts 1–3.

Second, the UCL angle. The very same censorship practices also violate settled public-policy norms—free expression, open scientific discourse, transparency promised in Apple's own guidelines—regardless of measured price or output effects. California's "unfair" prong is designed for precisely that sort of conduct: business behavior that may or may not violate federal antitrust law but nonetheless offends public policy and harms consumers at large. *Cel-Tech*, 20 Cal. 4th 163, 180-87 (1999); *Nationwide Biweekly*, 9 Cal. 5th 279, 303 (2020). Thus, even were the Court to rule that censorship falls outside the Sherman Act's compass, the same facts still state an "unfair" claim under the UCL. Conversely, if the Court agrees censorship is anticompetitive, that finding only strengthens— and certainly does not extinguish—its UCL unfairness.

Pleading in the alternative is both routine and expressly authorized. Fed. R. Civ. P. 8(d)(2). *Beverage* does not bar this approach: that opinion dismissed a UCL count that was nothing more than a repackaged price fixing theory; it did not address non-price speech restraint such as those alleged here. Accordingly, the censorship allegations simultaneously support antitrust liability and an independent UCL claim; no narrowing, waiver, or inconsistency is required.

# CONCLUSION

Apple attempts to rewrite its prior litigation positions, selectively ignores critical factual disputes, and distorts controlling precedent. But at the end of the day, this case boils down to simple principles of fairness and accountability: Apple cannot claim that "Coronavirus Reporter" is simultaneously a null entity, when it suits them, never once dignifying this Honorable Court with an explanation of what they actually meant. Nor can Apple distort Lawlor and Alaska Airlines to secure eternal antitrust immunity for escalating, coercive business practices. Such strategic maneuvers illustrate precisely why Rule 12(d) conversion or outright denial of Apple's motion is not merely warranted—it is required under Ninth Circuit precedent.

The straightforward way forward is to reject early disposition of this important discussion. The Court can simply refute Apple's Rule 12(b)(6) motion and allow the claims to proceed to discovery, where these contradictions can be tested on a complete record. If, however, the Court is inclined to credit any part of Apple's extra-pleading narrative, Rule 12(d) requires conversion to summary judgment procedure and narrowly tailored discovery into Apple's corporate identity flip-flops, its evolving DPLA terms, and its censorship & fee regime. Either path keeps the merits of this controversy—rather than morphing litigation stories—at the center of the case, and that is all Plaintiffs ask.

Executed on this 16th day of June, 2025.

Respectfully Submitted,

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Reply to Motion Pursuant to Rule 12(d) was delivered via ECF to all interested parties.

Executed on this 16th day of June, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105