Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION | Case No. 3:24-cv-8660-EMC |
| *on behalf of themselves and all others similarly situated* | |
| Plaintiffs, | **PLAINTIFF CORONAVIRUS REPORTER COPORATION'S MOTION FOR SANCTIONS** |
| *vs.* | |
| APPLE INC. | Date: August 21, 2025 |
| Defendant. | Time: 1:30 p.m. PT |
| | Place: Courtroom 5, 17th Floor |
| | The Honorable Edward M. Chen |

## NOTICE OF MOTION AND MOTION FOR SANCTIONS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on August 21, 2025, at 1:30 p.m. Pacific Time, or as soon thereafter as the matter may be heard before the Honorable Edward M. Chen in Courtroom 5, 17th Floor of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Coronavirus Reporter Corporation will and hereby does move for sanctions against Defendant APPLE INC. and its counsel GIBSON, DUNN & CRUTCHER LLP , RACHEL BRASS, AND JULIAN KLEINBRODT under (1) the Court's inherent authority, (2) 28 U.S.C. § 1927, and (3) Federal Rule 11(c)(3).

This Motion is based on the Memorandum of Points and Authorities, requested discovery, requested evidentiary hearing, all records on file, and any oral argument the Court may permit. The Plaintiff notes that a cross-motion pursuant to Rule 11 & § 1927 is pending by Defendant Apple; the Court may properly sever both motions into a distinct lawsuit so that this antitrust case may proceed without delay.

Dated: June 30, 2025

Keith A. Mathews, Esq.

# TABLE OF CONTENTS

**NOTICE OF MOTION PURSUANT TO CALIFORNIA CIVIL CODE PROCEDURE. § 425.16......I**

**TABLE OF AUTHORITIES**.................................................................................................**II**

**INTRODUCTION** ............................................................................................................................**1**

    I.    APPLE'S FRAUD ON THE COURT: SHIFTING NARRATIVES AND PERVERSION OF JUSTICE.................................................................................................................. 6

    *Cloaking Dr. Roberts and Contradicting His Role (CR I vs. CR II)*...................................... 6

    *Misrepresenting the Plaintiff's Existence (the "Corporation vs App" Discovery by Brass)* ............... 7

    *Silencing a Pro Se Litigant Through Threats and Intimidation*............................................. 8

    *False Claims About "Notarization" Inseparability from Operating Systems* ...................... 8

    *Cumulative Effect: An Nullified Judgment and the Need to Start Anew*............................... 10

    *Gibson Dunn's Pattern of Misconduct and Lack of Credibility* ........................................ 11

    *The Unfair Disparity: Others Validate Dr. Roberts' Claims While Apple Seeks to Silence Him* ....... 13

**LEGAL STANDARD**....................................................................................................................**14**

**ARGUMENT** ..................................................................................................................................**14**

    I.    THE NEED FOR IMMEDIATE INVESTIGATION AND A $20 MILLION SANCTION ........ 14

ADDITIONAL REMEDIES AND SUPPLEMENTAL CLAIMS ........................................ 18

    II.    DISGORGEMENT OF ILL-GOTTEN PROFITS........................................................ 18

    III.    ADA RETALIATION CLAIM................................................................................ 19

    IV.    DISQUALIFICATION OF COUNSEL (WITNESS-ADVOCATE RULE) ...................... 19

    V.    PARTIAL DEFAULT AS A SANCTION FOR FRAUD ON THE COURT ................................ 20

    VI.    CIVIL RICO CLAIM (SEVERED OR AMENDED).................................................. 21

**CONCLUSION**..............................................................................................................................**22**

**CERTIFICATE OF SERVICE**...................................................................................................**24**

# TABLE OF AUTHORITIES

CASES

*B.K.B. v. Maui Police Dep't,*
  276 F.3d 1091, 1107 (9th Cir. 2002) ------------------------------------------------------------------14

*Chambers v. NASCO, Inc.,*
  501 U.S. 32, 44–46 (1991) -----------------------------------------------------------------------------14

*Chevron/Ecuador Environmental Litigation*
  (2010-2012)-----------------------------------------------------------------------------------------------12

*Epic Games v. Apple*
  N.D. Cal. 2020-2021 -----------------------------------------------------------------------------------11

*Facebook User Privacy MDL*
  N.D. Cal. 2018-2022 -----------------------------------------------------------------------------------11

*Trump v. CASA, Inc*
  *US, June 27 2025 Slip opinion* ------------------------------------------------------------------------3

STATUTES

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ---------------------------------21

RULES

Model Rule of Professional Conduct 3.7 ------------------------------------------------------------------19

Rule 11(c)(3)-----------------------------------------------------------------------------------------------------14

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

For five years, Apple Inc. and its lawyers at Gibson, Dunn & Crutcher have dragged Plaintiff Coronavirus Reporter Corporation ("CRC") and its founder, Dr. Robert Roberts through a litigation quagmire built on frivolous, bad-faith arguments and outright contradictions. This cadre of attorneys – behaving more like corporate bullies than officers of the court – have wasted countless hours of the Court's and years of Dr. Roberts' time, all while besmirching the reputation of a world-renowned cardiologist with sham claims. Their scorched-earth tactics have one goal: delay and obfuscation, so that Apple can escape accountability. The behavior on display is as shameful as it is unlawful, and it demands this Court's immediate intervention.

Dr. Robert Roberts is no ordinary litigant. He is a celebrated cardiologist and researcher whose life-saving innovations have literally altered the course of medicine. Among his many achievements, Dr. Roberts developed the first quantitative test for MBCK (creatine kinase-MB), which became the gold-standard diagnostic for heart attacks worldwide for over three decades. This breakthrough – along with subsequent cardiac biomarkers like troponin – revolutionized heart attack care by enabling rapid, accurate diagnosis and treatment. Thanks to such advancements in cardiac science and medicine, the U.S. heart attack death rate has plummeted by nearly 90% since 1970 – a stunning decline to which Dr. Roberts' contributions fundamentally paved the way. He served as Chief of Cardiology at Baylor College of Medicine for over two decades and later led the University of Ottawa Heart Institute. He co-edited the premier cardiology textbook Hurst's The Heart for 25 years, and his accolades include the Distinguished Scientist Award of the American College of Cardiology, among many others. Millions of people are alive today in part due to Dr. Roberts' trailblazing work in cardiac care. In short, Dr. Roberts is a hero of modern medicine.

It is against this backdrop – a veteran physician-scientist who has devoted his life to saving others – that Dr. Roberts answered the call during the COVID-19 crisis. In early 2020, he helped develop the "Coronavirus Reporter" smartphone app to empower individuals to track COVID-19 symptoms and virus spread in real time. This app, created by experts in both medicine and software, had life-saving potential. Around the world, similar COVID tracking apps proved immensely valuable: for example, the U.K.'s ZOE COVID Symptom Study app (launched months after Roberts' app) attracted more than 4 million daily users, becoming the world's largest ongoing COVID study. Dr. Roberts' app sought to do the same in the United States as a first-mover initiative. Unfortunately, Apple chose to block this heroic effort. Citing a rigid App

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

Store policy that only "official" (government or hospital-affiliated, and Roberts' app was hospital affiliated, he wrote a letter to Apple from University of Arizona endorsing it) COVID-19 apps would be allowed, Apple refused to let Coronavirus Reporter onto the App Store. The result: a potentially vital COVID tracking tool – created by a former President of the American College of Cardiology – was silenced at the height of a global pandemic, simply because Apple wanted to play gatekeeper. The point of the internet – to democratize information – was clearly thwarted by Apple.

Instead of engaging with Dr. Roberts in good faith or acknowledging the public health importance of his app, Apple (through its lawyers at Gibson Dunn) set out to bury his small company through legal warfare. In mid-2021, Undersigned filed suit against Apple for this exclusion (Case No. 3:21-cv-05567-EMC, referred to here as "CR I"). Rather than litigate the merits honestly, Apple's attorneys deployed a barrage of technicalities and falsehoods to get the case tossed out before any discovery. They denied Dr. Roberts' very involvement in his own project, misrepresented the identity of the plaintiff, and shamelessly attacked the standing of the people behind the app. Gibson Dunn's strategy was to portray the lawsuit as a nullity – to convince the Court that there was no real plaintiff and thus no case at all. They even went so far as to threaten Dr. Roberts' co-developer (Mr. Jeffrey Isaacs) against appearing in the case, insisting that "Isaacs may not appear pro se" and that Coronavirus Reporter was a "nonexistent" entity unworthy of the Court's time. By erasing the actual people behind the app and painting the plaintiff as a phantom, Apple's lawyers managed to mislead the Court into dismissing a wrongly discredited CR I on procedural grounds. Judge Edward Chen, relying on Apple's distortions, granted dismissal and accepted Apple's assertion that it had no duty to distribute apps "inconsistent with its policies" and even accepted blatant falsehoods that Apple's notarization scheme was an "inseparable component of iOS." The truth was never reached; Apple won that round by litigating around the merits, not on them.

Fast forward to late 2024. After the improper dismissal of the first case, Dr. Roberts and his colleagues regrouped and joined a new lawsuit (Case No. 3:24-cv-08660-EMC, "CR II", which importantly alleged materially new conduct in addition to the CR matter) to finally get a fair hearing on Apple's conduct. But Apple and Gibson Dunn responded with jaw-dropping hypocrisy. The very same individuals whom Apple previously erased as non-participants in CR I (Dr. Roberts and Mr. Isaacs) were now central to Apple's defense – so central that Apple absurdly claims CR II should be barred by res judicata and even subject Dr.

Roberts to a sweeping nationwide injunction stemming from CR I. In other words, Apple's story has flipped 180 degrees: after spending CR I pretending Dr. Roberts wasn't there at all, Apple now argues Dr. Roberts was there all along (so much so that he is bound by the outcome of CR I). The same Dr. Isaacs whom Apple's counsel said had "no discrete app [he] can represent" and "no capacity" to appear in court and blocked his participation is suddenly, in Apple's new narrative, a key figure whose involvement magically ties everyone – including Dr. Roberts and even unrelated third parties – to Apple's desired preclusion result. As one filing in this case succinctly observed, Apple's positions have "shifted with the wind" to fit its needs of the moment. When it suited Apple in 2021, Isaacs and Coronavirus Reporter were nobodies with no rights; when it suits Apple in 2025, Isaacs becomes the linchpin to slam the courthouse doors on Dr. Roberts. This is litigation as warfare, not advocacy. It is a textbook fraud on the court, and it exemplifies the shamefulness of what is happening here: a group of brutally shameless attorneys at Gibson Dunn, on Apple's dime, have wasted five years of an 85-year-old doctor's life with frivolous, contradictory arguments that pervert the course of justice.

Most egregious of all, Apple and Gibson Dunn are now asking this Court for an extraordinary gag order to permanently silence Dr. Roberts and anyone associated with him, Dr. Isaacs, or any of their companies. In a Rule 11 and 28 U.S.C. § 1927 sanctions motion filed in CR II, Apple seeks a **"nationwide injunction"** forbidding the doctors, their companies, counsel, and even unrelated app developers from filing *any* related litigation against Apple. Apple literally wants to bar all their "affiliates" from ever petitioning any court about Apple's misconduct. Such overreach is not only procedurally improper; it is oppressive and unconstitutional. It is a blatant attempt to obtain through sanctions what Apple could not obtain on the merits: a lifetime of immunity from this **world hero's** claims and from others who would dare challenge its App Store practices. Rule 11 is meant to deter baseless filings, not serve as a corporate cudgel to "throttle the exercise of the right to petition" by one's adversaries. Apple's gambit here betrays its true motive – not to correct any frivolous filing, but to punish and silence Dr. Roberts and his colleagues forever. The Court should see this for what it is: a tyrannical move by a $3 trillion Goliath to stomp out a David who had the courage to stand up.

**Notably, Apple persisted in demanding this universal gag order even after the U.S. Supreme Court unequivocally outlawed such injunctions.** On June 27, 2025, the Supreme Court decided *Trump v. CASA, Inc.* – a case explicitly holding that district courts lack equitable authority to issue **"universal"**

**(nationwide) injunctions** beyond the parties in the case . In light of this decision, undersigned counsel immediately urged Apple's attorneys to withdraw their request for a nationwide injunction against Dr. Roberts and others. Rather than retreat from relief that the Supreme Court has now deemed improper, Apple's counsel flatly refused. Undersigned even asked that the issue be escalated to Apple CEO Tim Cook (given the gravity of seeking relief that offends separation-of-powers principles), but Apple provided no meaningful response aside from a blanket refusal to stand down. In short, Apple doubled down on an **illegitimate demand** for a court order silencing non-parties, **thumbing its nose at the Supreme Court's mandate**. This episode is emblematic of Apple's arrogance over the past five years – a belief that the rules simply do not apply to them – and it casts further doubt on the good faith of Apple's motions in this case.

Apple's and Gibson Dunn's hypocrisy is also laid bare by their public boasting about the very litigation they belittle in court. In January 2025, Law360 honored Gibson Dunn as its "Competition Group of the Year," specifically crediting the firm for **getting "Apple out of a $200 billion lawsuit"** accusing Apple of monopolistically booting COVID-19 tracking and other apps from the App Store. The case being referenced is **Dr. Roberts' own lawsuit** – the *Coronavirus Reporter* matter – which Gibson Dunn succeeded in having dismissed. What's astounding is that, **inside the courtroom, Apple's lawyers portrayed that case as frivolous and even denied Dr. Roberts' involvement**, yet **outside the courtroom they trumpet the win as a monumental accomplishment** (even attaching a colossal dollar value to the claims). Gibson Dunn cannot have it both ways. **If Dr. Roberts was a "non-entity" and his claims a sham (as they told Judge Chen), defeating him would not be worthy of bragging rights**. The fact that Gibson Dunn touts this outcome in the press demonstrates the **real significance of the case** – undermining Apple's litigation position that the suit was baseless. This Law360 accolade is thus more than just puffery; it is an admission against interest. It confirms that Apple and its counsel *knew* Dr. Roberts and his app were legitimate and important, even as they told the Court the opposite. Such two-faced conduct – misleading the tribunal while bragging in media – further evidences the **bad faith and fraud on the court** at issue in these sanctions proceedings.

This Motion for Sanctions is Dr. Roberts' response to Apple's perversion of justice. We present it with a plea for the Court to finally **restore integrity** to these proceedings. Given the extraordinary misconduct at issue, Plaintiffs respectfully request that the Court *either* (a) exercise its inherent powers

(and/or proceed under Rule 11(c)(3) on its own initiative) to sanction Apple and its counsel, even if that means treating this motion as an independent action, **or** (b) if the Court is inclined to entertain Apple's pending Rule 11 motion in this case, to consider this a cross-motion under Rule 11 and §1927 so that Apple's conduct is scrutinized side-by-side. In either scenario, the egregious, bad-faith behavior of Apple and Gibson Dunn must be addressed now, before it yields yet another miscarriage of justice. We candidly note that under Rule 11's standard "safe harbor" process (Rule 11(c)(2)), a party must serve a motion and wait 21 days – but in this case, Gibson Dunn's pattern of retaliation and dishonesty convinces us that any such advance notice would only invite further abusive tactics. Thus, we urge the Court to invoke its authority under Rule 11(c)(3) (sua sponte, if the Court concurs that the matter is egregious) and under its inherent power to immediately investigate and sanction this misconduct. The Court can, if it prefers, **sever** the sanctions issues into a separate proceeding (to be overseen by a neutral judge or special master) or consolidate them with Apple's own motion – whatever best serves the interests of justice. The key is that the **truth** must finally be uncovered and the **fraud on the court** remedied. No outcome in this litigation can be trusted until Apple's house of lies is swept away.

In the pages that follow, we detail the factual and legal basis for sanctions. We begin by recounting Apple's and Gibson Dunn's multiple acts of **fraud on the court** – from denying Dr. Roberts' role, to misrepresenting the plaintiff's existence, to silencing a pro se litigant, to making false technical claims – all of which corrupted the previous proceedings. We then turn to Gibson Dunn's broader **pattern of misconduct** in other cases, showing that what has happened here is part of a larger modus operandi of that firm's "win-at-all-costs" ethos. Finally, we explain why immediate action is required: we outline specific steps for the Court to take (from expedited discovery to an evidentiary hearing), and we argue that a monetary penalty of **$20 million** is warranted to punish and deter Apple and Gibson Dunn's conduct.

Apple and its lawyers have run a **shameful course** in this matter – lying, bullying, and contradicting themselves at every turn to avoid a fair fight on the merits. This Court now faces a moment of truth: Will it allow a multibillion-dollar Goliath and its hired guns to trample an 85-year-old physician-scientist and silence him with a bogus injunction? Or will it stand up for the rule of law and say, "**Enough is enough**"? Dr. Robert Roberts – a man who has saved millions of lives – deserves far better from our justice system. We urge the

Court to grant this motion, impose severe sanctions on Apple and Gibson Dunn, and thereby send an unmistakable message that no litigant (no matter how powerful) is above the law or beyond the truth.

## I.    APPLE'S FRAUD ON THE COURT: SHIFTING NARRATIVES AND PERVERSION OF JUSTICE

Apple's litigation tactics in this case amount to a brazen **fraud on the court**. From 2021 to present, Apple (through Gibson Dunn) has advanced **contradictory factual narratives** to suit its shifting litigation goals, blatantly misleading judges and abusing procedural rules. These aren't minor inconsistencies – they strike at the heart of the case and have perverted the judicial process. We detail below the most egregious examples of Apple's fraud: (1) erasing Dr. Roberts' very role in the first lawsuit, (2) misrepresenting the existence of the plaintiff entity, (3) silencing a key pro se litigant through intimidation, and (4) making false claims about technical "security" issues to dodge antitrust scrutiny. Any one of these would be sanctionable; together, they reveal a deliberate pattern of deception that invalidates Apple's purported "victory" in CR I and taints its conduct in CR II. The Court cannot permit a judgment or legal advantage obtained by such fraud to stand.

**Cloaking Dr. Roberts and Contradicting His Role (CR I vs. CR II)**

**In CR I (2021)** – Apple's counsel *denied Dr. Roberts' very existence in the project* to gain a public relations advantage. Gibson Dunn attorney Rachel Brass told Judge Chen, in substance, that the Coronavirus Reporter app had "no connection to medicine" via any doctor, casting Dr. Isaacs as the only person of note. Apple's filings **falsely portrayed Dr. Isaacs as acting alone**, despite firm evidence that Roberts served as Chief Medical Officer of the app's developer company. This was a calculated lie designed to eliminate the most credible and sympathetic plaintiff (Dr. Roberts) from the case. By erasing Dr. Roberts from the narrative, Apple could caricature the suit as the work of a non-practicing physician and deflect attention from the app's medical legitimacy. It is hard to imagine a more perverse distortion: Apple knew full well that Dr. Roberts was a driving force behind the app (their own records and correspondence and even a CNBC interview showed his involvement), yet in open court they pretended he didn't exist. This lie succeeded in misleading the Court. The dismissal of CR I obviously influenced by Apple's smear campaign. As a matter

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

of law, **judgments procured by fraud on the court cannot be allowed to stand.** Apple's deceit regarding Dr. Roberts' role is precisely such a fraud.

**In CR II (2024–25)** – Apple has done an about-face, unequivocally *confessing* that Dr. Roberts was integral all along. To try to bar CR II, Apple now argues that Dr. Roberts' claims are precluded because he (and those associated with him) were supposedly represented or in privity in CR I. Apple's recent motions insist that Dr. Roberts binds the prior judgment. Apple cannot have it both ways. **If Dr. Roberts was a nobody in CR I, he can't be bound by it; if he is bound by it, then Apple lied when it said he was a nobody.** By pivoting to assert Dr. Roberts' centrality now, Apple implicitly admits that its earlier stance was false. This self-contradiction is the **smoking gun** of fraud on the court. Indeed, Apple's own Rule 11 sanctions motion lays bare the truth: Apple asks to enjoin Dr. Roberts nationwide, which is an admission that he is a key party in interest. How could Apple seek to gag a man who, according to Apple's CR I position, had "no involvement"? The answer: it cannot, **unless** its CR I position was a lie. The Court has been whipsawed by Apple's factual flip-flops. Such manipulative inconsistency is not an innocent mistake; it is **intentional inconsistency**, i.e. fraud. The Ninth Circuit has held that "extended… vacillation about facts" undermines any claim of a bona fide position. Apple's vacillation about the very status of the plaintiff indicates a knowing attempt to mislead. The appropriate remedy is to **vacate** the tainted dismissal of CR I and hold Apple to account for this conduct before proceeding further.

### Misrepresenting the Plaintiff's Existence (the "Corporation vs App" Discovery by Brass)

A second layer – there exist many – of Apple's fraud was its discovery that **"Coronavirus Reporter" was not a legal entity** and thus the suit was a nullity. Apple's counsel sneered to the Ninth Circuit that "Coronavirus Reporter" was just an app name, a *"non-existent"* phantom with no corporate standing. Apple convinced the Court that the suit was improperly brought, leading to dismissal and affirmance. But in subsequent proceedings, Apple has pleaded the reverse of the truth they discovered: *of course* there was a real company and real people behind CR I, including Roberts. In CR II, Apple fraudulently asserts it always "assumed" the plaintiff was the corporation – a claim made only to argue preclusion. So, once again, Apple spoke out of both sides of its mouth: telling the Ninth Circuit that no corporation existed, then telling Judge Chen in 2025 that it "always" understood a corporation existed (so as to bind that corporation). **This is**

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

**outright fraud.** Gibson Dunn obtained dismissal, claimed it was based in part on the lack of a valid Plaintiff, and now wants to use that dismissal against the very entity whose existence it previously denied. The only appropriate cure is to void that dismissal and start with a clean slate, with the real parties acknowledged and the merits addressed.

### Silencing a Pro Se Litigant Through Threats and Intimidation

Apple's fraud on the court was not limited to paper filings; it extended to bullying a key participant outside of the courtroom. In CR I, when co-founder Jeffrey Isaacs – who suffers from serious neurological disabilities – attempted to assert his rights by filing pro se, Gibson Dunn moved swiftly to shut him up. On September 30, 2021, Ms. Brass sent Mr. Isaacs a **threatening letter** (later filed as ECF 70-3) that made Apple's position coercively clear: *"Isaacs may not appear pro se…."* The letter went on to demand that Isaacs cease communicating and warned that Apple would seek a *protective order* if he continued trying to participate in the litigation. This was a gross abuse of legal process. Never did Apple move the Court to clarify, they just enjoyed bullying a disabled Isaacs. Apple had *not* obtained any court order at that point barring Isaacs' participation; they simply used their big-law firm letterhead to intimidate a pro se litigant into effectively ceasing prosecution of his case, or materially impeding it. The result was that Dr. Isaacs – a key witness to Apple's conduct and a co-developer of the app – was effectively silenced in CR I. This underhanded maneuver deprived the Court of material facts and is yet another facet of **fraud on the court**. An attorney's duty of candor and fairness encompasses not using trickery to keep relevant parties out of the courtroom. By strong-arming Isaacs into the shadows, Apple and Gibson Dunn interfered with the rightful adjudication of the case. Such conduct cannot be countenanced. It further justifies vacating the prior judgment and restarting proceedings free of Apple's taint. We urge the Court to inquire into this incident specifically: who authorized the Brass letter, on what legal basis, what do internal communications reveal, and with what intent?

### False Claims About "Notarization" Inseparability from Operating Systems

Finally, Apple has continuously made **false or unsubstantiated technical claims** to avoid scrutiny of its App Store monopoly – another species of misrepresentation that has hamstrung this litigation. A core

1    issue in these cases is Apple's requirement that all iOS apps be **notarized** (approved and signed) by Apple,

2    and that distribution be through Apple's App Store unless an app meets Apple's strict exceptions. Apple's

3    justification is "security." It argues that its closed system is inseparable from iPhone security, and thus any

4    attempt to allow outside apps (or even allow Apple-approved apps outside the App Store) would compromise

5    iOS safety. This claim has been Apple's magic talisman to wave off antitrust claims, not just here but in other

6    cases (e.g., *Epic Games v. Apple*). **But there is a serious question whether this claim is actually true.**

7    Plaintiffs have long contended that Apple's "notarization = security" narrative is overblown or false – that

8    Apple *could* allow third-party app distribution or alternate notarization methods without endangering users,

9    but chooses not to in order to preserve its monopoly rents. Undersigned sought, five years ago, an evidentiary

10   hearing to challenge Apple on this point. Apple fought tooth and nail to prevent any such inquiry, and the

11   Court deferred to Apple's assertions without proof. In retrospect, given Apple's demonstrated willingness to

12   mislead, it was error to simply trust Apple's technical say-so. Indeed, recent developments validate our

13   skepticism. Apple is now facing mandates (from the EU's Digital Markets Act, for example) to allow

14   sideloading and third-party app stores, and its response has been revealing. Internally, Apple has treated these

15   pro-competition measures as dominoes to be toppled in sequence – first fighting off any easing of its anti-

16   steering rules, then resisting sideloading, then, ultimately, guarding the **notarization control** as its last line

17   of defense. Apple knows that if a court or regulator finds that independent notarization or security vetting is

18   feasible, Apple loses its monopoly chokehold. Therefore, Apple's lawyers have every incentive to perpetuate

19   the **myth** that only Apple can be trusted to approve apps and that any other system is dangerously untenable.

20   This myth was injected into CR I and colored the Court's view of the case. It was effectively a factual

21   misrepresentation used to justify dismissal (i.e., "notarization is an inseparable component of iOS"). We now

22   know from industry developments that this is a falsity. Apple's notarization in the EU serves no purpose

23   other than to extract a CTF. It is now clear as day fraud on the court. The Court must recognize that Apple's

24   say-so on notarization was not sacrosanct truth, and that allowing Apple to escape antitrust review by hiding

25   behind such false claims was an error induced by Apple's aggressive misinformation. As part of the sanction

26   and remedial measures, we urge the Court to permit a fulsome examination of Apple's internal ESI on

27   notarization, which will be nothing less than damning. No more taking Apple at its word – that word has

28   proven worthless in light of Apple's conduct elsewhere. The pattern is clear: Apple will cite "security" and

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

"policy" as fig leaves for anticompetitive behavior, and its lawyers will back up those claims even to the point of tolerating false testimony. This Court should no longer be a passive recipient of such narratives. Exposing the truth is part of curing the fraud on the court that has occurred.

**Cumulative Effect: An Nullified Judgment and the Need to Start Anew**

Viewed in totality, Apple's misconduct in CR I & II was **so egregious** that the resulting dismissals are incurably tainted. Apple achieved dismissal not by persuading the Court on the law or facts, but by **poisoning the process** – by conjuring a fake procedural defect (a "non-existent" plaintiff), by hiding the true identity and involvement of key people, by intimidating a co-plaintiff, and by feeding the Court dubious assertions as if they were facts. This is precisely what the doctrine of *fraud on the court* is meant to address. When a party's dishonesty undermines the integrity of the proceedings, the normal interest in finality yields to the paramount interest in justice. Here, justice demands that the slate be wiped clean of Apple's fraud. The Court should exercise its inherent authority to **vacate the dismissal of CR I & II** (and any orders built upon it) due to Apple's fraud.

Apple's pattern of deceit here is not an isolated lapse. It is part of a **broader pattern** of Gibson Dunn's litigation behavior, and it foreshadows the lengths to which they will go if unchecked. In *Epic Games v. Apple*, a federal judge found that Apple **"willfully"** violated a court injunction and that an Apple executive gave testimony "replete with misdirection and outright lies" which neither Apple **"nor its counsel"** corrected. Judge Gonzalez Rogers was so outraged that she referred the matter to the U.S. Attorney for a possible **criminal contempt** investigation. She observed that Apple's conduct was a "gross miscalculation" born of arrogance that the Court would tolerate such defiance. We see the same arrogance here: Apple (and its counsel) seemingly believed they could pull the wool over the Court's eyes with impunity. Similarly, in the Facebook privacy litigation, Judge Chhabria sanctioned Gibson Dunn and its client for a "sustained, concerted, bad-faith effort" to make the case unbearably difficult – behavior he described as "unusually egregious" and motivated by a desire to *wear down* the opposition through obstinacy. Again, we see parallels: Gibson Dunn's approach to Dr. Roberts' case has been to throw every obstacle and contradiction out, hoping Plaintiffs would tire or go broke. In the Chevron/Ecuador matter, Gibson Dunn lawyers were caught harassing a non-party witness in bad faith, leading Magistrate Judge Thomas Coffin to sanction them and conclude the deposition was "*meant to harass*". The *Chevron* saga in fact is replete with Gibson Dunn

1   misconduct – including outright false statements to forums – and even earlier, Gibson Dunn's tactics earned

2   it a $20 million sanction in Montana in 2003 for harassment of a witness. This firm has a recorded history of

3   crossing ethical lines when representing powerful clients, and Apple is no exception.

4       All of this is to say: the **fraud on the court in our case was not a one-off accident**. It was a conscious

5   strategy, consistent with Gibson Dunn's corporate culture of winning by any means necessary. The Court, as

6   guardian of justice, must take strong action to dissuade Apple and its counsel from ever thinking they can

7   play fast and loose with the truth in this courtroom again.

8           **Gibson Dunn's Pattern of Misconduct and Lack of Credibility**

9       Apple's ability to perpetrate the above-described fraud on the court is no doubt enabled by its chosen

10  counsel, **Gibson, Dunn & Crutcher** – a firm that has cultivated a notorious reputation for "anything goes"

11  litigation tactics. To fully appreciate the need for sanctions here, the Court should consider Gibson Dunn's

12  **pattern of misconduct** in other high-profile cases. Time and again, judges have called out Gibson Dunn for

13  egregious behavior: lying or tolerating lies, abusing the discovery process, multiplying proceedings, and

14  harassing opponents. This history means two things for our case: (1) the representations and excuses coming

15  from Gibson Dunn lawyers should be given zero credence without verification; and (2) the misconduct we've

16  seen here is likely part of a deliberate playbook, not an aberration. We expand a few key examples mentioned

17  above:

18  - **Epic Games v. Apple (N.D. Cal. 2020-2021):** If Gibson Dunn was willing to tolerate "outright lies"
19    in a case of Epic's magnitude, there is every reason to suspect they would lie (and have lied) in a case
20    involving a smaller opponent like Dr. Roberts. Indeed, some of the same lawyers (e.g., Mark Perry)
21    have been involved in both matters. Their credibility is nil.
22  - **Facebook User Privacy MDL (N.D. Cal. 2018-2022):** Gibson Dunn represented Facebook (now
23    Meta) in the Cambridge Analytica data privacy litigation. Their conduct was so obstructive that Judge
24    Vince Chhabria imposed nearly **$925,000 in sanctions** on Facebook and Gibson Dunn for "delay,
25    misdirection and frivolous arguments" during discovery. He described Gibson Dunn's tactics as a
26    *"sustained, concerted, bad-faith effort"* to throw obstacle after obstacle in front of the plaintiffs, with
27    the aim of wearing them down. Judge Chhabria was "long critical" of Gibson Dunn's handling of the
28    case and said their discovery obstruction was *"unusually egregious,"* designed to force a cheap
29    settlement. This directly parallels what Dr. Roberts has experienced: Gibson Dunn using every
30    procedural trick (meritless motions, frivolous arguments about standing or identity, endless delays)
31    to avoid a merits resolution and to bleed the plaintiffs dry. It also shows that Gibson Dunn habitually
32    **misdirects** courts – raising red herrings, advancing baseless points – to confuse and exhaust judges
33    and opposing counsel. When we tell the Court that Apple's ever-changing story here was strategic,
34    not accidental, the Facebook case is proof-positive. Gibson Dunn's modus operandi is to **flip
35    narratives, conceal evidence, and generally act in bad faith** if it serves their client's interests.

- **Chevron/Ecuador Environmental Litigation (2010-2012):** Gibson Dunn's "kill or be killed" approach has been documented in the long-running litigation over Chevron's pollution in Ecuador. In a 2011 Oregon discovery proceeding, Magistrate Judge Thomas Coffin sanctioned Gibson Dunn attorneys for **harassing a non-party witness**, finding the deposition was partly *"meant to harass"* and ordering Chevron (their client) to pay the witness's legal fees. The harassment included Gibson Dunn's lawyer deliberately misstating the witness's testimony and flouting deposition rules, to the point the court had to step in. Once sanctions were imposed, Gibson Dunn abruptly backed off and withdrew that discovery action – a tacit admission that they had no substantive justification for it aside from harassment. Furthermore, reports indicate Gibson Dunn engaged in **widespread misconduct** in the Chevron case: dozens of vexatious subpoenas against anyone connected to the plaintiffs, discovery abuses across the country, even attempting to mislead Congress with false statements about the case.

These examples are just a sampling. Other courts have rebuked Gibson Dunn for shady practices – California state court calling a Gibson Dunn suit "designed to harass" and suppress speech; another Gibson Dunn case hit with sanctions for a frivolous SLAPP to silence a filmmaker; etc.). The consistent theme is a lack of credibility and lack of respect for the truth. Gibson Dunn attorneys, including those here, have been caught with Apple lying to this District Court for this (Apple Sherman Act and UCL) matter. They view litigation not as a truth-seeking process, but as a battlefield where victory is the only goal and rules are meant to be bent or broken. It is in this context that the Court should evaluate Apple's submissions in our case. When Apple's lawyers make representations about what happened in 2021 or who said what, the Court should demand proof, not take them at their word.

This pattern amplifies the need for sanctions: A slap on the wrist or small fine will not deter a repeat offender of this magnitude. Gibson Dunn has likely budgeted occasional sanctions into its litigation strategy (as a cost of doing business while serving deep-pocket clients). To truly deter, the sanction must be significant (hence our $20 million proposal before unjust enrichment factoring; even that is 'pocket change' to Dunn, let alone Apple) and it must potentially threaten what the firm values most – its reputation or its ability to appear before courts unhindered. Judges in prior cases have referred Gibson Dunn's conduct to disciplinary boards or hinted at contempt; we urge this Court to do the same if the evidence we've presented holds true. Only by hitting them hard – in public reputation, in pocketbook, or both – will this firm possibly reconsider its ways. And only by sanctioning Apple's counsel can the Court send a message that it will not be a party to Gibson Dunn's next ethical transgression.

In sum, Gibson Dunn's history shows that what occurred in Dr. Roberts' case was not an anomaly. It was enabled by a corporate culture that prioritizes winning over truth. The shamefulness of Gibson Dunn's

1   conduct here is magnified by Dr. Roberts' stature: they have effectively attempted to gaslight and steamroll

2   a celebrated doctor who stepped up in a pandemic. If they can do that to him, they'll do it to anyone – unless

3   courts draw a line. We ask this Court to draw that line decisively, here and now.

4               **The Unfair Disparity: Others Validate Dr. Roberts' Claims While Apple Seeks to Silence Him**

5           Even as Apple and Gibson Dunn disparage Dr. Roberts and paint him as a vexatious litigant,

6   independent developments in the tech and legal world have **validated the very claims he brought**. It is

7   important for the Court to understand that Dr. Roberts was not alone or quixotic in challenging Apple's App

8   Store practices – he was **first** and he was **right**, and others have since followed on the same issues. Yet there

9   is a glaring disparity: those other challengers are getting a chance to be heard (with competent representation

10  and the prospect of class relief), while Dr. Roberts' case was snuffed out prematurely through Apple's

11  machinations. Fundamental fairness, as well as consistency in the law, demand that Dr. Roberts get the same

12  opportunity to pursue his claims as these others. We highlight one key example: **PhantomAlert, Inc.** and its

13  class action.

14          PhantomAlert is a small app developer known originally for police radar speed alert apps. In 2020,

15  after COVID-19 hit, PhantomAlert created a **contact-tracing app** to help users report exposures – a

16  functionality akin to what Coronavirus Reporter offered. Unsurprisingly, Apple **denied** PhantomAlert's app

17  from the App Store for the same reason: it wasn't government-sanctioned. In January 2025, Judge Trevor

18  McFadden granted Apple's motion to dismiss PhantomAlert's complaint, based on Gibson Dunn's argument

19  it was "identical" to CR I. PhantomAlert engaged an **antitrust team from Berger Montague**, a leading

20  plaintiffs' class-action firm (with Harvard-educated attorneys possessing significant DOJ experience in tech

21  antitrust). In other words, heavy hitters in the legal community looked at these claims and decided they have

22  merit and value. PhantomAlert's case is now on appeal (regarding the dismissal) with the backing of first-

23  rate counsel and a potential nationwide class of developers.

24          Why is this relevant here? Because it demonstrates that Dr. Roberts' crusade was **neither frivolous**

25  **nor isolated**. He was ahead of the curve in February 2020 trying to launch a life-saving app. He was among

26  the first to call out Apple's misuse of its App Store rules during a global emergency. Now, years later, others

27  are echoing those same complaints: that Apple's conduct was anticompetitive, harmed small developers, and

28  arguably violated laws like the Sherman Act and state unfair competition laws.

Apple essentially "picked off" Dr. Roberts as the tip of the spear, hoping that would deter others. To some extent, it worked for a while – others might have been hesitant watching what happened to him. But now that others have rallied (PhantomAlert, etc.), Apple is panicking, hence its bid for a global anti-suit injunction. This Court should not reward Apple for its strategy of selective suppression. If anything, **Dr. Roberts' case deserves greater respect** given who he is and what he tried to do.

We submit that equity and justice require leveling the playing field. If PhantomAlert and others will have their day in court (with class actions or otherwise), then Dr. Roberts – the pioneer of this cause – must have his day as well. It would be a bitter irony if the originator of the COVID app antitrust theory is the only one barred from litigating it due to procedural shenanigans and vendetta of Gibson Dunn.

## LEGAL STANDARD

Inherent power. A court may fashion an appropriate sanction for conduct which abuses the judicial process including fee-shifting, default, or contempt. *Chambers v. NASCO, Inc*., 501 U.S. 32, 44–46 (1991).

28 U.S.C. § 1927. An attorney who so multiplies the proceedings … unreasonably and vexatiously may be required to satisfy the excess costs, expenses, and attorneys' fees reasonably incurred. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002).

Additionally, Plaintiffs request the Court independently consider exercising its sua sponte authority under Rule 11(c)(3), given the egregious nature of Defendants' misconduct.

## ARGUMENT

## I.    THE NEED FOR IMMEDIATE INVESTIGATION AND A $20 MILLION SANCTION

Apple and Gibson Dunn's misconduct in this case is so severe that it calls for the **strongest sanctions** this Court can impose. Five years of lies, delays, and abuse have not only prejudiced Dr. Roberts, but have also made a mockery of this Court's processes. To restore integrity, we urge the Court to take swift and decisive action under its inherent powers, 28 U.S.C. § 1927, and even consider applying Rule 11(c)(3) sua sponte. Specifically, the Court should initiate a thorough investigation of Apple's and Gibson Dunn's litigation conduct and impose sanctions commensurate with the egregiousness of their actions. We outline below a set of recommended steps and remedies. These include targeted discovery to uncover the truth, an evidentiary hearing to put Gibson Dunn's lawyers under oath, referrals for disciplinary or criminal

14

1  proceedings if warranted, a **monetary sanction of $20,000,000**, unjust enrichment reallocation, and

2  additional relief to neutralize the fruits of Apple's misconduct (such as vacating the prior dismissal and

3  ensuring a fair path forward for Dr. Roberts' claims). **Nothing short of this comprehensive approach will**

4  **suffice** – Apple's behavior has been that bad, and justice delayed any longer will be justice denied.

5      **1. Immediate Court-Ordered Discovery into Gibson Dunn's Communications and**

6  **Representations:** The Court should order Apple and its counsel to turn over, on an expedited basis, all

7  communications, filings, and internal documents relevant to the inconsistent positions and factual

8  misrepresentations outlined above. This should include their entire file on Apple related antitrust litigation,

9  or more narrowly, the CR I & II files. At a minimum, correspondence or emails in which Gibson Dunn

10  discussed or decided how to characterize the plaintiff (app vs. corporation), their due diligence on Apple's

11  notarization mechanism and economic effects, internal drafts or notes from 2021 where Apple's team

12  formulated the "non-entity" theory, and communications from 2024-25 where they decided to invoke Dr.

13  Roberts and Isaacs for preclusion. The goal is to trace the evolution of Apple's narrative in their own words

14  – to see if, as we suspect, **Gibson Dunn consciously re-crafted the story at each phase knowing it was**

15  **contrary to what they said earlier**. We request that the Court set a very short deadline for production, and

16  consider appointing a special master or magistrate to oversee compliance. The specter of spoliation or foot-

17  dragging is real – Gibson Dunn has a history of delay and obstruction and Apple just last month lied to this

18  District Court and resisted document production. The Court should warn that any failure to fully and timely

19  comply will be met with severe consequences (up to default or contempt). By compelling this production,

20  the Court will quickly get to the bottom of whether Apple's counsel lied or deliberately misled the Court.

21  Documents often tell the story: if internal emails show, for instance, that Ms. Brass believed her "no entity"

22  email and later suggested otherwise, that's a smoking gun of bad faith. We need to see those smoking guns.

23      **2. Evidentiary Hearing with Witness Testimony (Including Gibson Dunn Attorneys and Apple**

24  **representative):** After expedited document production, the Court should hold an evidentiary hearing where

25  the key players testify under oath. This would likely include Attorney Rachel Brass, Perry, Kleinbrodt, and

26  any other Gibson Dunn lawyers who signed filings or letters with the misrepresentations (and any relevant

27  Apple in-house counsel or executives who directed strategy). They should be questioned about the factual

28  bases (or lack thereof) for their claims in CR I and CR II. For example, Brass should be asked: *"On what*

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

1   *basis did you tell the Court in 2021 that Coronavirus Reporter was not a company or that Dr. Roberts was*

2   *not involved? Were you aware of the Wyoming corporation and Dr. Roberts' role at that time? If so, why did*

3   *deny their existance?"* Similarly: *"How do you reconcile Apple's statement in 2021 that Isaacs 'could not*

4   *appear' with your current claim that Isaacs was effectively the prior plaintiff whose outcome binds everyone?*

5   *Did you ever inform Judge Chen of Dr. Roberts' true role?"* The hearing would serve two purposes: to allow

6   the Court to **observe the demeanor and credibility** (or lack thereof) of Apple's counsel, and to create a

7   clear record of what misrepresentations were made. If the attorneys attempt to justify their actions, the Court

8   can probe those explanations. If they take responsibility or reveal instructions from Apple, that is informative

9   too. We also would call Dr. Isaacs and Dr. Roberts to testify to their interactions with Apple's counsel – for

10  instance, Dr. Isaacs can authenticate the intimidation letter and describe its impact, and Dr. Roberts can testify

11  how he was marginalized. Ultimately, this hearing will inform the Court's decision on sanctions and possible

12  further action (like referrals). The importance of having lawyers speak under oath is underscored by the *Epic*

13  case – there, once evidence came out, Judge Gonzalez Rogers bluntly noted the lies and the failure of counsel

14  to correct them. We expect a similarly rigorous application of the law here.

15      **3. Referral to Disciplinary Authorities or DOJ if Appropriate:** If the evidence confirms that

16  Apple's counsel engaged in deceit or serious misconduct, the Court should not hesitate to refer them to the

17  relevant State Bar for investigation of ethical violations. Lying to a tribunal, framing false narratives, or

18  abusing procedure to stifle a party are potential breaches of rules of professional conduct (e.g., ABA Model

19  Rules 3.3, 4.4, etc.). Additionally, if perjury by a witness or subornation of perjury by counsel is uncovered,

20  a referral to the Department of Justice for perjury or obstruction of justice should be considered. We note

21  that in *Epic*, Judge Gonzalez Rogers explicitly referred Apple (and implicitly its counsel) for a criminal

22  contempt inquiry, because false testimony had been given about Apple's compliance with an injunction.

23  Federal courts have inherent power to protect themselves from fraud; sometimes that involves asking

24  prosecutors to step in when the fraud is egregious. Here, Apple's about-face on facts might not violate a

25  specific statute, but if any sworn declarations or statements were made that are proven false (and made

26  knowingly), that could be perjury.

27      **4. Monetary Sanctions of $20,000,000 (Jointly and Severally Against Apple and Gibson Dunn):**

28  The Court should impose a monetary sanction that is *punitive* and *deterrent*, not merely compensatory. We

propose **$20 million** for several reasons. First, this approximate figure represents about a small fraction of what Apple has likely paid Gibson Dunn to carry out its anti-competitive legal strategy. Imposing $20M as a sanction effectively **claws back** one year of ill-gotten gains and forces a wealthy defendant and a wealthy law firm to feel a pinch. To Apple (a $3T company), and even Gibson Dunn (a $2B/year firm), smaller sanctions (like the $925k in the Facebook case) are unfortunately just "loose change". Judge Chhabria himself noted that $925k was "loose change" to these actors – indeed Meta/Facebook agreed to pay $725 million to settle that case, dwarfing the sanction. We need to speak in a language Apple understands: dollars and shareholder impact. $20M is an amount that might get noticed by Apple's board or at least within Gibson Dunn's partnership (perhaps affecting bonuses). It is also symbolically significant because, as noted, Gibson Dunn once faced a $20M sanction in 2003 – apparently one of the largest ever against a law firm. That history shows that only very large numbers prompt soul-searching. Second, $20M is proportional to the harm. Dr. Roberts and his team spent five years fighting for a chance to be heard – five years of lost opportunity (the app never got launched), five years of litigation stress and expense, and incalculable damage to their morale and reputations. In antitrust terms, if Coronavirus Reporter had launched and been even moderately successful, it could have been worth hundreds of millions in value (especially at the height of COVID app demand). Apple's misconduct robbed them of that chance. While sanctions are not damages per se, this amount recognizes that the consequences here were enormous – not a trivial discovery spat, but the derailment of a lifesaving innovation and antitrust claim. Third, **deterrence**: We want to deter both Apple and *other litigants* from similar tactics. If a mere reprimand or small fine is given, Apple and firms like Gibson Dunn will continue with business as usual (calculating that they saved more by winning than the cost of sanction). But a $20M hit, publicly awarded, would make headlines and force some internal accountability. It would tell every lawyer in this case and others: do not lie or abuse procedure in the Northern District of California, or you will pay dearly. It would also resonate in Big Tech boardrooms: maybe it's better to litigate honestly than risk sanctions that meaningfully impact the bottom line. We stress that this $20M should be **joint and several** on Apple and Gibson Dunn. Apple must not be allowed to offload it entirely onto its firm (or vice versa); both should feel it.

**5. Vacatur of the CR I Dismissal and Other Appropriate Relief:** In addition to punitive measures, the Court must correct the litigation record by nullifying any outcome tainted by Apple's fraud. That means

**vacating the judgment of dismissal in CR I** (the 2021 case) under the Court's inherent power to address fraud on the court. The dismissal was obtained under false pretenses; it cannot be allowed to stand as a bar to anything. Once vacated, Apple's whole preclusion argument in CR II collapses – appropriately so, since one cannot derive preclusive effect from a fraudulent judgment. The Court should also deny Apple's pending Rule 11/§1927 motion in CR II, not only because it's baseless but also as a further sanction (indeed, that motion is an abusive filing that itself warrants being stricken and is pending antiSLAPP adjudication). Furthermore, we ask the Court to entertain a **fresh look at the merits** of Dr. Roberts' claims. Procedurally, this could mean reopening CR I and consolidating it with CR II, or simply proceeding in CR II but recognizing that it is unencumbered by the prior case. As part of remedying the situation, it may be appropriate for Judge Chen to recuse or for the case to be reassigned to ensure a completely fresh perspective. CRC, Undersigned and Dr. Roberts needs to know that the next decisions will be made on a clean record by a neutral arbiter not subconsciously affected by Apple's prior distortions. In any event, any injunction or extraordinary relief Apple seeks against Dr. Roberts should be off the table. An 85 year old hero should not be dragged through the mud in a Gibson Dunn-esque evil ploy. In fact, as a sanction, the Court could **enjoin Apple** from seeking any similar gag orders in this or related cases, since Apple has shown it wields Rule 11 for improper purposes. The Court should also consider granting leave for Plaintiffs to amend or supplement their complaint as needed, and to pursue expedited merits discovery, as a way to make up for lost time. Essentially, the litigation should resume as if it were filed anew, but with the knowledge of Apple's conduct informing a tighter leash on Apple's future litigation behavior.

**Additional Remedies and Supplemental Claims**

## II.    DISGORGEMENT OF ILL-GOTTEN PROFITS

Plaintiffs seek **disgorgement of Apple's monopoly profits** as an equitable remedy. A foundational principle of antitrust law is that a monopolist **"must not be permitted to profit from the violation"** of the law. Allowing Apple to retain billions in ill-gotten gains from its exclusionary **App Store notarization scheme** would undermine deterrence. Courts have broad authority to deprive a violator of unlawful gains – for example, California's Unfair Competition Law expressly permits orders **"necessary to restore to any person in interest any money or property…which may have been acquired"** by means of unfair practices.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

1    Here, Apple's **"notarization" requirement** (and parallel App Store restrictions) allegedly yielded

2    approximately **$20 billion per year** each of the past five years in unjust revenue. We therefore ask that the

3    Court, as part of final relief, compel Apple to **disgorge these ill-gotten profits**, returning value to those

4    harmed and preventing Apple from being unjustly enriched by its prolonged monopoly. Such disgorgement

5    is appropriate to **"prevent the violator from profiting"** from illegal conduct and to **restore** the status quo

6    that would have existed absent Apple's unfair monopoly.

7    **III.     ADA RETALIATION CLAIM**

8         Plaintiff also asserts a claim under the **Americans with Disabilities Act (ADA) for retaliation**, given

9    that a key team member's disability was brought to Apple's attention and met with reprisals. The ADA's

10   anti-retaliation provision, 42 U.S.C. § 12203, **broadly prohibits any person from discriminating against**

11   **an individual for opposing disability-based wrongdoing or participating in an ADA proceeding** . In this

12   case, Dr. **Isaacs** (a Plaintiff) repeatedly **warned Apple** that its policies were adversely impacting him due to

13   his documented disability – effectively **opposing practices made unlawful by the ADA** – yet Apple doubled

14   down and **punished him for speaking out**. For instance, Plaintiffs allege that after Dr. Isaacs objected to

15   Apple's discriminatory rejection of their app (and requested disability accommodations), Apple responded

16   by further **impeding his access and retaliating against his development account**, which **impaired his**

17   **ability to participate in this litigation**. Such alleged conduct fits squarely within ADA retaliation: *"No*

18   *person shall discriminate against any individual because such individual has opposed any act or practice*

19   *made unlawful by [the ADA]..."* In other words, Apple cannot lawfully **"target" a developer's disability**

20   **or retaliatory complaints** with punitive measures. We invoke the ADA's protections to seek relief for this

21   retaliation, which may include injunctive orders and other equitable remedies (as authorized by ADA

22   §12203(c)) to undo the harm and **ensure a fair, unbiased proceeding** going forward.

23   **IV.     DISQUALIFICATION OF COUNSEL (WITNESS-ADVOCATE RULE)**

24        Plaintiffs move to **disqualify Apple's counsel, Gibson Dunn & Crutcher, under the "lawyer-as-**

25   **witness" rule** (Model Rule of Professional Conduct 3.7), given the likelihood that key attorneys are

26   necessary witnesses in this matter. The advocate-witness rule exists to prevent prejudice and confusion that

27   arise when an attorney serves as both a zealous advocate and a witness on contested factual issues. As the

19

California Supreme Court has observed, **"an attorney who attempts to be both advocate and witness impairs his credibility as a witness and diminishes his effectiveness as an advocate."** Here, certain Gibson Dunn attorneys have firsthand knowledge of disputed events making their testimony **highly relevant**. If those same lawyers continue as trial counsel, the trier of fact could be **"confused or misled"**: a lawyer is expected to argue based on evidence, but as a witness the lawyer would be providing evidence based on personal knowledge. The dual role blurs the line between advocacy and evidence, raising the risk that the attorney's statements **"may not be clear [as to] whether [they] should be taken as proof or as an analysis of the proof."** Model Rule 3.7 (adopted in substance by California's Rules) therefore **prohibits a lawyer from acting as advocate in a proceeding if the lawyer is likely to be a necessary witness**, absent narrow exceptions. The rule aims to avoid **the appearance of impropriety and unfair prejudice** to the opposing party. In this case, Apple's counsel have effectively made themselves witnesses through their statements and actions (e.g. by **pleading specific factual representations on Apple's behalf and possibly orchestrating the alleged cover-up of Apple's conduct, tolerating lies on the witness stand, etc, etc**). This creates an untenable conflict. Even if another attorney at the firm were to conduct the trial, the **"stake" of the lawyer-witness's firm in the outcome could still undermine objectivity** . Courts retain discretion to disqualify counsel in such scenarios to preserve **the integrity of the proceedings and public trust in the justice system**. Accordingly, Plaintiffs ask that Gibson Dunn be disqualified as litigation counsel, or at minimum that any individual lawyer likely to testify withdraw from any advocacy role at trial. Apple should be required to retain conflict-free counsel who will not serve as witnesses, or else formally waive the advocate-witness conflict (if waiver is permissible) and proceed at its peril. We seek the Court's intervention to **enforce Model Rule 3.7's mandate**, thereby eliminating a serious ethical conflict and ensuring a fair trial.

## V.    PARTIAL DEFAULT AS A SANCTION FOR FRAUD ON THE COURT

Given the **egregious pattern of litigation misconduct** by Apple, Plaintiffs urge the Court to enter a **partial default judgment** against Apple on specific claims or issues as a sanction for **fraud on the court**. Federal courts possess inherent authority – as well as authority under Fed. R. Civ. P. 37 – to impose terminating sanctions when a party's bad-faith conduct undermines the judicial process. This includes the power to render a **default judgment** on some or all claims in extreme situations. An order of default is a **"drastic sanction,"** reserved for cases of deliberate misconduct showing a **"contumacious…disregard of**

1    **the court's authority.**" Here, we contend Apple has perpetrated a fraud on this Court by repeatedly

2    misrepresenting material facts – for example, suggesting that macOS **notarization was inseparable from**

3    **iOS** (a claim now shown false by our First Amended Complaint's evidence that those features are in fact

4    severable), Dr Roberts participation in CRC, Dr Isaacs pro se status, etc. Such misrepresentations, coupled

5    with Apple's concealment of evidence and improper interference with witnesses, amount to a **systematic**

6    **abuse of the judicial process**. Courts have made clear that when a party **fabricates evidence, perjures**

7    **itself, or otherwise "intentionally distort[s] the discovery and trial process," the appropriate remedy**

8    **is default judgment**. Lesser sanctions would not suffice to purge the prejudice and signal that such behavior

9    will not be tolerated. For instance, in one case a plaintiff who attached a **forged contract** as the "centerpiece"

10    of his complaint had his entire suit dismissed as a sanction. Likewise, if a defendant engages in egregious

11    discovery abuse or fraud, courts may **enter default on liability** as a punitive and remedial measure. We

12    request a tailored application of that principle here: at minimum, a **default judgment on the issue of Apple's**

13    **liability** for the claims tainted by its misconduct (such as the UCL claim regarding notarization and monopoly

14    maintenance) is warranted. This Court's broad discretion in fashioning sanctions includes the ability to strike

15    Apple's defenses or render judgment on particular issues where Apple's fraud has "infected" the fairness of

16    the adjudication. By imposing a **partial default**, the Court would protect the integrity of these proceedings

17    and ensure that Apple does not benefit from having **defrauded the Court**. In sum, the severity and deliberate

18    nature of Apple's litigation abuses call for a commensurately severe response – one that **strips Apple of its**

19    **defenses** on certain claims and allows this case to proceed directly to an assessment of appropriate relief.

20    **VI.    CIVIL RICO CLAIM (SEVERED OR AMENDED)**

21        Finally, Plaintiffs seek the Court's guidance on pursuing a **Civil RICO claim** (Racketeer Influenced

22    and Corrupt Organizations Act, 18 U.S.C. § 1962) based on Apple's ongoing scheme of developer retaliation

23    and fraud. We initially pleaded a RICO cause of action – alleging that Apple and its agents engaged in a

24    pattern of racketeering acts (mail and wire fraud, among others) to maintain its App Store monopoly and

25    retaliate against developers – but that claim was dismissed at the Rule 12 stage. The new evidence squarely

26    invokes multiple excessive predicate act violations and a refreshed claim. We respectfully submit that a RICO

27    theory remains viable if properly refined. **By statute, a § 1962(c) RICO claim requires** the plaintiff to allege

28    **"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (predicate acts) (5)**

21

1   **causing injury to the plaintiff's business or property."** We believe the facts here – including Apple's

2   systematic suppression of rival apps and appropriation of developers' ideas through fraudulent App Review

3   practices – satisfy these elements. However, to address the Court's prior concerns, we will **clarify the RICO**

4   **"enterprise" distinct from Apple** itself. The Ninth Circuit affirmed dismissal of our earlier RICO claim

5   because, as pleaded, it impermissibly made Apple the RICO person and effectively the enterprise (by naming

6   Apple's own management, counsel, and associates). A corporation **cannot be both the liable "person" and**

7   **part of the associated enterprise** under RICO. In a **revised RICO claim**, we would allege an enterprise

8   comprising entities and individuals separate from Apple (for example, a group of co-conspirators or shell

9   entities used by Apple to further the scheme), thereby satisfying the distinctness requirement. We are

10  prepared to **file a new, separate action** for civil RICO – to avoid complicating the current case – or, if the

11  Court prefers, to **amend the present complaint** to add the RICO count (since it arises from the same nucleus

12  of facts as our other claims). In the interest of judicial economy, an amended pleading might be appropriate

13  if the Court is inclined to permit it; alternatively, severance of the RICO allegations into a new case could be

14  ordered. **We respectfully request guidance** on the preferred procedure. Our aim is to ensure the RICO claim

15  is heard on its merits, given the gravity of Apple's alleged misconduct. The RICO statute was designed to

16  **reach concerted schemes of fraud and coercion** like those at issue – and to provide treble damages and

17  attorneys' fees to parties injured by such racketeering. While we will follow the Court's direction on timing

18  and format, we did not want to waive this important claim. In short, Plaintiffs stand ready to **re-plead a**

19  **focused RICO cause of action**, either here or in a new action, to hold Apple fully accountable under the

20  law's harshest anti-fraud provisions. We ask the Court to indicate how it wishes us to proceed so that the

21  RICO allegations can be properly adjudicated.

22                                            **CONCLUSION**

23          We finally return to the **human element**: Dr. Robert Roberts. This 85-year-old man has given society

24  immeasurable gifts – people literally live who would have died, because of his work. In the twilight of his

25  career, instead of enjoying retirement, he threw himself into combating a once-in-a-century pandemic, only

26  to be met with obstruction and character assassination by Apple's lawyers. The **shamefulness** of Apple's

27  conduct is amplified by Dr. Roberts' stature. Had Apple simply told the truth and litigated the case on the

28  merits, we likely would have a resolution by now – one that, whichever way it went, would at least show

respect for the issues. Instead, Apple chose the path of maximum resistance and maximum disrespect. They treated Dr. Roberts as a pest to be exterminated rather than an opponent to be respected. This offends not just legal standards, but basic decency. A sanctions order in this case is not merely about punishing rule-breaking; it is about **standing up for the principle that truth and fairness matter, no matter who the parties are**. If the courts won't protect a person like Dr. Roberts from being railroaded by falsehoods, who will they protect?

Accordingly, we urge the Court to grant this motion in full, ordering the investigations and sanctions outlined above. This Court has the opportunity to set right a profound wrong, to salvage a case that carries implications for public health and competition, and to deter future misconduct by one of the world's most powerful companies and one of its most aggressive law firms. Justice delayed has been justice denied for too long in this matter. It's time to end that delay. Let the truth come out, let the chips fall where they may for Apple and Gibson Dunn, and let Dr. Roberts have the fair day in court that he – and the public interest – deserve.

Enough is enough. Apple and Gibson Dunn have spent five years weaving a web of lies and obstruction to avoid answering for Apple's conduct, **wasting the Court's time and Dr. Roberts' time** in the process. Their tactics – from pretending a renowned doctor didn't send Apple a letter on his University professorship letterhead in March 2020 confirming his role in the app, to talking out of both sides of their mouth about who the plaintiff is, to trying to gag anyone who challenges them – are beyond the pale.

For the foregoing reasons, Plaintiffs urge the Court to grant this Motion, impose all appropriate sanctions (monetary, declaratory, and procedural), including a $20 million penalty and such other relief as discussed, and to take whatever additional steps are necessary to purge the taint of Apple's fraud from this case. Only by doing so can the Court ensure that this case – and others like it – proceed on the *truth*, not on a tapestry of lies. Dr. Roberts has earned his day in court; the law demands he get it. Justice and the integrity of this Court demand nothing less.

Submitted on this 30th day of June, 2025.

MOTION FOR SANCTIONS
CASE NO. 3:24-CV-8660-EMC

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing MOTION FOR SANCTIONS was delivered via ECF to all interested parties.

Executed on this 30th day of June, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105