Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>                    Plaintiffs,<br><br>*vs*.<br><br><br>APPLE INC.<br><br>                    Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**DECLARATION OF KEITH A. MATHEWS IN SUPPORT OF SHOW CAUSE MEMORANDUM**<br><br><br>The Honorable Edward M. Chen |

**DECLARATION OF KEITH ALLEN MATHEWS IN SUPPORT OF MEMORANDUM IN RESPONSE TO ORDER TO SHOW CAUSE**

I, Keith Mathews, Esq., declare as follows:

1. I am an attorney licensed to practice law and counsel of record for Plaintiffs in *Coronavirus Reporter Corp., et al. v. Apple Inc.*, No. 3:24-cv-08660-EMC (N.D. Cal.). I make this sworn declaration in support of Plaintiffs' Memorandum response to the Order to Show Cause ("OSC"). The statements herein are based on my personal knowledge and a review of relevant documents, and are made to affirm the good faith, academic, and public interest motivations behind Plaintiffs' litigation against Apple. Certainly some matters herein constitute my legal opinion, which is made to the best of my ability.

2. ***Plaintiffs' Academic and Public Interest Motivation***: The Plaintiffs' lawsuit against Apple was never intended to harass, but was driven by academic curiosity, public interest concerns, and principled legal objectives. Dr. Robert Roberts (a distinguished cardiologist involved in NASA's John Glenn shuttle mission), and his co-founder Jeffrey Isaacs developed apparently the first COVID-19 contact-tracing application in early 2020. Their goal in filing antitrust claims against Apple, which was done with caution, reluctance, and hesitation initially, was to 'liberate the way smartphones are controlled and censored by Big Tech' – in other words, to challenge Apple's gatekeeping of the App Store in the interest of innovation, democratic flow of information, and public health. This motivation is inherently public minded and academic-theoretical in nature, focusing on the novel intersection of smartphone monopoly power and healthcare technology, in conjunction with challenging antitrust law, rather than any personal vendetta against Apple. From the outset, we approached the case as a serious scholarly challenge at the frontier of digital markets and medical innovation. Dr Isaacs stated early on he felt his unique interdisciplinary training and experience could provide useful insight into the ongoing challenges that, frankly, have stumped many governments for two decades.

3. ***LSAC Recommendation Letter (Evidence of scholarly focus)***: A true and correct copy of a law school recommendation letter I wrote on November 11, 2024 for Dr. Isaacs is attached hereto. In that letter (addressed to the Law School Admissions Committee), I documented Dr. Isaacs' learning centered, intellectual approach to our complex antitrust litigation against Apple. For example, I observed that when we embarked on the Apple case with limited antitrust experience, Dr. Isaacs' "relentless intellectual curiosity and analytical prowess quickly became invaluable," as we together "developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple [and now, directly by others like Quinn Emmanuel and Berger Montague]." As their client representative, Isaacs' approach to this matter reflects Plaintiffs' corporate intent of treating the litigation as a rigorous academic endeavor – studying market economics, antitrust law, digital product evolution, and constitutional principles – rather than as a vehicle for harassment. Indeed, Dr. Isaacs was so intellectually invested in the issues that he applied to law school to formally become an antitrust professor, and my recommendation letter (Exhibit A) chronicles his aptitude for legal analysis and genuine commitment to the rule of law. It highlights how he *"truly loves teaching and problem solving as rewarding goals in their own right,"* thriving on challenging subjects and reducing them to intuitive terms. Such qualities are incompatible with any intent to merely annoy or harass; instead they demonstrate a desire to learn, debate, and advance novel legal theories for the public good.

4.  Plaintiffs – via representatives Dr. Roberts and his team– always viewed this case as a serious legal challenge with broad implications, including constitutional dimensions, rather than a private dispute. The founders come from professional and academic backgrounds (medicine, economics, and technology) that informed their approach. They saw Apple's exclusion of the Coronavirus Reporter app as raising fundamental questions about competition and innovation in a pandemic – effectively a test case on how far a dominant digital platform can go in controlling our everyday communications. In CR I, we early on indicated the different founders' projects were 'case studies' and joinder of the cases was meant to highlight these cases, like in an MBA or law teaching method. Apple has said the joinder of cases was in and of itself harassment, which, frankly, is absurd and at the very least, insulting. We likened the case to an academic project, examining whether such platform control could be checked by antitrust principles. Dr. Isaacs applied principles from his medical and MBA training, treating the litigation as an extension of his interdisciplinary research into market failures and public health. Likewise, Dr. Roberts lent his medical expertise to underscore the public interest stakes of the case (i.e. getting lifesaving technology to users). Far from being frivolous or harassing, the lawsuit was pursued as an earnest constitutional and economic experiment to clarify the law in a "novel intersection" of industries. This is evidenced by Plaintiffs' extensive legal briefing on issues like relevant market definition, and by their willingness to invest years in appeals and related proceedings to get answers to these cutting-edge questions. Put very, very simply, we thought we were smart problem-solvers tackling a major social issue; we can and will testify as to such intent and hereby request public evidentiary hearing to prove our innocence. We'd also (see below) like the Apple Antitrust Team to be cross-examined, in the interest of fairness.

5.  ***Plaintiffs' Active Engagement and Long-Term Commitment***: Plaintiffs' (and their client representatives and counsel) conduct throughout the litigation confirms their good faith and long-term commitment to lawful petitioning and regulatory accountability. They did not simply file complaints and disappear (as true harassers with no underlying academic insight might); rather, they actively participated in hearings, oral arguments, conducted CNBC interviews, and multiple rounds of briefing over several years. I can attest that Dr. Isaacs and/or Dr. Roberts were present (either in person or via remote access) at every significant court hearing in *Coronavirus Reporter I* (Case No. 3:21-cv-05567-EMC) and subsequent proceedings and apprised of comprehensive updates. Dr. Isaacs even presented oral argument himself during a crucial federal court hearing on a preliminary injunction in 2021, when a technical issue cut off my audio feed. With the Court's permission, Dr. Isaacs "seamlessly stepped in" and "articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues" at stake. His performance under pressure upheld our case and impressed observers (even a Department of Justice attorney contacted us to commend how confidently Dr. Isaacs debated Apple's counsel). This level of engaged, constructive participation is the opposite of harassment – it demonstrates respect for the judicial process and a desire to litigate properly on the merits. Dr Isaacs was proud of this accomplishment, speaking to this Court on a difficult and controversial subject such as the iPhone relevant market and *Amex* platforms. Apple counsel's attempt to diminish such admirable petitioning is part of a long, shameful campaign to deride and harm us. This Court refused to release the video of that hearing, when requested in 2021, and I hereby again request its release to the public, as it now forms critical evidence as to the Plaintiffs' intent and conduct.

6.  Plaintiffs and I have shown persistent, good faith engagement with every aspect of this litigation, further belying any notion of a vexatious motive. Over the past five years, I have diligently pursued related claims through trial court dismissals and into the appellate courts. I personally argued my theories before the Ninth Circuit Court of Appeals and even petitioned the Judicial Panel on Multidistrict Litigation (JPML) in an effort to take a leadership role (for a proposed Developer track) with our case with similar app store antitrust cases – steps indicating a strategic, long-term effort to

clarify the law. I worked overtime to secure the MDL Majority' Plaintiffs counsel lifting an objection to our joinder. There is no reason the JPML could not have added a developer track to that MDL, and I still believe it would have been in the public interest. It certainly wasn't 'harassment.' Quite to the contrary. Apple moved to discredit us to the JPML, who seemingly decided to 'stay out' of the mess *Defendant* has created.

7.  Dr. Isaacs in particular has devoted extraordinary time and effort to antitrust reform advocacy, as evidenced by the fact that "even his opponents recognize his tireless work ethic," noting his "maintained focus on antitrust reform spanning five years." Rather than abandoning the fight or resorting to out-of-court tactics, Plaintiffs and I consistently pressed our claims through proper legal channels – from motion practice, to discovery attempts, to appeals – demonstrating sincere commitment to addressing what we perceive as Apple's unlawful conduct. Such longterm, constructive engagement is a hallmark of lawful petitioning and is wholly inconsistent with any intent to merely harass Apple.

8.  **Validation of Plaintiffs' Theories by Subsequent Developments**: The substantive antitrust theories Plaintiffs advanced have been vindicated by events and other litigants, proving that Plaintiffs' case was neither frivolous nor malicious. In particular, Plaintiffs were early to allege that Apple's conduct constituted an illegal tying arrangement between two distinct products: (a) Apple's iPhone (and iOS operating system) in the foremarket, and (b) Apple's App Store (iOS app distribution services) in the aftermarket. Dr. Isaacs and I, in particular, spent literally years advocating this theory Isaacs refined, which to this date was never addressed by this Court or the Ninth Circuit. Apple, about a half dozen times, tried to steer the courts awry with a strawman shift of this theory to *Microsoft* platform tying, which the iPhone-App Store bundle simply is not. This is not a trivial validation. Again, years have been spent advocating this theory in particular. Nobody in their right mind could pursue such focused persistence, reading Hovenkamp on weekends and evenings, but for a sincere love for the intellectual scholarly challenge. We contended that Apple was using its dominance in smartphones to lock app developers and users into using the App Store, to the exclusion of any alternative distribution channels – a novel theory at the time we filed, and indeed, we stood alone for years. Today, multiple high-profile lawsuits and enforcement actions now echo this same tying theory. For example, in *Proton AG v. Apple Inc*., filed June 2025, a prominent app developer and the esteemed Quinn Emmanuel allege that Apple leveraged its smartphone monopoly to monopolize the iOS app distribution and payment markets, designing the iPhone such that the App Store is *'the sole gateway for iOS users to obtain applications,'* foreclosing any rival app stores. Likewise, in *PhantomALERT v. Apple Inc*., another developer's case focusing on Apple's COVID app policies, the plaintiff plainly alleges that "Apple unlawfully tied its devices to the App Store, making the App Store the exclusive means for users to obtain apps" (thereby barring alternative distribution channels). They did so after their seasoned team of antitrust lawyers engaged in hours long conferrals with Dr. Isaacs. Most significantly, the United States Department of Justice and over a dozen state Attorneys General have sued Apple in a massive antitrust action (filed 2024) on very similar grounds – challenging Apple's exclusionary control of iOS app distribution and other restraints. In that DOJ-led case, the court recently denied Apple's motion to dismiss, allowing the inherent claims to proceed. In other words, the core theories that we pioneered in Coronavirus Reporter – far from being crackpot or harassing – have now been adopted and validated by mainstream enforcers and credible plaintiffs. This trend powerfully corroborates the good faith basis of Plaintiffs' litigation: their claims were rooted in genuine legal and economic issues that are now front-and-center in global antitrust enforcement, not in any intent to harass. We should not be punished for being ahead of the curve on issues that are now widely recognized as serious and real.

9.  **Rebutting Apple's "Harassers" Label – Need for Evidentiary Review**: Apple's attempt to paint Plaintiffs as "harassers" or vexatious litigants is utterly incompatible with the documented record of Plaintiffs' conduct and intent. As detailed in my LSAC recommendation letter, Dr. Isaacs and his colleagues approached this litigation as principled, intellectually-driven litigants. In that letter, I described Dr. Isaacs as *"an unyielding advocate for justice"* guided by a *"strong ethical compass"* and *"motivated by a commitment to justice above all else,"* which led him to take on extraordinarily difficult cases as a matter of principle. This contemporary, candid assessment belies any notion that the lawsuit was a sham or harassment. Nothing in the extensive paper trail of this case suggests an intent to annoy or burden Apple without cause. To the contrary, the record shows Plaintiffs doggedly trying to litigate meritorious issues (often at personal expense and effort) in order to hold Apple accountable under the law. Apple's pejorative labeling of Plaintiffs as bad-faith actors is unsubstantiated and improper. In our legal system, if there is an allegation that a litigant acted with dubious intent, the proper course is to allow evidentiary development on that issue – not to summarily sanction the litigant based on the opponent's say-so. Here, determining Plaintiffs' litigation intent (i.e. whether their aim was legitimate enforcement of rights or mere harassment) requires a fact-driven inquiry into their actions, communications, and then testimony. Plaintiffs welcome such an inquiry, as we are confident it will confirm their good faith. But it would be unjust to impose OSC sanctions without first developing a full evidentiary record on intent. Apple's rhetoric cannot substitute for evidence. Given the stark contrast between Apple's accusations and the documented reality (Plaintiffs' academic approach, presence at hearings, persistence in courts, and even my own written impressions of their integrity), Plaintiffs respectfully submit that any decision about their motives should be reserved for after proper fact-finding – if it even remains an issue – rather than short-circuited by sanctions at this juncture.

10. From the outset, I have sincerely believed that our antitrust claims against Apple were meritorious and important. Our goal was never to harass Apple, but to vindicate the rights of developers and consumers affected by Apple's App Store practices. Over the past several years, time has proven that our concerns were valid. As detailed in a soon to be filed Motion for Reconsideration, numerous independent developments have echoed our core allegations. In addition to Proton, PhantomALERT, and the DOJ cases,  a new developer class action (Pure Sweat Basketball) has emerged after Apple was held in contempt for trying to preserve its App Store fees despite a court injunction, with a claim we filed a year before, demonstrating our deep knowledge of the Apple Antitrust situation. In light of these developments, I know as fact our First Amended Complaint raised substantial issues of Apple's unlawful conduct. I approached this litigation with an *innocent intent*, aiming to address what we saw as a serious competition problem. The fact that government enforcers and other plaintiffs are now pursuing the same issues confirms that our claims were far from frivolous or fanciful – they were early. We simply sought a chance to prove them on the merits, and our advocacy was passionate but grounded in facts and law.

11. **Five Years of Hard-Fought Litigation and Personal Toll:** This case (and its prior iteration) has been a five-year struggle for us. We have fought hard through multiple courts and procedural hurdles since 2020, all in a good-faith effort to get a fair hearing, which to us means a jury trial. That fight has taken a significant toll on everyone involved. We perceive ourselves as *victims of Apple's oppressive litigation strategy*, as Apple has vast resources to wear down challengers. In our case, a key financial backer of our efforts – a Greenflight business named OkCaller – abruptly was shut down by Google exactly one year after I filed the first Coronavirus Reporter lawsuit, for reasons that remain unclear. We were alarmed enough by the timing that we even filed a civil complaint citing 18 U.S.C. § 1512 (witness tampering/obstruction) out of concern that there might have been interference, though that matter was never investigated, and dismissed on failure to state a relevant market in the

FLSD. Regardless, the end of that funding source severely hampered our ability to continue. Despite these setbacks, we pressed on, motivated by the conviction that Apple's conduct was wrong. But there is no denying the personal and financial strain. Dr. Roberts is 85 years old; As CRC's Chief Legal Officer, I would not feel comfortable extending this case with any other new lawsuits, if the Court will not permit a prompt path forward. Likewise, another team member, Dr. Isaacs, plans to complete his legal studies he began at Vanderbilt (he intends to study antitrust law for two years) and he *hopes that by the time he graduates, someone else will have successfully tackled the "Apple problem."* In short, all Plaintiffs' representatives/founders and I have poured our hearts into this battle for half a decade, and we are proud of the work we've done. We believe we helped lay the factual and legal foundation – such as identifying Apple's tying of the iPhone to the App Store – that others are now building upon. However, we also recognize the realities of life and litigation. Apple is a formidable opponent with enormous resources, and we have already devoted five intense years to this cause. That is enough. Unless this case can *finally proceed swiftly to an actual trial on the merits*, we do not intend to spend further years on these issues. We have other endeavors and responsibilities to turn to. This hard decision comes from reflection on the toll it has taken on us, not from any belief that our cause was wrong. We still firmly believe in the justice of our claims, but we also value our wellbeing and the principle that litigation should not consume one's entire life.

12. **No Need for Sanctions or Injunctive Orders – Plaintiffs Will Not Refile and Have No Designs to Vex Apple:** In view of the above, I respectfully submit that sanctions against us are neither necessary nor appropriate. The Court's inherent power to sanction should be exercised only as needed to prevent abuse, and here there is nothing to prevent going forward. We have made our case; if the Court ultimately decides not to let it proceed after reconsideration, we will accept that outcome and move on once a mandate issues or cert is denied. We have no intent to file another lawsuit against Apple based on the COVID app rejection. (To clarify, we dispute Apple's characterization that this *second* suit was duplicative – we view it as a continuation with new facts and new parties, on unadjudicated tying claims – but either way, we will not file a third 'free app' censorship lawsuit.) Our focus is already shifting to other areas and projects. In other words, there is zero risk of "repeat offenses" by us that would warrant deterrent sanctions. Should anything come close to changing, we would agree to stipulate to asking the court for a pre-filing abbreviated review(for CAND matters), so long as it isn't viewed as a formal sanction. We want nothing further to do with Apple once this matter (whether one calls it CR I or CR II) is concluded. We simply sought our day in court; if that is ultimately denied, we will spend our time on what we perceive as more fair endeavors. Future scrutiny of Apple will be left to others (and indeed is already underway by Epic, the DOJ, Proton, Pure Sweat, and more). We are fairly confident that over time Apple's true practices will be exposed and checked by the proper authorities – but we do not need to be the ones driving that any longer, and indeed, our funding largely ran out for unexplained reasons.

13. Because we are deescalating voluntarily, punitive measures are unwarranted. In fact, imposing harsh sanctions would only compound the harm to the wrong parties. Any monetary sanction would be devastating to us: I personally do not have anywhere near $250,000 (the figure Apple seeks), after working over a decade as a small-town lawyer, and Plaintiff Greenflight Venture Corp. likewise has extremely limited resources and verges on insolvency after the shutdown of OkCaller. *Even a sanction of $50,000 would cause severe financial hardship* for us. Such a penalty would essentially bankrupt the very small companies and individuals who dared to challenge a trillion-dollar corporation. That outcome is not only unjust; it is unnecessary for any legitimate purpose. We have not acted in bad faith, and we are not continuing to burden the courts – so no sanction is needed to protect the Court or Apple going forward. Time will possibly show Apple as the aggressor, not us, it seems. We respectfully urge the Court to recognize our good faith and the extraordinary circumstances here. This case was brought with a proper motive and a belief in its merit, supported

by significant parallel evidence and validation from external events. While the Court has found the case barred on technical grounds, our conduct in pursuing it was reasonable and done in the sincere interest of justice.

14. I note that the inherent power sanctions doctrine counsels restraint. Sanctions under the Court's inherent authority must be tailored to what is necessary to address the misconduct. Here, there is no ongoing misconduct to address; another judge closed a case four months ago involving Apple's monopolization and specifically exonerated me of any wrongdoing. Thus, any sanction would serve only as retroactive punishment, which is not warranted absent truly egregious or bad-faith behavior (and I humbly maintain we engaged in no bad faith). The dismissal of our case is punishment enough. We have lost after years of tireless effort, and that is a heavy blow for us. We think Apple and Gibson Dunn had unfair advantages, to say the least. In short, nationwide injunctions or monetary penalties are unnecessary to "correct" anything here – our First Amended Complaint was a meritorious filing made in good faith, and its termination effectively concludes the matter from our perspective. There is nothing left that requires deterrence.

15. On to another specific motion at issue in this OSC, I respectfully respond to Apple's Opposition (Dkt. 90), which argues that our Amended Administrative Motion (Dkt. 85) seeking limited public input and amicus participation was procedurally improper and unjustified. Apple fundamentally misunderstands the scope and purpose of administrative motions under Local Rule 7-11(a), and wrongly asserts that our efforts were unrelated to this litigation. Local Rule 7-11(a) permits administrative motions for miscellaneous relief "not otherwise governed" by federal rules or statutes. While Apple claims our motion exceeded the intended scope of Rule 7-11 by seeking limited public and amicus input, courts in this district commonly permit amicus participation, public comment, or other forms of input even after dismissal or in unique circumstances where important public issues are at stake. Apple's cited cases (e.g., *Morgenstein v. AT&T Mobility LLC, Omoregie v. Boardwalk Auto Ctr.*) address motions for full litigation stays or major substantive rulings, not limited amicus participation or narrow public-input procedures. Thus, those cases are clearly distinguishable and do not apply here. Given the unique nature of our proposed class action—which directly addresses broader concerns of antitrust harm affecting thousands of developers and millions of consumers— our request for limited public input is neither inappropriate nor unprecedented. It is precisely the type of miscellaneous relief appropriately sought under Rule 7-11. I did attempt a stipulation, and Apple declined to do so; I do not fully understand their argument that I somehow violated procedure. In any event, in a substance over form context, I complied with Rule 7-11's intent.

16. As proposed class representatives in antitrust litigation, Plaintiffs are empowered—and indeed encouraged—to gather input, assistance, and perspective from similarly situated individuals, third parties, and the public. Courts widely recognize the important role of amicus briefing and public input in antitrust litigation of significant public impact. Plaintiffs here are seeking precisely such input in what we have openly described as a state of extreme vulnerability and perceived oppression, having encountered extraordinary resistance and retaliatory behavior from Apple. Our request for public comment and amicus participation is entirely consistent with established norms in complex litigation addressing significant antitrust issues, especially where the defendant commands vastly disproportionate resources. I am able to provide legal authority for all of my above points, should the Court wish formal, extensive legal briefing on each motion's appropriateness. I assume given the ten-page limit the Court imposed, these statements into my intent and beliefs suffice.

17. Apple wrongly suggests that our petition raising CEO Tim Cook's resignation is unrelated to our lawsuit. Quite the contrary: this litigation explicitly alleges developer retaliation and anticompetitive conduct overseen or permitted by Apple's highest executives, including Mr. Cook. The FAC

specifically pleads that Apple retaliated against developers (such as Plaintiffs) for challenging Apple's monopoly practices—precisely the conduct Judge Gonzalez Rogers recently highlighted in the Epic Games litigation when she referred Apple's counsel and witnesses to the DOJ for possible criminal contempt, noting Tim Cook "chose poorly" in overseeing developer related conduct.

18. Accordingly, our request for limited public input on Apple management's conduct and Apple's developer retaliation practices is directly germane to our case and pled allegations. Apple's claim that seeking public comment on these relevant issues amounts to improper commandeering of this Court's processes misrepresents both our intent and the applicable law. It is entirely appropriate, and indeed common, for parties in class and antitrust actions to seek public input and amicus support on precisely such questions of broad public concern and corporate governance.

19. Indeed, Apple itself commonly welcomes amici and public input in other litigation contexts. Apple's citation to inapplicable cases (e.g., *Gill v. Whitford*) addresses situations in which litigants improperly invoke federal courts to address generalized grievances wholly disconnected from specific legal claims. Here, our requests for public input concern specific conduct and claims—developer retaliation and tying practices—that lie at the heart of this litigation, and that have been pleaded in the operative FAC.

20. Apple also argues incorrectly that our request for public input and amicus participation was improper because it came after the Court's dismissal of this case. (Apple Opp'n at 1-3.) But nothing in Local Rule 7-11 or the Federal Rules prohibits parties—especially proposed class representatives in antitrust litigation—from requesting amicus input or limited public comment, even following dismissal. Indeed, amicus participation frequently occurs at post-dismissal and appellate stages, precisely because important issues continue to have public interest implications even after an adverse ruling.

21. Moreover, I did not file their request for public input as a motion for reconsideration of the Court's dismissal order or to reopen the case. Rather, I sought limited amicus input and public comment to address developments regarding Apple's retaliatory practices—practices directly relevant to the sanctions motion that Apple itself initiated after the dismissal. Indeed, Apple has moved for extraordinary sanctions against counsel, placing these issues front and center before the Court, independently of the prior dismissal ruling. Plaintiffs filed their administrative motion to ensure that the Court receives a balanced perspective on these critical questions—not to circumvent or improperly reopen the dismissed case. Apple has not cited any authority holding that seeking amicus support or public input after dismissal is inappropriate, and I have located none. To remove any doubt about our intentions, Plaintiffs clarify unequivocally that their administrative motion requesting public and amicus input was not intended as a motion for reconsideration of the Court's dismissal order. I respectfully request leave to file an appropriate motion for reconsideration within the 28-day timeframe prescribed by Federal Rule of Civil Procedure 59(e).

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

22. In this light, I respectfully bring to the Court's attention a troubling pattern I have witnessed consistently over the past five years litigating against Apple, exemplified once again in Apple's recent filing (Dkt. 90, page 4) opposing Plaintiffs' request for public input and amicus participation. Apple's opposition is indicative of its ongoing strategy to never concede even straightforward matters and, worse, to repeatedly reverse accusations against valid antitrust petitioners by labeling their legitimate advocacy as "improper." This tactic serves to chill and intimidate opponents who dare to question Apple's business practices.

23. Certainly, Apple never concedes core issues, like the fact our tying claim constitutes a properly pleaded per se violation under controlling Supreme Court precedent, such as *Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958). But this refusal to concede even major legal questions is mirrored by Apple's approach to lesser matters as well. Apple's consistent litigation strategy reflects a pattern widely recognized as "DARVO" (Deny, Attack, Reverse Victim and Offender, or simply, 'blame the victim, always')—in seemingly every circumstance, Apple portrays itself as the victim, while the petitioner is depicted as engaging in improper conduct. This matters now, because I am facing $400,000 in bankrupting sanctions as a result of Apple's DARVO strategy, which by implication means Apple's "Antitrust Team" has disregard for the law and social norms, and for the well-being of innocent petitioners. I am not a doctor, but am told that is consistent with conditions that warrant forensic psychiatry evaluation. Indeed, before I am bankrupted by Apple's oppressive motion, I do request the Court allow forensic medical evaluation of the small team that Gonzelez Rogers identified as engaging in probable criminal contempt. That team mostly overlaps with the team overseeing this litigation, to the best of my knowledge.  Surely basic inquiry by a physician into matters like "Is Apple a monopoly? Do they violate Sherman Act?  Did you take measures to block valid petitioners or even retaliate against them? What impact do you think five years of aggressive litigation maneuvers took on the CR I team?" are fair game, given the circumstances here.

24. Specifically at issue here is Apple "reserving" all rights to respond later to a "manifesto" petition concerning Tim Cook's failure to oversee antitrust litigation. That Mr. Cook failed to prevent lies on the witness stand is now fact - not opinion. Our FAC broadly alleges developer retaliation and Apple's intention to subvert antitrust enforcement.  Given this scenario, and our belief that conduct applied in the dismissal of CR II, we sought help from the public. I also "approved for distribution" a Petition which Apple now seeks to strike. Apple calls the Petition "manifesto," consistent with their five year efforts to deride us. But the Court should be aware that no human ever authored the Petition for Tim Cook's resignation, nor did any human spend more than about fifteen minutes on it. I am quite weary of Artificial Intelligence, as I am weary of Big Tech, as the Court knows. We have never done such a test before, but we thought there was an interesting computational legal experiment here. Apple has recently published controversial research that AI LLM's are, in short, not true intelligence. We asked the most powerful commercially available AI, ChatGPT o3 Pro "Deep Research" mode, a simple question:

*"Did Judge Gonzales Rogers' rebuke of Tim Cook's Epic conduct create a legally grounded impetus for his termination as CEO, and if so, write a petition explaining such basis, providing contextual background on critics' views of Apple's demise since Steve Jobs' death."*

Ten minutes later, the Petition was created by AI. I don't have the knowledge to know whether it is indeed 'intelligent,' but I was surprised at the quality of the work - so much so that (after making several minor corrections) I approved it for distribution and public input, to promote conversation on the complex implications herein. This is a matter ripe for discussion, and I request the motion be granted.

25. Hence, there exist no grounds for this legitimate evidence - which is what it is - to be stricken. Moreover, the implications of Apple's response - that it is improper manifesto- further substantiate the allegations in our underlying Sanctions motion. Apple unfairly attempts to chill and intimidate seemingly every single advocate; even an "unintelligent" AI is apparently writing 'manifesto' material Apple deems must be stricken for malicious intent. Think about that. It is nonsensical, I submit to the Court. We now know that Apple and counsel will break the law (in Epic) to subvert fair enforcement of the Sherman Act. The Court is now faced with cross-allegations of litigation harassment. We believe it goes so far as witness intimidation. The Court cannot resolve this issue on the papers, or likely, even in a brief hearing. Whatever tools the Court has at its powers - even forensic psychiatric evaluation of the few at Apple resisting Sherman Act (apparently a handful of counsel, a CFO, and Tim Cook, if I understand the *Epic* ruling correctly, I refer to them now as the "Apple Antitrust Team" of six or so core individuals that should be investigated) - is necessary to stop the internet and nations smartphones from being commandeered by a few individuals with consistent, proven intent to subvert justice, chill opponents, and even seek sanctions to bankrupt them, all to foster their own monopolistic greed.

26. I respectfully urge the Court to consider appropriate judicial remedies, potentially including the appointment of a neutral special master or even forensic psychiatric review, specifically to examine and clarify the intent, motivations, and underlying behavior of those at Apple Antitrust Team responsible for this persistent litigation misconduct.In short, whatever judicial tools the Court has available—whether procedural, forensic, or psychological—should be employed to ensure fairness and accountability. Such measures are fully justified to prevent the internet, smartphones, and app developers nationwide from continuing to be commandeered and intimidated by a few corporate officers and lawyers who have demonstrated a consistent, troubling intent to chill, obstruct, and retaliate against valid antitrust enforcement.

27. Finally, I note that Apple's Response to our Sanction motions proves it is not frivolous. They forfeited and/or failed to substantively address our core concerns. Apple simply never addresses our fraud-on-the-court allegations. Rachel Brass quadruple-downs that Apple had an "express assumption" about CRC during CR I. But she has never explained her email to me, telling me that the CR I plaintiffs, at least "Coronavirus Reporter" were null entities. And the record demonstrates zero express assumption by Apple about CRC, rather , it indicates Brass always cast doubt on the identity of the Plaintiffs and/or their existence or legitimacy, which is consistent with the above conduct I have detailed. In short, I actually agreed with Brass/Gibson Dunn on one of their endless critiques/DARVOs, and now I am being threatened with sanctions. Brass' response does not explain anything, it is rhetoric and procedural knit-picking that forfeits our main points.

28. Worse, Brass quadruple-downs on her witness intimidation of Dr. Isaacs. She claims that he was represented by me, but that I didn't represent Greenflight, but that he was pro se, and that he represented Greenflight. These cannot all be true, obviously. The truth, for the clarity of the reader, is that Dr. Isaacs proceeded pro se in CR I as a Greenflight investor – not as Greenflight (which is forbidden by federal rules). He was muzzled, intimidated, and oppressed by Apple's counsel.  This is outrage, and it is asinine. I demand justice for my client representative, Dr. Isaacs, who has truly suffered at the hands of Brass and her associates. She has no defense, it is clear. I demand discovery and evidentiary hearing on her sanctions response which constitutes forfeiture.

29. For all these reasons, I respectfully request that the Court decline to impose any sanctions on Plaintiffs or counsel. We sought only to raise genuine antitrust issues that we felt were of great public importance, and we prosecuted this case with conviction and integrity. Now that the Court has ruled, we will abide by that decision and bring this dispute to a close unless the reconsideration motion succeeds . Further punitive measures would be excessive under the circumstances and would serve no positive purpose. We thank the Court for its consideration throughout this case, and we will respect the final judgment of the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 14, 2025, at Manchester, New Hampshire.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC



Dear Law Admissions Committee,

I am delighted to recommend Dr. Jeffrey Isaacs as a candidate to your JD program. Over the past decade, I have had the privilege of working with Dr. Isaacs in various capacities: first as a client, then as a business partner and ally. Throughout our collaboration, I have consistently been impressed by his tenacity, intelligence, and unwavering drive.

I first met Dr. Isaacs in 2012, when he telephoned our firm seeking assistance with a legal dilemma affecting his post-graduate medical training at Dartmouth, just north of our office in Manchester. I had recently graduated law school myself, and took a keen interest in his case. By way of background, he had entered into a settlement agreement in 2007 with a California medical school. The only consideration of that agreement was a sealing of all academic records, with the intent to allow all parties to the agreement (including a medical school dean, an NIH director, and Dr. Isaacs) to move on with their careers. A second settlement agreement in 2008 acquitted and annulled any and all aspects of academic enrollment at that institution. Despite this, the matter was being held improperly against him, but we didn't know exactly how or why. The matter evolved over the course of the next decade; I worked with former Assistant US Attorney and Northeastern law professor Mark Josephs (deceased) who uncovered that the university was publishing the sealed records. Professor Josephs and I sought declaratory judgement to restore Dr. Isaacs' medical career. The American Academy of Medical Colleges (AAMC) had long before determined that the matter had been expunged; we sought federal declaration to augment the AAMC's position.

Over a decade later, having seen my fair share of injustices in the courtroom, Dr. Isaacs' matter stands out as most remarkable and extraordinary story of one individual's pursuit of justice – and a career – in circumstances that most clearly could not endure. Dr. Isaacs learned the workings of complex litigation and the judicial system from a most unfortunate perspective, to say the least.  But what stands out most to me was his determination to transform this adverse experience and into a force for good.

Having achieved considerable success in the new digital app economy, he came to me with a vision of a case meant to liberate the way smartphones are controlled and censored by the Big Tech. Along with NASA & John Glenn shuttle mission cardiologist Dr. Robert Roberts, he developed the first COVID tracking app – at a time when it was believed confined to Asia and small areas of Europe. Antitrust enforcement had been severely stalled as we started the case. Senators were blocked from bipartisan efforts to rein in Big Tech. Several other well-known efforts*, such as *Epic,* were largely abandoned after expending vast resources. Even this year, the entire European Union is struggling to redress Apple's non-compliance with their regulations. We worked tirelessly on claim theories – applying Dr. Isaacs' economics and medical training – in *Coronavirus Reporter v. Apple.* (21-cv-5567-EMC, Nor. Cal.) and *Coronavirus Reporter Corporation v. Apple* (24-cv-53-SVS, Wyo.)

When we embarked on our claim against Apple we possessed limited experience in the specialized field of antitrust litigation. Dr. Isaacs' relentless intellectual curiosity and analytical prowess quickly became invaluable. Together, we developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple. His ability to navigate and understand intricate legal frameworks, in the scope of rapidly evolving global technological change, not only impressed me but also evidences his capability as a legal strategist of the highest caliber.

A standout moment in our collaboration occurred during a crucial federal court hearing against Apple, represented by attorneys widely considered the best in their field, including Mark Perry and two of his partners at Gibson Dunn. This hearing concerned an injunction that would fundamentally change the way people used their smartphones, and certainly Apple would be prepared. Prior to the hearing, Dr. Isaacs and I participated in countless hours of mock-debate prep. Dr. Isaacs couriered me a copy of Herbert Hovenkamp's antitrust treatise several weeks beforehand. During our review sessions I realized how Dr. Isaacs truly loves teaching and problem solving as rewarding goals in their own right. And the more challenging a subject is, the more he thrives on reducing it to intuitive terms. This trait was invaluable for debate prep in high-stakes litigation.

The hearing was conducted by remote videoconference, and due to a technical issue I lost communication with the court, a scenario that would unsettle many litigators. However, Dr. Isaacs seamlessly stepped in with permission of the US District Judge. He articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues of Sherman relevant economic markets. His performance not only upheld our case but also showcased his exceptional skill. We received numerous phone calls after the hearing, including a DOJ career attorney, saying the same thing: Dr Isaacs confidently beat Gibson Dunn on a debate performance involving the largest monopoly in world history.

The matter is now in its fifth year, and I recently argued our theories to the Ninth Circuit and Judicial Panel on Multidistrict Litigation (JPML). We have already succeeded in raising awareness, and I firmly expect these theories to ultimately prevail – I hope sooner rather than later.

Dr. Isaacs possesses a natural talent for the practice of law; he is, in every sense, a born litigator. Moreover, by the very uniqueness of his experience, he is an unyielding advocate for justice. His insight into legal matters is complemented by his strong ethical compass; he believes deeply in the fairness of the justice system and is motivated by a commitment to justice above all else. This conviction has led him to take on some of the hardest cases imaginable, not merely as a challenge but as a testament to his belief that the legal system can and should provide equitable outcomes and improve the world. His passion for justice, combined with his formidable legal acumen, makes him an asset in any endeavor.

Looking back, from the moment he telephoned my office, it was uncannily clear that he was destined for this profession. His ability to synthesize original arguments on the most complex of subjects is truly remarkable. His writing is artful, demonstrating an innate understanding of the nuances of legal arguments and the art of persuasion. Dr. Isaacs is truly one of the most persistent individuals I have ever encountered. When he commits to a pursuit, he dedicates himself fully, giving 110% until the task is completed. Even his opponents recognize his tireless work ethic, notably mentioning his maintained focus on antitrust reform spanning five years.

I wholeheartedly recommend and endorse Dr. Jeffrey Isaacs' application. Your program will enable him to take on leadership roles that will serve others well. Dr. Isaacs' interdisciplinary background in medicine and economics provides him with a unique perspective that will enrich the classroom. His exceptional communication skills not only make him a persuasive advocate but also enable him to collaborate effectively with professionals across various fields. His commitment to public service and his proven ability to overcome challenges will make him an outstanding law student.

Regards,

Keith Mathews, Esq.
Partner, AWP Legal