Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE RECONSIDERATION**<br><br><br>Date: September 4, 2025<br>Time: 1:30 p.m. PT<br>Place: Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

## NOTICE OF ADMINISTRATIVE MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

(Civ. L.R. 7-11)

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation ("Plaintiffs") respectfully move pursuant to Federal Rules of Civil Procedure 54(b), 59(e), and 60(b)(6) and Civil Local Rule 7-11 for leave to file the attached Motion for Reconsideration of the Court's June 25 2025 Order (ECF 82) dismissing this action on res judicata grounds.

Plaintiffs recognize that, as of this filing, the Clerk has not entered a separate judgment under Rule 58(a). Accordingly, the Court's June 25, 2025 dismissal order is presently interlocutory and subject to the Court's inherent authority to revise it "at any time before entry of a final judgment" under Fed. R. Civ. P. 54(b) and Civil L.R. 7-9. Out of an abundance of caution, Plaintiffs respectfully request either

(i) that the Court treat this motion as a Rule 54(b)/Local Rule 7-9 motion for reconsideration of an interlocutory order, or

(ii) in the alternative, that the Court enter judgment forthwith and instruct Plaintiffs to file a timely Rule 59(e)/60(b)(6) motion wholly similar to the attached Proposed Motion.

This dual request ensures that the Court may reach the merits without procedural delay, decide whether to reconsider under interlocutory or final judgement criteria, and that no party is prejudiced by the clerical status of the judgment.

A proposed hearing is provisionally scheduled for September 4 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of the United States Courthouse, 450 Golden Gate Avenue, San Francisco,

This motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; and Proposed Motion attached thereto; the pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and such oral argument as may be presented at the hearing.

## MEMORANDUM OF POINTS & AUTHORITIES

### (Rule 7-11(b)(4))

*Exceptional New Authority Justifies Reconsideration*

1. *Shields v. World Aquatics*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. Sept. 17, 2024) –clarified that direct evidence of anticompetitive effects obviates rigid market definition pleading. Experienced Harvard-educated competition counsel at Berger Montague applied *Shields* one week ago to Defendant Apple's censorship of COVID apps in *PhantomALERT v. Apple* (D.C. Cir. No. 25-7017), a case Apple itself calls "identical." Undersigned is grateful for the diligent investigation of the Berger Montague team and their objective determination that *Shields* overcomes the market definition obstacles that had plagued these related cases for five years. Undersigned fully concurs with Berger Montague's newly filed analysis and incorporates it herein.

2. *United States v. Apple*, USDJ Neals (D.N.J. June 28, 2025) – DOJ monopolization suit survived Apple's Rule 12(b)(6) motion, rejecting the very defenses Apple advanced here.

3. *Gamboa v. Apple*, (N.D. Cal. June 16, 2025) – Judge Eumi K. Lee allowed § 2 technological tying claims based on Apple's design restrictions.

4. *Proton AG v. Apple* (filed June 30, 2025) & *Pure Sweat Basketball v. Apple* (filed May 2, 2025) – two developer class actions replicate Plaintiffs' theories.

5. *Epic Games v. Apple* contempt order (Apr. 30 2025) – finding Apple submitted "false and misleading" testimony, now a fresh RICO predicate.

*Apple Forfeited Objections to Shields and the Equities*

Plaintiffs' OSC filing (July 14, 2025) directly invoked *Shields* and detailed the balance-of-equities factors. Apple's OSC response was silent on these material issues. Under Ninth Circuit law, failure to address an argument constitutes waiver; Apple cannot resurrect those objections now.

*Good Cause Under L.R. 7-11*

Narrow timing: These authorities surfaced only after the Court's dismissal or Reply briefing was complete.

No prior opportunity: Plaintiffs could not reasonably present them earlier.

No prejudice: Apple is already litigating the same questions (DOJ, *Proton, Pure Sweat*).

Underlying motion effectively unopposed: Apple's forfeiture means the merits stand unrebutted.

*Meet and Confer*

Pursuant to L.R. 7-11(a), undersigned counsel emailed Apple's counsel on July 21, 2025, summarized the new authority, and requested stipulation to file. Counsel informed Apple of their forfeiture of *Shields* and equities. Apple declined to respond as of filing.

## CONCLUSION

Because the dismissal order is interlocutory and because overwhelming, unrebutted authority now demonstrates Plaintiffs' claims are viable—and Apple has forfeited its opposition—Plaintiffs respectfully ask the Court to grant leave to file the attached Motion for Reconsideration.

Dated: July 21, 2025                Keith A. Mathews, Esq.

**DECLARATION OF KEITH MATHEWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

I, Keith Mathews, declare as follows:

I am counsel of record for Plaintiffs Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation. I am admitted pro hac vice in this matter. I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

On July 21, 2025 at 2 p.m. PDT, I emailed Apple's lead counsel, and copied all counsel of record, requesting stipulation for this Administrative Motion and the accompanying Motion for Reconsideration. The email (a) notified Apple that Plaintiffs intended to file under Civil Local Rule 7-11, (b) mentioned new authorities such as *Shields*, and (c) explained that Plaintiffs believed Apple had forfeited any opposition to the *Shields* and balance-of-equities arguments by failing to address them in its July 17, 2025 OSC response. No Response. As of the execution of this declaration—more than 48 hours later—I have received no response from Apple's counsel, written or oral, despite a follow-up voicemail left on 20 July 2025 at 4:30 p.m. Because Apple has declined to stipulate or even respond, a stipulation "could not be obtained," satisfying Civ. L.R. 7-11(a).

Plaintiffs had initially assumed the had entered a Rule 58 judgment and therefore sought a litigation stay to deal with overwhelming new issues affecting this case. While no judgment has apparently yet been entered, the legal landscape has moved swiftly: the DOJ decision, *Gamboa*, the filing of *Proton*, the *Pure Sweat* contempt-based class action, and Berger Montague's *PhantomALERT* brief applying *Shields*. These developments, combined with Apple's forfeiture of *Shields* and equities arguments, create an urgent and compelling need for reconsideration now—before conflicting rulings or mandates issue.

This motion and the underlying request for reconsideration are made in good faith, not for purposes of delay. All newly cited authorities post-date the dismissal briefing (or could not reasonably have been presented earlier), and Plaintiffs believe they fundamentally alter the legal and equitable calculus. Granting leave will not prejudice Apple, which is already defending identical theories in the DOJ and developer class actions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of July 2025 in Manchester, New Hampshire.

/s/ Keith Mathews

Keith Mathews

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................1

INTRODUCTION ...........................................................................................................1

BACKGROUND AND RECENT DEVELOPMENTS..................................................2

INTERVENING DEVELOPMENTS..............................................................................3

LEGAL STANDARDS FOR RECONSIDERATION ..................................................6

ARGUMENT ...................................................................................................................8

    I.    *Res Judicata Should Not Be Rigidly Applied Where the Equities Strongly Favor Adjudicating Plaintiffs' Claims Alongside the Parallel Proceedings* ........................................................ 8

    II.    *Apple's "Unclean Hands" Strengthens the Equitable Case for Re-Opening* ............................ 9

    III.    *New Violations Give Rise to New Claims that Lawlor Protects*................................................. 11

    IV.    *Per Se Tying Claim and "Direct Evidence" Theory Were Never Adjudicated in CR I; They Survive and Are Now Bolstered by New Authority* ............................ 12

    V.    *RICO: Apple's Epic Contempt Is Not Unrelated - It Falls Within the Developer Retaliation Pattern Pleaded in CR I and Justifies Leave to Amend* .................... 15

    VI.    *The Pending DOJ Action Creates "Contingent Finality" that Justifies Equitable Relief* ......... 19

    VII.    *The Prior Dismissal Was a Procedural Termination; No Court Has Ever Adjudicated Whether Apple's Conduct Is Lawful*..................................................................................................... 20

    VIII.    *The Court's Finding of Privity Between Isaacs and Greenflight Was Clearly Erroneous and Requires Reconsideration* ...................... 21

CONCLUSION.................................................................................................................23

CERTIFICATE OF SERVICE......................................................................................24

# TABLE OF AUTHORITIES

### CASES

*Ackermann v. United States*,
  340 U.S. 193, 202 (1950) ------------------------------------------------------------------------------ 7

*Allstate Ins. Co. v. Herron*,
  634 F.3d 1101, 1111 (9th Cir. 2011) ------------------------------------------------------------ 6

*Citizens State Bank v. O'Leary*,
  856 F.2d 282, 287-88 (8th Cir. 1988) ---------------------------------------------------------- 10

*Coronavirus Reporter v. Apple Inc.*,
  85 F.4th 948 (9th Cir. 2023)------------------------------------------------------------------------ 2

*Coronavirus Reporter v. Apple Inc.*,
  No. 21-cv-05567-EMC ------------------------------------------------------------------------------- 2

*EEOC v. Recruit U.S.A., Inc.*,
  939 F.2d 746, 753 (9th Cir. 1991) -------------------------------------------------------------- 9

*Foman v. Davis*,
  371 U.S. 178 (1962) -------------------------------------------------------------------------------- 17

*Frank v. United Airlines, Inc.*,
  216 F.3d 845, 851–52 (9th Cir. 2000) --------------------------------------------------------13

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ---------------------------------------------------------------------------------- 5

*Gamboa v. Apple Inc.*,
  No. 5:24-cv-01270-EKL ----------------------------------------------------------------------------- 5

*Headwaters Inc. v. U.S. Forest Serv.*,
  399 F.3d 1047, 1054 (9th Cir. 2005)----------------------------------------------------------21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2, 15–18 (1984) ------------------------------------------------------------------------13

*Johnson v. Yellow Cab Transit Co.*,
  21 U.S. 383, 387 (1944) ---------------------------------------------------------------------------- 9

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322, 328 (1955) -------------------------------------------------------------------------- 7

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847, 863–64 (1988) -------------------------------------------------------------------- 7

*Living Designs v. DuPont*,
  431 F.3d 353, 362 (9th Cir. 2005) --------------------------------------------------------------16

*Montana v. United States*,
  440 U.S. 147, 154–55 (1979) -------------------------------------------------------------------22

*PhantomALERT v. Apple*,
  No. 25-7017 (D.C. Cir) ------------------------------------------------------------------------------ 4

*Phelps v. Alameida*,
  569 F.3d 1120, 1135-36 (9th Cir. 2009) ----------------------------------------------------- 6

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806, 814 (1945) -------------------------------------------------------------------------- 9

*Proton AG v. Apple*,
  No. 4:25-cv-05450----------------------------------------------------------------------------------- 4

i

*Rowland v. California Men's Colony,*
  506 U.S. 194, 201–03 (1993) -------------------------------------------------------------------------- 22
*Shields v. NCAA (World Aquatics),*
  92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024) ----------------------------------------------- 5
*Sys. Fed'n No. 91 v. Wright,*
  364 U.S. 642, 647–48 (1961) ------------------------------------------------------------------------- 19
*Taylor v. Sturgell,*
  553 U.S. 880, 893–95 (2008) ------------------------------------------------------------------------- 21
*United States v. Apple,*
  No. 2:24-cv-4055-JXN(D.N.J.), ---------------------------------------------------------------------- 3
*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) (en banc) ------------------------------------------------------------ 5

S<small>TATUTES</small>

18 U.S.C. § 1503 ----------------------------------------------------------------------------------------------- 16
18 U.S.C. § 1621 ----------------------------------------------------------------------------------------------- 16
18 U.S.C. § 1961 ----------------------------------------------------------------------------------------------- 16

R<small>ULES</small>

*Fed. R. Civ. P. 35(a)* ---------------------------------------------------------------------------------------- 18

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

**INTRODUCTION**

Plaintiffs respectfully seek reconsideration of the Court's June 25, 2025 Order (Dkt. 82) dismissing this action on res judicata grounds. In the short time since the dismissal briefing, no fewer than five major developments have overwhelmingly validated Plaintiffs' claims and theories. A U.S. Department of Justice antitrust suit against Apple survived a motion to dismiss raising identical defenses; a recent Ninth Circuit decision (*Shields*) undercuts the basis of the prior dismissal according to Berger Montague's appeal filed last week for *PhantomALERT*, an "identical" COVID app case; an app developer (*Gamboa*) prevailed on similar tying allegations in this District; and two separate class actions (*Proton* and *Pure Sweat*) have been filed by developers challenging the same App Store practices as the FAC. What was once dismissed as implausible "hinterlands" is now the subject of serious litigation and enforcement. It would be manifestly unjust to lock Plaintiffs out of this industry-wide reckoning. The Court has the equitable power under Fed. R. Civ. P. 59(e) and 60(b)(6) to prevent such injustice and to harmonize this case with the parallel proceedings examining Apple's conduct.

Importantly, Plaintiffs' claims have never been heard on the merits. The prior *Coronavirus Reporter I* ("*CR I*") case was dismissed at the pleading stage on technical grounds (market definition), with no adjudication of whether Apple's App Store practices are lawful. Fundamental fairness dictates Plaintiffs now be allowed to participate in the ongoing scrutiny of Apple's conduct. Apple will suffer no unfair prejudice by litigating this case on the merits: it is already defending identical allegations against the DOJ and private plaintiffs. Indeed, Apple has likely marshalled the very defenses needed here in those parallel cases, so proceeding will impose minimal additional burden. By contrast, denying reconsideration would irreparably prejudice Plaintiffs, leaving them the only affected developers with no forum to vindicate their rights, despite events proving they were right all along. Such equity disparity plainly all but proves Gibson Dunn and Apple's relentless tactics to oppress and discredit the Plaintiffs worked.

Notably, in its recent briefing (in response to the Court's Order to Show Cause), Apple tellingly failed to address two key points Plaintiffs raised: the equities warranting relief and the Ninth Circuit's intervening *Shields* decision. In other words, Apple forfeited any opposition to Plaintiffs' equity-based arguments and offered no answer to the new legal authority undermining the underlying market definition dismissal. The law is clear that a party who fails to respond to an argument effectively concedes it. Apple should therefore

1    be estopped from taking a new position now. This silence speaks volumes and is hardly an accidental

2    omission: Apple has no compelling rebuttal to the extraordinary circumstances justifying relief. Given the

3    confluence of new support for Plaintiffs' claims and Apple's inability (for fear of repercussions to mounting

4    judicially estopped positions) to refute the equitable and legal grounds for reopening the case, this motion

5    presents a compelling case for relief. Plaintiffs respectfully urge the Court to reconsider and vacate the

6    dismissal, and to allow this case to proceed alongside the related actions addressing Apple's alleged App

7    Store monopoly.

8                              **BACKGROUND AND RECENT DEVELOPMENTS**

9         **Prior CR I Litigation (2020–2023)**: *Coronavirus Reporter v. Apple Inc*., No. 21-cv-05567-EMC,

10   was a suit alleging that Apple's App Store practices – including excluding third-party apps and charging

11   developers a $99 annual fee and 30% commission – violated antitrust and other laws. On November 30,

12   2021, Judge Chen dismissed the CR I complaint with prejudice, finding Plaintiffs had not plausibly alleged

13   a relevant product market or antitrust injury and that further amendment would be futile. The dismissal was

14   a Rule 12(b)(6) ruling, effectively a pleading-stage defeat, not a factual determination on Apple's conduct.

15   The Ninth Circuit affirmed in 2023, agreeing that Plaintiffs' allegations (as pled at the time) were insufficient.

16   See *Coronavirus Reporter v. Apple Inc*., 85 F.4th 948 (9th Cir. 2023). Crucially, neither Judge Chen nor the

17   Ninth Circuit made any finding on whether the alleged per se App Store tying in fact violated antitrust laws

18   – those merits questions were left unanswered, in part due to Apple taking a judicially estopped position that

19   the tying involved software, rather than hardware.

20        **Current CR II Action (2024–present)**: On March 3, 2024, Plaintiffs filed this action in the District

21   of Wyoming (later transferred to N.D. Cal.) raising renewed antitrust claims against Apple's App Store

22   practices. The First Amended Complaint ("FAC") in this case builds on the DOJ antitrust complaint with a

23   broad set of facts applicable to its generalized, putative developer class. Plaintiffs detail Apple's ongoing

24   conduct since 2021 – for example, new efforts to subvert antitrust enforcement, new developer retaliation

25   claims, and Apple's yearly updates to its Developer Program License Agreement (DPLA) and continued

26   exaction of the annual $99 developer fee – as part of a persistent pattern of exclusionary behavior mostly

27   after the CR I judgment. The FAC also refines the relevant market allegations (identifying distinct markets

28   for iOS app distribution and apps themselves) and details antitrust injury to developers and innovation

through reduced app output and lowered app quality. Apple moved to dismiss the FAC, arguing that all claims are barred by res judicata (claim preclusion) due to the CR I judgment. On June 25, 2025, this Court granted Apple's motion and dismissed the case, holding that (i) this suit involved the same "nucleus of facts" as CR I, and that parties here are the same or in privity with those in CR I. (Dkt. 82, at 4–8.) The Court concluded that under res judicata, Plaintiffs could not relitigate their claims in this forum.

## INTERVENING DEVELOPMENTS

Since the dismissal of this case (and indeed, in the period after CR I's 2021 judgment), the landscape has changed dramatically. Multiple parallel actions and decisions have emerged that powerfully support Plaintiffs' position. These include government enforcement, new private class actions, and evolving case law, all directly relevant to the claims at issue:

United States v. Apple Inc. (D.N.J.) – *DOJ Antitrust Suit:* On March 21, 2024, the U.S. Department of Justice and several states sued Apple for monopolization, targeting Apple's smartphone app distribution practices. In June 2025, U.S. District Judge Julien Neals denied Apple's motion to dismiss the DOJ case, allowing the government's claims to proceed. In rejecting Apple's arguments, the court agreed that Apple's alleged conduct – far from being a lawful unilateral refusal to deal – involves exclusionary conditions and restraints that are actionable under the antitrust laws (see *United States v. Apple*, No. 2:24-cv-4055-JXN(D.N.J.), Order dated June 28, 2025). Apple had argued that it has a right to control its platform (suggesting a *Colgate* or *Aspen Skiing* "right to refuse to deal" defense), but the DOJ successfully countered that the case is about Apple's coercive tying and restrictive policies imposed on developers and users, not a simple refusal to license its IP or software. The court agreed that the refusal-to-deal doctrine does not shield Apple's conduct, because Apple is accused of leveraging its monopoly power by imposing anticompetitive terms and technological restrictions on those who wish to reach iPhone users, rather than merely declining to do business with a rival. In short, the DOJ case confirms that the very theories Plaintiffs advanced – that Apple's integration of its hardware, operating system (iOS), and App Store allows it to lock in users and exclude competition – present legally viable claims of monopolization. Most significantly, the D.N.J. rejected the same pretextual arguments Apple raised in both CR I and CR II regarding IP licensing fees, tying and refusal-to-deal exceptions.

1    Proton AG v. Apple Inc. (N.D. Cal.) – *Developer Class Action:* On June 30, 2025, Proton AG – the

2    Swiss-based developer of ProtonMail filed a nationwide class action in this District alleging that Apple's

3    App Store policies violate the Sherman Act. *See Proton AG v. Apple*, No. 4:25-cv-05450. Proton's 73-page

4    complaint (backed by prominent antitrust counsel) reiterates many of the same relevant market definitions

5    and anticompetitive conduct theories that Plaintiffs have long asserted. For example, Proton claims that

6    Apple unlawfully ties app distribution on iOS to the iPhone device. This theory was first advanced by

7    Undersigned five years ago, and is finally taking root.

8    PhantomALERT v. Apple Inc. (D.D.C. & D.C. Cir.) – *Parallel Developer Case on Appeal:*

9    PhantomALERT, a small app developer, filed an antitrust suit in 2024 challenging Apple's exclusion of its

10    COVID-related app and other App Store practices (claims very akin to Plaintiffs'). In January 2025, the U.S.

11    District Court for D.C. (Judge McFadden) dismissed PhantomALERT's case (granting Apple's motion to

12    dismiss) and denied leave to amend, citing issues such as timeliness and sufficiency of market allegations.

13    PhantomALERT has since appealed, and as of July 2025 its appeal is pending before the D.C. Circuit (No.

14    25-7017). Notably, in its opening brief filed July 11, 2025, PhantomALERT argues that the district court

15    erred and that output restriction of COVID apps alone suffices as direct injury pursuant to *Shields* (*see infra*).

16    Hence, in the weeks since CR II dismissal, leading antitrust counsel at Berger Montague has reviewed the

17    anticompetitive effects of an "identical" (Apple's words) COVID censorship case and deemed recent *Shields*

18    law saves the cases from 12(b)(6) pleading deficiency (see Brief for Appellant, *PhantomALERT v. Apple*,

19    No. 25-7017 (D.C. Cir. filed July 11, 2025)).  That alone suffices to reopen this case; *Shields* is unambiguous

20    and Apple's didn't even try to argue otherwise in last week's OSC briefing. They have waived their right to

21    object to *Shields'* implications, so the case must be reopened in deference to *Shields*. Basic fairness suggests

22    Plaintiffs should have the same opportunity to have their claims heard as PhantomALERT (who studied CR

23    I's progression through the courts for five years), rather than being uniquely shut out.

24    On May 2, 2025 (after Apple's reply was filed for the MTD), a putative class of iOS developers led

25    by *Pure Sweat Basketball* filed another lawsuit in this District (Case No. 5:25-cv-03858) focusing on Apple's

26    willful violation of a court-ordered injunction and its continued extraction of supracompetitive commissions.

27    By way of background, in the *Epic Games v. Apple* litigation, Judge Yvonne Gonzalez Rogers had issued a

28    nationwide injunction in 2021 (effective January 2022) prohibiting Apple's anti-steering rules. Rather than

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

comply in good faith, Apple devised new tactics to stymie competition including a "link tax"). Plaintiffs' FAC sought redress for this matter in March 2024, calling the conduct "malicious compliance" which harmed the putative developer class. In April 2025, Judge Gonzalez Rogers found Apple in contempt of the injunction. In the wake of these findings, Pure Sweat's class action seeks overlapping relief with Plaintiffs' FAC for developers who were harmed by Apple's conduct. In sum, *Pure Sweat* and the *Epic* contempt finding evidence Plaintiffs' UCL retaliation claim had merit, and concerned post-2021 conduct. This Court's failure to address the UCL retaliation claims constitutes manifest error, and *Pure Sweat's* filing supports the reopening of our first-to-file lawsuit.

In addition to the above enforcement and litigation developments, the legal landscape within the Ninth Circuit has seen important doctrinal shifts. In September 2024, the Ninth Circuit decided *Shields v. NCAA (World Aquatics)*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024). In *Shields*, the Ninth Circuit held that under the rule of reason, a plaintiff can rely on direct evidence of anticompetitive effects (such as reduced output or quality) to establish an antitrust violation even without defining the relevant market in detail. *Id.* at *3 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986), and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc)). This clarification is directly relevant here: one of the main reasons CR I was dismissed was the perceived failure to plead a precise market definition. *Shields* confirms that such precision is not necessary if the conduct's harm to competition can be shown directly – a principle that Plaintiffs invoked by alleging restriction and censorship of apps like COVID apps and others, but which was overlooked in CR I. Hence, not only did the CR I Court and Ninth Circuit never adjudicate per se tying, but even either of those courts had determined Rule of Reason applies (it doesn't), *Shields* allows the case to progress on direct evidence.

Furthermore, just last month (June 16, 2025), Judge Eumi K. Lee of this District issued an order in *Gamboa v. Apple Inc.*, No. 5:24-cv-01270-EKL, that resonates with Plaintiffs' claims. In *Gamboa*, the plaintiff challenged Apple's restriction of certain "iCloud Photos" features to Apple's own iCloud service (alleging that Apple effectively forced users to use iCloud by technologically disabling the ability to freely manage certain photo files on iPhones). Judge Lee denied Apple's motion to dismiss, holding that Apple's technological tying of its products/services could plausibly violate §2 of the Sherman Act. Specifically, the court recognized that Apple's design decision (making iPhones treat non-iCloud photo libraries as "restricted

files") might be an exclusionary act intended to coerce adoption of Apple's complementary service (iCloud), thus reinforcing its dominance. *Gamboa* illustrates that antitrust law in this Circuit is adapting to account for Apple's tying strategies, even when those strategies are implemented via unilateral technical restrictions rather than explicit contractual ties. Notably, the CR II FAC adds Section 2 tying allegations which were not present in CR I. *Gamboa* is persuasive authority that such Section 2 technical restriction tying allegations deserve scrutiny. Plaintiffs here allege the same leverage: Apple conditions full access to iPhone (and critical device functionality) on submission to its exclusive App Store terms and $99 annual fee, thereby reinforcing monopolies in both performance smartphones and iOS app distribution. FAC ¶¶ 299-306.  *Gamboa* confirms that such unilateral, design-based tying is actionable under § 2. Those holdings directly contradict Apple's contention (Mot. to Dismiss at 5-6) that Plaintiffs must plead traditional § 1 "conditioning" plus a fully articulated relevant market at the complaint stage. At the time CR I was dismissed, no court in this Circuit had allowed an Apple tying claim past the pleadings. *Gamboa* (2025), *Proton AG v. Apple* (2025), and the DOJ action now show that Plaintiffs' leveraging theories are legally plausible, if not ahead of their time. Treating the 2021 CR I dismissal as a permanent bar—while identical theories proceed for other plaintiffs— would 'work a manifest injustice.' *Phelps v. Alameida*, 569 F.3d 1120, 1135-36 (9th Cir. 2009).

Together, *Shields* and *Gamboa* represent an important shift: they validate approaches to antitrust liability (direct evidence, and non-traditional tying) that support Plaintiffs' theories. These cases did not exist or were not available at the time of the CR I judgment, but now provide judicial reinforcement that Plaintiffs' claims are far from fanciful – to the contrary, they are on the cutting edge of current antitrust adjudication. Plaintiffs have researched and adapted App Store tying claims for five years, evident from these developing cases which show Plaintiffs efforts to be grounded in accuracy and relevancy; this is far from the picture of vexatiousness Apple advances, but in fact, compelling (if not mandatory) grounds to reopen the case.

## LEGAL STANDARDS FOR RECONSIDERATION

A Rule 59(e) *Alteration or Amendment of Judgment* motion is an "extraordinary remedy" used to prevent manifest injustice or to correct clear errors of law or fact. *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). Grounds for Rule 59(e) include: (1) an intervening change in controlling law; (2) the emergence of new evidence not previously available; or (3) the need to correct a clear error or prevent

manifest injustice. *Id.* Here, Plaintiffs invoke Rule 59(e) because significant events and law changes after the dismissal have reshaped the case, and adherence to the original judgment would result in manifest injustice.

Rule 60(b)(6) allows a court to relieve a party from a final judgment for "any other reason that justifies relief." This is a grand reservoir of equitable power, to be used sparingly and only in extraordinary circumstances. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988). The moving party must show both injury (or undue hardship) and that extraordinary circumstances justify reopening the judgment. Intervening changes in law, new evidence, or a showing that the prior judgment is no longer equitable are recognized bases for 60(b)(6) relief. *See id.*; *Phelps v. Alameida*, 569 F.3d 1120, 1135–40 (9th Cir. 2009) (granting Rule 60(b)(6) relief where an intervening Supreme Court decision undermined the legal basis of the prior judgment, and emphasizing that courts must balance finality against the need to do justice in light of new developments). The Ninth Circuit instructs that courts considering Rule 60(b)(6) should examine a variety of factors, including the nature of the intervening change, the diligence of the movant, and the potential injustice of denying relief. *Phelps*, 569 F.3d at 1135–39.

Res Judicata vs. Equitable Power: While claim preclusion is a doctrine of general application, it is equitable in nature and should not be applied mechanically if doing so would work an injustice. The Supreme Court has cautioned that res judicata cannot be given the effect of extinguishing claims which did not even exist at the time of the prior judgment, and which could not have been sued upon in the previous case. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955). Thus, a judgment does not grant a defendant perpetual immunity from liability for all future conduct of the same type (*id.* at 327), nor does it bar claims that were not actually litigated or decided previously. In the Ninth Circuit, claim preclusion applies when a later suit involves the same claim or nucleus of facts as an earlier suit that resulted in a final judgment on the merits between the same parties. However, even where these technical elements are met, courts retain discretion to decline to enforce claim preclusion if unusual circumstances demand flexibility (for example, where significant new facts have arisen, or where applying preclusion would contravene the public interest). *See Ackermann v. United States*, 340 U.S. 193, 202 (1950) (res judicata is grounded in equity and should not be applied in a way that is manifestly unjust).

**ARGUMENT**

I.    **Res Judicata Should Not Be Rigidly Applied Where the Equities Strongly Favor Adjudicating Plaintiffs' Claims Alongside the Parallel Proceedings**

Claim preclusion serves important goals of finality and judicial economy, but it is not an iron mold that must be enforced without regard to context or fairness. Courts have long recognized that rigid application of res judicata may be inappropriate if it would lead to inequitable results. *See, e.g., Ackermann*, 340 U.S. at 202 (even where procedural requirements of res judicata are satisfied, relief may be warranted if upholding the judgment would be manifestly unfair). This is such a case. The balance of equities tips decisively in favor of allowing Plaintiffs' lawsuit to proceed. Plaintiffs' claims involve matters of substantial public importance – allegations that Apple has abused its monopoly power over app distribution to stifle competition and innovation. In 2021, when CR I was dismissed, these allegations were relatively novel. But in 2025, they are being taken very seriously by courts, enforcers, and industry stakeholders. Apple is now defending virtually identical claims in multiple forums, as discussed above: The DOJ, *Proton*, *Pure Sweat*, *PhantomALERT*, and *Gamboa*. The controversy over Apple's App Store practices has expanded far beyond Plaintiffs; it is now a nationwide, multi-front battle over the future of app competition. Against this backdrop, insisting that Plaintiffs alone be bound by a 2021 dismissal – which occurred at a time when these issues lacked the critical mass validation they now have – would work a substantial injustice.

Equitable factors favor reopening. Plaintiffs have been diligent and acted in good faith. They promptly filed this new action after the Ninth Circuit's mandate in CR I issued, seeking to plead their case with the benefit of AUSA counsel with antitrust experience, who reviewed the entire matter and concurred a viable case remained, with new post-2021 facts and curing of any jurisdictional naming defects. Apple cannot claim any *unfair* prejudice if this case proceeds. Apple is already deeply engaged in defending these same issues – it faces overlapping discovery, economic analysis, and witnesses in the DOJ case and developer class actions. In fact, coordination of this case with those actions could yield efficiencies. The marginal burden to Apple of including Plaintiffs' claims in the broader adjudication is negligible. By contrast, the prejudice to Plaintiffs from a strict res judicata bar would be profound: they would suffer the unique fate of having their allegations never examined on the merits, while others obtain relief for the very same alleged wrongdoing. Such an outcome would essentially penalize Plaintiffs for being early movers. It would also

1  create an inconsistent patchwork of justice: Apple potentially could be held accountable to every other injured

2  party *except* these Plaintiffs, simply due to timing and procedural happenstance.

3      Res judicata is meant to protect against duplicative litigation, but allowing this case to proceed does

4  not threaten that interest. There has been no prior merits litigation of Plaintiffs' claims – CR I was cut off at

5  the pleading stage. Therefore, there is no risk of undermining a jury verdict or factual finding from CR I,

6  because none exists. Nor would Apple face double liability for the *same* harm; Plaintiffs seek their own

7  damages (for their lost opportunities) and injunctive relief, distinct from what other cases seek, and despite

8  all the other recent cases, still provide the only Developer Compensation Fund for a general class of zero-

9  priced apps. If anything, resolving Plaintiffs' claims in tandem with the other proceedings would promote

10 consistent outcomes and comprehensive relief. It is far more anomalous to carve Plaintiffs out and leave them

11 with nothing if, say, the DOJ or Proton ultimately succeed in forcing changes to Apple's practices from which

12 Plaintiffs will indirectly benefit. Equity abhors such asymmetry.

13     In essence, finality concerns must yield to fairness here. The policies underlying res judicata do not

14 demand Plaintiffs' exclusion. This is a case where the *context surrounding the prior judgment has so changed*

15 that continuing to give that judgment preclusive effect would sanction an unfair result. As the Supreme Court

16 noted in *Lawlor*, a judgment cannot immunize a defendant against a continuing course of conduct

17 indefinitely. 349 U.S. at 327–28. Apple's alleged misconduct did not cease in 2021 – it continued and even

18 intensified in various ways (new developer fees and rules, defiance of court orders, etc.) The extraordinary

19 circumstances here – including the mobilization of the federal government and new plaintiffs to tackle

20 Apple's conduct – make this an exceptional situation where the Court's equitable intervention is justified.

21     **II.    Apple's "Unclean Hands" Strengthens the Equitable Case for Re-Opening**

22     Equity will not 'lend its aid' to a party that has been guilty of unconscionable conduct in connection

23 with the matter in controversy. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814

24 (1945).  When a defendant's own misconduct infects the litigation—or the underlying transactions—courts

25 routinely refuse to allow that defendant to invoke equitable doctrines such as claim preclusion. See *Johnson

26 v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (res judicata is grounded in equity and may yield where

27 enforcement would perpetuate manifest injustice); *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir.

28 1991) (unclean hands considerations inform application of res judicata).

Here, substantial post-dismissal facts show Apple's hands are anything but clean. Judge Gonzalez Rogers has already referred Apple witnesses and counsel for possible criminal contempt after finding that Apple provided "false and misleading" testimony designed to evade antitrust relief in *Epic Games v. Apple* (N.D. Cal., Apr. 30 2025 order at 15-18), thereby the subject of "harming" developers in the FAC. Moreover, in *DOJ v. Apple*, the government alleges Apple misrepresented technical restrictions "it knew were self-imposed" to regulators (¶¶ 214-221), directly applicable to Plaintiffs allegations that Apple misrepresented to this Court that notarization was an 'inseparable' component of an operating system. And similarly applicable to this case, Apple's June 2025 anti-SLAPP opposition serves as a new concession of prior witness intimidation when it admits that counsel Keith Mathews never represented Greenflight/Isaacs in CR I. That means opposing counsel chilled Isaacs's participation, a classic *witness intimidation* predicate act (18 U.S.C. § 1512). Faced with this allegation, Apple's OSC Reply only suggests that because Isaacs participated in the *CR I* live hearing, he couldn't have been intimidated. That is analogous to a schoolyard bully caught stealing lunch money using the defense "he still ate some lunch and didn't starve."

Taken together, these facts show Apple has leveraged litigation tactics, including inaccurate or misleading testimony, to insulate its App Store control. Equity does not allow a party to secure the shield of res judicata while simultaneously tainting the judicial process through perjury, contempt, or intimidation. See *Citizens State Bank v. O'Leary*, 856 F.2d 282, 287-88 (8th Cir. 1988) (unclean hands bars res judicata where prior judgment was procured by bad faith).

Accordingly, even if the ordinary elements of claim preclusion were satisfied (and there are many reasons the Court should reconsider that premise), the Court should exercise its equitable discretion under Rule 54(b)/60(b)(6) to vacate the dismissal. Allowing Apple to reap the benefit of its own litigation misconduct would perpetuate a fraud on the courts and produce precisely the "manifest injustice" the unclean hands doctrine exists to prevent. In sum, strict application of res judicata would produce a result at odds with the current reality and with fundamental fairness. This Court has the discretion to prevent that outcome. We respectfully urge the Court to exercise its equitable power to allow Plaintiffs' claims to be heard on their merits.

### III.    New Violations Give Rise to New Claims that Lawlor Protects

An independent reason to grant this motion is that much of what Plaintiffs allege in the FAC involves Apple's conduct after the CR I judgment, meaning those specific claims could not have been litigated in CR I and thus fall outside res judicata's scope. The Supreme Court's decision in *Lawlor v. National Screen* is directly on point. In that case, the plaintiff's second suit alleged antitrust violations that continued after the first suit's judgment; the Supreme Court allowed the second suit, emphasizing that a series of similar acts over time can be split into separate claims if they occur post-judgment.

Here, Apple's alleged wrongful conduct is continuing and iterative. For example: Apple imposes a $99 annual fee on developers every year. Each year's imposition (and each year a developer must pay anew or be excluded) is a fresh act that injures Plaintiffs. (FAC ¶¶ 148–151, 378.) Similarly, Apple updated its DPLA terms yearly, adding or modifying restrictions forming the total consideration for the $99 fee. Notably, after *Epic's* partial injunction, Apple added terms about external linking that have spawned a contempt ruling and follow-on class actions, including ours. Those actions in 2023–2024 are new antitrust violations that did not exist during CR I. (FAC ¶¶ 228–234.)

Apple's continued refusal to allow competing COVID-19 or public health apps (or broadly, competing app stores) in 2022–2024 perpetuated the alleged monopoly. And as alleged in last week's *PhantomALERT* appeal, Apple took great efforts to invalidate their own 'endorsement option' which should have allowed Dr. Roberts' University of Arizona endorsement to promptly place Coronavirus Reporter onto the App Store. That conduct – subverting their own endorsement contractual option – happened well after CR I was filed, and indeed, Plaintiffs only learned about much of it from last week's Berger Montague filing documenting years of investigation into that matter by PhantomALERT. Res judicata should not be construed to give Apple a "perpetual license" to continue violating the law simply because it fended off one lawsuit in 2021.

The Court's dismissal order in this case did not specifically address *Lawlor*. It found the "same nucleus of facts" between CR I and CR II, focusing on the broad course of Apple's App Store policies. (Dkt. 82 at 5–6.) But respectfully, that analysis overlooked that new facts after 2021 significantly broaden the nucleus. It left out paragraphs about retaliation claims (clearly post-2021) that were alleged under UCL:

"Apple is similarly [like CTF] in malicious compliance of a verdict in Epic v. Apple. This conduct again seeks to charge for notary stamps and IAP fees, through an improper commission on developers (FAC ¶ 76)… Apple is presently in malicious compliance with an Epic order from the CAND District, whereby they charge developers for links to non-Apple payment systems. These charges, like the EU CTF, are only feasible and/or enforceable because of Apple's notary stamp padlock on iOS. Apple's malicious compliance with the Epic order therefore serves as evidence that Apple intends to charge, directly or indirectly, for notary stamps and/or notarization services. (FAC ¶ 223) …Apple's CTF practices are similarly unlawful [under UCL] as they contravene the legal rules set out in the European Union's Digital Markets Act (DMA)…. Although the DMA is European legislation, its principles reflect global standards for fair competition, and … non-compliance affects [i.e. damages] US-based developers who wish to distribute apps in Europe, including Greenflight and CRC." (FAC ¶ 340.)

Correcting this error alone justifies relief under Rule 59(e) (to prevent clear legal error) or 60(b)(6) (to avoid an unjust extension of preclusion). Repeatedly failing to adjudicate core allegations, such as tying and retaliation is clear manifest error. At the very least, Plaintiffs should be allowed to proceed on claims based on Apple's post-2021 actions. Outright dismissal with prejudice sweeps too broadly by barring claims that could not have been raised in the first case. Furthermore, even regarding pre-2022 conduct, the law distinguishes between claims that were actually adjudicated previously and those that were not. As we explain next, several of Plaintiffs' specific legal theories were never actually litigated in CR I (they were effectively ignored due to the way that case was resolved). Res judicata does not attach to issues that were left undecided. Thus, the Court is free to consider those issues now – and given the new authorities and arguments on those issues, it should.

## IV.   Per Se Tying Claim and "Direct Evidence" Theory Were Never Adjudicated in CR I; They Survive and Are Now Bolstered by New Authority

One of Undersigned's primary claim theories has always been that Apple's conduct constitutes an unlawful tying arrangement – specifically, that Apple ties the use of its App Store to the iPhone, such that iPhone users and iOS developers are forced to use Apple's distribution and payment services if they want to participate in the iOS app market. In antitrust terms, the *"tying product"* is the iPhone device, and the *"tied product"* is app distribution via App Store, or notarization fees themselves. In CR I, Plaintiffs were the first to plead a *per se* tying claim under Sherman Act §1 (see CR I Count V) alleging Apple conditioned access to iPhone on developers and users using Apple's App Store, thereby restraining trade.

This *per se* tying theory is important because, under established law, a *per se* unlawful tying claim does not require detailed market definition or proof of market power in the tying product – those are presumed if the tie is shown between distinct products and the defendant has appreciable economic power. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15–18 (1984). In other words, if Apple indeed required that iPhone owners (and developers) use only Apple's App Store to obtain apps – which it did – and if iPhones are sufficiently desired by consumers (which confers power to Apple), then the law considers that arrangement inherently suspect.

In the CR I dismissal, however, the Court never addressed Plaintiffs' *per se* tying claim at all. The order made no mention of "tying," and it did not discuss the two-product test or whether Apple's conduct could be viewed as conditioning one product on another. Instead, the Court (and later the Ninth Circuit) analyzed the complaint as if it were solely a Rule of Reason monopoly case requiring market definition. This was a critical oversight. Despite voluminous briefing by all parties on the *Microsoft* platform exception – which Undersigned argued Apple was judicially estopped from raising because of Tim Cook's testimony that Apple sells devices – the Ninth Circuit was silent. Apple's OSC Response cites the same platform exception cases, which have never been adjudicated with regard to CR I or CR II and are judicially estopped. In short, the Ninth Circuit's decision said nothing about tying; it affirmed the dismissal on the narrow ground of insufficient market allegations and lack of antitrust injury framework. But it never recognized the tying claim, nor did it decide whether it was per se or Rule of Reason under the well-known *Jefferson Parish* framework test. Thus, no court has actually litigated or decided the merits of the CR I or CR II tying claims.

Why does this matter for res judicata? Because claim preclusion bars only those claims that were or *could have been* decided in the prior action. Here, the CR I Plaintiffs' tying theory *could not have been decided* if it was never acknowledged or analyzed. This is less a case of CR I failing to raise it – they did raise it and argue it extensively through the Supreme Court – and more a case of the prior courts perhaps overlooking it. That means there is no "final judgment on the merits" of the tying claim. It simply went unadjudicated. Under Ninth Circuit law, when a particular claim or issue was not actually litigated to a final decision, it generally isn't barred in a subsequent suit. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 851–52 (9th Cir. 2000) (res judicata applies to claims that were resolved or could have been resolved with

reasonable diligence in the first action; if an issue was not raised and the judgment did not encompass it, preclusion may be inapt especially if the issue is of a different nature).

Apple might argue that CR I Plaintiffs "could have" pressed the tying issue harder or appealed it – but they did. They argued on appeal that the *per se* tying analysis should have been applied. The Ninth Circuit did not engage, nor did the Supreme Court after heavily focused cert petitions concerning tying. In short, Undersigned and his clients have been totally deprived any day in court[1] on formidable theories that have been vindicated over the past five years. Regardless, the net result is that the tying claim remains unresolved. It is effectively a live claim that survived the prior litigation by omission.

This Court should therefore recognize that res judicata does not automatically wipe out the tying claim. In fact, continuing to preclude it would reward what was arguably a legal error in CR I (failing to consider a valid theory).  Significantly, the viability of Plaintiffs' tying theory is now stronger than ever. The Ninth Circuit's decision in *Shields* (2024) emphasizes that even outside the formal *per se* context, antitrust plaintiffs can prevail via *direct evidence of restricted output or consumer harm*, without needing meticulous market definitions. If *Shields* had been available and cited in CR I, the Court might have been more receptive to Plaintiffs' argument that Apple's outright ban on alternative app stores and non-institutional COVID apps was *inherently anticompetitive* behavior observable without complex market studies, even under the Rule of Reason. Apple's silence on this fact in their OSC Response is not accidental; if Gibson Dunn were arguing the other side, there is little question they would be seeking FRCP 60 re-opening of CR I on the basis of *Shields*. *Shields* shields any dismissal under res judicata for market definition, and it shields any allegation that the FAC is vexatious.

Similarly, the new *Gamboa v. Apple* decision (July 2025) further supports Plaintiffs' tying/leveraging theory under §2 of the Sherman Act. *Gamboa* recognizes that Apple's use of technical restrictions to favor its own iCloud service over others could constitute exclusionary conduct. By analogy, Apple's ban on other

---

[1] Apple complains that a related Petition (sent to DOJ and Apple's Board of Directors) has false statements that we never received a fair hearing. But the Petition is true; the CR I Count V tying claim never had its day in Court. Even if the 12(b)(6) dismissal analyzed tying (it didn't) the Petition would still be true as public-interest petitioning generally acknowledges "day in court" to mean a jury trial, not a pleading-technicality dismissal. This Honorable Court has a duty to fix this repeat, manifest error, where four years of diligently pled tying allegations worked their way all the way to the Supreme Court, yet were never adjudicated. There can't be a stronger case against res judicata.

app stores is a technical and contractual restriction to favor its own services. In fact, Apple's conduct in our case is an even clearer tie: Apple doesn't just make alternatives less convenient, it *categorically prohibits* them. Other plaintiffs in 2025 (*Proton*, etc.) directly plead almost identical tying. *Proton's* complaint repeatedly uses the language of tying: e.g., Apple "forces developers to distribute iOS apps exclusively through Apple's App Store and to use Apple's payment processing, tying the use of its platform to its own monopoly services" (*Proton AG Class Action Compl.* ¶¶ 3, 11). The fact that this framing is front-and-center in a new case – and that case was found related to *Epic* – indicates that the tying theory is considered credible, non-frivolous, and integral by those with deep knowledge of the subject.

Because the Ninth Circuit never discussed tying, Apple's position essentially asks this Court to extend the prior judgment to an issue never decided – effectively to decide it adversely to Plaintiffs without briefing on the merits. That is not how res judicata works. If anything, it demonstrates why the Court should reopen the judgment: to actually grapple with the tying issue now that it's ripe and supported by new authority.

Apple has suggested in other filings that Plaintiffs' renewed claims are frivolous or sanction-worthy (indeed, Apple filed a Rule 11 sanctions motion, arguing that re-filing these antitrust claims was baseless under the prior judgment). But the discussion above should dispel that notion. The legal foundation for Plaintiffs' claims is solid and growing more so by the day. When a DOJ case, a Ninth Circuit precedent (*Shields*), and multiple developer complaints all support the same theories, one can hardly label those theories frivolous. Plaintiffs' persistence in pressing these claims has been vindicated by external events – far from abusing the system, they identified a legitimate issue that is now broadly recognized. This context should reassure the Court that granting reconsideration is not indulging a vexatious litigant, but rather correcting course to allow meritorious claims to be heard.

## V.    RICO: Apple's *Epic* Contempt Is Not Unrelated - It Falls Within the Developer Retaliation Pattern Pleaded in CR I and Justifies Leave to Amend

The *CR I* (¶¶ 267-308) plaintiffs pleaded a pattern in which Apple (i) wields App Store gatekeeping to punish outspoken or non-compliant developers, (ii) issues false pretextual communications, and (iii) deploys outside lawyers and PR agents to smear or intimidate critics. The *CR II* First Amended Complaint repeats that "developer retaliation" (FAC ¶ 350) is a core UCL and antitrust theory—Apple preserves its monopoly by retaliating against any developer who tries to bypass or criticize its rules.

The *Epic* contempt order is the latest installment of that pattern. Apple lied under oath about its compliance with the anti-steering injunction; senior executives directed engineers to implement "deterrent" pop-ups and a 27 % "link tax" to punish developers who dared steer users to alternative payments; the Court referred Apple and an executive to the U.S. Attorney for possible criminal contempt. These findings are hardly unrelated coincidence; they are *precisely* the sort of retaliatory, deceptive conduct CR I and CR II describe: using false statements, aggressive lobbying, and technological coercion to stifle developers who threaten Apple's rents.

Under 18 U.S.C. § 1961(1), both perjury (18 U.S.C. § 1621) and obstruction of justice (18 U.S.C. § 1503) are RICO predicates that revive the RICO claim. The *Epic* contempt findings supply at least two new predicate acts (false sworn compliance declarations; obstruction through intentional injunction-evasion design changes).  They occurred in 2023-2025, long after CR I was dismissed, and therefore could not have been pled earlier.

Apple's "unrelated case" objection fails for three independent reasons. The enterprise alleged in CR I is Apple plus outside enablers who "exploit the work of developers by screening, suppressing, and retaliating."  The *Epic* contempt acts were executed by the same Apple legal chain of command to preserve the same monopoly rents; Plaintiffs call this the "Apple Antitrust Team."  That satisfies *Living Designs v. DuPont*, 431 F.3d 353, 362 (9th Cir. 2005): enterprise may consist of the corporation and outside actors furthering a common scheme. The contempt acts target *developers who provide competing monetization routes*—the identical victim class (independent developers) and identical goal (preserve the "Apple tax" and grip over internet censorship) pleaded before.  They therefore extend the pattern; they do not introduce a new, unrelated scheme. *Lawlor* bars claim preclusion for "new wrongful acts" post judgment, *even if they resemble the prior misconduct.*  Apple's perjury and obstruction happened in 2023-25, well after the November 2021 CR I dismissal; they are new wrongful acts that automatically escape res judicata.

Other developers have already invoked the same misconduct—demonstrating materiality. The *Pure Sweat Basketball* class action (N.D. Cal. No. 5:25-cv-03858) pleads that Apple's contemptuous conduct injured developers. *Microsoft* (*amicus* brief, *Epic* appeal, Apr. 2023) likewise cited Apple's anti-steering retaliation as ongoing exclusionary conduct. These independent complaints confirm that the contempt

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

findings are not idiosyncratic to *Epic* but part of a systemic developer retaliation scheme first spotlighted by Plaintiffs.

Leave to amend is not futile and cures the enterprise identity concern. By adding the new predicates Plaintiffs can (a) plead the enterprise as *Apple + identified outside law firms/PR agencies implementing the contempt strategy*, eliminating any person/enterprise merger issue, and (b) allege continuity through 2025. Under *Foman v. Davis*, 371 U.S. 178 (1962), such an amendment must be allowed absent prejudice— none exists because Apple is already litigating these very facts in *Epic* and *Pure Sweat*.

Apple also concedes a predicate violation in CR I. In its June 24, 2025 anti-SLAPP opposition and in the July 7, 2025 sanctions reply, Apple finally admits that attorney Keith Mathews did not appear for Greenflight Venture or Dr. Isaacs in CR I. Hence it is now uncontested that Apple muzzled a pro se Plaintiff in CR I and blocked his court-related proceedings. *Threatening or attempting to intimidate a witness or potential witness* is a predicate act under 18 U.S.C. § 1512(b) and therefore qualifies as "racketeering activity" for civil RICO purposes. Apple's new concession is critical: it establishes that Mathews was never counsel of record, so its ongoing attempt to silence Isaacs served no legitimate litigation purpose and can only be read as a tactic "to harass, intimidate, or silence" a percipient witness—exactly what § 1512(b) prohibits. Because Apple's concession was first made after the CR I dismissal (and indeed after briefing on the CR II motion-to-dismiss closed), it is a *newly revealed* predicate act—one that Plaintiffs could not have pleaded earlier, and by definition, happened after the CR I operative complaint was filed which joined Dr. Isaacs to the case.

The intimidation of Isaacs dovetails with the broader pattern alleged in CR I Count X: Apple and its agents "discredit developers and their advocates" and use procedural threats to chill testimony about Apple's anticompetitive conduct. Apple's latest filings demonstrate that pattern is ongoing and directed at anyone who might bolster developers' claims—as indeed Isaacs succeeded in bringing attention to tying conduct. RICO's "continuity" requirement is satisfied where predicate acts "amount to or pose a threat of continued criminal activity." Apple's 2022 intimidation of Isaacs—combined with the 2023-25 contempt findings in *Epic*—shows precisely that continuing threat. This new predicate, acknowledged only this summer, independently justifies reopening judgment and granting leave to amend the RICO count to plead (i) Apple's

§ 1512(b) witness tampering as a fresh predicate act; and (ii) a refined enterprise theory that avoids any person/enterprise merger concern.

The Court should (i) reopen judgment under Rule 59(e) or 60(b)(2)/(b)(6); (ii) vacate dismissal of Count X[2]; and (iii) grant leave for a Second Amended Complaint adding Apple's 2023-25 perjury/obstruction as fresh RICO predicates. Denying that relief would bias the record by shielding Apple from RICO scrutiny even as other developers and the Court itself have now documented Apple's retaliatory deceit.

### Apple's Double-Standard on "Psychiatric" Assertions Evidences Its Unclean Hands and Adds a New Predicate Act of Witness Harassment

*Plaintiffs'* July 2025 OSC Memorandum states that Apple's litigation intent has become central and the Court should authorize independent forensic psychiatric evaluation of Apple's dedicated "Antitrust Team." The request was made only after Apple outrageously characterized Plaintiffs' anti-SLAPP[3] petitioning as "harassment" and suggested sanctions. A neutral mental state assessment is a well recognized discovery tool whenever a party's good faith intent or capacity is in dispute. See *Fed. R. Civ. P. 35(a).* In its OSC Response, Apple now calls the medical evaluation request "ad hominem attack," accusing Plaintiffs of unnecessarily injecting psychiatry into the litigation. That position itself is judicially estopped by Apple's own conduct. Throughout CR I and the related appeals, Apple repeatedly asserted that co-founder Dr. Isaacs "suffers from neuro-psychiatric disability" and implied his condition explained Plaintiffs' "hinterlands" litigation posture. Apple cannot both (a) wield psychiatric labels to discredit Plaintiffs, and (b) condemn Plaintiffs as "ad hominem" for requesting an objective mental state evaluation of Apple executives who— according to Judge Gonzalez Rogers—lied under oath and were referred for criminal contempt.

---

[2] Plaintiffs' preferred vehicle for adjudicating this case is *competition law*, e.g. the Sherman Act of 1890 and the California Unfair Competition Law. Assuming Apple agrees it has forfeited opposing the reopening of the Tying claims under *Shields*, Plaintiffs hereby waive their right to reopen the RICO cause of action. In the alternative, should Apple thwart forfeiture case law, RICO is the necessary vehicle for this case to proceed. The ball is in Apple's court.

[3] When a lawsuit alleges the largest monopoly in history retaliates against antitrust advocates, it is textbook protected petitioning. When that monopoly effectively countersues seeking a review of five years of Supreme Court filings and broad, future-based injunctions against antitrust enforcement (violating *Trump v. CASA*), anti-SLAPP is the preferred remedy under California Law. When the monopoly plants the seed that the Court should strike the anti-SLAPP proceeding as harassment, it is time to evaluate the small "Apple Antitrust Team" that is commandeering the internet and this litigation.

18

This 180-degree switch once again[4] exemplifies Apple's DARVO pattern: Deny the misconduct, Attack the accuser, Reverse Victim and Offender.  Weaponizing mental health innuendo against Plaintiffs while decrying the same tool when pointed back at Apple is not merely hypocrisy; it substantiates that witness intimidation took place under 18 U.S.C. § 1512—*a qualifying RICO predicate*: Apple lied under oath, Undersigned sought their medical evaluation as part of his prosecution of developer retaliation claims, Apple moved[or supported] sanctions for the request, effectively proving their harassing mens rea/ intent in raising Isaacs' own psychiatry condition. Apple's shifting stance on psychiatric evidence—first as a sword, now as a shield—reinforces why this Court should (a) reopen the case, (b) permit amendment of the RICO count to reflect the newly revealed predicate acts, and (c) deny related sanctions motion in entirety.

## VI.    The Pending DOJ Action Creates "Contingent Finality" that Justifies Equitable Relief

Moreover, the Supreme Court has recognized that when parallel government proceedings may lead to remedies or outcomes inconsistent with a prior private judgment, courts should treat the prior judgment as "contingent" rather than strictly final. See *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961) (district courts have equitable authority to revisit and modify earlier decrees or judgments once the government obtains broader or conflicting relief in related litigation). This principle is grounded in the court's inherent equitable discretion to prevent injustice or inconsistency, particularly in antitrust contexts where private litigation and government enforcement overlap.

Here, the pending DOJ antitrust action against Apple—now moving beyond a motion to dismiss—poses exactly such a scenario. If the DOJ ultimately obtains broad remedial measures (for example, mandatory sideloading, removal of restrictive App Store policies, or other pro-competitive structural relief), maintaining a rigid claim-preclusion bar based on the earlier CR I judgment would create precisely the type of inconsistent or conflicting mandate the Supreme Court cautioned against. It would unjustly leave Plaintiffs as the only affected party without recourse, despite having sounded the alarm years earlier. Thus, equitable principles embodied in Wright favor reopening this matter now, before a potentially conflicting final judgment is entered in the DOJ litigation.

---

[4] Undersigned has a bookshelf containing nearly a dozen Supreme Court *certiorari* petitions, which collectively serve as a case study of Apple and/or opposing counsel's judicially estopped contradictions over time.

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

The fact that the U.S. Department of Justice — after extensive investigation — decided to sue Apple in 2024 is immensely significant and omitted from the Court's order. The DOJ's complaint and its successful defeat of Apple's motion to dismiss demonstrate that at least one federal court finds claims like Plaintiffs' to be plausible and legally sufficient; indeed the FAC is DOJ verbatim intended to represent a putative developer class; clearly this includes non-*CR I* conduct. Even if it were the same conduct, which it wasn't, the Ninth Circuit's decision in *Shields (2024)* clarified that plaintiffs need not satisfy rigid market-definition requirements if they have direct evidence of harm. If *Shields* had been law in 2021 (or if its principle had been applied), the outcome certainly would have differed – Plaintiffs had alleged that Apple's conduct reduced output (by excluding apps) and diminished consumer choice, which is direct evidence of harm.

Thus, continuing to enforce the prior judgment without reconsideration would effectively perpetuate a ruling that is at odds with the current state of the world. Beyond legal doctrine and new evidence, there is a compelling equitable narrative here: Plaintiffs were among the first to call out Apple's alleged misconduct, yet they risk being the only ones left without a remedy. In a real sense, Plaintiffs (or their related entities) were the canary in the coal mine. They spotted an antitrust problem before most others. It took a few years for the rest of the legal system to catch up, but it has. Now, imagine the outcome if reconsideration is denied. The DOJ might win relief that forces Apple to change certain App Store rules (perhaps allowing third-party app stores). *Proton* or *Pure Sweat* might secure damages or injunctions that compensate developers for Apple's past conduct and prevent future abuses. All the while, Plaintiffs – who sounded the alarm early – are left with nothing but accusations of 'vexatiousness.' This would be a bitter pill and frankly an inequitable outcome. Our justice system generally seeks to avoid depriving a party of a chance to be heard when circumstances permit a fair hearing. Here, Plaintiffs have *never* had a chance to fully present their case with the benefit of discovery and expert testimony.

## VII.    The Prior Dismissal Was a Procedural Termination; No Court Has Ever Adjudicated Whether Apple's Conduct Is Lawful

Finally, reconsideration is warranted because CR I's dismissal with prejudice, while a "final judgment" in form, was not an adjudication on the merits of the allegations in any substantive sense. It was a determination that Plaintiffs had not met technical pleading requirements (relevant market definition), made in a context where those Plaintiffs were intimidated and muzzled by Apple. The policy of res judicata is at

20

its weakest when the prior judgment did not actually involve a full and fair opportunity for the plaintiff to present evidence and argument on the substance of the claim. Here, Plaintiffs have never had their day in court regarding whether Apple's App Store policies violate antitrust laws. Basic fairness suggests they should have that chance, especially in light of everything discussed above.

It is instructive to consider what *did not* happen in CR I: There was no discovery. Plaintiffs never obtained documents from Apple, never took depositions, never had expert economic analysis to support their claims. The dismissal was purely on the face of the complaint. There was no evidentiary hearing or trial. No factfinder weighed Apple's justifications versus the harms, because the case ended before that stage. There were no substantive legal conclusions about Apple's conduct. For instance, the court in CR I did *not* hold, "Apple's $99 developer fee is lawful," or "Apple's App Store monopoly is not anticompetitive." It held only that the plaintiffs hadn't adequately alleged a relevant market and antitrust injury. That leaves open the possibility that with proper allegations, new case law, new DOJ compiled evidence, the claims could succeed.

The Ninth Circuit in *Phelps* noted that one factor favoring relief was that the prior judgment was based on now-defunct law, which meant the plaintiff never got a proper merits determination. Analogously, here the prior judgment was based on a legal understanding (market definition requirements) that is now in incorrect given new authority of *Shields* (and the fact tying was never even addressed for *per se* allegations). Plaintiffs effectively never got a "proper merits determination" of their core grievance.

## VIII.    The Court's Finding of Privity Between Isaacs and Greenflight Was Clearly Erroneous and Requires Reconsideration

The Court's dismissal order incorrectly found privity between Jeffrey Isaacs and Greenflight Venture Corporation based solely on Apple's unsupported assertions and mischaracterizations of the record. Under established law, privity is the exception rather than the rule; a corporation enjoys its own legal identity separate and distinct from its investors, officers, and representatives. See, e.g., *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (a party's mere alignment of interests or common ownership is insufficient to establish privity for res judicata purposes); *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054 (9th Cir. 2005) (Privity is narrowly construed, and corporate entities are presumed distinct from their investors or representatives absent extraordinary circumstances).

Here, Greenflight is a bona fide corporation with an independent legal and business identity. It served over 200 million customers with products and services entirely separate from Isaacs's personal dealings.

21

Indeed, public records from the United States Patent and Trademark Office (USPTO) recognize Greenflight—not Isaacs—as the holder of patents, including inventions developed by Isaacs himself. Far from merely being Isaacs's alter ego, Greenflight has an independent market presence, corporate history, and asset portfolio. Yet, the Court accepted Apple's misleading narrative—based solely on counsel's shorthand reference to Isaacs as a "client," rather than the more precise "client representative"—as sufficient to establish privity. (See Dkt. 82 at 6–8.)

Critically, this finding was made without any evidentiary inquiry or factual due diligence. Instead, Apple's counsel at Gibson Dunn offered only conclusory mischaracterizations to create the illusion of privity. At no point has Apple provided documentation, sworn testimony, or any credible proof sufficient to treat them as identical parties. Indeed, the available record directly contradicts Apple's portrayal. Isaacs appeared in CR I as a *pro se* individual investor "representing his interests," not as counsel or representative for Greenflight. Isaacs' role as an investor, or even his status as an inventor who licensed patents to Greenflight, does not convert Greenflight into Isaacs' legal alter ego. Such a standard would eviscerate basic corporate separateness principles universally recognized by U.S. law.

The Court's finding also overlooked that Isaacs was effectively "muzzled" from fully representing or advocating Greenflight's interests in CR I. As Apple itself now breathtakingly concedes in the anti-SLAPP reply, attorney Keith Mathews did not represent Greenflight or Isaacs in CR I. Thus, Greenflight has never been represented by counsel in prior litigation. It is axiomatic under federal and state law that a corporation cannot appear pro se—it must appear through counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 201–03 (1993). Accordingly, Greenflight as a corporation was never properly before the court in CR I, and never had a full and fair opportunity to litigate its claims. The Court effectively and improperly assigned Isaacs—a non-attorney founder/investor—the role of pro se representative for Greenflight, without Greenflight's consent, counsel, or participation. That procedural anomaly alone compels reconsideration and relief from judgment.

Under the federal standard for privity, one party's litigation conduct binds another only when the second party was adequately represented and had actual control or input into the first litigation. *Taylor*, 553 U.S. at 894–95; *Montana v. United States*, 440 U.S. 147, 154–55 (1979). Neither condition is met here: Isaacs never legally represented Greenflight, nor did Greenflight have counsel or adequate representation at all.

Furthermore, Isaacs's own appearance in CR I was as an individual investor and inventor, not as an officer, director, or authorized representative of Greenflight. Apple provided no evidence to the contrary, and the Court conducted no hearing or factual inquiry to justify its opposite conclusion.

Therefore, Greenflight's independent corporate identity must be respected. The mere presence of a common investor or inventor does not suffice to collapse separate legal identities into a single entity for purposes of res judicata. Allowing Apple's unsupported misrepresentations to stand uncorrected would not only improperly punish Greenflight, but also set a troubling precedent that undermines corporate separateness and fairness in litigation. Justice demands reconsideration: Greenflight must be permitted to pursue its own claims independently, free of an incorrect and unjust privity determination.

Accordingly, Plaintiffs respectfully request the Court to reconsider and correct its erroneous finding of privity between Isaacs and Greenflight, vacate the dismissal as to Greenflight's independent claims, and permit Greenflight's claims to proceed on their own merits alongside the related ongoing actions. Importantly, Greenflight seeks to serve as a class representative of entities similarly situated – i.e. developers who paid the Apple Tax. Isaacs never paid the Apple Tax – Greenflight did. Ten years of receipts, which Undersigned may provide to the Court if so requested, proves this beyond any doubt. That simple fact alone warrants reopening so this class action may proceed without delay.

## CONCLUSION

For all the above reasons, Plaintiffs respectfully request that the Court grant this motion for reconsideration. Specifically, Plaintiffs ask that the Court vacate its June 25, 2025 dismissal order (and the accompanying judgment) and reopen the case. Upon reconsideration, the Court should hold that res judicata does not bar Plaintiffs' claims in light of the significant new developments and extraordinary circumstances that have arisen since the prior judgment. At a minimum, any portions of the FAC addressing post-2021 conduct or legal theories not previously adjudicated (such as Plaintiffs' tying claims) should be allowed to proceed on their merits.

Plaintiffs are prepared to move forward expeditiously. Apple will not be unduly burdened, as it is already litigating these issues. The important point is that Plaintiffs be permitted a fair opportunity to present their case. Given the overwhelming new support for their claims – from the DOJ action, the *Proton* and *Pure Sweat* lawsuits, the *PhantomALERT* appeal, and the *Shields* and *Gamboa* decisions – fundamental fairness

23

means the Plaintiffs should continue to participate in the ongoing litigation. Apple, in its responses, has not articulated any substantial prejudice or addressed the equity and new law points, effectively conceding that if the Court has the power to grant relief, it should.

In our justice system, finality is not meant to eclipse fairness. This is a compelling case where the interests of justice require relaxing finality to allow adjudication on the merits. Plaintiffs respectfully urge the Court to exercise its discretion under Rule 59(e) and 60(b)(6) to prevent manifest injustice. The motion should be granted, and Plaintiffs' First Amended Complaint should be reinstated so that this matter can proceed to a resolution consistent with the industry wide examination of Apple's App Store practices.

Dated: July 21, 2025.


/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Motion for Leave to File Reconsideration was delivered via ECF to all interested parties.

Executed on this 21st day of July, 2025.


/s/ Keith Mathews

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

MOTION FOR LEAVE TO FILE RECONSIDERATION
CASE NO. 3:24-CV-8660-EMC