Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CORONAVIRUS REPORTER CORPORATION,
CALID INC.,
GREENFLIGHT VENTURE CORPORATION

    *on behalf of themselves and*
    *all others similarly situated*

                  Plaintiffs,

*vs.*

APPLE INC.
                  Defendant.

Case No. 3:24-cv-8660-EMC

**PLAINTIFFS' OBJECTION TO FEE APPLICATION**

## TABLE OF CONTENTS

**PLAINTIFFS' OBJECTION TO FEE APPLICATION** ............................................................... 1

I.    THE FIRST AMENDED COMPLAINT WAS A SOPHISTICATED, DOJ PARALLEL ANTITRUST SYNTHESIS, NOT A REPACKAGED 2020 APP DISPUTE ................................ 3

II.    APPLE'S FEE APPLICATION FUNCTIONALLY SEEKS TO PUNISH THE LAWSUIT ITSELF, VIOLATING NOERR-PENNINGTON ........................................................................ 7

III.    THE PRIVITY FINDING RESTED ON SUPERSEDED LAW ........................................... 9

IV.    RULE 11(C)(5)(A) BARS MONETARY SANCTIONS AGAINST THE REPRESENTED CORPORATE PLAINTIFFS FOR LEGAL CONTENTIONS ........................................................ 11

V.    APPLE'S FEE APPLICATION MUST BE DENIED FOR ILLEGALLY COMMINGLING FORBIDDEN SUA SPONTE FEES ........................................................................................ 13

VI.    EXHIBIT A IS DEFECTIVE UNDER RULE 11 ............................................................... 14

VII.    RULE 11 PERMITS ONLY A NOMINAL DETERRENT AWARD, AND ANY LARGER AMOUNT REQUIRES A TARGETED EVIDENTIARY HEARING ......................................... 17

VIII.    THE COURT'S SUA SPONTE TREATMENT OF THE TIM COOK PETITION PUNISHED PURE PETITIONING AND POLITICAL OPINION—NOT LITIGATION FRAUD, NOT EVIDENTIARY MISCONDUCT, AND NOT A RULE 11 WRONG ................. 20

IX.    APPLE'S SANCTIONS CAMPAIGN IS RETALIATORY ............................................. 22

**CONCLUSION** ............................................................................................................. **23**

**CERTIFICATE OF SERVICE** ........................................................................................ **24**

## TABLE OF AUTHORITIES

CASES

*Barber v. Miller*, 146 F.3d 707, 711 (9th Cir. 1998) --------------------------------------------------- 13

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) --------------------------------------- 17

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) -------- 7

*Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990)------------------------------- 10

*Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir. 1986)-------------- 6

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–09 (2017) ------------------------------ 12

*Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262 (1972)--------------------------------- 22

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993) ------------- 5

*In re Yagman*, 796 F.2d 1165, 1184–85 (9th Cir. 1986) ----------------------------------------------- 18

*Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110–12 (9th Cir. 2005)------------------------------------ 19

*Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 328 (1955) --------------------------------- 11

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)----------------------------------------- 21

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. ("PRE").* 508 U.S. 49 (1993)---------------------------------------------------------------------------------------------------------- 7

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) ----------------------------------------- 18

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932–33 (9th Cir. 2006)--------------------------------------- 8

*Taylor v. Sturgell*, 553 U.S. 880 (2008)--------------------------------------------------------------- 9

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) -------------------------------- 7

*United States v. Apple,* No. 2:24-cv-04055-JXN-LDW *(D.N.J. filed Mar. 21, 2024)* ------------------ 2

*Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994) ----------------------------------------------- 18

STATUTES

California Code of Civil Procedure § 425.16------------------------------------------------------------- 14

# PLAINTIFFS' OBJECTION TO FEE APPLICATION

This fee application arises from a simple but nationally important question: can Apple use the federal courts to financially persecute and silence the first developers who challenged its App Store censorship and technical tying practices, before any court has ever adjudicated the theory on the merits?

Plaintiffs object in full to Apple's improper sanctions campaign, and maintain that it is compelling evidence in support of our underlying retaliation claims. For five years, Apple has responded to a straightforward Sherman Act tying theory not by squarely defeating it on the merits (the tying claims were never reached in *Coronavirus Reporter I*) but by trying to punish the people who raised it. In Plaintiffs' view, this is a familiar corporate defense playbook: shift the court's attention away from the underlying monopoly allegations and recast the challenger as the wrongdoer, with complex sanctions theories.

A former Gibson Dunn attorney associated this exact playbook with the firm's campaign on behalf of Chevron against Steven Donziger, whose breathtaking litigation over rainforest environmental misconduct gave way to an extraordinary private contempt prosecution. In that case, Gibson Dunn achieved what is virtually unprecedented in American history: the incarceration of an advocate by a private law firm -- after the U.S. Department of Justice notably declined to press charges. That maneuver that drew sharp criticism from the U.N. Working Group on Arbitrary Detention.

Plaintiffs invoke that history because Apple's sanctions effort reflects the identical inversion with identical corporate stakes. Here, the underlying harm is not the destruction of rainforests, but mass censorship and financial oppression like never seen before in history. The playbook remains the same: blame the victim, weaponize procedure, and make the challenger (not the $4 trillion monopolist) the subject of the case. According to our informant, it's truly anything goes to protect "the client," here the largest monopoly in history. Firm-wide presentations boasting of such unorthodox take-downs are hardly rare.

Plaintiffs and counsel have spent a year (or five, depending on how one counts) defending these tactics, fearing financial collapse, and facing an escalating toll on reputation and well-being. They implore

the courts to bring an end to this neverending oppression, which came about only because Plaintiffs were years ahead of any other meaningfully similar antitrust enforcement action.

For Apple, the progression of iPhone tying cases is an existential threat. Despite downplaying the original *CR I* litigation to the courts as being "in the hinterlands," Gibson Dunn simultaneously touted a Law360 "Competition Group of the Year" accolade, bragging to the press that it "got Apple off the hook" for a "$200 billion developer class action." Apple knows its tying arrangement is where its monopoly is most legally vulnerable. Therefore, when Plaintiffs filed the operative complaint, incorporating years of *Lawlor* new conduct (including *Epic* 'malicious compliance' and the EU DMA Core Technology Fee) alongside a new corporate plaintiff to create a generalized developer class, Apple knew it had to ensure the merits were never reached.

Apple faced one substantial problem in invoking Rule 11: Plaintiffs' pleading was virtually identical in substance to the government's antitrust case *United States v. Apple,* No. 2:24-cv-04055-JXN-LDW *(D.N.J. filed Mar. 21, 2024)*, and it was independently reviewed and signed by an objective former Assistant U.S. Attorney. Unable to cleanly defeat the filing under Rule 11's objective reasonableness standard, Gibson Dunn devised a sprawling, retaliatory hybrid sanctions motion—a de facto vexatious litigation suit in all but name—seeking to permanently enjoin Plaintiffs from ever suing Apple again and demanding a ruinous fee award. But that motion, and its improper attempt to sweep in years of valid appeals and *certiorari* petitions, largely failed. The Court did not grant the hybrid sanctions package.  But one would not know that from reading Apple's fee submission, which again treats the entire litigation history as "sanctionable conduct." Not only was such a fee application improper, it firmly evidences the underlying retaliation alleged in this very lawsuit.

The resulting July 30, 2025 Order produced an irreconcilable procedural anomaly. Plaintiffs were sanctioned for accurately characterizing Apple's motion as a disguised vexatious litigant claim (via an Anti-SLAPP invocation), while in the same Order, the Court paradoxically recognized that Apple was

seeking vexatious litigant relief and instructed Apple to "properly initiate the vexatious litigant process." Plaintiffs therefore preserve their position that the sanctions process itself is retaliatory, distorted, and deeply unjust. The first developers to bring a class action tying challenge against Apple now face a $735,193.20 judgment, not because their theory was tested and rejected, but because they advocated for the adjudication of a critically important theory that has now been adopted by other sophisticated litigants.

Nothing stated in this Opposition should be read as conceding that sanctions were proper in the first place. Plaintiffs' reliance on California's Section 425 statute, the *Lawlor* doctrine, and sister court validations was, at minimum, objectively reasonable. Any narrower objections raised below are asserted strictly in the alternative to mitigate an award that never should have been sought. Even if this Court declines to reconsider the underlying liability, Apple's $735,193.20 fee application is structurally and jurisdictionally defective. It violates the absolute immunity of represented parties under Rule 11(c)(5)(A); it illegally seeks to recover fees for *sua sponte* Court inquiries in violation of Rule 11(c)(4); and it relies on block billed, unapportioned general defense ledgers that include procedurally defective relief and cross-forum venue maneuvers. Apple's fee application must be denied in its entirety.

## I. THE FIRST AMENDED COMPLAINT WAS A SOPHISTICATED, DOJ PARALLEL ANTITRUST SYNTHESIS, NOT A REPACKAGED 2020 APP DISPUTE

Apple's entire fee narrative depends on a drastic reduction of the operative pleading. Its theory works only if the Court presumes that the First Amended Complaint was nothing more than *Coronavirus Reporter I* restyled under a new caption. The pleading itself refutes that reduction. The Wyoming First Amended Complaint was a 105-page Sherman Act class action, co-signed by a former AUSA, that synthesized intervening sovereign enforcement theories, newly emerging post-*Epic* conduct, broadened state law competition theories, new platform exaction claims, and Greenflight's independent developer fee injuries into a generalized developer case aimed at Apple's system of App Store control. Dkt. 30 at 1–3, 23–25, 38–46, 63–74, 79–105. That is not a photocopy. It is legal synthesis. And Rule 11 does not permit

Gibson Dunn to caricature legal synthesis as sanctionable repetition simply because Apple persuaded the Court to adopt an aggressive preclusion theory.

The structure of the FAC makes the point unmistakable. It did not plead one rejected app and ask the Court to relitigate a single 2020 event. It framed Apple's conduct as a platform-wide course of exclusion affecting multiple technologies and downstream markets. The complaint alleged monopolization and attempted monopolization of both the performance-smartphone and broader smartphone markets, a tying claim between iPhone devices and App Store / "notary stamp" access, a class recovery theory directed at Apple's annual $99 developer fee, new retaliatory and evasive conduct, and state law competition claims under the WCPA and California's Unfair Competition Law. Dkt. 30 at 82–104. Those are the components of a generalized antitrust architecture, not the components of a private replay.

The FAC also mirrored the kinds of platform restraints that had become central to the public antitrust conversation by 2024: control over app distribution, private API bottlenecks, "notary" or notarization control, downstream exclusion of cross-platform technologies, ranking manipulation, developer fees, and market-wide monopolization of performance smartphones and app-distribution services. Dkt. 30 at 63–74, 82–98, 103–04. Its request for relief expressly sought to stop Apple from using app distribution control and private APIs to undermine super apps, cloud streaming apps, COVID-19 apps, WebRTC apps, messaging, smartwatches, and digital wallets. Dkt. 30 at 103–04. A complaint built that way is, by design, a comprehensive structural challenge to Apple's platform in 2025, incorporating vast DOJ findings.

The most telling feature of the FAC is temporal. It expressly targeted post-2021 conduct and newly escalated exactions. The FAC challenged Apple's later "Core Technology Fee" practices, treated those practices as unlawful exactions affecting U.S.-based developers who distribute in Europe, and used California UCL and Wyoming consumer protection theories to capture unfair and deceptive aspects of Apple's platform conduct that traditional Sherman Act pleading may not fully reach. Dkt. 30 at 97–103. It

likewise framed Apple's *post-Epic* conduct as retaliatory and structurally relevant to the class wide theory of developer suppression. Dkt. 30 at 101–02.

That architecture matters because it was built to invoke the exact principle Apple wanted the Court to ignore: a prior judgment cannot automatically immunize a defendant against liability for later arising conduct. *Lawlor v. National Screen Service Corp.* holds precisely that. 349 U.S. 322, 328 (1955). And even aside from *Lawlor*, later manifestations of an ongoing tying or aftermarket control have long been recognized as capable of generating their own competitive injuries. See, e.g., *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993). Whatever one thinks of the ultimate success of those theories, they are not the work of a pleader mindlessly duplicating an old complaint. They are the work of counsel attempting to harmonize evolving law with evolving market conduct.

The FAC also introduced Greenflight's WebRTC and WebCaller allegations as part of a broader cross platform suppression theory advanced by the DOJ action. It alleged that Apple delayed support for WebRTC, suppressed WebCaller in App Store rankings, privileged competing applications and partners, and later used similar functionality in FaceTime after years of bottlenecking independent developers. Dkt. 30 at 38–46. Those allegations connected Greenflight's concrete injuries to a broader theory that Apple maintained smartphone power by impeding middleware and cross-platform technologies that reduced dependence on the iPhone ecosystem. Dkt. 30 at 38–46, 103–04. The FAC itself tied those allegations to Apple's larger "moat" strategy and to platform-wide suppression of rival technologies. Dkt. 30 at 46, 82–84, 96–98, 103–04.

That matters because Apple's fee demand rests on flattening all of this into "the same suit again." It was not. Greenflight's WebRTC / WebCaller allegations supplied a distinct technological and economic dimension to the generalized developer case, and they did so in a way that made increasing sense as public antitrust scrutiny of cross-platform restrictions matured. A pleading that connects proprietary bottlenecks, API control, ranking suppression, self-preferencing, and cross-platform impediments into one market

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

theory is not a photocopy; it is precisely the sort of cumulative antitrust synthesis that complex monopolization cases require. Dkt. 30 at 38–46, 82–84, 96–98.

The FAC also broadened its doctrinal reach through state law competition claims. It did not rely exclusively on Sherman Act counts. It separately pleaded violations of the Wyoming Consumer Protection Act and California's UCL, expressly alleging unfair, unlawful, oppressive, and deceptive conduct, including censorship, self-preferencing, API restrictions, extracted monopoly rents, and the use of App Store control to suppress independent developers and scientists. Dkt. 30 at 97–103.

Apple misled the Court by converting a class action necessity into supposed proof of bad faith. In a generalized class complaint, Rule 23 requires facts to establish commonality, typicality, adequacy, and superiority. That necessarily means alleging how the named representatives were actually injured by the challenged conduct. The FAC did exactly that. It proposed nationwide developer classes, alleged that Apple acted on grounds generally applicable to those classes, and asserted that class treatment would provide a single adjudication, economies of scale, and uniform decisions. Dkt. 30 at 79–83, 103–04.

Ninth Circuit law is clear that Rule 11 is not "intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir. 1986). That principle is decisive here. The FAC did not merely repeat old allegations; it harmonized a massive public record and a complicated sequence of intervening developments: DOJ-style market framing, post-*Epic* evasive conduct, later developer exactions, broadened state-law competition theories, generalized developer classes, and Greenflight's WebRTC / WebCaller injuries. The fact that Gibson Dunn chose to describe that synthesis as a "duplicate" does not make it one. It makes their sanctions theory convenient.

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

## II. APPLE'S FEE APPLICATION FUNCTIONALLY SEEKS TO PUNISH THE LAWSUIT ITSELF, VIOLATING NOERR-PENNINGTON

Apple's present fee application cannot be treated as a narrow request to remedy an isolated Rule 11 defect. From the outset, Apple's sanctions papers did not confine themselves to one paper, one citation, or one procedural lapse. Apple described this case as "harassing and frivolous," insisted it had been brought in bad faith "from its inception," sought fees for the "entirety of its defense in this case," and asked for a nationwide injunction forbidding the parties from suing Apple in any federal court. That is not the language of a movant seeking a modest Rule 11 correction for a discrete paper. It is the language of a litigant asking the Court to treat the existence and maintenance of the lawsuit itself as the wrong.

The July 30 order held the complaint "patently frivolous" on res judicata grounds, stated that "but for" the filing of the complaint and the later motions Apple would not have had to defend itself "in this litigation," and concluded that the fees incurred "in connection with this litigation" were the direct result of sanctionable conduct. The Court also separately recognized that Apple was effectively asking it to declare Plaintiffs and related persons vexatious litigants by seeking revocation of counsel's pro hac vice status and a pre-filing injunction. Whatever label Apple chose not to use, its fee theory operates as a reimbursement request to against the lawsuit itself. Once that is true, the First Amendment right to petition is no longer peripheral. It is central.

That constitutional principle is settled. Under the *Noerr-Pennington* doctrine, resort to courts is protected petitioning unless it falls within the narrow exception defined in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. ("PRE")*. 508 U.S. 49 (1993). *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). The Supreme Court held that petitioning loses protection only if it is objectively baseless—that is, if "no reasonable litigant could realistically expect success on the merits"— and only then may a court inquire whether the litigant was using governmental process itself, rather than

7
OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

the hoped for outcome, as a weapon. *Id*. at 60–61. The Court was equally explicit that an "objectively reasonable effort to litigate" cannot be stripped of protection "regardless of subjective intent." Id. at 57. The Constitution therefore does not allow a private litigant to recast a reasonably based lawsuit into a compensable injury merely because the defendant later won a motion to dismiss.

The Ninth Circuit has applied the same framework broadly. In *Sosa v. DIRECTV, Inc*., it held that *Noerr-Pennington* protects not only the filing of a lawsuit itself but also conduct "incidental to litigation," because effective petitioning requires breathing room beyond the four corners of a complaint. 437 F.3d 923, 932–33 (9th Cir. 2006). And the Supreme Court in *BE&K Construction Co. v. NLRB* reaffirmed that even unsuccessful but reasonably based suits occupy protected First Amendment ground. 536 U.S. 516, 531–37 (2002). These authorities matter here because Apple's fee application still attempts to sweep the complaint, the continuation of the action, and related petitioning conduct into one undifferentiated course of compensable abuse. The Constitution does not permit that shortcut.

Rule 11 does not change the analysis. Rule 11 is a procedural rule designed to deter sanctionable filings. Apple's theory is fundamentally broader. Apple seeks to use a contested preclusion ruling as retroactive proof that this lawsuit never should have existed, then to recover a premium general defense bill on that basis. PRE governs that move whether Apple says the word "sham" or not.

Apple cannot satisfy PRE. The First Amended Complaint was filed as a generalized developer class action, paralleled sovereign antitrust enforcement, and was signed by counsel that included a former Assistant United States Attorney. It asserted broad market-wide claims concerning App Store tying, platform restraints, developer exactions, and post-2021 conduct that no prior judgment had squarely extinguished. Apple's present effort to monetize the FAC is therefore miles away from the PRE standard. Apple is not confronting a lawsuit no reasonable litigant could have thought worth bringing. It is confronting a lawsuit it persuaded this Court to dismiss on an aggressive preclusion theory, and it now seeks to transform that dismissal into a punitive fee engine. PRE does not allow that. The Supreme Court

specifically warned against the "hindsight fallacy" of using loss on the merits to retroactively prove baselessness. 508 U.S. at 60 n.5. That warning fits this fee application exactly.

### III.    THE PRIVITY FINDING RESTED ON SUPERSEDED LAW

Apple's sanctions theory depends on a single move: treating Greenflight Venture Corporation, a corporation not named in *CR I*, as though it had already had its day in court merely because Dr. Isaacs had participated in earlier litigation. See Dkt. 102 at 3. That is not a routine application of settled preclusion law. It is an aggressive expansion of nonparty preclusion that conflicts with the Supreme Court's controlling decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008), which rejected the very sort of "virtual representation," "substantial identity," and loose 'common interest' shortcuts Apple needed in order to win dismissal.

A dismissal built on a contestable and structurally overbroad nonparty preclusion theory is not a proper foundation for a ruinous Rule 11 fee award. The Supreme Court held in *Taylor* that "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit," and therefore cannot be bound except in a "limited" set of established circumstances. 553 U.S. at 892–93. The Court expressly rejected "virtual representation" and insisted that nonparty preclusion cannot be expanded through vague notions of alignment, closeness, or overlapping interests. Id. at 901–05.

That is precisely what happened here. The July 30 order stated that Greenflight was in privity because it was Dr. Isaacs' "solely owned entity," and cited a "substantial identity" formulation. Dkt. 102 at 3. But sole ownership is not itself a *Taylor* category. "Substantial identity" is not itself a Taylor category. A district court cannot substitute those looser formulations for the Supreme Court's narrow exceptions and then treat resistance to that shortcut as sanctionable. Because Taylor rejects broad identity-based shortcuts, Apple could bind Greenflight only by proving that it fell within one of the recognized nonparty preclusion exceptions. Apple never made that showing.

9

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

First, Greenflight never agreed to be bound by the 2021 judgment, and Apple identified no special statutory scheme, such as bankruptcy or probate, that independently foreclosed it from litigating its own claims. *Taylor*, 553 U.S. at 893–95. Second, ordinary stock ownership is not the kind of "substantive legal relationship" that automatically transfers future antitrust claims between shareholder and corporation. Id. at 894. That category addresses relationships such as preceding and succeeding owners of property, not the mere fact that a shareholder owns stock. Third, Greenflight was not adequately represented in CR I within the meaning of *Taylor*. It was not a named party, not an absent class member in a certified class action, and not the beneficiary of any trusteeship, guardianship, or other formal representative action. Id. at 894–95. The record shows only that Dr. Isaacs was a named plaintiff in CR I. Dkt. 102 at 3 n.1. That is not enough to extinguish a distinct corporation's later claims. Fourth, Apple never proved true "assumed control." To satisfy that exception, the nonparty itself must have exercised effective choice over "the legal theories and proofs to be advanced" in the prior case. *Taylor*, 553 U.S. at 895. The order did not find that Greenflight, as a corporation, directed *CR I*; it found only that it was Isaacs's solely owned entity. Dkt. 102 at 3. That is not the same thing. The Supreme Court rejected the idea that overlap of interests, resources, or loyalties is enough. Fifth, Apple's proxy theory is unstable for an additional reason: it collides with the shareholder standing rule. A shareholder (even a sole shareholder) generally may not sue in his own name for injuries to the corporation. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). Because corporate claims belong to the corporation, Apple cannot casually assume that Dr. Isaacs' personal participation in CR I automatically represented and adjudicated Greenflight's distinct corporate injuries.

Apple's position is made weaker, not stronger, by its own prior litigation stance. Earlier, Apple insisted that Dr. Isaacs could not represent a corporation *pro se*. That earlier position matters. If Isaacs could not lawfully represent a corporate entity in the prior litigation, then Apple cannot later turn around and say that his personal participation automatically bound Greenflight as though he had been acting as its authorized corporate representative all along.

Apple's privity theory also ignored the objective federal record confirming corporate reality. As Plaintiffs' supplemental notice explained, Greenflight has been litigating for a decade across multiple federal proceedings as a distinct corporate actor, including intellectual property disputes, appellate antitrust litigation, and recent mass-tort privacy litigation. See Plaintiffs' Notice of Supplemental Authority (Dkt. 110). Rule 11 does not punish counsel for according a corporation the same separateness that other federal courts, sophisticated adversaries, and appellate counsel have already accorded it.

The final weakness in Apple's position is temporal. Even if Greenflight had some meaningful relationship to the earlier plaintiffs, that still would not automatically extinguish later injuries. In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 328 (1955), the Supreme Court held that an earlier judgment cannot bar claims based on conduct occurring after that judgment, even where the new conduct is part of a continuing monopolistic scheme.

## IV.    RULE 11(C)(5)(A) BARS MONETARY SANCTIONS AGAINST THE REPRESENTED CORPORATE PLAINTIFFS FOR LEGAL CONTENTIONS

Apple's $735,193.20 fee application rises or falls on a basic category defect. Apple's fee submission seeks one blended lodestar as though every dollar of its defense bill were equally chargeable to every Plaintiff. That is not a mere arithmetic oversight. It is a direct violation of Rule 11's text.

Rule 11(c)(6) provides that "[a]n order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6). Rule 11(c)(4) in turn permits only "the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). And it adds an absolute limit that controls this application: "The court must not impose a monetary sanction . . . against a represented party for violating Rule 11(b)(2)." Fed. R. Civ. P. 11(c)(5)(A). Those provisions require precise allocation. Apple has not done it. Instead, it has submitted a monolithic general-defense ledger and asked the Court to sort it out in its favor. The Rule does not permit that shortcut.

11

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

The order itself divided the conduct into separate buckets. First, the Court held that the complaint was "patently frivolous" because barred by res judicata. Dkt. 102 at 6–7. That is a classic Rule 11(b)(2) legal contention ruling. Second, the Court addressed the "Petition to Demand Tim Cook's Resignation." Third, the Court addressed hallucinated cases and quotations in later filings. Those are Rule 11(b)(2) legal contention findings.

The significance of that breakdown is decisive. Apple cannot treat all three buckets as though they were interchangeable. The complaint/res judicata bucket and the hallucinated-authority bucket are legal-contention buckets. The only bucket that even arguably sounds outside Rule 11(b)(2) is the Tim Cook Petition inquiry discussion. And even there, the Court's analysis was expressly directed at counsel's conduct: "Plaintiffs' counsel violated Rule 11" and "Mr. Mathews' violations warrant sanctions under Rule 11." Dkt. 102 at 9. Apple's fee application obliterates these distinctions because those distinctions are fatal to the broad client level award Apple seeks.

Rule 11(c)(5)(A) governs sanctions allocation: "The court must not impose a monetary sanction against a represented party for violating Rule 11(b)(2)." Coronavirus Reporter Corporation, CALID Inc., and Greenflight Venture Corporation were represented corporate parties.

For purposes of fee allocation only, the only bucket that even arguably falls outside Rule 11(b)(2) is the Tim Cook Petition inquiry issue. At minimum, Apple was required to isolate the incremental fees directly resulting from counsel's preparation and filing of that petition. Rule 11(c)(4) allows only the "reasonable attorney's fees and other expenses directly resulting from the violation." The Supreme Court has enforced the same causation principle in sanctions law more generally, holding that a fee award may reach only those expenses that would not have been incurred but for the sanctionable conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–09 (2017). Apple has not done that work. It has instead submitted a unitary defense ledger and asked the Court to infer the answer in Apple's favor.

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

Apple's submission therefore suffers from a structural defect; a unitary $735,193.20 demand that ignores the aforementioned limits is simply not a request for a permissible Rule 11 fee award.

If the Court does not deny the fee request outright on this ground, the Rule nonetheless dictates the narrowest possible monetary consequence. Apple's blended fee application should be denied. In the alternative, the Court should hold that the represented corporate Plaintiffs are immune from any monetary sanction arising from the Rule 11(b)(2) buckets, require Apple to segregate with precision any counsel-only non-(b)(2) amount it claims survives, and disallow all uncertainty against Apple as the party that chose to submit a monolithic defense ledger rather than the apportionment the Rule requires.

## V.    APPLE'S FEE APPLICATION MUST BE DENIED FOR ILLEGALLY COMMINGLING FORBIDDEN SUA SPONTE FEES

Apple's Phase II fee request attempts to convert the Court's own Rule 11(c)(3) sua sponte show cause proceeding into a private reimbursement stream for Gibson Dunn. The Federal Rules strictly forbid this. Rule 11 draws an impenetrable boundary between sanctions imposed on a party's motion and sanctions initiated by the Court itself. The 1993 Advisory Committee Notes are absolute: "The court may not award attorney's fees to a party on its own initiative." The Ninth Circuit strictly enforces this prohibition, holding that when a court issues a sua sponte Order to Show Cause, it may only impose penalties payable to the court, not fee-shifting to the adversary. See *Barber v. Miller*, 146 F.3d 707, 711 (9th Cir. 1998).

Despite this clear prohibition, Apple knowingly billed Plaintiffs for Gibson Dunn's time spent inserting itself into the Court's sua sponte inquiry. Defendant's Exhibit A reveals that between July 15, 2025, and July 17, 2025, Gibson Dunn billed $21,506 to analyze plaintiffs' response to show-cause order, draft outline of responsive filing, and "heavy edit on brief re order to show cause."

This is not a mere accounting oversight; it demonstrates an overreaching intent that infects the entire fee application. Gibson Dunn is an elite national law firm well-versed in the Federal Rules. Counsel knows, or should know, that Rule 11 explicitly forbids shifting fees to the adversary for a court-initiated OSC

proceeding. By attempting to slip tens or hundreds of thousands of dollars of legally impermissible fees into its lodestar calculation, Apple is demonstrating unclean hands. A party seeking the equitable enforcement of a sanctions award cannot deliberately inflate its demand with statutorily forbidden fees. This overreach proves the application is designed for harassment rather than compensation, justifying the denial of the fee request in its entirety.

Because Apple chose to submit a monolithic ledger that inextricably commingles legitimate Phase II defense costs with legally forbidden OSC billing, the burden of uncertainty falls entirely on Apple. *Fox v. Vice*, 563 U.S. 826, 836–37 (2011). The Court should not be forced to sift through Apple's block-billed entries to untangle the allowable from the forbidden. Apple's deliberate inclusion of unauthorized fees warrants the denial of the Phase II request in its entirety.

Accordingly, the Court should strike from Apple's request all fees attributable to the Rule 11(c)(3) branch. Awarding Apple hundreds of thousands of dollars for opposing an Anti-SLAPP motion turns public policy on its head. The express legislative purpose of California Code of Civil Procedure § 425.16 is to protect litigants with limited resources from being buried by well-funded opponents through exhausting litigation tactics. Allowing a $4 trillion corporation to weaponize Rule 11 by demanding $335,000 simply because Plaintiffs invoked a protective anti-retaliation statute creates a horrific chilling effect.

## VI.    EXHIBIT A IS DEFECTIVE UNDER RULE 11

Even if Apple could overcome the threshold defects identified above, the present fee submission still fails for a more basic reason: it is not a sanctions ledger. It is a general defense ledger from a premium national firm that litigated this matter in a broad and expensive manner possible and now seeks to shift ordinary defense costs onto the parties it defeated. Rule 11 does not permit that. The Rule authorizes, at most, "the reasonable attorney's fees and other expenses directly resulting from the violation." The Supreme Court has enforced the same causation principle repeatedly: the court may shift only those fees that would not have been incurred but for the sanctionable conduct. *Goodyear Tire & Rubber Co. v.*

*Haeger*, 581 U.S. 101, 108–09 (2017). Hours spent on unsuccessful claims, unrelated legal theories, optional strategic maneuvers, and ordinary case administration must be excluded.

Exhibit A does not come close to satisfying that standard. It begins with work on the Wyoming complaint in March 2024, immediately moves into transfer strategy, then broadens into scheduling motions, relation motions, motion-to-dismiss merits work, sanctions drafting, default opposition, and reply briefing. Dkt. 107-4, Ex. A at 2–9. It is a litigation ledger, not a narrow Rule 11 damages computation.

**Time Spent Pursuing the Broad Sanctions Package Apple Lost Must Be Excluded**

Apple's original sanctions motion did not simply ask for a limited Rule 11 fee award. It invoked Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority; sought "the entirety" of Apple's defense fees in this case; requested revocation of counsel's pro hac vice admission; and sought a nationwide pre-filing injunction. Dkt. 70 at 31–34. Judge Chen did not grant that package.

That ruling has immediate fee consequences. Apple cannot recover as though it prevailed on the full hybrid sanctions motion when it did not. Time spent researching, drafting, and supporting the denied vexatious-litigant / pre-filing / pro hac vice branches is noncompensable. *Hensley*, 461 U.S. at 440 (hours spent on unsuccessful claims must be excluded). The same is true of time spent building the sprawling five year litigation narrative deployed to support those denied remedies. Apple chose to transform a Rule 11 motion into a quasi-vexatious-litigant record. It may not now force Plaintiffs to underwrite that failed strategic expansion.

**Transfer and Forum Selection Work Are Ordinary Defense Costs**

Apple's own time records show heavy transfer work beginning at the inception of the case. Apple is entitled to litigate venue as it wishes. What it is not entitled to do is call every dollar of that elected forum strategy a Rule 11 loss. Transfer work is a classic example of ordinary defense expenditure. It is not compensable merely because Apple later persuaded the Court that the complaint was barred by res judicata. Rule 11(c)(4) still requires direct causation. *Goodyear*, 581 U.S. at 108–09. And Apple's transfer strategy

15

OBJECTION TO FEE APPLICATION

CASE NO. 3:24-CV-8660-EMC

was not the inevitable or minimally necessary response to the sanctionable conduct as the Court ultimately described it. Apple could have moved to dismiss on preclusion grounds in the transferor court; instead it chose first to litigate for its preferred forum, then to litigate transfer-related supplementation and scheduling. Those are ordinary strategic costs of defense. They are not properly shifted wholesale as "sanction damages."

The same overreach infects the Rule 12(b)(6) work. Exhibit A contains extensive entries for antitrust injury, relevant market, antitrust standing, state-law, and Rule 12(d) briefing. For example, in December 2024 and January 2025, Apple billed repeatedly for drafting and revising the "res judicata section," the "antitrust injury section," the "relevant markets section," and "antitrust standing" portions of the motion to dismiss. Dkt. 107-4, Ex. A at 5–7. The chart then continues through February, March, and April 2025 with heavy edits to the motion to dismiss and its reply, including state-law sections, supporting exhibits, and additional client-driven revisions. Id. at 7–9.

That is ordinary merits defense work. Apple cannot convert the entire MTD record into sanction damages. The Court did not sanction Plaintiffs for forcing Apple to brief relevant market doctrine, antitrust injury, state law issues, or every alternative merits defense Apple elected to develop. Those are the ordinary burdens of litigation. *Fox*, 563 U.S. at 836–37, teaches that where only one among several issues is fee-generating, the defendant may recover only for work that would not have been performed but for that particular issue. Apple's ledger makes no such distinction. It simply aggregates all merits work into the ask.

**Time Spent Litigating Collateral Cross-Motions Fails the "Direct Result" Standard**

A major portion of Apple's Phase II demand (totaling $335,193.20) is dedicated to Gibson Dunn's time spent defending against Plaintiffs' Anti-SLAPP motion and Plaintiffs' affirmative Motion for Sanctions (e.g., Dkt. 107-4, Ex. A at 10–12). Rule 11(c)(4) strictly limits recovery to fees "directly resulting from the violation."

The Supreme Court has mandated strict causal standards for fee-shifting, preventing courts from treating a sanctions order as a blank check for all subsequent docket activity. *Goodyear Tire*, 581 U.S. at 108–09. Even if the Court maintains that the First Amended Complaint contained Rule 11(b)(2) defects, Plaintiffs' subsequent, affirmative motions challenging Apple's litigation tactics constitute satellite issues. Apple's decision to aggressively litigate against a cross-sanctions motion and an Anti-SLAPP challenge is not a "direct result" of Plaintiffs pleading res judicata defenses in the FAC. It is the result of the parties engaging in subsequent, highly contested procedural disputes.

By burying tens of thousands of dollars of collateral cross-motion defense work into a monolithic Phase II bucket, Apple is attempting to force Plaintiffs to underwrite the entirety of the post-dismissal docket. Because Apple has failed to segregate the fees that "directly resulted" from the FAC from the fees incurred fighting collateral cross-motions, the Phase II calculation is structurally defective and must be denied.

## VII.  RULE 11 PERMITS ONLY A NOMINAL DETERRENT AWARD, AND ANY LARGER AMOUNT REQUIRES A TARGETED EVIDENTIARY HEARING

Rule 11 is not a roving fee shifting statute designed to make a prevailing defendant whole; it is a narrow disciplinary rule whose purpose is deterrence, not private enrichment. See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Apple's request for $735,193.20 is not tailored to deterrence. It is an eradication demand. Its deterrent function has already been fully achieved; the sanctions campaign has "thoroughly and permanently deterred" from taking on a challenge of this magnitude in the future, and that the public reprimand in the Court's July 30 Order, combined with the year-long threat of financial annihilation, has already achieved the "ultimate deterrent purpose of Rule 11." Declaration of Keith A. Mathews. He further states that he would not file another action against Apple if the appeals in this matter do not succeed. Id.

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

A court abuses its discretion when it imposes a sanction more severe than reasonably necessary to accomplish deterrence. See *In re Yagman*, 796 F.2d 1165, 1184–85 (9th Cir. 1986) (sanctions should be no more severe than reasonably necessary to deter misconduct).

The Ninth Circuit requires courts to consider ability to pay in setting Rule 11 sanctions. *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994). Mathews has declared that he operates as a solo practitioner without the institutional backing or financial cushion of a large firm; that Apple's requested $735,193.20 is entirely beyond his capacity to pay; that an award of that magnitude would force him into "immediate personal and professional bankruptcy"; and that even a sanction in the range of $5,000 to $10,000 would be a significant financial blow and would exert the maximum reasonable deterrent effect.

The same declaration explains that the corporate Plaintiffs are in no better position. CRC has never generated revenue and is functionally insolvent. Greenflight has not generated meaningful profit in years and is near insolvency. Mathews further states that a joint-and-several sanction of ¾ million dollars would not "serve a corrective purpose"; it would force the liquidation and bankruptcy of all three corporate Plaintiffs. Id. That evidence is unrebutted. A sanction that would destroy counsel and bankrupt the client entities is not calibrated to deterrence. It is, by definition, excessive. See *Warren*, 29 F.3d at 1390; *In re Yagman*, 796 F.2d at 1184–85.

If the Court is inclined to impose a material monetary sanction beyond a nominal deterrent amount, then the disputed factual predicates become too significant to resolve on Apple's papers alone. At that point, a targeted hearing is the prudent and fair course. Plaintiffs should be permitted to develop the scope and nature of the AUSA pre-filing review, evidence on ability to pay, and most importantly, their intellectual curiosity and good intentions in studying and petitioning the Sherman Act for five years- an area of law previously unknown to their representatives and counsel. See *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) (sanctions should not be assessed without fair procedures); *Lasar v. Ford Motor*

*Co.*, 399 F.3d 1101, 1110–12 (9th Cir. 2005) (recognizing the need for procedural fairness where sanctions turn on disputed factual issues).

Also conspicuously absent from the accompanying Declaration of Julian Kleinbrodt is any sworn attestation that Apple Inc. actually paid, or is contractually obligated to pay, these specific 'sticker price' amounts for this isolated litigation. This omission is legally fatal, and it requires the Court to compel full disclosure of Apple's actual billing arrangements before assessing any award. Rule 11 does not permit a prevailing party to use a sanctions order as a profit center or a revenue-generating vehicle. In complex litigation, the submission of a "lodestar" chart detailing standard hourly rates is routinely sticker price fiction. Sophisticated corporate clients like Apple, when retaining Big Law firms for 'bet the company litigation,' rarely pay the standard hourly rates listed on a fee application. Instead, they operate under Alternative Fee Arrangements (AFAs), flat portfolio retainers, blended rates, or massive volume discounts.

The necessity for billing transparency is highly magnified in this case due to the sprawling, interconnected nature of Apple's antitrust defense. As demonstrated by Gibson Dunn's historical handling of decade long, multi-jurisdictional defense campaigns—such as its notorious representation of Chevron, where the corporate client's overarching legal and investigative spend reportedly exceeded a billion dollars—the firm is accustomed to operating under massive, portfolio-wide defense budgets. Gibson Dunn currently represents Apple across an entire overlapping portfolio of App Store antitrust cases, including actions involving the DOJ, *Epic Games*, *Proton AG*, and *PhantomAlert*, and frequently cross-cites these cases and others. The legal strategies, procedural defenses, and historical research compiled by Gibson Dunn regarding the App Store and the Epic fallout are inherently reusable across this portfolio. Apple cannot legally bill Plaintiffs for 40 hours of research on a motion to transfer venue or a res judicata defense if that same research was utilized, adapted, or simultaneously billed to the *Epic*, *Proton*, or *DOJ* dockets.

Because the burden of proof rests entirely on the fee applicant, Apple must prove what it actually suffered in out-of-pocket loss. Plaintiffs possess a reasonable basis to suspect that the hours logged in

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC

Gibson Dunn's Exhibit A are subject to a broader, discounted AFA or global defense retainer, and that the billed work product has cross-pollinated with other active dockets. Therefore, before the Court can accurately assess the fees "incurred" under Rule 11 and Goodyear, Apple must be ordered to produce the operative retainer, engagement letter, or billing agreement between Apple Inc. and Gibson Dunn governing this specific matter, invoices or ledgers proving that Apple actually paid the exact, unadjusted dollar amounts claimed in Exhibit A; and a sworn attestation from a Gibson Dunn billing partner that no time entries were utilized for, billed to, or cross-subsidized by any other parallel App Store antitrust proceeding. Absent this mandatory transparency, the Court must deny the fee application in its entirety.

## VIII. THE COURT'S SUA SPONTE TREATMENT OF THE TIM COOK PETITION PUNISHED PURE PETITIONING AND POLITICAL OPINION—NOT LITIGATION FRAUD, NOT EVIDENTIARY MISCONDUCT, AND NOT A RULE 11 WRONG

The Court converted a public petition about Apple's monopoly and Tim Cook into a "ChatGPT sanction." Gibson Dunn followed with a $330,000 augmentation to their fees request. This is a core wrong and an alarming assault on civil liberties. Counsel published a public petition summarizing five years of Plaintiffs' observations about Apple's conduct, Tim Cook's leadership, the Epic contempt record, its China controversies, and even environmental concerns. The petition asked for exactly what Americans are supposed to be free to ask for: a public hearing and public scrutiny of one of the most powerful corporations on earth. Dkt. 85-1 at 1–5, 13–19. That is petitioning in the most traditional American sense.

What happened next is the real scandal. Instead of asking the relevant questions—Was the petition materially false? Did it deceive the Court? Did it impose any concrete litigation harm?—the Court reduced the entire episode to a sensational story about "ChatGPT," "fifteen minutes," and an "experiment." Dkt. 102 at 7–9; Dkt. 97-1 at 9–10. That framing camouflages the truth. This was not a sanction for a false filing. It was, in substance, punishment for publishing an opinionated public interest petition and calling for Tim Cook to answer in public. In other words, the Court took a plea for public process and repackaged it as a

"ChatGPT problem." That is not a minor doctrinal mistake. It is a profound misunderstanding of what the Petition Clause protects and what Noerr-Pennington forbids. Fees should not be awarded.

Apple encouraged this distortion by mocking the petition as a "manifesto." Dkt. 97-1 at 9. But the Court ultimately made the constitutional error by treating the existence of an LLM-assisted petition as sanctionable while never identifying a single material falsehood in the petition itself. Dkt. 102 at 7–9.

The First Amendment protects sharp public criticism of powerful actors on matters of enormous public concern. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Tim Cook is not a private bystander. He is the chief executive of one of the most powerful corporations in the world, the central executive figure in an active national antitrust controversy, and the public face of Apple's response to the *Epic* contempt findings. A petition arguing that he should resign because of governance failures is core opinion speech, not litigation fraud.

The Court also misconstrued the significance of the "fifteen minutes" remark. Counsel's declaration described the final generation and final review of the petition, not the entirety of his knowledge of its subject matter, or even the entirety of the ChatGPT conversation which lead to the final "fifteen minute" prompt. Dkt. 97-1 at 9–10. Courts do not police the private drafting history of opinion pieces, public letters, or petitions to see how many intermediate prompts were used before the final public product emerged. The product is judged by what it says and whether it materially misleads. Here, the product was a public petition on public facts and public controversies.

In short, what happened would alarm any civil rights advocate, and therefore sanctions for $330,000 cannot be awarded. A lawyer created a public petition explaining why a major monopoly case deserved a hearing, and a federal court—acting sua sponte—turned that act of petitioning into part of a sanctions case, not by identifying material falsity, but by seizing on the fact that ChatGPT helped produce the draft. That is not a mere Rule 11 mismatch. It is a fundamental error about what petitioning means in a democracy.

## IX.    APPLE'S SANCTIONS CAMPAIGN IS RETALIATORY

Apple's fee application should also be viewed for the retaliation it would achieve. It built a five-year narrative of supposed serial abuse, asked for a broad monetary sanction, sought revocation of counsel's pro hac vice admission, and demanded a nationwide injunction designed to bar future litigation against Apple. Dkt. 70 at 1-2, 22-25. Judge Chen rejected the vexatious litigant / injunctive branch and held that such relief would require a separate proceeding with proper notice and hearing. Dkt. 102 at 10-12. Apple's present $735,193.20 fee request is therefore best understood as an effort to accomplish indirectly (through financial ruin) what the Court would not grant directly by injunction.

The structure of Apple's sanctions campaign is revealing. Apple did not confine itself to the specific papers ultimately identified in by the Order. Instead, it catalogued multiple prior lawsuits, challenged the legitimacy of the action from inception, and sought prospective restraints on future access to the courts. Dkt. 70 at 10-13, 22-25. That is the language of suppression, not calibration. It is one thing to ask a court to sanction a particular defective filing. It is another to build a record designed to label an entire litigating campaign abusive and then to ask for a revocation of *pro hac vice* and a crushing fee award. The latter does not merely punish past conduct; it seeks to deter future petitioning by making the price of challenging Apple existential.

This retaliatory use of sanctions is especially troubling in antitrust. Congress did not leave the enforcement of the Sherman Act to the United States alone. It expressly authorized private damages actions and private injunctive suits. See 15 U.S.C. §§ 15, 26. The Supreme Court has repeatedly recognized that private antitrust plaintiffs serve a public enforcement function. See, e.g., *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262 (1972). The practical message of Apple's request is impossible to miss. Plaintiffs have already been dismissed, publicly reprimanded, and dragged through a year-long sanctions process. Counsel has sworn that the experience has fully and permanently deterred him from bringing a challenge of this magnitude again. Yet Apple still asks for $735,193.20. That number does not

communicate disciplined deterrence. It communicates destruction. And because Apple knowingly and improperly targeted the corporate plaintiffs for legal contentions, the message extends beyond one attorney: small developers who challenge Apple's platform architecture do so at risk of corporate insolvency.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Apple's fee application in its entirety or, in the alternative, reduce any award to a strictly nominal deterrent sanction. Apple's demand can succeed only if the Court accepts an extraordinary chain of implausible and punitive propositions: that counsel was forbidden to believe Greenflight Venture Corporation was a genuine, independent corporate plaintiff despite its decade long litigation history with and against AmLaw 100 firms across multiple federal circuits; that counsel had no right to take seriously Gibson Dunn's own prior "non-entity" position regarding *Coronavirus Reporter I*, a position that former co-counsel and former Assistant United States Attorney likewise understood to present a serious and colorable preclusion issue; that counsel's synthesis of public antitrust records later echoed by institutional shareholders and other sophisticated litigants, and the DOJ, was "harassment"; and that Plaintiffs' never adjudicated tying theory—advanced five years later in other developer actions, including *PhantomAlert* and *Proton*—was so irrational that it warrants financial hardship. That is not a credible view of this record. It is a punitive fiction. Even if this Court ultimately disagreed with Plaintiffs on particular doctrinal issues, including *Lawlor*, *Dual-Deck*, nonparty preclusion, or the scope of later-arising claims, losing a complex legal argument is not the same thing as filing a sham. Rule 11 is not a weapon for crushing small plaintiffs and solo counsel because they pressed a common sense Sherman Act theory before the market, the press, institutional shareholders, and later litigants caught up. The Court should not contort Rule 11 into a mechanism for silencing protected antitrust petitioning and rewarding Apple for turning a contested dismissal into a campaign of financial distress. Apple's fee application is structurally defective, legally overbroad, and fundamentally unjust. It should be denied.

Submitted on this 14th day of April, 2026.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing Objection was delivered electronically to all interested parties. Executed on this 14th day of April, 2026.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

OBJECTION TO FEE APPLICATION
CASE NO. 3:24-CV-8660-EMC