Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**DECLARATION OF KEITH A. MATHEWS IN SUPPORT OF FEE APPLICATION OBJECTION** |

**DECLARATION OF KEITH MATHEWS IN SUPPORT OF OBJECTION TO ATTORNEYS' FEES**

I, Keith Mathews, declare as follows:

1. I am an attorney at law admitted to practice before this Court, and I am counsel of record for the Plaintiffs in this action. I submit this declaration in support of Plaintiffs' Objections to Defendant Apple Inc.'s court ordered submission of attorneys' fees. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2. I submit this declaration with a profound sense of disheartened reflection. Five years ago, at the onset of the COVID-19 lockdowns, my clients and I observed conduct from Apple that felt fundamentally authoritarian and anti-democratic. We witnessed a systemic shift in how structural power was being wielded against independent scientists, and we felt an overwhelming civic and professional obligation to voice our concerns.

3. As history and recent federal interventions have begun to show, we were onto something real. The unprecedented, unchecked power that Big Tech has consolidated since the 2020 lockdowns, and continues to expand into the era of artificial intelligence, represents a structural challenge our nation has never faced.

4. I am, by trade, a legal generalist. Taking on an adversary of this magnitude and immersing myself in the outer limits of the Sherman Act was far outside my normal realm of practice. However, fueled by a genuine idealism, I believed we had assembled the right team to advocate for the greater good and effectuate positive change for developers and all smartphone users.

5. Tragically, that idealism has been entirely fractured by this process. What began as a good faith effort to petition for antitrust scrutiny has devolved into what my clients and I perceive as a coordinated campaign of scapegoating, victim blaming, and improper intimidation. Facing the limitless resources of Apple and the constant, overwhelming specter of Gibson Dunn's influence, the stress placed upon my small firm has been indescribable. If any solo practitioner were put into our shoes, armed with such limited resources against the most highly capitalized corporate defense apparatus in the world, I believe the psychological and professional distress would be equally evident.

6. It is exceptionally difficult to maintain a mindset of positive change when a Defendant successfully convinces a court to view genuine advocacy as sanctionable misconduct. While I respectfully maintain my profound disappointment in how this process has concluded, I must be unequivocally clear with this Court: the sheer asymmetry and intimidation of this experience have completely dismantled my capacity and desire to take on new litigation in this arena again. I am thoroughly and permanently deterred from taking on a challenge of this magnitude in the future, should this sanction be finalized. The toll it has taken on my firm, my clients, and my personal wellbeing is significant.

7. I hope this written declaration conveys the reality of our situation to the Court. However, my team and I stand ready and willing to testify in person at an evidentiary hearing, should the Court wish to evaluate our good intents, our deeply held convictions regarding Big Tech's misguided influence, and the genuine devastation this process has wrought. We are simply a team of good people who felt it necessary to speak up. I cannot predict the future of technology, but it is my hunch that history will ultimately show our concerns were valid, and our efforts to voice them were admirable.

8. I operate as a solo practitioner. Unlike the attorneys representing the Defendant in this matter, I do not have the backing, infrastructure, or financial safety net of a global law firm. Certainly it is unusual, if not remarkable, that a solo practitioner's efforts have resulted in significant case law, legal journal coverage, and even Apple's own frequent citations to CR I in related litigation. My practice is fundamentally sustained by managing limited resources to support individual and small business clients.

9. I have reviewed Defendant's fee ledger requesting an award of $735,193.20. An award of this magnitude, or even a fractional percentage of it, is entirely beyond my capacity to pay. Such an award would not act as a "deterrent"; it would be a hardship inducing economic sentence that would force me into immediate personal and professional bankruptcy.

10. To contextualize the profound disproportionality of this demand, the $735,193.20 sought by Apple vastly exceeds the total balance of the mortgage on my personal home.

11. As a solo practitioner, managing my firm's overhead and ensuring my monthly mortgage payments are met requires constant, diligent effort. It is difficult but rewarding work. Because my financial margins are extremely tight, a monetary sanction of even $5,000 to $10,000 would represent a devastating financial blow. Finding the liquidity to pay a greater penalty would directly impact my ability to sustain my practice and meet my basic living expenses. Consequently, a nominal fine in that range would exert the maximum possible reasonable deterrent effect upon me. Anything beyond that ceases to be a deterrent and becomes a source of meaningful hardship.

12. As counsel of record, and in-house counsel, I am closely familiar with the operational and financial realities of the corporate Plaintiffs in this matter (Coronavirus Reporter Corporation, Greenflight Venture Corporation, and Calid, Inc.). Like my own solo practice, none of these entities possess the revenue streams necessary to satisfy Apple's $735,193.20 fee demand, nor even a fractional percentage of it.

13. Coronavirus Reporter Corporation (CRC): CRC has never generated revenue. The entity has been functionally insolvent since its singular software application was rejected by Apple approximately four years ago. It holds no liquid assets, no operating budget, and no financial capacity to pay a monetary sanction.

14. Greenflight Venture Corporation: Greenflight has not generated meaningful profit in over three years. The company suffered a catastrophic loss of revenue following the termination of its primary application, "OkCaller"—an event that is currently the subject of parallel antitrust litigation on appeal before the Eleventh Circuit Court of Appeals (arising from the Southern District of Florida). Greenflight is near insolvency.

15. Calid, Inc.: Calid currently holds no meaningful assets and has not generated significant revenue for years. It exists strictly as a corporate vehicle for contracts with Apple.

16. Imposing a joint and several sanction of ¾ of a million dollars against these specific entities would not serve a corrective purpose; it would simply force the immediate liquidation and bankruptcy of all three corporations.

17. The past year of defending against this sanctions campaign has inflicted immense, debilitating distress upon me. The Court's July 30, 2025 Order dismissing the action and formally reprimanding my conduct regarding the drafting procedures utilized in the post-dismissal briefing has been received

with the utmost seriousness. The public nature of that reprimand, combined with the year-long duress of facing financial eradication, has already achieved the ultimate deterrent purpose of Rule 11. I would not file another action against Apple, should our appeals in this case not succeed. I am fully deterred under the standard imposed under Rule 11 and there is no risk of a subsequent repeat of this highly atypical, complex case, which I believe I did my best to prosecute admirably given our minimal resources. The *Epic* litigation was reported to have amassed around $300 million in lawyer fees. We litigated the same timeframe at one-one thousandth the Big Law fees. The imposition of any further financial judgment, especially one untethered to my objective ability to pay, would serve only to financially ruin a solo practitioner, rather than to correct the specific procedural errors identified by this Court.

18. My firm invested substantial time and effort to identify the most qualified Wyoming co-counsel we could obtain before filing the operative complaint in that jurisdiction. I authorized overtime compensation to a paralegal who spent the greater portion of a month assisting with outreach and preliminary interviews of potential pro hac vice and local counsel candidates. This was not a superficial exercise. Because I understood that Apple and Gibson Dunn would aggressively litigate issues of corporate identity and new *Lawlor* conduct antitrust pleading, I believed it was essential to locate counsel with the highest level of credibility and relevant experience available to us within our practical means.

19. When my client representatives and I first met with former Assistant United States Attorney Theriault, we provided her with a detailed background of the case, including the history of the *Coronavirus Reporter I* litigation, and, most importantly, the unusual corporate identity issue first identified by Rachel Brass' position that "Coronavirus Reporter" in the earlier litigation was a null entity. We specifically discussed our understanding that, if Apple itself had taken the position that the earlier plaintiff was not the actual Wyoming corporation, then refiling with the correctly named corporate plaintiff Coronavirus Reporter Corporation ("CRC") was a valid and colorable legal response. Former AUSA Theriault agreed that both the adjudicated, and never-adjudicated CR claims could be properly proceed with the correct entity (CRC) as named Plaintiff.

20. Ms. Theriault contributed substantive legal judgment of her own ideas and beliefs. In particular, she was passionate that Wyoming consumer protection theories should be added to address continuing and unremedied misconduct by Apple and other dominant technology platforms, including harms that did not fit neatly within traditional federal antitrust damage theories. It was her view that the Wyoming Consumer Protection Act provided an additional and appropriate vehicle for challenging persistent unfair conduct. Her input was therefore meaningful in at least two separate respects: first, as an experienced second opinion supporting the decision to proceed with CRC as the correctly identified entity in light of Apple's earlier "non-entity" position; and second, as a source of substantive legal guidance regarding the inclusion of the Wyoming Consumer Protection Act count. In short, my firm did not proceed recklessly or in isolation. We conducted a comprehensive search for qualified Wyoming counsel, we retained former AUSA Theriault, and her expertise materially informed the operative pleading. The new (and never adjudicated) WCPA claims would not exist, but for an AUSA's recommendation.

21. I also wish to provide further clarification regarding the creation of the Petition for a Public Hearing on Apple's Sherman Act evasion and Mr. Cook's resignation. That document was prepared and published as a public interest petition and was posted to Scribd for the purpose of informing the public and potential amici and other interested observers, about our viewpoint, our opinions, and the relevant facts we had studied and observed concerning Apple for over five years. Given the scale and complexity of antitrust litigation against Apple, I believed that a concise public petition could help

explain why we were requesting a public hearing and why broader public participation was justified. I did not view the document as an affidavit, pleading, or formal motion. It was, in substance and intent, a petition and opinion document addressed to the public and to those who might wish to understand the significance of the litigation. I attached it for the Court to see my efforts to educate the public, before the input session I had requested.

22. Apple and Gibson Dunn responded to that petition by characterizing it as a "manifesto," which I believed was an improper and intentionally inflammatory attempt to discredit both the petition and the petitioners rather than address the substance of the concerns being raised. In response, I submitted a declaration explaining the context in which the petition had been created and explaining what I viewed as a recurring pattern of DARVO-type tactics by "Apple's Antitrust Team." In my view, Gibson Dunn's repeated efforts to tarnish and ridicule Plaintiffs and counsel as was part of a larger strategy to discredit good people raising concerns about Apple's anticompetitive conduct. My concerns in that regard were genuine and remain genuine. Indeed, the later filing of the *Hollywood Police Officers'* derivative action (See Dkt. 111) against Tim Cook and Apple's board further reinforced my belief that the concerns I had been raising about Apple's "anticompetitive playbook" were serious, real, and widely shared by sophisticated actors, even if I used different language—such as "DARVO"—to describe the same pattern.

23. In order to rebut Apple's insinuation that the petition reflected some sort of unorthodox manifesto, I candidly informed the Court that the final petition text had been compiled by ChatGPT in approximately fifteen minutes using a "Deep Research" mode, and I described my early use of AI as "experimental." I did so because it was true, because candor was required, and because I believed the fact convincingly undercut Apple's improper smear. If the document had truly been the product of some feverish or manifesto-like fixation, AI would not have generated it so quickly from respectable sources it listed as references.

24. I candidly informed the Court such use of AI for an antitrust petition was "experimental." This is true, and nothing to be ashamed of. Google's 2017 "All You Need Is Attention" transformer invention, which is what ChatGPT is, is clearly a great experiment by humanity. Even its inventors (i.e. Geoffrey Hinton) have expressed significant fear the experiment will end badly for humanity. Nonetheless, hundreds of millions of Americans now use ChatGPT or similar tools in their daily lives. To sanction me for being candid about the experiment is simply unreasonable. Large language models are an important and widely used technological development by lawyers, courts, law students, and others. Millions of Americans use them routinely. My candid disclosure of that fact should not be transformed into grounds for punishment.

25. I also believe the Court drew an incorrect factual inference from my use of the term "fifteen minutes." What I meant was that the final assembled output of the petition was generated and reviewed in roughly that timeframe. I did not mean that the subject matter reflected only fifteen minutes of thought or inquiry. To the contrary, I had already spent years immersed in the underlying subjects. The ChatGPT conversation that produced the final petition was not built in a vacuum and was not limited to a single final prompt. The final prompt simply asked the model to assemble and synthesize material that I already knew well and had largely already discussed in prior prompts. Stated differently, the final output was created quickly, but the knowledge base behind my review of that output had been built over years.

26. The petition itself contained several distinct sections, all of which concerned subject matter with which I was already deeply familiar. The petition introductory request for amicus briefings and public input was, in similar form, conveyed to Gibson Dunn seeking their assent, several weeks before it

DECLARATION OF KEITH A. MATHEWS
CASE NO. 3:24-CV-8660-EMC

appeared in the petition. I was very familiar with that request, and corresponded with Gibson Dunn about it. The next portion summarized the background of the CR I and CR II litigation, including our belief that the core tying theory had never been adjudicated on the merits. Another portion summarized Judge Gonzalez Rogers' contempt findings and criminal referral of the "Apple Antitrust Team" for concerns arising from the *Epic* Games litigation, which is detailed in my other court filings. Another portion discussed widely reported public criticism that Apple under Mr. Cook had shifted from innovator to monopolist. Another portion discussed public controversies concerning Apple's relationship with China, a subject I had already referenced in other court filings and that has been the subject of extensive journalism and even bestselling books such as *Apple in China*. That section mentioned hundreds of billions of dollars of kickbacks to the Chinese government that Mr. Tim Cook failed to disclose in a timely fashion to shareholders; I wrote a RICO claim about this in CR I, which was dismissed on highly technical grounds of enterprise identity.

27. I reviewed the final petition against that preexisting familiarity and believed it was a fair and accurate public summary of those subjects. To this day, I am not aware of any materially false factual statement in the petition. In my judgment, the petition complied with the level of inquiry appropriate to what it actually was: a public facing petition and expression of opinion on matters I had been studying and litigating for years. In short, the final petition may have been assembled in roughly fifteen minutes, but it drew on years of prior litigation, years of prior research, and prior prompts and conversations with the model that had already covered much of the same material over the preceding hours if not days. My conclusion at the time (and now) is that the experiment was successful in producing a concise public petition built from diverse subject matter I had reasonably and diligently studied over a long period of time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of April 2026, at Manchester NH.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

DECLARATION OF KEITH A. MATHEWS
CASE NO. 3:24-CV-8660-EMC